IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| WI-LAN INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | C.A. No. 15-379 (LPS) |
| | ) | |
| SHARP ELECTRONICS CORPORATION, | ) | REDACTED - PUBLIC VERSION |
| | ) | |
| Defendant. | ) | |
| | ) | |
| WI-LAN INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | C.A. No. 15-788 (LPS) |
| | ) | |
| VIZIO, INC., | ) | REDACTED - PUBLIC VERSION |
| | ) | |
| Defendant. | ) | |

**APPENDIX TO DEFENDANTS' OPPOSITIONS TO PLAINTIFF
WI-LAN'S MOTIONS FOR SUMMARY JUDGMENT AND
MOTIONS TO EXCLUDE EXPERT OPINIONS**

**VOLUME I OF III**

MORRIS, NICHOLS, ARSHT & TUNNELL LLP
Jack B. Blumenfeld (#1014)
Stephen J. Kraftschik (#5623)
1201 North Market Street
P.O. Box 1347
Wilmington, DE  19899-1347
(302) 658-9200
jblumenfeld@mnat.com
skraftschik@mnat.com

*Attorneys for Sharp Electronics Corporation*

YOUNG CONAWAY STARGATT & TAYLOR, LLP
Pilar G. Kraman (#5199)
Rodney Square
1000 North King Street
Wilmington, DE 19801
(302) 576-3586
pkraman@ycst.com

*Attorneys for VIZIO, Inc.*

Originally Filed:  November 9, 2018
Redacted Version Filed:  November 16, 2018

| VOLUME I | |
|---|---|
| **EXHIBIT** | **DESCRIPTION** |
| A | Declaration of Stephen J. Kraftschik |
| B | Declaration of Pilar G. Kraman |
| 59 | Materials Considered, Rebuttal Expert Report of Cliff Reader (August 31, 2018) |
| 60 | Expert Report of Cliff Reader (June 15, 2018) |
| 61 | *Curriculum Vitae* of Cliff Reader, Ph.D. |
| 62 | U.S. Patent No. 5,671,018 to *Ohara* – Invalidity Claim Chart for the '654 Patent |
| 63 | U.S. Patent No. 5,181,110 to *Katsumata* – Invalidity Claim Chart for the '654 Patent |
| 64 | U.S. Patent No. 6,166,773 to *Greggain* – Invalidity Claim Chart for the '654 Patent |

# EXHIBIT A

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| WI-LAN INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | C.A. No. 15-379 (LPS) |
| | ) | |
| SHARP ELECTRONICS CORPORATION, | ) | |
| | ) | |
| Defendant. | ) | |
| WI-LAN INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | C.A. No. 15-788 (LPS) |
| | ) | |
| VIZIO, INC., | ) | |
| | ) | |
| Defendant. | ) | |

**DECLARATION OF STEPHEN J. KRAFTSCHIK IN SUPPORT OF DEFENDANTS'
OPPOSITIONS TO WI-LAN'S MOTIONS FOR SUMMARY JUDGMENT AND
MOTION TO EXCLUDE EXPERT OPINIONS**

I, Stephen Kraftschik, hereby declare as follows:

1.      I am an attorney duly licensed to practice law in the State of Delaware. I am an

attorney with Morris, Nichols, Arsht & Tunnell, LLP, counsel for Sharp Electronics Corporation

("SEC").  I have knowledge of the following and, if called as a witness, could and would testify

competently to the contents of this declaration.

2.      I make this declaration in support of Defendants' Answering Briefs in Opposition

to Wi-LAN's Motion for Summary Judgment of Infringement, Wi-LAN's Motion for Partial

Summary Judgment of No Invalidity, and Wi-LAN's Motion to Exclude the Infringement and

Validity Reports of Clifford Reader filed contemporaneously herewith ("Defendants' Summary

Judgment and *Daubert* Oppositions").

3.      Defendants SEC and Vizio, Inc. are filing an Appendix containing exhibits in support of Defendants' Summary Judgment and Daubert Oppositions ("Defendants' Appendix").

4.      This Declaration is submitted as Exhibit A to the Defendants' Appendix.

5.      Defendants' Appendix also includes as Exhibit B the Declaration of Pilar Kraman, counsel for VIZIO, Inc.

6.      Defendants' Appendix further contains exhibits 59-77, and includes a table of those exhibits with a description of each exhibit.

7.      The descriptions of exhibits 59, 60, 61, 62, 63, 64, 65, 66, 67, 68, 69, 70, 71, 72, 73, 74, 75, and 76 are accurate, and the documents submitted as those exhibits are true and correct copies as described in the table of Defendants' Appendix.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct to the best of my knowledge, information and belief.

Executed on November 9, 2018 at Wilmington, Delaware.

*/s/ Stephen J. Kraftschik*
Stephen J. Kraftschik (#5623)

# EXHIBIT B

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| WI-LAN INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | C.A. No. 15-379 (LPS) |
| | ) | |
| SHARP ELECTRONICS CORPORATION, | ) | |
| | ) | |
| Defendant. | ) | |
| WI-LAN INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | C.A. No. 15-788 (LPS) |
| | ) | |
| VIZIO, INC., | ) | |
| | ) | |
| Defendant. | ) | |

**DECLARATION OF PILAR G. KRAMAN IN SUPPORT OF DEFENDANTS'
OPPOSITIONS TO WI-LAN'S MOTIONS FOR SUMMARY JUDGMENT AND
MOTION TO EXCLUDE EXPERT OPINIONS**

I, Pilar Kraman, hereby declare as follows:

1.      I am an attorney duly licensed to practice law in the State of Delaware. I am an

attorney with Young Conaway Stargatt & Taylor, LLP, counsel for VIZIO, Inc. ("VIZIO").  I

have knowledge of the following and, if called as a witness, could and would testify competently

to the contents of this declaration.

2.      I make this declaration in support of Defendants' Answering Briefs in Opposition

to Wi-LAN's Motion for Summary Judgment of Infringement, Wi-LAN's Motion for Partial

Summary Judgment of No Invalidity, and Wi-LAN's Motion to Exclude the Infringement and

Validity Reports of Clifford Reader filed contemporaneously herewith ("Defendants' Summary

Judgment and *Daubert* Oppositions").

3.      Defendants SEC and Vizio, Inc. are filing an Appendix containing exhibits in support of Defendants' Summary Judgment and Daubert Oppositions ("Defendants' Appendix").

4.      This Declaration is submitted as Exhibit A to the Defendants' Appendix.

5.      Defendants' Appendix also includes as Exhibit A the Declaration of Stephen J. Kraftschik, counsel for VIZIO, Inc.

6.      Defendants' Appendix further contains exhibits 59-77, and includes a table of those exhibits with a description of each exhibit.

7.      The description of exhibit 77 is accurate, and the document submitted as that exhibit is a true and correct copy as described in the table of Defendants' Appendix.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct to the best of my knowledge, information and belief.

Executed on November 9, 2018 at Wilmington, Delaware.

*/s/ Pilar G. Kraman*
Pilar G. Kraman (#5199)

# EXHIBIT 59

# Exhibit B

**Exhibit B**

*List of Materials Considered for Rebuttal Expert Report of*
*Dr. Clifford Reader*

U.S. Patent No. 6,359,654

U.S. Patent Appl. No. 08/798,240

U.S. Provisional Appl. No. 60/011,656

European Patent No. EP0539033A1 ("Nakanishi")

U.S. Patent No. 6,166,733 ("Greggain")

Expert Report of David Kennedy dated June 15, 2018, and all exhibits and documents cited therein

Expert Report of Dr. Cliff Reader dated June 15, 2018 and all documents cited therein

Expert Report of Ionut Mirel dated June 15, 2018, and all exhibits and documents cited therein

Supplemental Expert Report of Ionut Mirel dated August 17, 2018, and all exhibits and documents cited therein

This Report and all documents cited therein

Deposition of Benjamin Felts dated April 18, 2018

Deposition of Benjamin Felts from *Wi-LAN USA, Inc., et. al. v. Toshiba Corporation, et. al.* 1:12-cv-23744 matter, dated June 26, 2013

Deposition of Dave Wilson from *Wi-LAN USA, Inc., et. al. v. Toshiba Corporation, et. al.* 1:12-cv-23744 matter, dated July 10, 2013

Deposition of James Sanduski dated August 10, 2018

Deposition of James Sanduski dated May 30, 2018

Deposition of James Sanduski dated May 31, 2018

Deposition of Stephen Glennon dated April 24, 2018

Deposition of Stephen Glennon from *Wi-LAN USA, Inc., et. al. v. Toshiba Corporation, et. al.* 1:12-cv-23744 matter, dated August 8, 2013

Deposition of Toru Yakura dated July 26, 2018

Claim Construction Order dated April 27, 2018

Wi-LAN's Opening Claim Construction Brief (D.I. 254)

Memorandum Opinion dated April 27, 2018

All Materials produced by MStar Semiconductor Inc., including source code, documentation, and declarations

All Materials produced by Sigma Designs, including source code, documentation, and declarations

All Materials produced by MediaTek Inc., including source code, documentation, and declarations

SEC00016731

SEC00069271

SEC00069323

SEC00069684
SEC00069685
SEC00069686
SEC00069687
SEC00069688
SEC00069689
SEC00069690
SEC00069691
SEC00069692
SEC00069693
SEC00069694
SEC00069702
SEC00069703
SEC00069706
SEC00069707
SEC00069708
SEC00069709
SEC00069710
SEC00069711
SEC00069712
SEC00069713
SEC00069714
SEC00069715
SEC00069716
SEC00069717
SEC00069718
SEC00069719
SEC00069720
SEC00069721
SEC00069722
VIZIO094751
VIZIO094794
VIZIO094824
VIZIO094837
WILAN_001409
WILAN_001411
WILAN_062532
WILAN_069302

WILAN_070867

WILAN_SEC_000897

WILAN_VZ_001882

Hubble L., Reader C., "State of the art in image display systems", SPIE Vol. 199, pp. 2-8, 1979

ISO/IEC 13818-2, 1995; ITU-T H.262, 1995

J Adams, C Patton, C Reader, D Zamora, "Hardware for Geometric Warping", Electronic Imaging, April, 1984

Keith Jack, Video Demystified, A Handbook for the Digital Engineer, pp. 32-335, Hightext Publications (1993)

Naimpally, S; Johnson, L; Darby, T; Meyer, R; Phillips, L; Vantrease, J, INTEGRATED DIGITAL IDTV RECEIVER WITH FEATURES, IEEE Trans on CE; Vol. 34, No.3, Aug. 1988

Reader C, Flanagan W.D., Design Considerations for Real-Time Image Processing, SPIE Vol. 180, 1979

Reader C, Hubble L, Trends in Image Display Systems, Proceedings Of The IEEE, Vol.69, No. 5, May 1981

Reader C., "Intraframe and Interframe Adaptive Transform Coding," SPIE Vol. 66, 1975

Reader C., "Orthogonal Transform Coding of Still and Moving Pictures," U. Sussex, England, 1973

Thacker, W, Rinaldi R, Reader C, Multiwindow Displays of Text, Graphics and Images, SPIE Vol. 757, 1987

Wang F-M, Anastassiou D, Netravali A N, MOTION COMPENSATED DEINTERLACING OF VIDEO SEQUENCES, Sixth Multidimensional Signal Processing Workshop, Sep. 1989

http://www.experimentaltvcenter.org/how-monitor-and-camera-work-scanning-process

Discussion with James Sanduski

https://us.answers.acer.com/app/answers/detail/a_id/1815/~/what-are-the-18-formats-of-atsc-standard%3F

https://www.fcc.gov/about-fcc/fcc-initiatives/incentive-auctions/post-auction-transition

https://www.nab.org/repacking/

# EXHIBIT 60

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| WI-LAN INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | C.A. No. 15-379 (LPS) (CJB) |
| | ) | |
| SHARP ELECTRONICS CORPORATION, | ) | |
| | ) | |
| Defendant. | ) | |
| WI-LAN INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | C.A. No. 15-788 (LPS) (CJB) |
| | ) | |
| VIZIO, INC., | ) | |
| Defendant. | ) | |

## DECLARATION OF CLIFF READER, Ph.D

I, Dr. Cliff Reader, pursuant to 28 U.S.C. § 1746, declare as follows:

1. I have been retained by Defendants Sharp Electronics Corporation and VIZIO, Inc. to opine on certain issues in the above-captioned matter.

2. A true and correct copy of my opening expert report on invalidity of U.S. Patent No. 6,359,654 is attached here.

3. The statements and opinions made in my expert report are true and correct to the best of my knowledge and belief.

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge.

Dated: November 8, 2018

_____
Dr. Cliff Reader

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| WI-LAN INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | C.A. No. 15-379 (LPS) (CJB) |
| | ) | |
| SHARP ELECTRONICS CORPORATION, | ) | JURY TRIAL DEMANDED |
| | ) | |
| Defendant. | ) | |
| | ) | |

| | | |
|---|---|---|
| WI-LAN INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | C.A. No. 15-788 (LPS) (CJB) |
| | ) | |
| VIZIO, INC., | ) | JURY TRIAL DEMANDED |
| | ) | |
| Defendant. | ) | |
| | ) | |

**EXPERT REPORT OF CLIFF READER, Ph.D. ON INVALIDITY**
**OF U.S. PATENT NO. 6,359,654**

Dated:  June 15, 2018

_____
Dr. Cliff Reader

1

## Table of Contents

Page

I.     INTRODUCTION ................................................................. 5

II.    BACKGROUND AND EXPERTISE ........................................ 6

III.   INFORMATION CONSIDERED .......................................... 9

IV.    SUMMARY OF OPINIONS .................................................. 9

       A.     '654 Patent .............................................................. 9

V.     LEGAL UNDERSTANDINGS ............................................ 12

       A.     Patent Ineligible Subject Matter — 35 U.S.C. § 101 ............... 13

       B.     Anticipation — 35 U.S.C. § 102 ................................... 13

       C.     Obviousness — 35 U.S.C. § 103 ................................... 14

       D.     Written Description — 35 U.S.C. § 112 ¶ 1 ..................... 17

       E.     Enablement — 35 U.S.C. § 112 ¶ 1 ............................... 17

       F.     Indefiniteness — 35 U.S.C. § 112 ¶ 2 ........................... 18

       G.     Claim Construction .................................................. 18

VI.    ONE OF ORDINARY SKILL IN THE ART ............................ 18

VII.   BACKGROUND AND REVIEW OF THE RELEVANT TECHNOLOGY  19

       A.     Human Vision System Temporal Response ....................... 19

       B.     History of Television ................................................ 20

              1.     Introduction of electronic television ...................... 20

              2.     "Hi Fi" TVs and EDTVs ..................................... 23

              3.     Digital TVs ..................................................... 24

       C.     Interlaced Display ................................................... 25

              1.     Definition ....................................................... 25

              2.     Why interlace? ................................................ 26

              3.     Data structure ................................................. 27

              4.     Deinterlace ..................................................... 28

       D.     Computer Graphics .................................................. 31

              1.     Introduction .................................................... 31

              2.     Computer monitors ........................................... 32

              3.     Overlaying graphics on video ............................... 32

       E.     Frame Rate Conversion ............................................. 33

|  |  | 1. | Introduction ...................................................................33 |
|  |  | 2. | International TV broadcasts – PAL-NTSC .....................34 |
|  |  | 3. | Film Mode – 3:2 Pull-down ...........................................34 |
|  | F. | Video Scaling ...........................................................................35 |
|  | G. | Early History of Real-Time Video Display .............................35 |
|  |  | 1. | Architecture of video display systems ...........................35 |
|  |  | 2. | Concepts of graphic & text overlays...............................36 |
|  |  | 3. | Image analysis displays and workstations .....................36 |
|  | H. | Digital Editing and Composition .............................................38 |
|  |  | 1. | Introduction ...................................................................38 |
|  |  | 2. | Non-linear editing systems; post-production studios; compositing...................................................................39 |
|  | I. | Video Coding Standards – ITU-R BT.601, H.261, MPEG1 and MPEG2 ......................................................................40 |
|  |  | 1. | Professional Digital Video Standard...............................40 |
|  |  | 2. | The H.261 Videoconferencing Standard..........................40 |
|  |  | 3. | MPEG1 Video Coding Standard......................................42 |
|  |  | 4. | MPEG2 Video Coding Standard......................................43 |

**VIII. THE '654 PATENT..................................................................... 45**

|  | A. | Background of the '654 Patent .................................................45 |
|  |  | 1. | Displaying "all fields"....................................................47 |
|  |  |  | (a) Display both fields at different positions on the display ........47 |
|  |  |  | (b) Alter the video to correct for the offset between fields..........48 |
|  | B. | Prosecution History of the '654 Patent ....................................49 |
|  |  | 1. | Overview........................................................................49 |
|  |  | 2. | U.S. Provisional Patent Application No. 60/011,656 ...................50 |
|  |  | 3. | U.S. Non-provisional Patent Application No. 08/798,240 ............51 |
|  |  |  | (a) Office Action of September 2, 1998 ......................................54 |
|  |  |  | (b) Applicants' Response to Office Action of September 2, 1998...............................................................55 |
|  |  |  | (c) Office Action of April 28, 1999 ...........................................64 |
|  |  |  | (d) Applicants' Response to the Office Action of April 28, 1999.......................................................................65 |
|  |  |  | (e) Office Action of September 9, 1999 ......................................70 |
|  |  |  | (f) Applicants' Response to the Office Action of September 9, 1999...............................................................70 |
|  |  |  | (g) Office Action of May 9, 2000 ..............................................71 |

    (h) Applicants' Response to the Office Action of September 9, 1999 ...................................................71

    (i) Office Action of October 11, 2000 ............................71

    (j) Applicants' Response to the Office Action of October 11, 2000 ...................................................72

    (k) Notice of Allowance ..............................................72

  C. Claim Construction for the '654 Patent ....................................72

  D. The '654 Patent Is Invalid ........................................................74

    1. Claims 1, 4, and 9 of the '654 Patent Claim Patent-Ineligible Subject Matter Under 35 U.S.C. § 101 ...........................74

    2. Claims 1, 4, and 9 of the '654 Patent Are Invalid Under 35 U.S.C. § 112 ..........................................................79

     (a) "Concurrently" ......................................................79

     (b) "To Substantially Correct for the Vertical Offset Between the Pairs of Fields" -- 35 U.S.C. § 112 ¶ 2 ............................84

    3. Anticipation of the Asserted Claims of the '654 Patent ...............86

     (a) U.S. Patent No. 5,671,018 to Ohara et al. "Ohara" ...............87

     (b) U.S. Patent No. 5,181,110 to Katsumata et al. "Katsumata" ....................................................90

     (c) U.S. Patent No. 6,166,773 to Greggain et al. "Greggain" ......93

     (d) U.S. Patent No. 5,329,314 to Correa et al. "Correa" .............96

     (e) U.S. Patent No. 5,091,783 to Miyaguchi "Miyaguchi" ..........99

     (f) EP 0539033 A1 to Nakanishi "Nakanishi" .........................103

     (g) U.S. Patent No. 5,633,687 to Bhayani et al. "Bhayani" .......106

    4. Obviousness of the '654 Patent ................................................109

     (a) The Teachings of Keith Jack Support the Obviousness of the '654 Patent ..................................................111

     (b) Combinations Rendering the '654 Patent Obvious ............141

     (c) Secondary Considerations for the '654 Patent ....................151

**IX. RESERVATION OF RIGHTS ........................................................ 151**

## I.     INTRODUCTION

1.      My name is Dr. Clifford Reader.  I am an independent digital video consultant.  I am over 18 years of age and, if I am called upon to do so, I would be competent to testify as to the matters set forth herein.

2.      I have written this Initial Report on Invalidity ("Report") at the request of the above-named defendants ("Defendants") for consideration by the U.S. District Court for the District of Delaware, captioned *Wi-LAN Inc. v. Sharp Electronics Corp.*, 15-cv-379-LPS and *Wi-LAN Inc. v. VIZIO, Inc*., 15-cv-788-LPS.  This Report addresses invalidity of claims 1, 4, and 9 of U.S. Patent No. 6,359,654 ("the '654 Patent").

3.      The '654 Patent issued on March 19, 2002, and I understand it has expired. The '654 Patent states that the application that led to the issuance of the '654 Patent, U.S. Patent Appl. No. 08/798,240, was filed on February 12, 1997.  The '654 Patent states that it claims the benefit of U.S. Provisional Appl. No. 60/011,656, filed on February 14, 1996. The '654 Patent is entitled "METHODS AND SYSTEMS FOR DISPLAYING INTERLACED VIDEO ON NON-INTERLACED MONITORS."  It describes methods for deinterlacing video and locking the non-interlaced monitor display rate to a relationship with the incoming interlaced signal field rate.

4.      I understand the application that led to the '654 Patent was filed by a company named Brooktree Corporation and then assigned to a company named Conexant Systems, Inc. upon issuance.  I understand that Wi-LAN, Inc. ("Wi-LAN" or "Plaintiff"), the plaintiff in the above-captioned matters, alleges to have acquired the '654 Patent before bringing this suit against Sharp Electronics Corporation ("SEC") and VIZIO, Inc. ("VIZIO"). *See* WILAN_SEC_000001; WILAN_VZ_000001-000023.

5.     In forming my opinions, I have relied on my knowledge and experience in digital video and on the documents and information referenced in this Report.  I reserve the right to amend or supplement my analysis in this Report, including in response to any reports prepared on behalf of Plaintiff.  I also reserve the right to amend or supplement my opinions based on further discovery and information provided in this case.

6.     At this time, I have not created any exhibits to be used as a summary of, or as support for, my opinions apart from the claim charts in the appendices.  I reserve the right to create any additional summaries, tutorials, demonstrations, charts, drawings, tables and/or animations that may be appropriate to supplement and demonstrate my opinions at trial.

7.     I have been retained by Defendants as an expert in this case.  My compensation does not depend in any way on the content of my report and is not affected by the outcome of this case.  I am compensated at the rate of $500/hour.

8.     I understand that Plaintiff asserts claims 1, 4, and 9 of the '654 Patent.

9.     The opinions stated in this report are based on my own personal knowledge and professional judgment.  I am prepared to testify with regard to these opinions if called as a witness during the trial in this matter or if called for deposition during the discovery phase of this matter.

## II.     BACKGROUND AND EXPERTISE

10.     I received my Doctoral degree in 1974 from University of Sussex, England.  My thesis was on "Orthogonal Transform Coding of Still and Moving Pictures."  The research

for my thesis was performed in residence at the Image Processing Institute, University of Southern California, Los Angeles.

11.     I received my B. Eng. Degree with Honors in 1970 from University of Liverpool, England.

12.     I am a digital video consultant providing technical, business development and intellectual property consulting services in the areas of digital imaging and digital video including consumer video, real-time processing and display, image and video compression, imaging/video systems architecture, and imaging/video chip architecture.  I have held this position since 2001.

13.     From 1970 to 1973 I performed my graduate research in video compression.

14.     I was one of the first to perform a type of image coding (adaptive block transform coding) and the first to apply this type of coding to video.  This type of coding is described in my thesis[1] and summarized in an SPIE paper.[2] These techniques underlie the audiovisual coding standards known as MPEG (Motion Picture Experts Group), and virtually all other video compression schemes today.

15.     From 1978 to 1979 I conducted an exhaustive study of image display technology and products.  The results are summarized in a Society of Photo-Optical Instrumentation Engineers (SPIE) paper. [3]

---

[1] Reader C., "Orthogonal Transform Coding of Still and Moving Pictures," U.  Sussex,, England, 1973.
[2] Reader C., "Intraframe and Interframe Adaptive Transform Coding," SPIE Vol. 66, 1975.
[3] Hubble L., Reader C., "State of the art in image display systems", SPIE Vol. 199, pp. 2-8, 1979.

7

16.     From 1982 to 1983 I implemented pipeline processor and feedback loop designs for real-time image filtering, scaling and geometric warping [4] [5] that were sold in professional markets including military reconnaissance, medical imaging and earth resources management.  The geometric scaling and warping algorithms implemented in firmware and hardware deployed spatial interpolation algorithms as later recited by the '654 Patent. The system provided similar functionality to Google Maps by scaling and adjusting satellite photography to register it with ground truth.

17.     I was Head of Delegation (HoD) to MPEG for the United States in 1991-1992, and Editor in Chief of the MPEG1 standard.  I personally reviewed and edited all three parts of the standard in detail, and wrote much of the informative annex for the MPEG1 standard.

18.     In 1992-1993, I was hired by CableLabs to be the technical expert for establishing the MPEG Patent Pool (Now MPEGLA).  In the course of creating a list of essential IP to practice the standard, I reviewed approximately 10,000 abstracts and 1,000 patents.  This is summarized in a chapter of the MPEG book by Mitchell et al., "MPEG Video Compression Standard," Edited by J.  L.  Mitchell et al, Chapter 16, "MPEG Patents," pp. 357-362.

19.     I led design teams at Cypress Semiconductor and Samsung Semiconductor in the 1990s, developing products for digital televisions.

20.     From 1999-2001, I led sales and marketing for a semiconductor company called nDSP that made chips for deinterlacing video for TVs and DVD players.

---

[4] Reader C, Flanagan W.D., Design Considerations for Real-Time Image Processing, SPIE Vol. 180, 1979.
[5] J Adams, C Patton, C Reader, D Zamora, "Hardware for Geometric Warping", Electronic Imaging, April, 1984.

21.     Additional information concerning my professional publications and presentations in the field of digital video and cases in which I have served as an expert are set forth in my current Curriculum Vitae, a copy of which is attached as Exhibit A.  This Curriculum Vitae lists many of the publications authored or co-authored by me; and lists the cases in which I have been deposed in the preceding 4 years.

## III.     INFORMATION CONSIDERED

22.     In forming my opinions, I have considered, in addition to my own knowledge and experience, the documents and items listed in Exhibit B, as well as any other references referred to or cited herein.

23.     This report is based on my study of the information available to me at this time. My understanding is that certain claim terms of the '654 Patent have been construed.  *See* D.I. 280 and 281 [SEC] *and* D.I. 219 and 220 [VIZIO].  Therefore I have interpreted the claims as one of ordinary skill in the art at the time the '654 Patent was filed would have understood them.  I reserve the right to supplement or amend this report at any time in view of additional information obtained through discovery or other information that might become available between now and trial.

## IV.     SUMMARY OF OPINIONS

### A.     '654 Patent

24.     It is my opinion that the technology of the '654 Patent was well known, understood, and obvious to persons of ordinary skill in the art prior to the filing of the

'654 application, and that the asserted claims are anticipated and/or rendered obvious by the prior art.[6]

25.   I have reviewed Plaintiff's infringement contentions in this case. As Plaintiff appears to be interpreting and applying the claims, it is my opinion that:

- U.S. Patent No. 5,671,018 to Ohara et al. anticipates Claims 1, 4, and 9;
- U.S. Patent No. 5,181,110 to Katsumata et al. anticipates Claims 1, 4, and 9;
- U.S. Patent No. 6,166,773 to Greggain et al. anticipates Claims 1, 4, and 9;
- U.S. Patent No. 5,329,314 to Correa et al. anticipates Claims 1, 4, and 9;
- U.S. Patent No. 5,091,783 to Miyaguchi anticipates Claims 1, 4, and 9;
- EP 0539033 A1 to Nakanishi anticipates Claims 1, 4, and 9; and
- U.S. Patent No. 5,633,687 to Bhayani et al. anticipates Claims 1, 4, and 9

To the extent any of these references are interpreted as lacking an explicit teaching of one or more elements of the asserted claim, it would have been obvious to one skilled in the art to combine or modify the systems taught by that reference with one or more of the remaining references and/or information generally available to those of ordinary skill to supply such teachings.

26.   It is also my opinion that the following combinations of prior art references render certain claims of the '654 Patent obvious:

- U.S. Patent No. 5,671,018 to Ohara et al. in view of Katsumata (Claims 1, 4, and 9)
- U.S. Patent No. 5,671,018 to Ohara et al. in view of Miyaguchi (Claims 1, 4, and 9)
- U.S. Patent No. 5,671,018 to Ohara et al. in view of Greggain (Claims 1, 4, and 9)
- U.S. Patent No. 5,671,018 to Ohara et al. in view of Greggain and Keith Jack (Claims 1, 4, and 9)

---

[6] For simplicity, I refer to "the '654 application" throughout this report as meaning the application that lead to the '654 Patent, which is U.S. Patent Application No. 08/798,240.

- U.S. Patent No. 5,181,110 to Katsumata et al. in view of Ohara (Claims 1, 4, and 9)

- U.S. Patent No. 5,181,110 to Katsumata et al. in view of Miyaguchi (Claims 1, 4, and 9)

- U.S. Patent No. 5,181,110 to Katsumata et al. in view of Greggain (Claims 1, 4, and 9)

- U.S. Patent No. 6,166,773 to Greggain et al. in view of Keith Jack (Claims 1, 4, and 9)

- U.S. Patent No. 6,166,773 to Greggain et al. in view of Ohara (Claims 1, 4, and 9)

- U.S. Patent No. 6,166,773 to Greggain et al. in view of Miyaguchi (Claims 1, 4, and 9)

- U.S. Patent No. 6,166,773 to Greggain et al. in view of Keith Jack and Bhayani (Claims 1, 4, and 9)

- U.S. Patent No. 5,329,314 to Correa et al. in view of Katsumata (Claims 1, 4, and 9)

- U.S. Patent No. 5,329,314 to Correa et al. in view of Keith Jack (Claims 1, 4, and 9)

- U.S. Patent No. 5,329,314 to Correa et al. in view of Greggain (Claims 1, 4, and 9)

- U.S. Patent No. 5,091,783 to Miyaguchi in view of Keith Jack (Claims 1, 4, and 9)

- U.S. Patent No. 5,091,783 to Miyaguchi in view of Ohara (Claims 1, 4, and 9)

- U.S. Patent No. 5,091,783 to Miyaguchi in view of Greggain (Claims 1, 4, and 9)

- EP 0539033 A1 to Nakanishi in view of Keith Jack (Claims 1, 4, and 9)

- EP 0539033 A1 to Nakanishi in view of Ohara (Claims 1, 4, and 9)

- EP 0539033 A1 to Nakanishi in view of Greggain (Claims 1, 4, and 9)

- EP 0539033 A1 to Nakanishi in view of Miyaguchi (Claims 1, 4, and 9)

- U.S. Patent No. 5,633,687 to Bhayani et al. in view of Keith Jack (Claims 1, 4, and 9)

- U.S. Patent No. 5,633,687 to Bhayani et al. in view of Ohara (Claims 1, 4, and 9)

- U.S. Patent No. 5,633,687 to Bhayani et al. in view of Katsumata (Claims 1, 4, and 9)

- U.S. Patent No. 5,633,687 to Bhayani et al. in view of Greggain (Claims 1, 4, and 9)

27.     Therefore, it is my opinion that the references listed in Exhibits 1 through 7

anticipate and/or render obvious at least claims 1, 4, and 9 of the '654 Patent.

11

28.     In addition, it is my opinion that at least claims 1, 4, and 9 of the '654 Patent are invalid under 35 U.S.C. §§ 101 and 112.

## V.     LEGAL UNDERSTANDINGS

29.     I have been informed that patent claims must be novel to be valid.  In other words, a claim that lacks novelty is invalid.  A claim lacks novelty if it was known or used by others in the United States, or patented or described in a printed publication in the United States or a foreign country before it was invented by the patent applicants.

30.     I have been informed that a claim also lacks novelty if it was patented or described in a printed publication in the United States or a foreign country or in public use or on sale in this country, more than one year prior to the date of application for patent in the United States.  Furthermore, a claim lacks novelty if the invention was described in an application for patent, published by the U.S. Patent and Trademark Office (USPTO), filed in the United States before the invention by the applicant for patent.  Additionally, a claim lacks novelty if the invention was described in a patent granted on an application for patent by another filed in the United States before the invention by the applicant for patent.

31.     I am not an attorney and have not been asked to offer my opinion on the law. However, as an expert assisting this Court in assessing validity, I understand that I am obliged to follow existing law.  I understand that, because the '654 Patent has effective filing dates before September 16, 2013, the pre-AIA forms of 35 U.S.C. §§ 101, 102, 103, and 112 apply.

32.     I understand the following legal principles apply to analysis of validity and invalidity pursuant to 35 U.S.C. §§ 101, 102, 103, and 112.

### A.     Patent Ineligible Subject Matter — 35 U.S.C. § 101

33.     I understand that a patent is invalid if it claims patent ineligible subject matter, including laws of nature, natural phenomena, and abstract ideas, unless the inventor has contributed an inventive concept that transforms an abstract idea into something more.  I understand that courts look to the basic character of the claimed subject matter to determine whether the claims focus on a specific means or method that improves the relevant technology, or instead are directed to a result or effect that itself is an abstract idea and merely invoke generic processes and machinery to accomplish that result or effect.  If the claims are directed to an abstract idea, a court then asks whether the claims contain an inventive concept sufficient to transform the claimed abstract idea into a patent eligible application.

### B.     Anticipation — 35 U.S.C. § 102

34.     For a claim to be anticipated, every limitation of the claimed invention must be found in a single prior art reference, either expressly or inherently.

35.     A claim element is inherently present in a prior art reference if the element is necessarily present and one of ordinary skill in the art would recognize that the element must be present.

36.     A claim is invalid as anticipated under § 102(a) if the claimed invention was "known or used by others in this country, or patented or described in a printed publication in this or another country, before the invention thereof by the applicant for patent."

37.     A claim is invalid as anticipated under § 102(b) if the claimed invention was "patented or described in a printed publication in this or a foreign country or in public use

or on sale in this country, more than one year prior to the date of the application for patent in the United States."

38.    A claim is invalid as anticipated under § 102(e) if "the invention was described in (1) an application for patent, published under section 122(b), by another filed in the United States before the invention by the applicant for patent or (2) a patent granted on an application for patent by another filed in the United States before the invention by the applicant for patent, except that an international application filed under the treaty defined in section 351(a) shall have the effects for the purposes of this subsection of an application filed in the United States only if the international application designated the United States and was published under Article 21(2) of such treaty in the English language."

### C.    Obviousness — 35 U.S.C. § 103

39.    A claim is invalid as obvious if the differences between the subject matter sought to be patented and the prior art are such that the subject matter as a whole would have been obvious at the time the invention was made to a person having ordinary skill in the art to which said subject matter pertains.  When considering the issues of obviousness, I understand that I am to do the following:

     a.   Determine the scope and content of the prior art

     b.   Ascertain the differences between the prior art and the claims at issue

     c.   Resolve the level of ordinary skill in the pertinent art

     d.   Consider objective evidence of non-obviousness

40.    Obviousness is a determination of law based on underlying determinations of fact. These factual determinations include the scope and content of the prior art, the level of

ordinary skill in the art, the differences between the claimed invention and the prior art, and secondary considerations of non-obviousness.

41.     It is my understanding that any assertion of secondary considerations must be accompanied by a nexus between the merits of the claimed invention and the evidence offered, otherwise the evidence does not actually tend to show that the invention was non-obvious.  Further, I understand that, even where evidence of non-obviousness exists, it may not be compelling enough to overcome a strong showing of obviousness in light of the prior art.

42.     In determining whether the subject matter as a whole would have been obvious to one of ordinary skill in the art at the time that the invention was made, I understand there are several guiding principles.

43.     I understand that a combination of familiar elements according to known methods is likely to be obvious when it yields predictable results.

44.     I understand that if one of ordinary skill in the art can implement a "predictable variation" in a prior art device, and would have seen the benefit from doing so, such a variation would be obvious. In particular, when there is pressure to solve a problem and there are a finite number of identifiable, predictable solutions, it would be reasonable for one of ordinary skill to pursue any of those options that fall within his or her technical grasp. If such a process leads to the claimed invention, then the latter is not an innovation, but more the result of ordinary skill and common sense.

45.     Whether prior art invalidates a patent claim as obvious is determined from the perspective of one of ordinary skill in the art.  There is no requirement that the prior art

contain an express suggestion to combine known elements to achieve the claimed invention. Rather, the suggestion to combine known elements to achieve the claimed invention may come from the prior art, as filtered through the knowledge of one of ordinary skill in the art. In addition, the inferences and creative steps a person of ordinary skill in the art would employ are also relevant to the determination of obviousness.

46.    In determining whether a prior art reference could have been combined with other prior art or other information known to one of ordinary skill in the art, I understand that:

   a.  A combination of familiar elements according to known elements is likely to be obvious if it yields predictable results;

   b.  The substitution of one known element according to known elements is likely to be obvious if it yields predictable results;

   c.  The use of a known technique to improve similar items or methods in the same way is likely to be obvious if it yields predictable results;

   d.  The application of a known technique to a known device (method, or product) ready for improvement to yield predictable results;

   e.  Any need or problem known in the field and addressed by the patent can provide a reason for combining the elements in the manner claimed;

   f.  A person of ordinary skill often will be able to fit the teachings of multiple patents together like a puzzle; and

   g.  The proper analysis of obviousness requires a determination of whether a person of ordinary skill in the art would have a "reasonable expectation of

success"—not "absolute predictability" of success—in achieving the claimed invention by combining prior art references.

47.     When a work is available in one field, design alternatives and other market forces can prompt variations of it, either in the same field or in another.  If a person of ordinary skill in the art can implement a predictable variation, and would see the benefit of doing so, that variation is likely to be obvious.  In many fields there may be little discussion of obvious combinations, and in these fields market demand – not scientific literature – may drive design trends.  When there is a design need or market pressure and there are a finite number of predictable solutions, a person of ordinary skill in the art has good reason to pursue those known options.

### D.     Written Description — 35 U.S.C. § 112 ¶ 1

48.     I understand that under the written description requirement the patent specification must reasonably convey to those skilled in the art that the inventor had possession of the claimed subject matter as of the filing date. A description that merely renders the alleged invention obvious does not satisfy this requirement. I also understand that when, as here, a patent applicant adds new claims after the original filing date, the new claims must find support in the original specification.

### E.     Enablement — 35 U.S.C. § 112 ¶ 1

49.     I understand that under the enablement requirement, the specification of a patent must teach those skilled in the art how to make and use the full scope of the claimed invention without undue experimentation. I also understand that it is the specification, not the knowledge of one skilled in the art, that must supply the novel aspects of an invention in order to constitute adequate enablement.

### F.      Indefiniteness — 35 U.S.C. § 112 ¶ 2

50.     I have been instructed that for a claim to be definite under 35 U.S.C. §112, ¶ 2, it must particularly point out and distinctly claim what the applicant regards as his invention. I understand this to mean that a person skilled in the art must be able to understand the scope of the invention when read in conjunction with the specification.  I further understand that a patent is invalid as indefinite if its claims, read in light of the specification and the prosecution history, fail to inform with reasonable certainty those skilled in the art about the scope of the inventions.

### G.      Claim Construction

51.     I understand that the claims of a patent should be construed as one of ordinary skill in the art at the time of the invention would understand them.

52.     In determining what a claim term means, I understand that one of skill in the art should look first to the claim language, then to the patent specification and prosecution history, and then to extrinsic evidence, if needed.

53.     As noted above, I understand that the Court has construed certain terms in the '654 Patent, and issued an order regarding those constructions.  *See* D.I. 280 and 281 [SEC] *and* D.I. 219 and 220.

## VI.     ONE OF ORDINARY SKILL IN THE ART

54.     I have reviewed and considered the '654 Patent and associated file history.

55.     It is my opinion that for the '654 Patent, one of ordinary skill in the art would be a person having an undergraduate degree in electrical engineering or its equivalent with at least three years of professional experience in video display systems, or a master's degree

in electrical engineering or its equivalent and at least two years of professional experience in video display systems.

56.     I am a person of at least ordinary skill in the art and was so at the time of the purported inventions of the '654 Patent.

## VII.     BACKGROUND AND REVIEW OF THE RELEVANT TECHNOLOGY

### A.     Human Vision System Temporal Response

57.     The presentation of motion to the human vision system may be accomplished by presenting a rapid succession of still images. This phenomenon has been known for well over 100 years – flip books were produced in the 1800s. The movie industry experimented with various film rates in its early period, and settled on a rate of 24 frames per second to portray smooth motion.

58.     It is well known that the human vision system is sensitive to flicker – light being substantially turned on and off. When the frequency of the flicker is low, it is easily perceived, but as the frequency of flicker is increased, perception of it diminishes and eventually the light is perceived as steady. Light bulbs are flickering at imperceptible rates due to the AC electricity supply which in the US cycles at 60Hz. The frequency at which flicker disappears is not absolute, and depends both on ambient light conditions, (it is less perceivable in low light conditions) and incident angle to the eye (peripheral vision is more sensitive to flicker).

59.     The discrepancy between the rate needed to produce the perception of smooth motion and the rate needed to avoid flicker was a challenge for presentation of moving

images on a screen. It was tackled in two different ways, first by the movie industry and later by the TV industry.

60.     In brief, the movie industry solved the problem by opening and closing the projector shutter twice for every frame. Illuminating the entire screen 48 times per second was sufficient to avoid flicker in the darkened movie theatre. The TV industry solved the problem by dividing each frame into a succession of two interlaced fields. The fields illuminate the entire screen 60 times per second, which was sufficient to avoid flicker in the brighter ambient light of a typical living room.

### B.     History of Television

#### 1.     Introduction of electronic television

61.     Electronic television was developed in 1927 by Philo Farnsworth.  Television service was introduced in the 1930s with the BBC's inaugural broadcast on November 2, 1936.  The format was 405 lines, 2:1 interlace and 25 frames/second (frames/s).  Of course, it was black and white pictures.  Color television was introduced in 1953, governed by the NTSC standard (National Television Systems Committee), with a format of 525 lines, 2:1 interlace and 30 frames/s. Color television was introduced in Europe in the late 1960s, governed by the PAL (Phase Alternating Line) standard.[7] The format was 625 lines, 2:1 interlace and 25 frames/s.

62.     The display devices for electronic TVs until recently were CRTs (cathode ray tubes).  CRTs scan the screen in a one-dimensional sequence from left to right and top to bottom by generating a beam of electrons in a "gun" at the back of the tube that is

---

[7] France implemented its own standard.  The USSR adopted the French standard.

accelerated toward a screen of phosphorescent material that emits light when struck by the beam.  Because the beam must "fly back" from right to left at the end of a line and from bottom to top at the end of a field, the television signal includes active line periods during which the beam is illuminating the screen, and fly-back periods, also known as blanking intervals, during which the beam is retraced and no illumination occurs.

63.     Both the US and European analog TV standards used an odd number of lines per frame.  As a result, they both included a half line in each field. In the US system, there were 262½ lines per field, of which approximately 240 lines were active. Each was offset from the other field by one line. This is illustrated in Figure 1.

http://www.experimentaltvcenter.org/how-monitor-and-camera-work-scanning-process.

ODD Field:

The solid lines are traces and the broken lines are retraces.



Figure 1a.

- Trace begins at A
- Active trace moves A to 2 left to right (and slightly down)

21

- Blanked out horizontal retrace moves 2 to 3 right to left
- When trace reaches B, beam vertical retrace moves from B to C and is blanked out

Even field:



Figure 1b.

- Trace begins at C
- Active trace moves C to 1 left to right
- Blanked out horizontal retrace moves 1 to 2 right to left
- When trace reaches D, vertical retrace beam moves back to A (blanked out)

64.    One Frame consists of one odd field and one even field:



Figure 1c.

- Solid lines are odd traces
- Broken lines are even traces
- Retraces are not shown

65.     Television receivers displayed a two-dimensional picture that was captured by a television camera. Although the picture displayed on the television screen was two-dimensional, it was generated by the one-dimensional time sequential scan described above. Correspondingly, the picture captured by the camera, was scanned in the same one-dimensional sequence, and broadcast as a one-dimensional time-sequence signal that formed the TV transmission. This elegant design allowed two-dimensional visual information to be broadcast using the same basic technology that radio used for aural information.

66.     A crucial aspect of the analog television system design was that it was memory-less.  Memory was impractical and very expensive until the 1990s.  The analog television system provided a way to simultaneously and instantaneously broadcast full-motion video and accompanying audio to millions of TV receivers.

## 2.     "Hi Fi" TVs and EDTVs

67.     Television receivers until the 1990s suffered from quality issues that largely masked the artifacts produced by interlace.  Due to issues such as a diffuse spot-size for the CRT beam, the actual displayed resolution was typically only half that of the official standards.  In effect, the lines of the fields merged on the screen.  Starting in the 1980s, efforts began to design and produce TVs that provided quality close to the theoretical resolution of NTSC or PAL.  Naimpally, S; Johnson, L; Darby, T; Meyer, R; Phillips, L; Vantrease, J, INTEGRATED DIGITAL IDTV RECEIVER WITH FEATURES, IEEE Trans on CE;

23

Vol. 34, No.3, Aug. 1988.  Simply improving the quality of the CRTs and circuits powering them, however, produced much narrower scan lines, so interlace artifacts such as interline twitter became visible.  It was realized that, in concert with improved display design, deinterlacing was necessary.

68.     At the same time, it became feasible to include frame memories in at least high-end TVs, so enhanced progressive-scan TVs began to be sold.  Hybrid designs in which sophisticated digital processors supplemented the traditional analog circuits provided higher-quality CRT displays with progressive scan, noise reduction, color enhancement, and more.[8]

### 3.     Digital TVs

69.     The golden age of progressive scan analog CRT receivers was short-lived however, due to the arrival of modern LCD and Plasma TV receivers.  These TVs comprise two-dimensional arrays of pixels, as opposed to the fundamentally one-dimensional scan of CRTs.  In the last decade, such TVs have rapidly overtaken the market, and include very sophisticated digital signal processing to provide a far higher display quality.

70.     The video compression algorithms used to code the video signals for storage and transmission are fundamentally two-dimensional in nature.  So in contrast to the rigid one-dimensional scanning and transmission of the analog TV system, modern TV systems enjoy considerable flexibility in how each video frame is transmitted spatially and in the timing of such transmission.

---

[8] In 2000, nDSP Inc. began selling low-cost digital deinterlacing and enhancement chips to TV manufacturers and DVD manufacturers in China and Japan.  See Ex. A, Reader CV.

71.     Today, a TV receiver comprises little more than a case, screen, power supply, and digital signal processing and memory circuits.  Since all TV transmissions are digital, employing powerful video compression techniques, nothing in the end-to-end broadcast chain is synchronous in the strict way it had to be in analog TV systems.  This has provided far more flexibility in system design, including TV receiver design, leading to feature-rich TVs and excellent high-definition display.

### C.     Interlaced Display

#### 1.     Definition

72.     Interlace format is a scan technique for frames of video in which the frame is spatially divided into a set of mutually exclusive subframes called fields.  The most common data structure is one in which the odd-numbered lines of a frame comprise one field, while the even-numbered lines comprise another field.  These are almost invariably called the odd field and even field, respectively.

73.     It is important to understand the difference between an interlaced field and a downscaled frame.  If a frame were downscaled vertically by a factor of two, it would then contain half the number of lines – the same number of lines as a field. But the lines of the downscaled frame would be low resolution – half the resolution of the lines of the original frame. In contrast, the lines of an interlaced field have the corresponding width of lines in a complete frame; i.e., they have the vertical resolution of the lines of a complete frame. In a static scene, interleaving the lines of both fields will provide a full frame. While there is only half the number of lines in a field and there are gaps between the lines in a field, the lines of a field span the full extent of the frame, i.e., they image the full field of view of

25

the frame, and have the same scale as the frame.  This is essential for meeting the objective explained above of illuminating the entire screen fast enough to avoid flicker.

### 2.      Why interlace?

74.      Interlace format was deployed from the inception of electronic television in 1936. It provides a solution for the difference in human vision between flicker and motion requirements.

75.      The simple solution of displaying every frame of film twice was not feasible for television until recently, because it requires each frame to be available at the receiver for presentation twice, and that requires a frame store.  Only in the past decade or so, has the density and cost of semiconductor memory facilitated provision of memories in mass consumer market TVs.

76.      Therefore, interlace format provided a simple, low-cost approach for the first 60 years of television.  Half the information for a frame was captured, transmitted and displayed in a first time interval by scanning the odd lines from the top to the bottom of the frame to form the odd field, and then the other half of the information for a frame was captured, transmitted and displayed in a second time interval by scanning the even lines from the top to the bottom of the frame to form the even field.  This approach refreshed the entire screen at the field rate to minimize flicker, while transmitting information at the frame rate to save cost, yet adequately represent smooth motion.

77.      Interlaced format has disadvantages as well.  Because the fields are captured at different times, they contain different information for parts of the scene that are moving. This means artifacts will be introduced if the fields are simply interleaved to form a frame, and it complicates the motion estimation and compensation used in digital video coding.

26

Also, high-contrast horizontal edges may appear on one line of a frame, meaning that the edge appears correctly on that line of the corresponding field, but appears on an adjacent line in the other field.  Since each field is presented only once per frame, i.e., at the same rate as the frame, the position of the line will move up and down at the frame rate, which will be visible to the eye.  The resultant effect is visually irritating and called "interline twitter."  Also, although the eye integrates the two fields to perceive a full frame, it cannot do so with full vertical resolution.  It perceives a vertical resolution that is the number of frame lines multiplied by the "Kell factor," which is usually taken as 0.7.  For example, the perceived number of lines if 1080i television were viewed on an interlaced TV would be 1080 * 0.7 = 756 lines.

### 3.      Data structure

78.      The fields of an interlaced frame span the entire frame—they have the same scale as the frame—but alternate lines are missing.  The task of deinterlacing is to "fill in" the missing lines on each field by mathematically estimating the data that would have been imaged at those locations from the real world had a progressive scan camera been used. There is a range of algorithms to do this, with varying levels of simplicity, cost, and efficacy.

79.      Generically, given the location of a desired new data point in the output address space that is interstitial to existing points, the desired new point is calculated based upon a neighborhood of existing points and the distance of such existing points from the desired new point.  However, unlike scaling, deinterlacing is a non-linear interpolation process, due to the particular data structure of the interlaced fields.

80.      Sampling theory tells us that a band-limited continuous signal can be sampled at the Nyquist rate, to produce a sequence of samples, from which the original band-limited continuous signal can be perfectly reconstructed.  Applying sampling theory to the vertical dimension of a TV frame, if an interlaced field were to be created as a half-resolution version of the frame, it would be low-pass filtered to band-limit the data, and then subsampled 2:1.  However, an interlaced field is not a reduced-resolution version of the frame – it is a full-resolution extracted subset of the frame.

### 4.      Deinterlace

81.      Deinterlacing technology has been evolving rapidly since at least as far back as the 1980s for at least two reasons.  One reason was to mitigate the artifacts introduced by interlaced format, in order to present a superior quality television picture.  A niche industry for video "hi-fi" emerged, notably due to the efforts of Yves Faroudja.  Another motivation was displaying television video on computer monitors.

82.      As reported by Keith Jack in <u>Video Demystified</u> in 1993 (*Keith Jack*), there were at least three ways to deinterlace: 1) scan line duplication, 2) scan line interpolation, and 3) field merging.  *Keith Jack*, <u>Video Demystified, A Handbook for the Digital Engineer</u>, pp. 32-335, Hightext Publications (1993).  The first two ways concern processing each field separately.  The first is a zero-order interpolator, and Jack describes a first-order interpolator for the second, although higher-order interpolators could be used and were known at the time.

83.      As a result, the third way—field merging—forms the basis for high-quality deinterlacing today, and has been used in products since at least 2000.  Ex. A, Reader CV – nDSP employment, 1999-2001.  *Keith Jack* describes the third way as a combination of

simple interleaving of the two fields and scan line interpolation.  *Keith Jack*, p. 332.  More commonly in the field, this is called motion-adaptive deinterlacing.  As *Keith Jack* describes, the two fields can be interleaved in regions of the scene that are static.  The lack of motion in those regions means the two fields have imaged the same scene.  In regions where there is motion, some form of interpolation may be used.  If the motion is high, a lack of spatial resolution, such as that resulting from simple interpolation will not be perceivable, due to the phenomenon of human vision in which there is an exchange of spatial and temporal resolution.  So the significant problem is deinterlacing in regions with modest amounts of motion.  Companies practicing this art are highly secretive about their proprietary solutions for this problem, which in essence strive for a smooth, imperceptible transition between simple interleaving for static regions and simple vertical interpolation in high-motion regions.

84.     Figure 2 illustrates the field-merging approach.  Two frames are shown, each comprising two fields, in which a stationary ball is located at the top-left of the frame and a moving ball is located at the bottom of the frame.



Figure 2a. Four fields with stationary and moving balls.



Figure 2b. Four deinterlaced frames with field merging only.



Figure 2c. Four deinterlaced frames with motion-adaptive deinterlacing.

85.     Figure 2a shows a sequence of four interlaced fields. Figure 2b shows the result of deinterlacing the fields using only field merging.  The static ball is reproduced perfectly, but the moving ball shows the artifacts resulting from the movement of the ball between the fields.  The third figure, 2c shows motion-adaptive deinterlacing, in which the static ball is deinterlaced by field merging, but the moving ball is deinterlaced by line doubling. While the moving ball has artifacts due to the simple doubling algorithm, it is demonstrably better than the previous case.

86.     A paper by Naimpally et al. in 1988 describes an advanced digital television receiver design with many enhancements including deinterlacing.  Naimpally, S; Johnson, L; Darby, T; Meyer, R; Phillips, L; Vantrease, J, INTEGRATED DIGITAL IDTV RECEIVER WITH FEATURES, IEEE Trans on CE; Vol. 34, No. 3, Aug. 1988.  A spatial-temporal median filter is used to compute the value of a pixel in a missing line. (Figure 4).

87.     Wang, et al. described a sophisticated motion-compensated deinterlacing scheme in a 1989 presentation at the Multidimensional Signal Processing workshop.  Wang F-M, Anastassiou D, Netravali A N, MOTION COMPENSATED DEINTERLACING OF VIDEO SEQUENCES, Sixth Multidimensional Signal Processing Workshop, Sep. 1989.

### D.  Computer Graphics

#### 1.  Introduction

88.  Early computers used character generators to draw a screen of data to present to the operators.  The 1980s saw development of fast, bit-mapped graphics, and the 1990s saw the development of fast 3D graphics.

89.  On the PC, graphics cards initially contained all the semiconductor chips needed to support graphics and text on the screen, but advances in semiconductor technology led to integration of this technology on VLSI devices referred to as graphics chips.  Due to the combined requirements of operation in high ambient light environments and computer user fatigue and safety, these graphics generators refreshed the screen at rates of 72 frames/s, 85 frames/s and more.  Commercial pressures forced prices down, so it became cheap and simple to generate bit-mapped graphics at high frame rates.

90.  In the first half of the 1990s, PC architecture evolved to include a fast CPU bus that could connect the CPU, main memory and graphics chip directly and independently of slow peripheral devices.  This facilitated the development of graphics that could refresh the screen at high rates.  *Keith Jack* notes the difference between video refresh rates "50 or 60 Hz interlaced" and computer graphics refresh rates "60-80 Hz non-interlaced."  *Keith Jack*, p. 8.  Jack goes on to say that a simple architecture for implementing overlay of graphics on video requires the refresh rate for the two data types to be the same, i.e., 50-60 Hz, but "Note that some newer computer display monitors may not support refresh rates this low."  *Id*. at 10-11.  In other words, back in 1993, computer graphics generation rates already exceeded video display rates, even in the low-cost PC segment.

91.     Such graphics were relatively complex.  For example, video games were introduced for PCs that painted full-color computer graphics on the screen in real time.  In contrast, graphics on TV receivers were rudimentary, comprising strings of text and simple rectangular menu boxes.  In other words, generating TV graphics at higher frame rates was not a significant cost issue in the mid-1990s.

### 2.    Computer monitors

92.     Historically, computer monitors have differed from TV displays in a number of ways due to the difference between the applications and attendant requirements. Computer monitors have traditionally been used for business and scientific applications. TVs of course have been used for entertainment purposes, and cost considerations have been important.

93.     Computer monitors have needed to present text and graphics information with high definition—sharp edges, high contrast, no fatigue from flicker, etc.  Such monitors are viewed at close range, unlike TVs, so fidelity has been important.  Therefore, computer monitors have employed circuit designs with good frequency characteristics, and CRTs with high quality deflection and focus characteristics, and high frame rates with short-persistence phosphors.  The '654 Patent states, "However, most computer monitors are designed and built with 'Short persistence' phosphors.  This is because they are typically designed to be refreshed 75 times per second or more."  '654 Patent at 8:65- 9:1.

### 3.    Overlaying graphics on video

94.     In simple terms, overlaying graphics on video means replacing the video information at a given location on the screen with graphics information.  Similarly,

overlaying video on graphics means replacing the graphics information at a given location on the screen with video information.

95.     Technically, this is a binary operation in which, at a given point on the screen, either one or other of the data types is displayed.  It can be implemented in several ways. First, the video and graphics can be supplied from different memories and combined on the fly.  Second, the video and graphics information can be stored in a single memory in different bitplanes, which are read out and combined on the fly.  Third, one of the data types can overwrite the other data type into a single memory, which is then read out for display.

96.     More sophisticated systems perform overlays using alpha planes to achieve effects such as translucency.  In such systems, the video and graphics data are combined using an arithmetical operation instead of binary operation.  A so-called alpha plane the same dimensions as the video and graphics information is used to describe a combination factor for every point.

### E.     Frame Rate Conversion

#### 1.     Introduction

97.     Historically, several standards have been deployed across the world for video frame rates.  For practical design reasons, analog television systems were designed to match the video frame rate to the frequency of the electrical supply.  The U.S. NTSC system used a 60Hz field rate while the U.K. and E.U. PAL system used a 50Hz field rate.

98.     Production of TV programs was performed in two raw content environments.  In the U.S., with its strong background in film production, TV production was predominantly conducted on film, which is 24 frames/s.  In other countries, TV production was

33

predominantly conducted on videotape, and used the frame rate of the country—such as 30 frames/s.

### 2.     International TV broadcasts – PAL-NTSC

99.     Beginning in the 1960s, live international broadcasts have been conducted.  Such broadcasts require real-time transcoding between the 60 frames/s NTSC originated content and the 50 frames/s PAL originated content.  Frame rate conversion is a part of the transcoding process.  Such broadcasts have been subtitled for the enjoyment of the global audience, and the subtitles are subject to frame rate conversion as appropriate.

### 3.     Film Mode – 3:2 Pull-down

100.     The broadcasting of films on television networks has long been standard practice. In the PAL 50Hz countries, the 4% difference between the film frame rate and TV frame rate has been tolerated as a slight speedup in the film presentation.  In the United States, a technique called 3:2 pulldown has been used to convert the 24 frames/s of film to 60 fields/s of TV.  Each frame of film is alternately converted to three fields of video or two fields of video.  This is a frame rate conversion operation.

101.     When the MPEG2 standard was developed, it was decided to allow encoders to undo this formatting and to encode the 24 frames/s of film in progressive scan format. This has the obvious benefit of encoding fewer frames per second, plus motion estimation and compensation work much better on progressive-scan format data.

102.     In consequence, all compliant MPEG2 decoders must decode 24 frames/s content, and if they want to display it on a conventional TV receiver, they must perform the rate conversion to 30 frames/s.

### F.     Video Scaling

103.    Spatial scaling has been required for image and video display in scientific, military and medical applications since the 1970s, and for computer windows display since the 1980s.  Scientific, military and medical applications require the ability to zoom in on a portion of the data, to see the image of an object in greater detail, or zoom out on a large format data set to see an overview of a complete scene.  For computer windows applications, it has been a standard requirement that users of window-based graphical user interfaces (GUIs) can draw and resize arbitrary windows with the expectation that the image or video will automatically resize to fit the window.

104.    In general, in these applications, the output points will not be coincident with the input points, so zooming requires interpolation of the output points for display from the input points of the raw data.

### G.     Early History of Real-Time Video Display

#### 1.     Architecture of video display systems

105.    In the early 1970s, real-time image display systems were driven from magnetic drum drives or disk drives with recordable media.  These early systems encoded single images ("stills") or brief sequences of images, i.e., video sequences, as PCM (Pulse Code Modulated) data.  Each image comprised three color components—red, green and blue (RGB), typically with 8 bits per component.  As technology advanced, display systems were driven by more sophisticated disk drive systems, e.g., RAID systems for some applications, or by other media such as large-capacity solid-state DRAM memory in other applications.  The state of the art in 1981 is summarized in an IEEE Proceedings Paper.

Reader C, Hubble L, TRENDS IN IMAGE DISPLAY SYSTEMS, Proceedings Of The IEEE, Vol.69, No. 5, May 1981.

### 2. Concepts of graphic & text overlays

106.    Real-time displays had storage for PCM encoded 24-bit full-color images and 2-4 additional bits for storage of PCM encoded graphic overlays.  These data were read from the recordable medium and decoded in hardware pipeline processors for display.  The graphic overlays were decoded in a parallel pipeline processor to the image data pipeline processor.  The graphic overlays were combined with the image data in real time in a programmable color look-up-table (CLUT), for display in a programmable window at a programmable location, thereby allowing the graphics to appear as any color, of any size or location, and for special effects, such as choosing whether the graphic was opaque or translucent.  These overlays were frequently used with text to annotate the image data.  It was recognized almost from the beginning that such overlays needed to provide sufficient contrast between the text and image data, so the systems were programmable in order to provide this.

### 3. Image analysis displays and workstations

107.    Real-time image analysis displays and workstations were used in the 1970s and 1980s for diverse applications including military reconnaissance imagery analysis, military mission planning and battlefield management, medical imaging, Earth resources management, distance learning and more.  In many applications, short video sequences were displayed, and these were annotated with text and graphics.

108.    By the mid-1980s, these displays had evolved from a pure hardware design to a hybrid combination of dedicated hardware interfaced with, and under the control of, a

microcomputer system.  The workstations used hardware pipeline processors to decode and display the video, while the overlays were processed either in parallel pipelines or in the host processor.

109.    A key feature of these display systems was scaling.  Large-format images with dimensions of thousands of pixels could be viewed zoomed down on the screen to provide an overview of the imaged scene, while real-time zoom features allowed images to be scaled up (and panned) so that local areas in the scene could be studied in detail.

110.    In the early days, the scaling was performed by pixel and line replication.  As hardware became more powerful (and less expensive), higher-order interpolative scaling was implemented.  In 1983, I, with my team, designed a product that was successfully sold in the marketplace and that provided sophisticated geometric warping of image data.  The product is described in a 1984 paper.  Adams J, Patton C, Reader C, Zamora D, Hardware for Geometric Warping, Electronic Imaging, April 1984.

111.    This paper describes our output-driven design, in which first, the addresses of display pixels were calculated in input-space coordinates to an accuracy of $1/16^{th}$ pixel, and then the display pixels were interpolated from the input pixels.

112.    A few years later, a product was developed and sold that provided real-time scaling of images and short video sequences for display on a window-based computer monitor screen.  This is described in a 1987 paper.  Thacker, W, Rinaldi R, Reader C, MULTIWINDOW DISPLAYS OF TEXT, GRAPHICS AND IMAGES, SPIE Vol. 757, 1987.

### H.     Digital Editing and Composition

#### 1.     Introduction

113.     The professional movie and television industries define two basic stages of creating content.  The production phase involves the shooting or filming of raw content. The post-production phase concerns editing the raw content into a finished product – a movie or TV show.  The post-production process has evolved from film editing – a process of combining fragments of content into a composite final product.  Typical movie or TV show content includes a video track, one or more audio tracks and subtitles.

114.     The emergence of computer graphics introduced another content type – computer animation.  Increasingly over the past two decades, movies and TV productions (notably commercials) have been composed from a fusion of natural (i.e., real-world) images and computer-generated images.  The computer graphics images might comprise short segments of a production in their entirety, or the computer graphics might be overlaid on natural image data using a variety of techniques such as blue-screen, mattes and blending. The computer graphics might be opaque or translucent.  It might be confined to a specific region of the final display or displayed across the whole region.  Video special effects consist of blending content – fades from one to another, wipes from one to another, overlaying computer graphics on natural video.

115.     Film-based editing was slow, expensive and limiting.  Electronic editing was introduced to streamline the process.  Initially this used analog videotape and specialized hardware.  It was an improvement, but still "linear" meaning it could only be done by linearly moving through the data on tape in an analogy to moving through film.  The next development in the 1980s was introduction of digital techniques.

## 2.    Non-linear editing systems; post-production studios; compositing

116.    Beginning in the 1980s, studios began to replace magnetic tape-based editing with computer-workstation-based editing.  These computer workstations include a CPU, system bus, memory, disk drives, display controller and one or more display monitors.  Special purpose add-in cards were used to accelerate such functions as video capture.  The ability to almost instantly access any location within sequences of video data stored on disk as opposed to the old technique of searching linearly through videotape, gave rise to the name "non-linear editing."  Non-linear editing workstations provide a multi-track interactive user interface for the operator in which each track may contain one of various data types including natural video, computer-generated video, graphics overlays and text annotation.  The video data could have been produced from a film camera at 24 frames/s or from a video camera at 30 frames/s.  The natural video data may be PCM encoded, or ITU-T BT.601 encoded.  During the non-linear editing process, the various tracks may be read from memory or disk, decoded, interactively associated with each other and displayed on the screen.

117.    Video post-production includes editing video to splice production sequences together, and also compositing to overlay video on video, images on video and computer graphics on video.  Compositing may be a many-layer process, in which multiple video sequences, multiple graphic overlays, and text layers, like captions, are all combined for the final product.  If the sources of data have different frame rates, it may be best to transform all the source content to a single format – such as 24 frame/s film – perform the compositing operations and then convert the result into an output format such as 30 frame/s video.

## I.     Video Coding Standards – ITU-R BT.601, H.261, MPEG1 and MPEG2

### 1.     Professional Digital Video Standard

118.    In the early 1980s, the professional video industry set up a standard for digital television data formats.  This standard, called ITU-R BT.601 (formerly CCIR 601) was widely deployed in studios, especially for post-production, including non-linear editing and digital special effects.

119.    The standard accommodated the different NTSC and PAL standard formats by defining a single pixel rate for the digital versions of those standards.  The NTSC version encoded 720 pixels by 486 lines at 29.97 frames per second with 2:1 interlace, and the PAL version encoded 720 pixels by 576 lines at 25 frames per second with 2:1 interlace.

120.    High definition versions of the 601 standard have been developed subsequently and are used in professional video studios today.

### 2.     The H.261 Videoconferencing Standard

121.    The H.261 standard, which was technically completed in late 1989, encodes reduced resolution video frames for videoconferencing applications.  It is an international standard of the ITU-T (formally CCITT) for global videotelephony.  As such, it provides for real-time video transmission and display between different national video standards, particularly the NTSC standard in the US, Japan, Korea and other countries, and the PAL standard in Europe and much of the rest of the world.

122.    To facilitate exchange of video data for display on both NTSC-compatible and PAL-compatible video telephony terminals, the committee developing H.261 established a Common Interchange Format (CIF).

123.    It was not possible in the 1980s to encode full-resolution NTSC or PAL format video, so the committee decided to encode a format with half the resolution in each dimension—i.e., one-quarter of the resolution.  The simplest approach was to encode one of the NTSC or PAL interlaced fields to reduce the vertical resolution, and filter and subsample each line by a factor of two to reduce the horizontal resolution.

124.    This was not however the technically correct solution, due to the particular frequency structure of the interlaced video lines.  One approach offering improved —but not necessarily optimum—quality is described in Document #55 contributed to the committee in October 1985.  Standards Conversion to and from Single Mode 288, 29.97 Format, BT & NTT, Document #55, Oct. 1985.  This document concerns converting NTSC format and PAL format to and from a common format of 288 lines (half the PAL lines) and 29.97 frames/s (the NTSC frame rate).

125.    Converting NTSC to 288, 29.97 is described in section 2 of the paper as comprising two steps.  In the first step, a 480-line non-interlaced frame is formed by taking the lines of one field, and interleaving them with the average of lines from the two adjacent fields.  See Figure 1(a).  The second step filters and interpolates the 288 lines from the 480 lines using a transversal filter and 5-tap interpolator.

126.    Converting PAL to 288, 29.97 is described in section 4 of the paper.  In this case, a succession of 288 line non-interlaced frames is formed from 2 fields that have their lines shifted up and down by ¼-line by applying a 5-tap transversal filter, and then taking a running average of pairs of fields.  This 50 frame/s series is then converted to a 29.97 frame/s series y linear interpolation.

41

127.     The paper goes on in section 6 to describe the necessary steps to take at the picture boundaries.  Three candidate methods are offered for interpolating lines at the top and bottom of the picture, since the 5-tap filter will extend beyond the picture boundary for the first two lines.

### 3.     MPEG1 Video Coding Standard

128.     The MPEG1 standard also focused on coding a ¼-resolution version of the broadcast TV standard format.  In this case, the motivation was providing good full-motion video on a compact disk, the data rate and capacity of which did not allow full-resolution NTSC or PAL video to be encoded with acceptable quality.  The MPEG1 standards document – ISO/IEC 11172-2: 1993 (E) – describes this format in Annex D, section D.3.  The MPEG committee defined a "Source Input Format" (SIF), similar to the ITU CIF.

129.     Section D.3.1 describes conversion from the ITU-R BT.601 format to the SIF format.  It notes that: "*One way to reduce the vertical resolution is to use only the odd or the even fields.*"  But it points out that "*If the other field is simply discarded, spatial aliasing will be introduced, and this may produce visible and objectionable artifacts.*"  Again, this is due to the frequency content of the interlaced lines.  The standard continues: "*More sophisticated methods of rate conversion require more computational power, but can perceptibly reduce the aliasing artifacts.*" An example would be the approach taken earlier in the H.261 contribution #55 that was discussed above.

130.     Section D.3.2 discusses MPEG1 coding of 24 frames/s film content.  It describes such content as an excellent source that may be coded by the MPEG1 standard at exactly 24 frames/s and digitized at a desired resolution.  It notes however that if the film has been

previously converted to 30 frames/s video by 3:2 pulldown, "*A sophisticated encoder might detect the duplicated fields, average them to reduce digitization noise, and code the result at the original 24 pictures/s rate.*"  It points out: "*This should give a significant improvement in quality over coding at 30 pictures per second, since direct coding at 30 pictures/s destroys the 3:2 pulldown timing and gives a jerky appearance to the final decoded video*."

### 4. MPEG2 Video Coding Standard

131.    The MPEG2 standard, which, unlike the MPEG1 standard, can encode interlaced format video data, provides specific tools for managing 3:2 pulldown.  If a sophisticated encoder does detect and eliminate the duplicate fields, it can signal the decoder using two fields in the picture header how to reconstruct the signal with its original cadence. See the MPEG2 specification sections 6.2.3.1 and 6.3.10 Picture coding extension for the top_field_first and repeat_first_field flags syntax and semantics respectively.

132.    Figures 6-2 and 6-3 illustrate the options for order of the fields within an MPEG frame. The vertical offset between the fields is clearly visible.



**Figure 6-2 – Vertical and temporal positions of samples in an interlaced frame with top_field_first = 1**   **Figure 6-3 – Vertical and temporal positions of samples in an interlaced frame with top_field_first = 0**

133.    The MPEG standards employ motion-compensated prediction either unidirectionally for so-called "P-frames" or bidirectionally for so-called B-frames. Prediction may be frame-based or field-based. Decoded frames and fields may be stored temporarily in frame or field buffers when and as appropriate, for use in predicting frames or fields that have yet to be received and decoded.  In due course, these reference picture buffers will provide the frames and fields for display.

134.    The MEG2 standard normatively specifies a coded bitstream and decoding process for interlaced video frames. It should be noted that MPEG2 went into service in 1994 in the DirecTV satellite broadcast system, which achieved a market penetration of over 1M subscribers in less than one year.

135.    In summary, it is my opinion that the techniques of displaying interlaced video on computer monitors, including interlaced video containing film content, and frame-rate conversion of graphics overlaid on video were known as of the critical date of the '654 Patent.

## VIII.   THE '654 Patent

136.     The subject matter of the '654 Patent involves displaying interlaced video on non-interlaced monitors.

137.     It is my opinion that the technologies and techniques described in the asserted claims of the '654 Patent were well known and understood in the field as of its filing date, and that the asserted claims of the '654 Patent are invalid as anticipated by, or obvious in view of, the prior art, and/or invalid under 35 U.S.C. §§ 101 and 112.

### A.     Background of the '654 Patent

138.     U.S. Provisional Appl. No. 60/011,656 was filed on February 14, 1996; U.S. Patent Appl. No.: 08/798,240 was filed on Feb. 12, 1997; and the '654 Patent was subsequently issued on Mar. 19, 2002.  It is entitled "METHODS AND SYSTEMS FOR DISPLAYING INTERLACED VIDEO ON NON-INTERLACED MONITORS."

139.     The field of the invention relates to computer display systems. Col. 1:12-13.

> The patent is concerned with computer display systems, particularly
> displaying interlaced video on monitors that are non-interlaced.

'654 Col. 1:13-15.

140.     Considering the patent as a whole, two issues are identified:

    a.   capturing two interlaced fields and processing them into non-interlaced frames for display, and

    b.   displaying 24 frame/s film content that has been converted to 60 Hz interlaced video with 3:2 pull-down, on a non-interlaced display.

I understand that only claims related to the first issue are asserted in this case, and my report is limited to the issue of capturing two interlaced fields and processing them into

non-interlaced frames for display.  Should consideration of the second issue arise in the future, I reserve the right to amend my report.

141.    The Background of the Invention section of the '654 Patent describes selected methods to solve particular problems according to the alleged invention.

142.    The patent states: "*Until now there have been two commonly used simple methods for displaying interlaced video being fed into the computer system on a computer monitor.*" Col. 1:18-21.  However, it cites to pages 332-333 of the <u>Video Demystified</u> book by Keith Jack, where there are clearly three commonly used methods described.  The '654 Patent specification then goes on to discuss all three methods, reiterates problems known in the 1980s (but omits discussion of solutions known at the time), and cites to advanced techniques in the *Keith Jack* reference.

143.    The Summary of Invention then proceeds to tackle the "problems" related to deinterlacing recited in the background section.  Two methods are described—one for displaying interlaced fields spatially on a computer monitor and the other for displaying interlaced fields temporally on a computer monitor.

144.    The methods outlined in the Summary of the Invention are described in the ensuing Detailed Description of the Invention:

    a.   "*(1) Display All Fields*" Col. 4:42-Col. 7:49

          i.   "*(a) The two fields can be displayed at different positions on the display using a non-interlaced display.*"
             Col. 5:17-Col. 6:9

          ii.   "*(b) The video data can be altered to correct the positional offset between the fields.*"
             Col. 6:10-Col. 7:49

46

b. "*(2) "Dealing with Temporal Artifacts"*"

Col. 7:50-Col. 10:36.

I understand that no claims directed to this second method (*i.e.,* Dealing with Temporal Artifacts") have been asserted.

### 1.    Displaying "all fields"

145.    The patent states it is a "feature" of the alleged invention to "*display all of the incoming fields but one at a time, and correcting for the positional offset of one field relative to another in the interlaced data.*"

146.    The patent states the problem it seeks to solve as: "*If the two fields are displayed "as is" in the same position on the output screen, it appears that the image is rapidly jiggling up and down.*" Col. 5:4-7.

147.    Further the specification states: "*In* order *to display the fields in a way which eliminates this artifact, it is necessary to either display the odd and even fields in different positions on the display, or to alter the data before it is displayed to correct this vertical offset between the two fields.*" The patent states: "*Prior art methods do not consider repositioning alternate fields*" Col. 5:65-66.

148.    The specification proceeds with two ways to purportedly deal with the problem.

### (a)    Display both fields at different positions on the display

149.    The discussion in the specification is based on processing the fields separately, and scaling each of them by factors that are ideally stated to be divisible by 2.  For other factors, the patent states: "*It is possible and desirable to perform repositioning for other*

*vertical scale factors, but the repositioning does not exactly correct for the vertical offset of the original fields*." Col. 5:39-46.

<div align="center">

**(b)    Alter the video to correct for the offset between fields**

</div>

150.    In the second purported solution, the patent states: "*It is possible to modify the video data to correct for the positional difference in the fields. In the simplest case, one of the fields can be re-sampled vertically such that the pixels of a displayed line are generated by averaging two vertically adjacent pixels from two lines. The resulting averaged pixel is effectively a pixel positioned half way between the two lines, thereby implementing a half line vertical repositioning*." Col. 6:12-19.  So considering an even field, whose lines in the frame are 2, 4, 6, etc., the patent proposes to average them vertically with the notion the data would then represent the data in the frame where the even lines are located.

151.    The patent's proposal, however, would have a negative consequence.  The averaging operation is a low-pass filter, so the even field would have lower resolution than the odd field.  The patent acknowledges this at Col. 6:43-48 in the context of a discussion about performing the operation on the input or output path: "*If the data is resampled (but not scaled) on the input path, one of the fields will have had each of its lines generated by averaging two lines. This results in a certain amount of smoothing of the picture before the pixels are stored in the frame buffer memory*."

152.    This would probably be visible to the viewer as a kind of oscillating disturbance at the frame rate, which is within the temporal passband of the human eye. The patent acknowledges this: "*This may result in a visible disparity between the two fields when displayed*."

<div align="center">48</div>

153.    The patent alleges this is an attractive solution, requiring little hardware at Col.

6:22-31: "*All that is required is the ability to set the initial value of the vertical*

*interpolator such that the first line it generates is 50% of the top line and 50% of the line*

*after the top line.  If the same vertical interpolator is used for both odd and even fields it is*

*necessary to be able to alter the initial line behavior on a field to field basis, so that one*

*field can be generated with the first line being 100% of the first line of the incoming data*

*(that is, no vertical repositioning), and the other field being generated using 50% line 1*

*and 50% line 2 for the first stored/displayed line*."

### B.    Prosecution History of the '654 Patent

#### 1.    Overview

154.    The following provides a brief summary of the prosecution history for the '654

Patent.  I have reviewed the entire prosecution history for the '654 Patent in forming my

opinions herein.

155.    In my opinion, the field of converting interlaced signals to progressive signals for

display on computer monitors or televisions was *very* crowded when the '654 Patent was

filed.  The non-provisional patent application that matured into the '654 Patent ("the '654

application") took over five years to issue (February 12, 1997 to March 19, 2002).

156.    In my opinion, the difficulty that the applicants faced in achieving allowance of

their claims correctly reflects a lack of novelty in what was claimed.  The references cited

by the examiner either expressly or inherently taught the key feature of what the

applicants described as their purported invention—the "adjusting" step.  As discussed

further below, the only reason that the examiner allowed issued claim 1 was that the

examiner did not find a reference disclosing the operation of "adjusting" "concurrently" with the operation of "scaling."

157.    In my opinion, as discussed further below, at least one reference cited by the examiner *does* teach the operation of "adjusting" "concurrently" with the operation of "scaling." However, the examiner did not fully apply the teachings of that reference to the rejections issued.

158.    Further, in my opinion, the applicants' characterization of these references reflects an explicit disclaimer of claim scope to the extent that the cited references taught "adjusting" and the applicants disputed that teaching. Each of these issues is addressed in the sections that follow.

### 2.    U.S. Provisional Patent Application No. 60/011,656

159.    The '654 Patent states that it claims the benefit of U.S. Provisional Appl. No. 60/011,656, filed on February 14, 1996.

160.    I have been told that Wi-LAN has not shown that the '654 Patent is entitled to priority to the provisional application filed on February 14, 1996, and has not produced any evidence that the '654 Patent is entitled to an earlier invention date. I thus understand that the priority date of the '654 Patent is considered to be the February 12, 1997 filing date of the '654 application, but that Wi-LAN may contend that the priority date of the '654 Patent is the February 14, 1996 filing date of the provisional application. Regardless of whether the priority date is determined to be February 14, 1996 or February 12, 1997, my analysis and opinions described in this Report remain the same. To the extent Wi-LAN contends that the difference in priority date would have an impact on my analysis, I reserve the right to respond to Wi-LAN's position.

### 3.   U.S. Non-provisional Patent Application No. 08/798,240

161.   U.S. Non-provisional Patent Application No. 08/798,240 was filed on February 12, 1997.  '654 File History at WILAN_00082-000123.  This patent application later matured into the '654 Patent.  *See* Notice of Allowance for application 08/798,240 at WILAN_000289.

162.   Originally presented claim 1, shown below, recited that a scaling step inherently corrected for "relative vertical offset."  As shown below, originally presented claim 1 did not recite separate scaling and adjusting steps.

> 1.     A method for displaying incoming interlaced video data having a plurality of fields on a non-interlaced monitor, comprising the steps of:
>     capturing said plurality of fields into at least two buffers; and
>     sequentially displaying and scaling said captured fields to fill vertical resolution of said non-interlaced monitor such that alternate fields are adjusted to correct for relative vertical offset of said data in said alternate fields.

'654 File History at WILAN_000116.

163.   By contrast, as-issued claim 1 recites performing separate scaling and adjusting steps.

What is claimed is:

1. A method for displaying interlaced video data on a non-interlaced monitor, the interlaced video data comprising a plurality of paired fields, each pair of fields being vertically offset relative to each other by one-half of a field line spacing distance, each field comprising a plurality of lines of video data, the method including:

(a) capturing a first field and a second field of each pair of fields into respective buffers;

(b) scaling each of the first field and second field of each pair of fields to fill vertical resolution of the non-interlaced monitor;

(c) adjusting one of the first field or second field of the pair of fields to substantially correct for the vertical offset between the pairs of fields, where said adjusting is performed concurrently with said scaling;

(d) displaying the first field of each pair of fields on the non-interlaced monitor in a first time period; and

(e) displaying the second field of each pair of fields on the non-interlaced monitor in a second time period subsequent to the first time period.

'654 Patent at Claim 1.

164.   It is my opinion that the applicants' decision to originally claim a scaling step that inherently corrected for relative vertical offset and then amend the pending claims to recite a scaling step separate from an adjusting step is significant because it shows that the applicants made a conscious decision to separate scaling and adjusting into separate operations.

165.   In addition, because originally presented claim 1 recited a scaling step that inherently corrected for relative vertical offset, rather than an adjusting step separate from the scaling step, originally presented claim 1 did not recite any timing relationship between the scaling and adjusting operations.

> 1.   A method for displaying incoming interlaced video data having a plurality of fields on a non-interlaced monitor, comprising the steps of:
>
> capturing said plurality of fields into at least two buffers; and
>
> sequentially displaying and scaling said captured fields to fill vertical resolution of said non-interlaced monitor such that alternate fields are adjusted to correct for relative vertical offset of said data in said alternate fields.

'654 File History at WILAN_000116.

166.    By contrast, as-issued claim 1 reflects that the "scaling" and "adjusting" steps are performed "concurrently."

> **What is claimed is:**
> **1.** A method for displaying interlaced video data on a non-interlaced monitor, the interlaced video data comprising a plurality of paired fields, each pair of fields being vertically offset relative to each other by one-half of a field line spacing distance, each field comprising a plurality of lines of video data, the method including:
> (a) capturing a first field and a second field of each pair of fields into respective buffers;
> (b) scaling each of the first field and second field of each pair of fields to fill vertical resolution of the non-interlaced monitor;
> (c) adjusting one of the first field or second field of the pair of fields to substantially correct for the vertical offset between the pairs of fields, where said adjusting is performed concurrently with said scaling;
> (d) displaying the first field of each pair of fields on the non-interlaced monitor in a first time period; and
> (e) displaying the second field of each pair of fields on the non-interlaced monitor in a second time period subsequent to the first time period.

'654 Patent at Claim 1.

167.    Originally presented claims 2-20 also did not recite any timing relationship between the scaling and adjusting operations.  '654 File History at WILAN_000116-000119.

168.     By contrast, as-issued claim 6 recites that the "scaling" step is performed "before"

the "adjusting" step and as-issued claim 7 recites that the "scaling" step is performed

"after" the "adjusting" step.

> 6. The method of claim **1**, wherein the step of scaling is performed before the step of adjusting.
>    7. The method of claim **1**, wherein the step of scaling is performed after the step of adjusting.

'654 Patent at Claims 6 and 7.

169.     Circumstances surrounding amendments that introduced the "concurrently,"

"before," and "after" limitations discussed above are described below in conjunction with

individual corresponding responses to office actions.

### (a)     Office Action of September 2, 1998

170.     The '654 application was rejected several times at the USPTO.  The first of these

rejections was an office action issued on September 2, 1998.  '654 File History at

WILAN_000141-000154.  In this office action, the examiner rejected claims 1-3, 5-7, 10,

11, 13, 16 and 18 under 35 U.S.C. § 102(e) as anticipated by U.S. Patent No. 5,668,602 to

Sid-Ahmed (the '602 Patent) (WLPA00000547).  '654 File History at WILAN_000142.

In addition, the examiner rejected claims 4, 8, 9,12, 14, 15, 17, 19, and 20 as unpatentable

under 35 U.S.C. § 103(a) over the '602 Patent in view of the knowledge of a person of

ordinary skill in the art.  '654 File History at WILAN_000145-000150.

171.     The examiner's § 102(e) rejection of claim 1 over the '602 Patent is noteworthy for

its relevance to issued claim 1 of the '654 Patent.  In particular, the examiner concluded

that the '602 Patent taught the scaling step that inherently adjusted one field within then-

presented claim 1.  The examiner stated that the '602 Patent discloses "sequentially

displaying the captured field such that alternate fields are adjusted to correct for relative vertical offset in alternate fields."  '654 File History at WILAN_000142, citing 3:37-4:59 of the '602 Patent.  Moreover, the examiner stated that "correction for vertical offset is met by line doubling and interpolation."  *Id.*

### (b)   Applicants' Response to Office Action of September 2, 1998

172.    In response to the office action of September 2, 1998, the applicants canceled claims 1-20 and added claims 21-40 through amendment.  The applicants also distinguished their amended claims from the '602 Patent.  Each of these events is discussed below.

173.    In response to the office action of September 2, 1998, the applicants canceled claims 1-20 and added claims 21-40.

> **IN THE CLAIMS:**
> Please cancel claims 1-20 without prejudice. Please add claims 21-40 as follows:

'654 File History at WILAN_000172.

174.    Amended claim 21, as added in response to the office action of September 2, 1998, is very close to as-issued claim 1 in the '654 Patent.  The table below compares the elements and limitations of added claim 21 to as-issued claim 1.  Words present in claim 1 but not present in claim 21 are underlined, and words present in claim 21 but not present in claim 1 are bracketed.

> 1. [21.] A method for displaying interlaced video data on a non-interlaced monitor, the interlaced video data comprising a plurality of paired fields, each pair of fields being vertically offset relative to each other by one-half of a field line spacing distance, each field comprising a plurality of lines of video data, the method including [the steps of]:

| |
|---|
| (a) capturing a first field and a second field of each pair of fields into respective buffers; |
| (b) scaling each of the first field and second field of each pair of fields to fill vertical resolution of the non-interlaced monitor; |
| (c) adjusting one of the first field or second field of the pair of fields to substantially correct for the vertical offset between the pairs of fields, where said adjusting is performed concurrently with scaling; |
| (d) displaying the first field of each pair of fields on the non-interlaced monitor in a first time period; and |
| (e) displaying the second field of each pair of fields on the non-interlaced monitor in a second time period subsequent to the first time period. |

'654 File History at WILAN_000172.

175.    The preceding table illustrates that as-issued claim 1 but not amended claim 21 recites "where said adjusting is performed concurrently with scaling."  Additionally, the preamble of amended claim 21 but not the preamble of as-issued claim 1 recites "the steps of."  Otherwise, amended claim 21 is identical to as-issued claim 1.

176.    Amended claims 22-30, as added in response to the Office Action of September 2, 1998, are also very close to as-issued claims 2-9 in the '654 Patent.  The table below compares the elements and limitations of added claims 22-30 to as-issued claims 2-9. Words present in as-issued claims 2-9 but not present in added claims 22-30 are underlined, and words present in added claims 22-30 but not present in as-issued claims 2-9 are bracketed.

| |
|---|
| 2. [22.] The method of claim 1 [21], wherein scaling is achieved by line replication. |
| 3. [23.] The method of claim 1 [21], wherein scaling is achieved by line dropping. |
| 4. [24.] The method of claim 1 [21], wherein scaling is achieved by vertical interpolation between at least adjacent lines in the field being scaled. |

| |
|---|
| 5. [25.] The method (of) claim 1 [21], wherein the scaling step includes scaling to a size other than two times the size of the interlaced video by interpolating the video data. |
| 6. [26.] The method of claim 1 [21], wherein the step of scaling is performed before the step of adjusting. |
| 7. [27.] The method of claim 1 [21], wherein the step of scaling is performed after the step of adjusting. |
| 8. [28.] The method of claim 1 [21], wherein the adjusting step includes changing display positions of one of the scaled first field or scaled second field by one or more lines on the noninterlaced monitor. |
| 9. [29.] The method of claim 1 [21], wherein the adjusting step is achieved by vertical interpolation between at least adjacent lines in the field being adjusted. |
| [30.]  The method of claim 21, wherein the steps of scaling and adjusting are performed concurrently.] |

'654 File History at WILAN_000172.

177.    The preceding table illustrates that amended claim 30 recites "wherein the steps of scaling and adjusting are performed concurrently," which is similar to the "where said adjusting is performed concurrently with scaling" limitation in as-issued claim 1. Otherwise, aside from differences in claim numbering, amended claims 22-29 are identical to as-issued claims 2-9.

178.    The applicants explained that claims 21-30 replaced claims 1-10 to clarify the language involving "correction of vertical displacement between pairs of fields when converting from an interlaced to a non-interlaced display format."; i.e., the adjusting step of amended claim 21.

**The §102 Rejection**

The Examiner has rejected claims 1-3, 5-7, 10, 11, 16, and 18 under 35 U.S.C. §102(e) as being anticipated by the reference to Sid-Ahmed. Applicants respectfully traverse this rejection with respect to the claims as amended.

With respect to claims 1-3, 5-7, 10, new claims 21-30 replace claims 1-10, and provide clarifying language to more distinctly claim one aspect of the invention, which generally involves correction of vertical displacement between pairs of fields when converting from an interlaced to a non-interlaced display format. In particular, claim 21 now recites:

21. A method for displaying interlaced video data on a non-interlaced monitor, the interlaced video data comprising a plurality of paired fields, each pair of fields being vertically offset relative to each other by one-half of a field line spacing distance, each field comprising a plurality of lines of video data, the method including the steps of:
   (a)  capturing a first field and a second field of each pair of fields into respective buffers;
   (b)  scaling each of the first field and second field of each pair of fields to fill vertical resolution of the non-interlaced monitor;
   (c)  *adjusting one of the first field or second field of the pair of fields to substantially correct for the vertical offset between the pairs of fields;*
   (d)  displaying the first field of each pair of fields on the non-interlaced monitor in a first time period; and
   (e)  displaying the second field of each pair of fields on the non-interlaced monitor in a second time period subsequent to the first time period. [Emphasis added]

'654 File History at WILAN_000175.

179.    Addressing the § 102(e) rejection, the applicants distinguished the claimed adjusting step in amended claim 21 from the '602 Patent.  In particular, the applicants expressly argued that the '602 Patent contains "no mention . . . About the problem of correcting vertical displacement between adjacent fields.  In particular, col. 3, l. 37 to col. 4, l. 59, cited by the examiner, does not appear to address the problem solved by Applicants' invention." '654 File History at WILAN_000175.

180.    The applicants also distinguished amended claim 28 from the teachings of the '602 Patent.  "Also, Sid-Ahmed does not appear to teach or suggest the technique of '*changing display positions* of one of the scaled first field or scaled second field *by one or more lines on the non-interlaced monitor*' (see claim 28).  Accordingly, Sid-Ahmed does not teach or

suggest this aspect of the invention as now claimed."  (Emphasis in original)  '654 File History at WILAN_000176.

181.    In my opinion, the applicants mischaracterized the '602 Patent (Sid-Ahmed) when responding to the office action of September 2, 1998.  As discussed above in conjunction with that office action, the examiner recognized that the '602 Patent teaches the adjusting step of original claim 1 and also teaches the claimed "changing display positions of one of the scaled first field or scaled second field by one or more lines on the non-interlaced monitor" step of original claim 6.  I believe that the examiner's description of the '602 Patent was correct and that the applicants' characterization of the '602 Patent was incorrect.  My bases for these conclusions are set forth below.

182.    In my opinion, the examiner correctly recognized that the '602 Patent taught the claimed scaling step that inherently adjusted one field.  For example, the passage within the '602 Patent cited by the examiner (3:37-4:59) does teach doubling the vertical and horizontal size of an image.  One approach utilizes a fast Fourier transform (FFT) and inverse FFT.  *See* '602 Patent at 3:26-42 (WLPA00000547).  Another approach utilizes horizontal replication of pixels and lines followed by low-pass filtering.  *See* '602 Patent at 3:43-4:63 (*Id.*).

183.    Figure 6 of the '602 Patent (shown below) illustrates that address generation for a buffer capturing a field alternates between odd and even first lines as reflected by the least-significant bit for the Y address receiving a one-bit signal every 1/60th of a second (i.e., every field).

184.



'602 Patent at Figure 6 (WLPA00000554).

185.   Figure 9 also illustrates that address generation for a buffer capturing a field alternates between odd and even first lines as reflected by the least-significant bit for the Y address receiving a one-bit signal every 1/60th of a second (i.e., every field).



'602 Patent at Figure 6 (WLPA00000554).

186.    The '602 Patent also discloses capturing both fields.  '602 Patent at 5:30-46

(discussing the two memories shown in Figure 5 - each memory capturing one field).



'602 Patent at Figure 5 (WLPA00000553).

187.    Further, the '602 Patent teaches displaying each resulting field.

[57]                    **ABSTRACT**

Circuitry and methods multiply the number of pixels in a television image without the need for changes in current transmission standards. One memory array or storage buffer is used to store one image, while data is being read from another memory or array storage buffer. The role of the two memory arrays changes with every incoming image, the memory array that was in the read mode is switched to the write mode, and vice-versa. The image read is interpolated through pixel replication in two-dimensions, followed by a square symmetrical two-dimensional low-pass filter, which provides interpolation based on the Sampling Theorem. This may be a two-dimensional (2-D) circularly-symmetrical high-pass filter for image enhancement. Interpolation may alternatively be carried out through a one-dimensional (1-D) filter, or through the Discrete Cosine transform. A description of a circuit realizing a 2-D infinite impulse response filter and the filter coefficients for a square symmetrical low-pass filter having near-linear phase is provided. Circuits for addressing the two memory arrays are also described for displaying video images through either progressive or inter-laced scanning.

'602 Patent at Abstract (WLPA00000547).

188.    Therefore, in my opinion, the examiner correctly determined that the '602 Patent anticipated then-presented claim 1. Thus, the applicants' characterization of the '602 Patent as "not appear[ing] to address the problem solved by the applicants' invention" ('654 File History at WILAN_000175) represents a mischaracterization of the '602 Patent.

189.    I have been told that distinguishing arguments made by applicants during prosecution can lead to prosecution history estoppel. In particular, I have been told that distinguishing arguments made by applicants can estop applicants or an assignee from asserting infringement under the doctrine of equivalents if the asserted equivalent reflects claim scope disclaimed during prosecution.

190.    In my opinion, the '602 Patent's teaching of the adjusting step of original claim 1 and teaching of the "changing display positions of one of the scaled first field or scaled second field by one or more lines on the non-interlaced monitor" step of original claim 6 coupled with the applicants' mischaracterizations of the '602 Patent as to then-pending claims 21 and 28 should estop Wi-LAN from arguing that such teachings reflect those portions of as-issued claims 1 or 8 under the doctrine of equivalents.

### (c)    Office Action of April 28, 1999

191.    The '654 application received a second office action on April 28, 1999.  '654 File History at WILAN_000182-000197.  In that office action, the examiner rejected claims 21-30 under 35 U.S.C. § 103(a) as unpatentable over the '602 Patent in view of U.S. Patent No. 4,426,661 to Okada et al. (the '661 Patent).  '654 File History at WILAN_000184.

192.    As previously discussed, the applicants' response to the office action of September 2, 1998 distinguished the claimed adjusting step in amended claim 21 from the '602 Patent and distinguished amended claim 28 from the teachings of the '602 Patent notwithstanding that the examiner correctly characterized the teachings of the '602 Patent.

193.    In the office action of April 28, 1999, the examiner changed his characterization of the '602 Patent.  Specifically, the office action of April 28, 1999 states "Sid-Ahmed fails to disclose <a> the claimed adjusting one of the first field or second field of the pair of fields to substantially correct for the vertical offset between the pairs of fields . . . ."  '654 File History at WILAN_000184.

194.    In my opinion, the applicants' characterization of the '602 Patent concerning part of the adjusting step of then-presented claim 21 (i.e., part of the adjusting step of as-issued

claim 1) or the additional limitation in then-presented claim 28 (i.e., as-issued claim 8) reflects a disclaimer of claim scope.

195.    Therefore, in my opinion, Wi-LAN should be estopped from attempting to recapture that claim scope through the doctrine of equivalents.  Accordingly, Wi-LAN should be estopped from arguing infringement under the doctrine of equivalents based on part of the claimed adjusting step in then-presented claim 21 (i.e., the adjusting step in as-issued claim 1) or the additional limitation of then-presented claim 28 (i.e., the additional limitation of as-issued claim 8) reflected in the '602 Patent.

196.    Notwithstanding the examiner's new characterization of the '602 Patent, the examiner rejected the pending claims as obvious over the '602 Patent in view of the knowledge of a person of ordinary skill in the art and certain applied references.  '654 File History at WILAN_000184-000197.  The applicants' responses to these rejections are discussed below.

### (d)    Applicants' Response to the Office Action of April 28, 1999

197.    In response to the office action of April 28, 1999, the applicants characterized then-pending claim 21 as being directed to correcting vertical offset, argued that the '602 Patent did not teach the claimed adjusting step of then-pending claim 21, argued that line interpolation taught by the '602 Patent did not inherently teach correction of the vertical offset of sequential fields, and argued that the claimed adjusting step was not taught by *Keith Jack*.  Each of these arguments are discussed below.

198.    The applicants reiterated that the claims were directed to the adjusting step.  More specifically, the applicants stated "independent claim 21 is directed to correcting vertical

offset between pairs of fields when converting from an interlaced to a non-interlaced display format.  Specifically, each pair of fields are [sic] scaled and adjusted to correct for the vertical offset."  '654 File History at WILAN_000199.  Thus, the applicants once again made clear that the adjusting step was what distinguished the prior art in their opinion.

199.    The applicants argued that the '602 Patent did not teach the claimed adjusting step of then-pending claim 21.  More specifically, the applicants stated that "Sid-Ahmed . . . is principally directed to methods and circuits for multiplying the number of pixels in an incoming digitized video image in real time (column 1, lines 57-67).  This is achieved by horizontal replication of the incoming pixels followed by low-pass filtering of the replicated pixels."  '654 File History at WILAN_000199-000200.

200.    The applicants' characterization of the '602 Patent, reproduced above, selectively omits the most significant teachings within the referenced passage in the '602 Patent and therefore reflects a mischaracterization of the '602 Patent.  Specifically, 2:1-4 of the '602 Patent states that "[t]he method aspect of the invention includes the step of receiving pixels associated with an incoming digitized video image, replicating each pixel, interpolating the replicated pixels using low-pass filtering *in two dimensions*" (emphasis added).  In particular, the applicants acknowledged that incoming pixels were replicated in the horizontal dimension but failed to acknowledge that the replicated pixels were thereafter interpolated *in two dimensions* as discussed in the same sentence.

201.    In my opinion, as discussed above in conjunction with my explanation of the '602 Patent, the '602 Patent teaches every element of then-presented claim 21 and every element of as-issued claim 1.  More specifically, as previously discussed, Figure 5

illustrates capturing a first field and a second field into respective buffers. As previously discussed, the '602 Patent teaches two approaches to doubling the vertical and horizontal size of an image. One approach utilizes a fast Fourier transform (FFT) and inverse FFT. *See* '602 Patent at 3:26-42 (WLPA00000547). Another approach utilizes horizontal replication of pixels and lines followed by low-pass filtering. *See* '602 Patent at 3:43-4:63 (*Id.*). As previously discussed, Figure 6 illustrates that the address generation circuits include a least-significant bit generator whose value alternates with each input field, thereby offsetting odd fields from even fields by one line in the buffer, thereby affecting the claimed correction of vertical offset when the FFT and inverse transform is performed. This process of writing data into a memory, with blank pixels and lines of pixels, followed by performing a FFT and inverse transform, or by doubling pixels horizontally and doubling lines vertically prior to filtering, operates to concurrently scale and adjust one of the fields as previously discussed. Thereafter, the '602 Patent teaches that the result is displayed. Thus, the '602 Patent teaches all features of then-pending claim 21 and as-issued claim 1.

202.    Thus, in my opinion, the applicants' characterization of the '602 Patent as not teaching the adjusting step of then-presented claim 21 is not correct.

203.    The applicants argued that vertical interpolation discussed in the '602 Patent does not inherently teach the adjusting step in then-presented claim 21. More specifically, the applicants stated that "the line interpolation taught by Sid-Ahmed does not inherently result in a correction of the vertical offset of sequential fields. Sid-Ahmed neither discloses nor suggests correcting for the vertical offset."

204.    As previously discussed, the '602 Patent does teach that sequential fields are vertically offset by one field line.  For example, Figure 6 of the '602 Patent illustrates that even and odd fields are offset in memory by one field line.  Figure 9 illustrates a similar circuit structure.

205.    In my opinion, vertical interpolation in combination with storing alternate fields in positions offset by one field line reflects the claimed scaling and adjusting steps.  Therefore the '602 Patent teaches those claimed features and the applicants' characterization of the '602 Patent is incorrect.

206.    The applicants stated that the applied references and *Keith Jack* fail to suggest the adjusting step so then-presented claim 21 cannot be obvious.  More specifically, the applicants state that "neither the references cited by the examiner nor the *Keith Jack* treatise cited by the applicants—all of which are directed to improving image quality and reducing artifacts - teach or suggest the 'adjustment' aspect of the invention as claimed." '654 File History at WILAN_000200.

207.    As discussed in greater detail below (Section VIII.E.4), *Keith Jack* teaches the claimed adjusting step and scaling both fields.  Therefore, I disagree with the applicants' assertion that *Keith Jack* does not teach the adjusting step.



*FIG - 6*

'602 Patent at Figure 6 (WLPA00000554).

**(e)      Office Action of September 9, 1999**

208.      A third office action issued on September 9, 1999. '654 File History at

WILAN_000213-000229.  The examiner rejected claims 21-33, 36, 38, and 40 under

35 U.S.C. § 103(a) as unpatentable over U.S.  Patent No. 5,621,470 to Sid-Ahmed (the

'470 Patent) in view of U.S. Patent No. 4,670,722 to Bolger (the '772 Patent)

(WLPA00000741-00000755).  '654 File History at WILAN_000215.  Although this office

action cites the '602 Patent on its face (e.g., see references to Sid-Ahmed at

WILAN_000215), the examiner later acknowledged that references to Sid-Ahmed in this

office action concerned U.S.  Patent No. 5,621,470 (also to Sid-Ahmed).

WILAN_000225.

**(f)      Applicants' Response to the Office Action of September 9, 1999**

209.      In response to the office action of September 9, 1999, the applicants characterized

then-pending claim 21 as being directed to correcting vertical offset and argued that the

applied references did not disclose or suggest the claimed adjusting step.

WILAN_000238-000239.  Each of these issues is discuss briefly below.

210.      The applicants reiterated that the claims were directed to the adjusting step.  More

specifically, the applicants stated "[e]ach of independent claims 21 and 31 is directed to

correction of vertical offset between pairs of fields when converting from an interlaced to

a non-interlaced display format."  '654 File History at WILAN_000238.  Thus, the

applicants once again made clear that the adjusting step was what distinguished the prior

art in their opinion.

211.      The applicants also characterized the '772 Patent as failing to disclose or suggest

the adjusting step.  The applicants previously argued that the '470 Patent also did not

disclose or suggest the adjusting step.  Therefore, in the applicants' view, the '772 Patent

could not render then-presented claim 21 obvious.  '654 File History at WILAN_000238.

### (g)   Office Action of May 9, 2000

212.   A fourth office action issued on May 9, 2000.  '654 File History at

WILAN_000241-000253.  The examiner rejected claims 21, 22, 24, 26-29, 31, 33, and 36

under 35 U.S.C. § 102(b) as unpatentable over the '470 Patent.  '654 File History at

WILAN_000243.  The examiner also concluded that claims 30, 38, and 40 reflected

allowable subject matter.  WILAN_000251.

### (h)   Applicants' Response to the Office Action of September 9, 1999

213.   In response to the office action of May 9, 2000, the applicants amended then-

pending claim 21 (which became as-issued claim 1) to incorporate then-pending claim 30

(reciting the "concurrently" limitation).  WILAN_000254-000255.  The applicants also

canceled then-pending claim 30.  WILAN_000256.  The applicants' remarks merely

acknowledged the amendments.  WILAN_000261.

### (i)   Office Action of October 11, 2000

214.   A fifth office action issued on October 11, 2000.  '654 File History at

WILAN_000263-000267.  The examiner concluded that claims 21-29, 31-37, 39, and 40

were allowed but that the applicants must submit drawings to reflect the claimed subject

matter.  WILAN_000265.

215.   In the examiner's reasons for allowance, the examiner noted that the prior art did

not teach a combination of the "capturing" and "adjusting" steps such that adjusting and

scaling were performed concurrently.  WILAN_000265.

216.    Thus, in my opinion, the examiner concluded that the allegedly new aspect of then-presented claim 21 (as-issued claim 1) was that the adjusting step was performed concurrently with the scaling step.

### (j)    Applicants' Response to the Office Action of October 11, 2000

217.    In response to the office action of October 11, 2000, the applicants amended the specification to add Figures 4-6.  WILAN_000269- WILAN_000277.  Figure 4 illustrates and discusses performing the scaling and adjusting steps concurrently.  The applicants did not dispute the examiner's characterization of the reasons for allowance.

### (k)    Notice of Allowance

218.    The examiner issued a notice of allowance on June 4, 2001.  WILAN_000289. The '654 Patent issued on March 19, 2002.

## C.    Claim Construction for the '654 Patent

219.    Below is a table of the constructions by the Court in the Court's Claim Construction Order of April 27, 2018.  D.I. 280 and 281 [SEC]; D.I. 219 and 220 [VIZIO]. I have applied these constructions when performing my analyses.  Where there is no construction of a phrase or term, or where the Court determined that no construction was necessary, I have used their ordinary and customary meaning to one of ordinary skill in the art.

220.    The court has construed terms of the asserted claims as follows:

| Claim Term | Court's Construction |
|---|---|
| "A method for displaying interlaced video data on a non-interlaced monitor, the | Preamble is limiting |

| | |
|---|---|
| interlaced video data comprising a plurality of paired fields, <br><br> each pair of fields being vertically offset relative to each other by one-half of a field line spacing distance, each field comprising a plurality of lines of video data" | |
| "respective buffers" | "separate buffers for the first field and the second field" |
| "scaling" | "changing the vertical resolution by changing by a constant factor the number of lines in a field" |
| "adjusting" | "vertical repositioning" |
| "to substantially correct for the vertical offset between the pairs of fields" | "to largely or approximately correct for the vertical offset" |
| "said adjusting is performed concurrently with said scaling" | "the adjusting and scaling steps must overlap, either by interleaving or simultaneous execution, such that one cannot complete before the other begins" |
| "vertical interpolation between at least adjacent lines" | "calculating values for new pixels between at least vertically adjacent lines using known values" |
| "the adjusting step is achieved by vertical interpolation between at least adjacent lines" | "the adjusting step is achieved by calculating values for new pixels between at least vertically adjacent lines using known values" |

### D.   The '654 Patent Is Invalid

#### 1.   Claims 1, 4, and 9 of the '654 Patent Claim Patent-Ineligible Subject Matter Under 35 U.S.C. § 101

221.   It is my opinion that at least claims 1, 4, and 9 of the '654 Patent are invalid because they claim patent ineligible subject matter under 35 U.S.C. § 101.

222.   It is my opinion that Claim 1 is directed to an abstract idea - specifically, it purports to claim a method for reprocessing video data, *i.e.*, converting it from one format (interlaced video data) to another (non-interlaced video), for display.

223.   Ultimately, the steps of Claim 1 reduce to mathematical operations performed by generic computer components.  Each step of Claim 1 relates to this abstract process, which includes taking the video data from an interlaced video field and (a) remembering that video data; (b) generating new video data; (c) altering the video data; and then (d) showing the resulting video data.  The claim as a whole represents the abstract idea of reprocessing video data for display.

224.   I understand that a claim that is directed to abstract subject matter may nonetheless be patent eligible if it includes an inventive concept that transforms the abstract idea into something more.  This requires an element or combination of elements that is sufficient to ensure that the patent in practice amounts to significantly more than a patent upon the ineligible concept itself.

225.   However, in my opinion and based on Plaintiff's apparent interpretation of the subject limitations, there is no such inventive, transformative concept.  The limitation added in order to obtain allowance ("where said adjusting step is performed concurrently with said scaling") does not constitute an additional feature that transforms the claim into

something more than a well-understood, conventional activity.  Indeed, Plaintiff appears to interpret this limitation to permit the *same interpolation process* to effect both a scaling and adjustment of the video data:



Final Infringement Contentions, at [SEC] 83, [VIZIO] 84 (contentions for "scaling" step).



Final Infringement Contentions, at [SEC] 126, [VIZIO], 127 (presenting identical contention for scaling and adjusting steps).

226.    However, changing the timing of an abstract process does not render it less abstract, nor does it provide an inventive, transformative concept

227.    Looking at each individual step and the claim as a whole, the claim does not include an inventive concept, and each step could be performed by a conventional computer or by an individual human when processing video data.

228.    I understand the Court construed the preamble to be limiting.  D.I. 281, at 2.  The preamble describes displaying of a *kind of data*, namely "interlaced video data comprising a plurality of paired fields, each pair of fields being vertically offset relative to each other by one-half of a field line spacing distance, each field comprising a plurality of lines of video data."  '654 Patent, at Claim 1, Preamble.  This element does not provide an inventive concept that transforms the abstract process.

229.   Claim 1, element (a) purports to use generic components (buffers) to capture portions of the video data described in the preamble.  I am mindful that the Court construed the term "respective buffers," a part of this element, to mean "separate buffers for the first field and the second field." But data buffers are conventional components, routinely used to store data for processing. Moreover, the '654 Patent expressly informs that the use of multiple buffers was well-known in the art.  *E.g.,* '654 Patent, at 4:58-63. Further, *Keith Jack* describes the use of multiple separate buffers and the benefits of such use in detail.  *See, e.g., id.*; *and see* 4/24/2018 Glennon Depo. Tr., at 49:4-7 ("Q. Is it accurate to say that while at Brooktree, you would refer to the Keith Jack book as the bible of video at the time? A. Yes.").  This element does not provide an inventive concept that transforms the abstract process.

230.   Claim 1, element (b) calls for the "scaling [of] each of the first field and second field of each pair of fields to fill the vertical resolution of the non-interlaced monitor."  I understand that the Court construed the term "scaling" to mean "changing the vertical resolution by changing by a constant factor the number of lines in a field."  D.I. 281, at 2. This step thus describes a mathematical process and does not provide an inventive concept that transforms the abstract process.

231.   Claim 1, element (c) calls for "adjusting one of the first field or second field of the pair of fields to substantially correct for the vertical offset between the pairs of fields, where said adjusting is performed concurrently with said scaling."  I understand that the Court has construed "adjusting" to mean "vertical repositioning," "to substantially correct for the vertical offset between the pair of fields" to mean "to largely or approximately correct for the vertical offset," and "said adjusting is performed concurrently with said

scaling" to mean "the adjusting and scaling steps must overlap, either by interleaving or simultaneous execution, such that one cannot complete before the other begins."  D.I. 281, at 2.  As with element (b), this step is simply a mathematical process, and the '654 Patent teaches that a "correction of the positional offset" could be performed by either altering the position of video data or altering the video data itself.  *See generally* '654 Patent, at 5:12-7:7; *and see id*. at 5:14-18 (first of "two ways to deal with the vertical offset of the two fields" as "[t]he two fields can be displayed at different positions on the display using a non-interlaced display") and 6:10-11 ("[t]he video data can be altered to correct the positional offset between the fields").  Regardless of the method used, altering video data does not provide an inventive concept that transforms the abstract process.

232.    Finally, in elements (d) and (e), Claim 1 calls for the display of the resulting video data.  For element (d), the video data for "the first field of each pair of fields" is displayed "on the non-interlaced monitor in a first time period."  '654 Patent, cl. 1, el. (d).  For element (e), the video data corresponding to the "second field of each pair of fields" is displayed "on the non-interlaced monitor in a second time period subsequent to the first time period."  *Id.* at el. (e).  Even to the extent this element calls for the use of a generic monitor, implementing such an abstract idea using generic components fails to transform the idea into anything less abstract.

233.    Claims 4 and 9 include no additional step that alter my opinion, as both claims merely purport to apply a (well-known) mathematical process – *i.e.*, interpolation – in order to accomplish one of these steps. Interpolation is a mathematical process of manipulating or altering video data, and might be as simple as "doing simple averaging for interpolation" (4/18/2018 Felts Dep. Tr., at 200:1-6; *see also* 272:16-273:5).

234.    It is my opinion that Claims 1, 4, and 9 are directed to abstract subject matter and lack any inventive, transformative concept that renders the subject matter of those claims patent-eligible, and thus it is my opinion that Claims 1, 4, and 9 are directed to patent-ineligible subject matter.

### 2.    Claims 1, 4, and 9 of the '654 Patent Are Invalid Under 35 U.S.C. § 112

235.    It is my opinion that at least claims 1, 4, and 9 of the '654 Patent are invalid under 35 U.S.C. § 112.

### (a)    "Concurrently"

236.    Claim 1 recites "where said adjusting is performed ***concurrently*** with said scaling[.]"

237.    It is my opinion that the asserted claims of the '654 Patent are invalid under 35 U.S.C. § 112.

### (i)    Written Description -- -- 35 U.S.C. § 112 ¶ 1

238.    It is my opinion that the asserted claims of the '654 Patent are invalid under 35 U.S.C. § 112 for lack of written description because the original application does not reasonably convey to a person having ordinary skill in the art that the inventors had possession of an invention that required performing scaling and adjusting "concurrently" as recited in the asserted claims at the time of the purported invention.

239.    The non-provisional application, as filed, does not use the word "concurrently" at all, not even in the claims as originally presented. The provisional application does not use the word "concurrently" either. The non-provisional application, as filed, only includes Figures 1-3 of the '654 Patent, all of which describe prior art (not the claimed invention).

240.     In response to the office action of September 2, 1998, the applicants canceled all original claims (1-20) and added by amendment claims 21-40. Added claim 30 introduced the "concurrently" limitation for the first time.

241.     On October 11, 2000, the examiner issued a Quayle action requiring the applicants to submit drawings to support the allowed claims. In response to that office action, the applicants submitted Figures 4-6. Figure 4 is a flow chart that references "concurrent" adjusting and scaling.  However, Figure 4 was not part of the original application, and thus is not evidence that the inventors had possession of the claimed subject matter as of the filing date.

242.     The deposition testimony of named inventors Benjamin Felts and Stephen Glennon provide additional support for my conclusion that the specification of the '654 does not show that the inventors had possession the alleged invention claimed in the asserted claims at the time of the purported invention.

243.     At deposition, Mr. Felts was asked to point to any place in the '654 specification that described concurrent adjusting and scaling.  He conceded that the specification does not contain any such disclosure.

> Q.     Can you point to anyplace where the concurrent adjusting and scaling is described at all in the specification?
>
> THE WITNESS:     In the specification it refers to doing both of them. I do not see that it specifically says that you can or cannot do them concurrently. Those are two aspects of the operation that are mentioned. It does not specifically say one way or another.

4/18/18 Felts Dep. Tr. at 298.

244.    Similarly, in his deposition Mr. Glennon could not identify any language in the

specification that referenced concurrent scaling and adjusting, or any discussion of the

timing relationship between adjusting and scaling:

> Q.    The language you pointed to doesn't say anything about resampling and
> scaling happening at the same time, does it?
>
> A.· ·That one sentence uses the term "resampling and rescaling" in the same
> sentence.
>
> ·Q.· ·It doesn't say anything about them happening concurrently, does it?
>
> A.    It does not use the word "concurrent."
>
> Q.    It doesn't say anything about the temporal relationship between resampling
> and scaling, does it?
>
> A.    No.
>
> ·Q.    So there's nothing in this patent that describes the temporal relationship
> between rescaling and samples in a way that corrects ·the vertical offset,
> correct?
>
> A.    I think it's quite clear from lines 65 on column 6, the use of resampling and
> rescaling in the same sentence describes that operation.
>
> Q.    But it doesn't say anything about the timing of those two operations,
> rescaling and --
>
> A    No, but I think it's quite clear to someone -- I'll let you finish.
>
> Q.    The language you're citing doesn't say anything about the timing
> relationship between resampling and scaling, correct?
>
> A.    No, it does not.

4/24/18 Glennon Dep. Tr. at 151-153.

245.    For the foregoing reasons, it is my opinion that the asserted claims of the '654

Patent are invalid under 35 U.S.C. § 112 for lack of written description because the

original application does not reasonably convey to a person having ordinary skill in the art

that the inventor had possession of an invention that required performing scaling and

adjusting "concurrently" as recited in the asserted claims at the time of the purported

invention.

(ii)     **Enablement -- 35 U.S.C. § 112 ¶ 1**

246.    It is my opinion that the asserted claims of the '654 Patent are invalid under 35

U.S.C. § 112 for lack of enablement because the specification of the '654 Patent does not

teach those skilled in the art how to make and use the full scope of the claimed invention

without undue experimentation.

247.    As discussed above, the only purportedly novel aspect of the asserted claims of the

'654 Patent is the step of performing scaling and adjusting concurrently. The only

reference in the specification to concurrent scaling and adjusting is in Figure 4. However,

Figure 4 (a flow chart) merely recites concurrent scaling and adjusting as a step in the

claimed method. It provides absolutely no information as to how one would perform

scaling and adjusting concurrently. In fact, nowhere does the specification provide any

information as to how one would perform scaling and adjusting concurrently, let alone

provide the level of detail required under Section 112.

248.    The testimony of named inventors further supports this conclusion.

249.    Benjamin Felts, a named inventor, conceded in deposition that the specification

does not describe how one would perform scaling and adjusting concurrently. 4/17/17

Felts Dep. Tr. at 298-299 ("There is no specific place that I see in the detailed description

that it describes how to perform concurrent scaling and resampling.").[9]

---

[9] Mr. Felts also testified he was not sure whether a person having ordinary skill in the art
in 1996 would know how to perform concurrent scaling and resampling within the
meaning of claim 1, and could only "conjecture." 4/17/18 Felts Dep. Tr. at 300-301). Even
if one assumed, for purposes of argument, that a person having ordinary skill in the art in
1996 would know how to perform concurrent scaling and resampling within the meaning of
claim 1, this would not satisfy the written description requirement. As discussed above,
it is the specification, not the knowledge of one skilled in the art, that must supply the
novel aspects of an invention in order to constitute adequate enablement.

250.    Similarly, when asked in deposition to identify any portion of the specification that described how one concurrently adjusts and scales within the meaning of Claim 1, Stephen Glennon, another named inventor, was unable to do so. Instead, he conceded that the specification does not even discuss the timing relationship between scaling and adjusting, let alone provide an explanation as to how one would scale and adjust concurrently.

> Q.    . . . . My question is not where does it imply that one could do one pass concurrent scaling and resampling. My question is, where does it explain how one concurrently resamples and scales in a way that corrects vertical offset?
>
> A.    I can't point to specific language that directly combines the resampling and the scaling.
>
> Q.    Can you point to anything in the discussion of Embodiment B-1 that explains how one performs concurrent resampling and scaling in a way that corrects vertical offset?
>
> A.    Lines 65 and beyond from column 6. It says, "In addition, if the resampling is to be performed on the output path it can be performed using whatever output rescaling scheme is implemented in hardware.· This can but (is not limited to) schemes which vertically scale in the DAC, as the Brooktree BtV 2487 does." I think that's a fairly specific point or two combining the two operations.
>
> Q.    How does that explain how one concurrently resamples and scales in a way that corrects vertical offset? I don't see any steps in the language you've just cited.
>
> A.    I think it's fair to suggest that someone ordinarily skilled in the art that the use of an interpolator and a scaler and this specific language about using the output scaler to perform the interpolation would see those as being combined operation.
>
> Q.    The language you pointed to doesn't say anything about resampling and scaling happening at the same time, does it?
>
> A.    That one sentence uses the term "resampling and rescaling" in the same sentence.
>
> Q.    It doesn't say anything about them happening concurrently, does it?
>
> A.    It does not use the word "concurrent."
>
> Q.    It doesn't say anything about the temporal relationship between resampling and scaling, does it?

A.      No.

Q.      So there's nothing in this patent that describes the temporal relationship between rescaling and samples in a way that corrects the vertical offset, correct?

A.      I think it's quite clear from lines 65 on column 6, the use of resampling and rescaling in the same sentence describes that operation.

Q.      But it doesn't say anything about the timing of those two operations, rescaling and --

A.      No, but I think it's quite clear to someone -- I'll let you finish.

Q.      The language you're citing doesn't say anything about the timing relationship between resampling and scaling, correct?

A.      No, it does not.

4/24/18 Glennon Dep. Tr. at 150-153.

251.    For the foregoing reasons, it is my opinion that the asserted claims of the '654 Patent are invalid under 35 U.S.C. § 112 for lack of enablement because the specification of the '654 Patent does not teach those skilled in the art how to make and use the full scope of the claimed invention without undue experimentation.

252.    As a result, it is my opinion that independent Claim 1 and all asserted claims depending upon it (*i.e.*, Claims 4 and 9) are invalid as indefinite under Section 112, paragraph 2.

> **(b)     "To Substantially Correct for the Vertical Offset Between the Pairs of Fields" -- 35 U.S.C. § 112 ¶ 2**

253.    Claim 1 recites "adjusting one of the first field or second field of the pair of fields to substantially correct for the vertical offset between the pairs of fields[.]"

254.    It is my opinion that the asserted claims of the '654 Patent are invalid under 35 U.S.C. § 112 as indefinite because the term "to substantially correct for the vertical offset between the pairs of fields," read in light of the specification and the prosecution history,

fails to inform with reasonable certainty those skilled in the art about the scope of the claimed subject matter.

255.    I understand that the Court construed this term to mean "to largely or approximately correct for the vertical offset."  D.I. 281 [SEC]; D.I. 220, at 2 [VIZIO]. Further, I understand that the Court analyzed arguments presented by Defendants SEC and VIZIO that this term was indefinite.  In the course of its opinion, I understand the Court confirmed that the term "to substantially correct for the vertical offset" was limiting, and not merely an intended result.  D.I. 280, at 12 [SEC]; D.I. 219, at 12 [VIZIO].

256.    I understand that the Court found the term "substantially" was a "modifier used to account for the varying amounts of correction that may occur when the adjusting step is performed, recognizing that the functional goal of the adjusting step is to get as close to exactly correct repositioning as possible."  *Id.* at 14-15.  Thus, the Court found "substantially" was a term of approximation.  *Id.* at 14.

257.    Notwithstanding, having reviewed the Court's memorandum opinion, and the materials of record in this matter, it is my opinion that the term "substantially" is indefinite because a person of skill would be unable to determine when any correction of vertical offset was "substantial" enough to meet the limitation.  That is, even as an approximation, it would be impossible to determine whether an "adjusting" step claimed by the '654 Patent at Patent Claim 1 had been met.

258.    In particular, I note that Wi-LAN's infringement contentions allege that certain televisions subject to its accusations perform the 'adjusting step' and allegedly "substantially correct" for vertical offset.  *See, e.g.,* Final Infringement Contentions to SEC (served Oct. 2, 2017), at 182-185; Final Infringement Contentions to VIZIO 183-186

85

(served Oct. 2, 2017); *and see, e.g.,* WILAN_SEC_001096, at WILAN_SEC_001101; WILAN_SEC_005011, at WILAN_SEC_005018.  However, reviewing the same materials and purported test results, it is my opinion that not only is it impossible to determine that any adjustment has been performed "to largely or approximately correct for the vertical offset," it is in fact impossible to state that any adjustment has been performed at all.  My opinions regarding this matter as regards Wi-LAN's infringement contentions will be set forth in greater detail in my forthcoming Expert Report Regarding Non-Infringement.

259.     Suffice to say, Wi-LAN's continued allegations that the Accused Products meet this limitation (a perquisite to their ongoing allegation of infringement) demonstrates that no definite meaning for this term exists, even under the Court's saving construction of the term.

260.     As a result, it is my opinion that independent Claim 1 and all asserted claims depending upon it (*i.e.*, Claims 4 and 9) are invalid as indefinite under Section 112, paragraph 2.

### 3.     Anticipation of the Asserted Claims of the '654 Patent

261.     Based on Plaintiff's infringement contention, it is my opinion that the asserted claims 1, 4, and 9 of the '654 Patent are invalid under 35 U.S.C. § 102 because every element of the asserted claims can be found in the prior art, either expressly or inherently, as understood by a person having ordinary skill in the art.

262.     For example, the following prior art anticipates asserted claims of the '654 patent:

Exhibit 1: U.S. Patent No. 5,671,018 to Ohara et al.
Exhibit 2: U.S. Patent No. 5,181,110 to Katsumata et al.

Exhibit 3: U.S. Patent No. 6,166,773 to Greggain et al.

Exhibit 4: U.S. Patent No. 5,329,314 to Correa et al.

Exhibit 5: U.S. Patent No. 5,091,783 to Miyaguchi

Exhibit 6: EP 0539033 A1 to Nakanishi

Exhibit 7: U.S. Patent No. 5,633,687 to Bhayani et al.

263.    I incorporate Exhibits 1 through 7 into my report.  In addition to the discussion

below, Exhibits 1 through 7 provide my opinions about the anticipation of asserted claims

of the '654 Patent.

<div align="center">

**(a)     U.S. Patent No. 5,671,018 to Ohara et al. "*Ohara*"**

</div>

264.    U.S. Patent No. 5,671,018 was issued to Ohara et al. (WLPA00000001, "*Ohara*")

from an application filed on February 7, 1995.

265.    *Ohara* describes methods for scaling interlaced fields of video data. The patent

background section observes that scaling is conventionally performed only on single

fields, because motion between fields diminishes picture quality if fields are combined for

scaling. Ohara describes scaling using inter-field scaling when there is no motion between

fields, intra-field scaling when there is motion between fields, or a weighted combination

of both methods. Processing is performed on a pixel basis by calculating a measure of

movement. The invention explicitly addresses deinterlacing – see e.g., 2:41-44: "In

addition to these tasks, other tasks performed by processor system 13 could include

linearization (de-gamma) and de-interlacing to convert interlaced fields into display

frames." Ohara specifically discloses interpolation to perform the scaling operations,

including the bilinear and cubic methods (5:9), and explicitly discloses the adjustment of

the fields by a method similar to the "phases" of interpolation discussed by Felts in his

deposition. (*See* Fig. 6, 4:57-5:34). Ohara also discloses the use of a "double buffer"

memory where one buffer is used to capture a first frame, and another buffer is used to capture a second frame. (*See, e.g.*, 2:53-65).

266.    It is my opinion that *Ohara* discloses each and every element of asserted claims 1, 4, and 9 of the '654 Patent. The details of my opinion are found in Exhibit 1, which I incorporate here by reference.

(i)      **Claim 1 Preamble**

267.    It is my opinion that *Ohara* discloses "[a] method for displaying interlaced video data on a non-interlaced monitor, the interlaced video data comprising a plurality of paired fields, each pair of fields being vertically offset relative to each other by one-half of a field line spacing distance, each field comprising a plurality of lines of video data" as recited in claim 1. Ex. 1 at Claim 1, Preamble.

(ii)      **Claim 1, element (a):** capturing a first field and a second field of each pair of fields into respective buffers;

268.    It is my opinion that *Ohara* discloses "capturing a first field and a second field of each pair of fields into respective buffers" as recited in Claim 1. Ex. 1, at Claim 1, element (a).

(iii)      **Claim 1, element (b):** scaling each of the first field and second field of each pair of fields to fill vertical resolution of the non-interlaced monitor;

269.    It is my opinion that *Ohara* discloses "scaling each of the first field and second field of each pair of fields to fill vertical resolution of the non-interlaced monitor" as recited in Claim 1. Ex. 1, at Claim 1, element (b).

(iv)      **Claim 1, element (c)(1):** adjusting one of the first field or second field of the pair of fields to

88

substantially correct for the vertical offset between the pairs of fields;

270.     It is my opinion that *Ohara* discloses "adjusting one of the first field or second field of the pair of fields to substantially correct for the vertical offset between the pairs of fields" as recited in Claim 1.  Ex. 1, at Claim 1, element (c)(1).

> (v)     **Claim 1, element (c)(2):** where said adjusting is performed concurrently with said scaling;

271.     It is my opinion that *Ohara* discloses "where said adjusting is performed concurrently with said scaling" as recited in Claim 1.  Ex. 1, at Claim 1, element (c)(2).

> (vi)    **Claim 1, element (d):** displaying the first field of each pair of fields on the non-interlaced monitor in a first time period;

272.     It is my opinion that *Ohara* discloses "displaying the first field of each pair of fields on the non-interlaced monitor in a first time period" as recited in Claim 1.  Ex. 1, at Claim 1, element (d).

> (vii)   **Claim 1, element (e):** displaying the second field of each pair of fields on the non-interlaced monitor in a second time period subsequent to the first time period;

273.     It is my opinion that *Ohara* discloses "displaying the second field of each pair of fields on the non-interlaced monitor in a second time period subsequent to the first time period" as recited in Claim 1.  Ex. 1, at Claim 1, element (e).

> (viii)  **Claim 4:** wherein scaling is achieved by vertical interpolation between at least adjacent lines in the field being scaled;

274.     It is my opinion that *Ohara* discloses "wherein scaling is achieved by vertical interpolation between at least adjacent lines in the field being scaled" as recited in Claim 4.  Ex. 1, at Claim 4.

(ix)     **Claim 9:** wherein the adjusting step is achieved by vertical interpolation between at least adjacent lines in the field being adjusted.

275.   It is my opinion that *Ohara* discloses "wherein the adjusting step is achieved by vertical interpolation between at least adjacent lines in the field being adjusted" as recited in Claim 1.  Ex. 1, at Claim 9.

### (b)     U.S. Patent No. 5,181,110 to Katsumata et al. "*Katsumata*"

276.   U.S. Patent No. 5,181,110 to Katsumata et al. (WLPA00000387, "*Katsumata*") was issued on January 19, 1993 from an application filed on December 27, 1990, and claims priority as a continuation of Serial No. 343,495, filed April 25, 1989 and JP63-100328, filed April 25, 1988.

277.   *Katsumata* discloses enlarging and displaying an interlaced video signal. Also disclosed is generation of a progressive scan display from an interlaced signal. A received interlaced video signal is captured, field by field into respective buffers (3:51-52), The background section of Katsumata discloses problems with prior art including the "comb-tooth" artifact if lines of video from a previous field are used to form a current field. *Katsumata* discloses performing motion adaptive scanning line interpolation using data from multiple fields when there is no motion but using only data from the current field when motion exists. (4:52-65, Figs., 4B & 5B). *Katsumata* illustrates the correct vertical alignment of progressive-scan frames generated from odd and even fields. (See e.g., Fig. 5C). The enlarged area of the interlaced video will of course be generated from an area smaller than the full frame in *Katsumata*. The patent provides for that smaller area to be located anywhere in the input frame, which means the patent discloses use of a vertical

(and horizontal) offset (adjustment) of any number of lines (pixels). (See 9:34-38, Fig.
15C, 10:52-68 & Fig. 16).

278.    It is my opinion that *Katsumata* discloses each and every element of asserted
claims 1, 4, and 9 of the '654 Patent.  The details of my opinion are found in Exhibit 2,
which I incorporate here by reference.

<div align="center">(ii)    <b>Claim 1 Preamble</b></div>

279.    It is my opinion that *Katsumata* discloses "[a] method for displaying interlaced
video data on a non-interlaced monitor, the interlaced video data comprising a plurality of
paired fields, each pair of fields being vertically offset relative to each other by one-half of
a field line spacing distance, each field comprising a plurality of lines of video data" as
recited in claim 1.  Ex. 2, at Claim 1 Preamble.

> (iii)    **Claim 1, element (a):** capturing a first field and a
> second field of each pair of fields into respective
> buffers;

280.    It is my opinion that *Katsumata* discloses "capturing a first field and a second field
of each pair of fields into respective buffers" as recited in Claim 1.  Ex. 2, at Claim 1,
element (a).

> (iv)    **Claim 1, element (b): scaling each of the first field
> and second field of each pair of fields to fill
> vertical resolution of the non-interlaced monitor;**

281.    It is my opinion that *Katsumata* discloses "scaling each of the first field and
second field of each pair of fields to fill vertical resolution of the non-interlaced monitor"
as recited in Claim 1.  Ex. 2, at Claim 1, element (b).

> (v)    **Claim 1, element (c)(1):** adjusting one of the first
> field or second field of the pair of fields to

<div align="center">91</div>

> substantially correct for the vertical offset between the pairs of fields;

282.    It is my opinion that *Katsumata* discloses "adjusting one of the first field or second field of the pair of fields to substantially correct for the vertical offset between the pairs of fields" as recited in Claim 1.  Ex. 2, at Claim 1, element (c)(1).

> (vi)    **Claim 1, element (c)(2):** where said adjusting is performed concurrently with said scaling;

283.    It is my opinion that *Katsumata* discloses "where said adjusting is performed concurrently with said scaling" as recited in Claim 1.  Ex. 2, at Claim 1, element (c)(1).

> (vii)   **Claim 1, element (d):** displaying the first field of each pair of fields on the non-interlaced monitor in a first time period;

284.    It is my opinion that *Katsumata* discloses "displaying the first field of each pair of fields on the non-interlaced monitor in a first time period" as recited in Claim 1.  Ex. 2, at Claim 1, element (c)(2).

> (viii)  **Claim 1, element (e):** displaying the second field of each pair of fields on the non-interlaced monitor in a second time period subsequent to the first time period;

285.    It is my opinion that *Katsumata* discloses "displaying the second field of each pair of fields on the non-interlaced monitor in a second time period subsequent to the first time period" as recited in Claim 1.  Ex. 2, at Claim 1, element (e).

> (ix)    **Claim 4:** wherein scaling is achieved by vertical interpolation between at least adjacent lines in the field being scaled;

286.    It is my opinion that *Katsumata* discloses "wherein scaling is achieved by vertical interpolation between at least adjacent lines in the field being scaled" as recited in Claim 4.  Ex. 2, at Claim 4.

92

(x)  **Claim 9:** wherein the adjusting step is achieved by vertical interpolation between at least adjacent lines in the field being adjusted.

287.    It is my opinion that *Katsumata* discloses "wherein the adjusting step is achieved by vertical interpolation between at least adjacent lines in the field being adjusted" as recited in Claim 1.  Ex. 2, at Claim 9.

(c)  **U.S. Patent No. 6,166,773 to Greggain et al. "*Greggain*"**

288.    U.S. Patent No. 6,166,773 to Greggain et al. (WLPA00000622, "*Greggain*") issued from an application filed August 14, 1997 and claiming priority as a continuation of U.S. Application No. 08/555,288, filed November 8, 1995.

289.    *Greggain* concerns "converting interlaced video fields of arbitrary size to progressive scan format video frames of arbitrary size." (Abstract), i.e., *Greggain* identifies a problem with prior art deinterlacing and scaling that is limited to exactly doubling or quadrupling the number of lines. *Greggain* addresses the problem of outputting a deinterlaced signal with arbitrary size and arbitrary position. (See e.g., "The method and apparatus of the present invention de-interlaces video by properly interpolating and spatially positioning each input field line at the correct output progressive scan line position based on the relative size of the input and output video frames." 2:4-8). One of the Greggain patent's applications is computer monitors – the same as the '654 Patent: "computer video-in-a-window displays" 1:32.

290.    The two step process described in my 1984 paper is essentially followed by *Greggain*, who states:  "video de-interlacing is achieved in accordance with the present invention by continuously calculating the spatial position of the output lines and then mapping interlaced input fields to progressive scan output frames." 2:57-61. Naturally,

*Greggain* takes account of the different vertical positions of the odd and even fields. (See eqn. 1-2, and the remark: "It is important to note that only the first line of the even field (YO) maps to the first line of the even output frame (FO) and the last line of the odd field (Y7) maps to the last line of the odd output frame (F7)." 3:48-51). So Greggain performs the adjustment of one of the fields, scales the fields (in this example by a factor of two) and does so concurrently. The patent includes software listings, with comments that explicitly disclose the adjustment for offset between the two fields.

291.    It is my opinion that *Greggain* discloses each and every element of asserted claims 1, 4, and 9 of the '654 Patent.  The details of my opinion are found in Exhibit 3, which I incorporate here by reference.

### (ii)    **Claim 1 Preamble**

292.    It is my opinion that *Greggain* discloses "[a] method for displaying interlaced video data on a non-interlaced monitor, the interlaced video data comprising a plurality of paired fields, each pair of fields being vertically offset relative to each other by one-half of a field line spacing distance, each field comprising a plurality of lines of video data" as recited in claim 1.  Ex. 3 at Claim 1 Preamble.

> ### (iii)    **Claim 1, element (a):** capturing a first field and a second field of each pair of fields into respective buffers;

293.    It is my opinion that *Greggain* discloses "capturing a first field and a second field of each pair of fields into respective buffers" as recited in Claim 1.  Ex. 3, at Claim 1, element (a).

> (iv) **Claim 1, element (b): scaling each of the first field and second field of each pair of fields to fill vertical resolution of the non-interlaced monitor;**

294. It is my opinion that *Greggain* discloses "scaling each of the first field and second field of each pair of fields to fill vertical resolution of the non-interlaced monitor" as recited in Claim 1.  Ex. 3, at Claim 1, element (b).

> (v) **Claim 1, element (c)(1):** adjusting one of the first field or second field of the pair of fields to substantially correct for the vertical offset between the pairs of fields;

295. It is my opinion that *Greggain* discloses "adjusting one of the first field or second field of the pair of fields to substantially correct for the vertical offset between the pairs of fields" as recited in Claim 1.  Ex. 3, at Claim 1, element (c)(1).

> (vi) **Claim 1, element (c)(2):** where said adjusting is performed concurrently with said scaling;

296. It is my opinion that *Greggain* discloses "where said adjusting is performed concurrently with said scaling" as recited in Claim 1.  Ex. 3, at Claim 1, element (c)(2).

> (vii) **Claim 1, element (d):** displaying the first field of each pair of fields on the non-interlaced monitor in a first time period;

297. It is my opinion that *Greggain* discloses "displaying the first field of each pair of fields on the non-interlaced monitor in a first time period" as recited in Claim 1.  Ex. 3, at Claim 1, element (d).

> (viii) **Claim 1, element (e):** displaying the second field of each pair of fields on the non-interlaced monitor in a

95

second time period subsequent to the first time period;

298.     It is my opinion that *Greggain* discloses "displaying the second field of each pair of fields on the non-interlaced monitor in a second time period subsequent to the first time period" as recited in Claim 1.  Ex. 3, at Claim 1, element (e).

(ix)     **Claim 4:** wherein scaling is achieved by vertical interpolation between at least adjacent lines in the field being scaled;

299.     It is my opinion that *Greggain* discloses "wherein scaling is achieved by vertical interpolation between at least adjacent lines in the field being scaled" as recited in Claim 4.  Ex. 3, at Claim 4.

(x)     **Claim 9:** wherein the adjusting step is achieved by vertical interpolation between at least adjacent lines in the field being adjusted.

300.     It is my opinion that *Greggain* discloses "wherein the adjusting step is achieved by vertical interpolation between at least adjacent lines in the field being adjusted" as recited in Claim 1.  Ex. 3, at Claim 9.

**(d)     U.S. Patent No. 5,329,314 to Correa et al. "*Correa*"**

301.     U.S. Patent No. 5,329,314 was issued to Correa et al. (WLPA00000425, "*Correa*") from an application filed April 9, 1993, and claiming priority to DE 4211955 filed April 9, 1992.

302.     *Correa* addresses the problem of "conversion of video signals from an interlaced form to a non-interlaced or "progressive scan" form." (1:9-11). The state of the art for deinterlacing in 1992 is disclosed to "employ some form of spatial and/or temporal interpolation to obtain "extra" lines for display from the incoming video signal." With methods including "repeating lines" (*i.e.*, line doubling) and "vertical (spatial)

interpolation." (1:20-21). *Correa* also discloses prior art methods of motion-adaptive deinterlacing. The goal of *Correa* is to provide good quality deinterlacing at low complexity. To do so, Correa avoids the complexity of motion detection and provides for two median filters for each pixel to be interpolated. (*i.e*., the pixels in each line that is not present in a field. One median filter operates in the temporal direction while the other works in the vertical spatial direction. The system employs two field buffers, and performs both spatial and temporal interpolation. Figure 1 of *Correa* shows the progressive output pixels, and clearly the deinterlaced lines of pixels from the odd and even input fields are correctly aligned. Correa has thus performed the "adjusting" step.

303.    It is my opinion that *Correa* discloses each and every element of asserted claims 1, 4, and 9 of the '654 Patent.  The details of my opinion are found in Exhibit 4, which I incorporate here by reference.

<div align="center">

(ii)     **Claim 1 Preamble**

</div>

304.    It is my opinion that *Correa* discloses "[a] method for displaying interlaced video data on a non-interlaced monitor, the interlaced video data comprising a plurality of paired fields, each pair of fields being vertically offset relative to each other by one-half of a field line spacing distance, each field comprising a plurality of lines of video data" as recited in claim 1.  Ex. 4 at Claim 1 Preamble.

                        (iii)     **Claim 1, element (a):** capturing a first field and a second field of each pair of fields into respective buffers;

305.    It is my opinion that *Correa* discloses "capturing a first field and a second field of each pair of fields into respective buffers" as recited in Claim 1.  Ex. 4, at Claim 1, element (a).

<div align="center">

97

</div>

          (iv)     **Claim 1, element (b): scaling each of the first field and second field of each pair of fields to fill vertical resolution of the non-interlaced monitor;**

306.    It is my opinion that *Correa* discloses "scaling each of the first field and second field of each pair of fields to fill vertical resolution of the non-interlaced monitor" as recited in Claim 1. Ex. 4, at Claim 1, element (b).

          (v)     **Claim 1, element (c)(1):** adjusting one of the first field or second field of the pair of fields to substantially correct for the vertical offset between the pairs of fields;

307.    It is my opinion that *Correa* discloses "adjusting one of the first field or second field of the pair of fields to substantially correct for the vertical offset between the pairs of fields" as recited in Claim 1. Ex. 4, at Claim 1, element (c)(1).

          (vi)     **Claim 1, element (c)(2):** where said adjusting is performed concurrently with said scaling;

308.    It is my opinion that *Correa* discloses "where said adjusting is performed concurrently with said scaling" as recited in Claim 1. Ex. 4, at Claim 1, element (c)(2).

          (vii)     **Claim 1, element (d):** displaying the first field of each pair of fields on the non-interlaced monitor in a first time period;

309.    It is my opinion that *Correa* discloses "displaying the first field of each pair of fields on the non-interlaced monitor in a first time period" as recited in Claim 1. Ex. 4, at Claim 1, element (d).

          (viii)     **Claim 1, element (e):** displaying the second field of each pair of fields on the non-interlaced monitor in a

second time period subsequent to the first time period;

310.     It is my opinion that *Correa* discloses "displaying the second field of each pair of fields on the non-interlaced monitor in a second time period subsequent to the first time period" as recited in Claim 1.  Ex. 4, at Claim 1, element (e).

          (ix)    **Claim 4:** wherein scaling is achieved by vertical interpolation between at least adjacent lines in the field being scaled;

311.     It is my opinion that *Correa* discloses "wherein scaling is achieved by vertical interpolation between at least adjacent lines in the field being scaled" as recited in Claim 4.  Ex. 4, at Claim 4.

          (x)    **Claim 9:** wherein the adjusting step is achieved by vertical interpolation between at least adjacent lines in the field being adjusted.

312.     It is my opinion that *Correa* discloses "wherein the adjusting step is achieved by vertical interpolation between at least adjacent lines in the field being adjusted" as recited in Claim 1.  Ex. 4, at Claim 9.

      **(e)**    **U.S. Patent No. 5,091,783 to Miyaguchi "*Miyaguchi*"**

313.     U.S. Patent No. 5,091,783 was issued to Miyaguchi et al. (WLPA00000324, "*Miyaguchi*") from an application filed March 1, 1990.

314.     *Miyaguchi* discusses limitations of traditional analog TV and focuses on maximizing reproduced video quality within the bounds of the existing TV transmission standards. "Because existing transmission standards are deeply entrenched and difficult to change, one approach would be to re-design television receivers to improve the display produced by standard signal transmissions. This approach is referred to as improved definition television (lDTV). (1:51-56). One enhancement is "non-interlacing," i.e.,

deinterlacing. (1:58-59). The patent discloses use of digital signal processing techniques to accomplish this goal. The digital processors are supported by field memories: "A plurality of field memories for providing data samples representing delayed fields of said television picture to the processor." (2:25-28; see also 9:38-55). The *Miyaguchi* patent discloses a "SIMD" processor called SVP that can process all the pixels in a line of an image/frame in parallel and can process a line of video in realtime. Vertical timing is accurate to one line, so the SVP can accurately process interlaced video fields. "Vertical timing generator 51*b* provides control codes to horizontal timing generator 51*c*, constant generator 51*d,* and instruction generator 52. It provides timing to external circuits requiring a timing resolution of one horizontal line." (8:20-24). *Miyaguchi* explicitly acknowledges the vertical offset between fields, and accounts for it in the enhancement processing for "Non-Interlacing": " As well as being temporally spaced, due to the 2: ı interlacing of standard television transmission signals, the images are also offset in the vertical direction by ½ line." (16:61-64). This is illustrated in Fig. 11, and further explained for composite video signals and component video signals in the Miyaguchi specification. (See e.g., 17:1-26 and Fig. 18, 19:6-21, 20:6-20). Miyaguchi discloses scaling, which is referred to as doubling the data rate. Also see e.g., 20:35-53 and Fig. 20.

315.    It is my opinion that *Miyaguchi* discloses each and every element of asserted claims 1, 4, and 9 of the '654 Patent.  The details of my opinion are found in Exhibit 5, which I incorporate here by reference.

### (ii)    Claim 1 Preamble

316.    It is my opinion that *Miyaguchi* discloses "[a] method for displaying interlaced video data on a non-interlaced monitor, the interlaced video data comprising a plurality of

paired fields, each pair of fields being vertically offset relative to each other by one-half of a field line spacing distance, each field comprising a plurality of lines of video data" as recited in claim 1.  Ex. 5 at Claim 1 Preamble.

          (iii)     **Claim 1, element (a):** capturing a first field and a second field of each pair of fields into respective buffers;

317.    It is my opinion that *Miyaguchi* discloses "capturing a first field and a second field of each pair of fields into respective buffers" as recited in Claim 1.  Ex. 5, at Claim 1, element (a).

          (iv)     **Claim 1, element (b): scaling each of the first field and second field of each pair of fields to fill vertical resolution of the non-interlaced monitor;**

318.    It is my opinion that *Miyaguchi* discloses "scaling each of the first field and second field of each pair of fields to fill vertical resolution of the non-interlaced monitor" as recited in Claim 1.  Ex. 5, at Claim 1, element (b).

          (v)     **Claim 1, element (c)(1):** adjusting one of the first field or second field of the pair of fields to substantially correct for the vertical offset between the pairs of fields;

319.    It is my opinion that *Miyaguchi* discloses "adjusting one of the first field or second field of the pair of fields to substantially correct for the vertical offset between the pairs of fields" as recited in Claim 1.  Ex. 5, at Claim 1, element (c)(1).

          (vi)     **Claim 1, element (c)(2):** where said adjusting is performed concurrently with said scaling;

320.    It is my opinion that *Miyaguchi* discloses "where said adjusting is performed concurrently with said scaling" as recited in Claim 1.  Ex. 5, at Claim 1, element (c)(2).

(vii)   **Claim 1, element (d):** displaying the first field of each pair of fields on the non-interlaced monitor in a first time period;

321.    It is my opinion that *Miyaguchi* discloses "displaying the first field of each pair of fields on the non-interlaced monitor in a first time period" as recited in Claim 1.  Ex. 5, at Claim 1, element (d).

(viii)  **Claim 1, element (e):** displaying the second field of each pair of fields on the non-interlaced monitor in a second time period subsequent to the first time period;

322.    It is my opinion that *Miyaguchi* discloses "displaying the second field of each pair of fields on the non-interlaced monitor in a second time period subsequent to the first time period" as recited in Claim 1.  Ex. 5, at Claim 1, element (e).

(ix)    **Claim 4:** wherein scaling is achieved by vertical interpolation between at least adjacent lines in the field being scaled;

323.    It is my opinion that *Miyaguchi* discloses "wherein scaling is achieved by vertical interpolation between at least adjacent lines in the field being scaled" as recited in Claim 4.  Ex. 5, at Claim 4.

(x)     **Claim 9:** wherein the adjusting step is achieved by vertical interpolation between at least adjacent lines in the field being adjusted.

324.    It is my opinion that *Miyaguchi* discloses "wherein the adjusting step is achieved by vertical interpolation between at least adjacent lines in the field being adjusted" as recited in Claim 1.  Ex. 5, at Claim 9.

**(f)** **EP 0539033 A1 to Nakanishi "*Nakanishi*"**

325.    European Patent Application EP 0539033 A1 to Nakanishi et al. (WLPA00000009, "*Nakanishi*") was published on April 28, 1993 from an application filed on September 25, 1992 and claiming priority to September 25, 1991.

326.    *Nakanishi* addresses the problem of displaying an interlaced video signal with a larger number of lines – such as 625-line PAL – on a display screen with fewer lines – such as a 525-line NTSC TV without cropping. The patent further discloses "non-interlacing" methods, i.e., deinterlacing methods in numerous embodiments, by a variety of methods. The patent discloses known methods for non-interlacing, (See e.g., 1:51-54: "method of converting non-interlacing method, 1. the field interpolating method of using field memory, and 2. the line interpolating method of using line memory are known.") and provides a motivation to do so even in 1991 for LCD displays. (1:47-51). The known methods capture the interlaced fields into separate field memories, see Figs. 5(1) and 5(2), and deinterlace the fields using the field interpolation method for display on a progressive scan LCD display device see Fig. 6. The line interpolating method is shown in Fig. 7. This method is also referred to by *Nakanishi* as the "double speed of writing" method or "double speed conversion." *Nakanishi* provides examples of this method in Figs. 8 and 9, in which the adjustment of one of the fields is clearly evident: See 2:9-21 including, "as shown in FIGS. 8(1)-(2), … in the first field, data of line m are displayed [i]n line k and line k +1, and in the second field, data of line in are displayed in line k+1 and line k+2." and "as shown in FIG. 9, data of lines m to m+5 are displayed in lines k to k+11, and data of lines n to n+5 are displayed in lines k+1 to k+12." In *Nakanishi*, for example, a PAL signal may be displayed on a 640x480 LCD display by "thinning" lines of the PAL signal.

One line in every group of lines is not displayed with a size of the group being chosen to match the "thinned" number of lines to the screen resolution. The patent described several possible implementations, including not writing the thinned lines into the field buffers, or not reading the thinned lines from the field buffers. However, for the case of deinterlacing the fields for progressive-scan display, *Nakanishi* notes that each field must be scaled for display, and discloses a method of line doubling by reading each line twice at double speed, except to accomplish thinning of excess lines, one line in each group of lines can be read only once. This provides a more subtle thinning process and again the size of the group can be chosen to thin the number of display lines to match the display screen. To avoid flicker, *Nakanishi* synchronizes the thinning between fields. (See 7:7-18).

327.    It is my opinion that *Nakanishi* discloses each and every element of asserted claims 1, 4, and 9 of the '654 Patent.  The details of my opinion are found in Exhibit 6, which I incorporate here by reference.

<div align="center">

(ii)    **Claim 1 Preamble**

</div>

328.    It is my opinion that *Nakanishi* discloses "[a] method for displaying interlaced video data on a non-interlaced monitor, the interlaced video data comprising a plurality of paired fields, each pair of fields being vertically offset relative to each other by one-half of a field line spacing distance, each field comprising a plurality of lines of video data" as recited in claim 1.  Ex. 6 at Claim 1 Preamble.

        (iii)    **Claim 1, element (a):** capturing a first field and a second field of each pair of fields into respective buffers;

329.    It is my opinion that *Nakanishi* discloses "capturing a first field and a second field of each pair of fields into respective buffers" as recited in Claim 1.  Ex. 6, at Claim 1, element (a).

        (iv)    **Claim 1, element (b):** scaling each of the first field and second field of each pair of fields to fill vertical resolution of the non-interlaced monitor;

330.    It is my opinion that *Nakanishi* discloses "scaling each of the first field and second field of each pair of fields to fill vertical resolution of the non-interlaced monitor" as recited in Claim 1.  Ex. 6, at Claim 1, element (b).

        (v)    **Claim 1, element (c)(1):** adjusting one of the first field or second field of the pair of fields to substantially correct for the vertical offset between the pairs of fields;

331.    It is my opinion that *Nakanishi* discloses "adjusting one of the first field or second field of the pair of fields to substantially correct for the vertical offset between the pairs of fields" as recited in Claim 1.  Ex. 6, at Claim 1, element (c)(1).

        (vi)    **Claim 1, element (c)(2):** where said adjusting is performed concurrently with said scaling;

332.    It is my opinion that *Nakanishi* discloses "where said adjusting is performed concurrently with said scaling" as recited in Claim 1.  Ex. 6, at Claim 1, element (c)(2).

        (vii)    **Claim 1, element (d):** displaying the first field of each pair of fields on the non-interlaced monitor in a first time period;

333.    It is my opinion that *Nakanishi* discloses "displaying the first field of each pair of fields on the non-interlaced monitor in a first time period" as recited in Claim 1.  Ex. 6, at Claim 1, element (d).

(viii)   **Claim 1, element (e):** displaying the second field of each pair of fields on the non-interlaced monitor in a second time period subsequent to the first time period;

334.   It is my opinion that *Nakanishi* discloses "displaying the second field of each pair of fields on the non-interlaced monitor in a second time period subsequent to the first time period" as recited in Claim 1.  Ex. 6, at Claim 1, element (e).

(ix)   **Claim 4:** wherein scaling is achieved by vertical interpolation between at least adjacent lines in the field being scaled;

335.   It is my opinion that *Nakanishi* discloses "wherein scaling is achieved by vertical interpolation between at least adjacent lines in the field being scaled" as recited in Claim 4.  Ex. 6, at Claim 4.

(x)   **Claim 9:** wherein the adjusting step is achieved by vertical interpolation between at least adjacent lines in the field being adjusted.

336.   It is my opinion that *Nakanishi* discloses "wherein the adjusting step is achieved by vertical interpolation between at least adjacent lines in the field being adjusted" as recited in Claim 1.  Ex. 6, at Claim 9.

**(g)   U.S. Patent No. 5,633,687 to Bhayani et al. "*Bhayani*"**

337.   U.S. Patent No. 5,633,687 to Bhayani et al. WLPA00000536, "*Bhayani*") was issued from an application filed October 23, 1995.

338.   *Bhayani* addresses the problem of displaying interlaced video data on a non-interlaced display, and discloses a method of suppressing interlace artifacts by upscaling fields of interlaced video data and filling in the missing lines with a uniform mid-grey color. Explicitly disclosed is the vertical adjustment of one of the fields: "The method and system further includes shifting the location of the constant signal levels lines by a scan

106

line responsive to a timing signal from the display, and providing the other of the odd and the even field to the display responsive to the shift." (Abstract). Bhayani addresses a problem similar to those described in the '654 Patent – display of interlaced video on a computer monitor: "Computers are being utilized extensively that have a video viewing capability. In most instances. as is well known. these video images are interlaced and the graphics displays associated with such computers are noninterlaced."  (1:11-14). Bhayani discloses the technique may be used on a full screen display and also on a "freely scalable video window" (See e.g., 3:19). An implementation of Bhayani is shown in Fig. 5.The system includes capturing the fields of interlaced video into buffer memory; logic controls independent horizontal and vertical zoom (i.e., scaling) for display in an arbitrary size window. The patent specification specifically discloses adjusting the field according to whether it is odd or even as follows: "A key element is at the end of each display frame period, the overlay control provides a switching signal to then cause the pseudo field signal to be switched resulting in shifting up or down by one scan line the location where video data is displayed and location where constant level signal is displayed." (5:66-6:3).

339.    It is my opinion that *Bhayani* discloses each and every element of asserted claims 1, 4, and 9 of the '654 Patent.  The details of my opinion are found in Exhibit 7, which I incorporate here by reference.

<div align="center">(ii)    <b>Claim 1 Preamble</b></div>

340.    It is my opinion that *Bhayani* discloses "[a] method for displaying interlaced video data on a non-interlaced monitor, the interlaced video data comprising a plurality of paired fields, each pair of fields being vertically offset relative to each other by one-half of a field

line spacing distance, each field comprising a plurality of lines of video data" as recited in

claim 1.  Ex. 7 at Claim 1 Preamble.

> (iii)    **Claim 1, element (a):** capturing a first field and a second field of each pair of fields into respective buffers;

341.    It is my opinion that *Bhayani* discloses "capturing a first field and a second field of

each pair of fields into respective buffers" as recited in Claim 1.  Ex. 7, at Claim 1,

element (a).

> (iv)    **Claim 1, element (b): scaling each of the first field and second field of each pair of fields to fill vertical resolution of the non-interlaced monitor;**

342.    It is my opinion that *Bhayani* discloses "scaling each of the first field and second

field of each pair of fields to fill vertical resolution of the non-interlaced monitor" as

recited in Claim 1.  Ex. 7, at Claim 1, element (b).

> (v)    **Claim 1, element (c)(1):** adjusting one of the first field or second field of the pair of fields to substantially correct for the vertical offset between the pairs of fields;

343.    It is my opinion that *Bhayani* discloses "adjusting one of the first field or second

field of the pair of fields to substantially correct for the vertical offset between the pairs of

fields" as recited in Claim 1.  Ex. 7, at Claim 1, element (c)(1).

> (vi)    **Claim 1, element (c)(2):** where said adjusting is performed concurrently with said scaling;

344.    It is my opinion that *Bhayani* discloses "where said adjusting is performed

concurrently with said scaling" as recited in Claim 1.  Ex. 7, at Claim 1, element (c)(2).

> (vii)   **Claim 1, element (d):** displaying the first field of each pair of fields on the non-interlaced monitor in a first time period;

345.    It is my opinion that *Bhayani* discloses "displaying the first field of each pair of fields on the non-interlaced monitor in a first time period" as recited in Claim 1.  Ex. 7, at Claim 1, element (d).

> (viii)   **Claim 1, element (e):** displaying the second field of each pair of fields on the non-interlaced monitor in a second time period subsequent to the first time period;

346.    It is my opinion that *Bhayani* discloses "displaying the second field of each pair of fields on the non-interlaced monitor in a second time period subsequent to the first time period" as recited in Claim 1.  Ex. 7, at Claim 1, element (e).

> (ix)   **Claim 4:** wherein scaling is achieved by vertical interpolation between at least adjacent lines in the field being scaled;

347.    It is my opinion that *Bhayani* discloses "wherein scaling is achieved by vertical interpolation between at least adjacent lines in the field being scaled" as recited in Claim 4.  Ex. 7, at Claim 4.

> (x)   **Claim 9:** wherein the adjusting step is achieved by vertical interpolation between at least adjacent lines in the field being adjusted.

348.    It is my opinion that *Bhayani* discloses "wherein the adjusting step is achieved by vertical interpolation between at least adjacent lines in the field being adjusted" as recited in Claim 1.  Ex. 7, at Claim 9.

#### 4.    Obviousness of the '654 Patent

349.    In addition to the above-described patents and publications, which I discuss in additional detail in Exhibits 1 through 7, it is my opinion that it would have been obvious

for one of ordinary skill in the art, prior to filing the '654 application, to combine one or more of the above-described references with knowledge of one of ordinary skill in the art in a manner that would make obvious claims 1, 4, and 9 of the '654 Patent.

350.    The obviousness of the asserted claims of the '654 Patent was confirmed by Wi-LAN's own expert. Wi-LAN's expert confirmed that as of 1996, systems that used interlaced video and non-interlaced video were well-known in the art. Tanner Tr. at 86-89. 124 (admitting that the Claim 1 preamble was well-known to one of ordinary skill in the art). Non-interlaced video was common in computer displays, and the inventors were motivated to take interlaced video and deinterlace it so that it could appear on computer monitors.  Tanner Tr. at 88. Wi-LAN's expert also admitted that vertical interpolation was a well-known prior art technique, and, for instance, that "you can do a lot of things with a vertical interpolator." Tanner Tr. at 208-09, 252-253, 274-277.  Wi-LAN's expert admitted that "one would understand it's a [] tiny, tiny leap to say I have a missing line, but I have no second input for [] the interpolator, and I can create that." Tanner Tr. at 252-253, 259-265 ("it's an amazingly short leap to understand how you could create that top line.").

351.    Modifying the references described above by combining with teachings of one or more other references discussed in Exhibits 1 through 7 (which are incorporated by reference) would have been obvious, including because the benefits with the techniques and technologies described were well-known in the art.  In addition to the discussion below, which is incorporated by reference into each of Exhibits 1 through 7, I present my additional opinions regarding each of the above-described references in the respective Exhibits.

(a)     The Teachings of *Keith Jack* Support the Obviousness of the
        '654 Patent

        (i)     **Claim 1, element (a):** capturing a first field and a
        second field of each pair of fields into respective
        buffers;

352.    It would have been obvious to persons having skill in the art to capture a first field

and second field of each pair of fields into respective buffers, including because the

benefits associated with double buffering were well-known in the art.  For example, the

Description of the '654 Patent admits that a motivation existed in the art to use two buffers

to receive input signals - namely that the problem of "tearing" could be avoided.

> The multiple buffering is to ensure that a video buffer is
> not being updated while it is being displayed, to avoid
> "tearing" (a horizontal discontinuity in the displayed data
> caused by the simultaneous display of part of one field and
> part of the following field)—a technique commonly known
> in the art and discussed in Keith Jack (see pages 358–359).

'654 Patent, at 4:58-63.

353.    *Keith Jack* discusses the motivation to use multiple buffers extensively. For

example, *Keith Jack* details both the cause of video artifacts caused by use of a single

buffer ("It is due to the updating of video frame buffers not being synchronized to the

graphics display") and a known solution (use of two buffers):

> Tearing occurs when a video picture is not from a single video frame, but rather is a portion of two separate frames. It is due to the updating of the video frame buffers not being synchronized to the graphics display. As a result, a video picture may not be from a single video frame, but rather a portion of two separate frames. Switching between the video frame buffers must be done during the display vertical retrace interval only after the video frame buffer that is to be used to drive the display has been completely updated with new video information.

*Keith Jack*, at 14.

354.    *Keith Jack* goes on to explain that not only was the problem of 'tearing' known in the art, it was a concern addressed by "most systems" and had a known solution: "us[ing] multiple video frame stores":

> As a result, when displaying live video on the computer monitor, most systems currently do not compensate for the frame-rate differences other than attempting to ensure "tearing" does

> not frequently occur (see Chapter 2 for additional system-level discussions on frame-rate conversion). To ensure "tearing" does not occur, some high-end systems use multiple video frame stores. Note that processing must be performed on component (i.e., RGB, YUV, YIQ, YCrCb, etc.) video signals. Composite color video signals cannot be processed directly due to the subcarrier phase information present (which would be meaningless after processing).

*Id.* at 358-359.

355.    Capturing a first field and a second field of each pair of fields into respective buffers would have yielded known benefits, including as described in *Keith Jack* and admitted by the Description and Background of the '654 Patent itself.

112

356.     A motivation to avoid tearing through use of two buffers ("double buffering") was therefore known in the art, including because employing this technique would prevent "tearing" artifacts and result in a "higher-end" (or higher-quality) system.  *Keith Jack* at 358-359.  Indeed, implementing use of two buffers was a technique "commonly known in the art" as conceded by the '654 Patent and as reflected in *Keith Jack*.  *See generally* '654 Patent, at 4:58-4:63; *and also see Keith Jack* at 412 (defining "Double Buffering" and explaining solution).

357.     In addition, it would have been obvious to capture a first field and second field of each pair of fields into respective buffers because there were only a finite number of predictable solutions, because known work in the field prompted variations based on predictable design incentives, or in light of market forces either in the field or analogous and related fields would have suggested the combination.  Indeed, the combination or utilization of this technique would have been obvious because such a combination represents known potential options with a reasonable expectation of success.  No technical barrier would have prevented the incorporation of respective buffers to capture a first field and second field of each pair of fields, no unexpected results would have arisen, and no undue experimentation would have been required.  These techniques were well known in the art (*see Keith Jack*) so their implementation would have been well within the skill of a person of ordinary skill in the art.

358.     Consequently, it is my opinion that a person of skill would have been motivated to and capable of combining or modifying techniques and systems to capture a first field and second field of each pair of fields into respective buffers.

113

> (ii)  **Claim 1, element (b): scaling each of the first field and second field of each pair of fields to fill vertical resolution of the non-interlaced monitor;**

359.   It would have been obvious to a person having skill in the art to scale each of the first field and second field of each pair of fields to fill vertical resolution of the non-interlaced monitor, including because the because the benefits of "scal[ing] (interpolat[ing])" the number of scan lines "up to … however many [scan lines] are in the current display mode" were known in the art, consistent with Wi-LAN's allegations regarding this element.  *See* Final Infringement Contentions, at [SEC] 95 and [VIZIO] 96.

360.   Scaling by interpolation to fill a display, consistent with Wi-LAN's allegations regarding this element, was known method in the art, as described by *Keith Jack*:

> Until now there have been two commonly used simple methods for displaying interlaced video being fed into the computer system on a computer monitor. These are normally independent of whether the computer monitor is interlaced or not, as even when the monitor is interlaced it normally refreshes at a rate independent of the incoming video signal.
>
> Throughout this description NTSC video is assumed for the sake of illustrative examples, with references to 240 line fields, 480 line frames, 60 fields per second and 30 frames per second. This does not restrict the invention to NTSC or the line counts or frame or field rates but is merely used for simplicity. The invention is equally applicable to other video standards such as, but not limited to, PAL with 288 line fields, 576 line frames, 50 fields per second and 25 frames per second.
>
> The first method is just capturing one of the two fields, and displaying 240 lines scaled (interpolated) up to 480 or however many are in the current display mode. The special case of scaling to 480 lines (line doubling) is currently used in the art and is well documented. See pages 332–333 of "Video Demystified: a Handbook for the Digital Engineers" by Keith Jack, HighText Publication Inc., 1993 (referred to herein as "Keith Jack").
>
> The second method is to perform simple de-interlacing where both fields are captured into a single 480 line buffer and double the buffer line length for a single field in order to store a field in every other line. This is referred to as "Field Merging" (see p. 333 of Keith Jack)

'654 Patent, at 1:18-46; *and see, e.g.,* Final Infringement Contentions, at [SEC] 83, 95, and [VIZIO] 84, 96.

361.   *Keith Jack* identifies and describes techniques known in the art for performing an interlaced to non-interlaced conversion.  *Keith Jack*, at 332 (scan line duplication), 333 (scan line interpolation), and 333-335 (field merging); *and see id.* at 334, at Figures 9.3, 9.4, and 9.5:



Figure 9.3. Deinterlacing using Scan Line (Field-based) Duplication. Shaded scan lines are generated by duplicating the real scan line above it.

Figure 9.4. Deinterlacing using Scan Line (Field-based) Interpolation. Shaded scan lines are generated by interpolating between the real scan lines above and below it.



Figure 9.5. Deinterlacing using Field Merging. Shaded scan lines are generated by using the real scan line from the next or previous field.

362.   As illustrated in Figures 9.3, 9.4, and 9.5, *Keith Jack* demonstrates that persons of ordinary skill knew of and used various techniques known in the art to generate additional

115

scan lines from an input field to create an output frame that is scaled to fill vertical resolution of the non-interlaced monitor, consistent with Wi-LAN's allegations regarding this element.  *And see, e.g.,* Final Infringement Contentions, at [SEC] 83, 95, and [VIZIO] 84, 96.

*363.*    A person of skill would have been motivated to perform any such video processing on "each pair of fields to fill vertical resolution of the non-interlaced monitor," consistent with Wi-LAN's allegations regarding this element, and indeed there is no reason that any person of skill would have failed to do so.  *See, e.g.,* Final Infringement Contentions, at [SEC] 83, 95, and [VIZIO] 84, 96.  Persons of skill in the art at the time of the claimed invention understood that a higher frame rate resulted in a higher quality video, including with less flicker:

| PAL | PAL stands for Phase Alternation Line. PAL is to Europe as NTSC is to North America. In other words, PAL is the video standard used in Europe and a few other countries. There are a few differences. PAL uses 625 lines per frame while NTSC has 525 lines. Therefore, PAL has higher vertical resolution. The frame rate of NTSC is 30 frames per second while for PAL it is 25. This means the update rate for NTSC is higher and therefore there is more flicker with PAL. PAL uses the YUV color space while NTSC uses YIQ or YUV. That's no big deal, just a little mathematical difference. It is becoming increasingly important for imaging systems suppliers to produce equipment that can be sold worldwide without many manufacturing difficulties. This implies that the equipment must be designed from the start to accommodate both standards. |
|---|---|

*Keith Jack*, at 422.  *Keith Jack* also informs that persons of skill in the art knew of and applied techniques to convert and increase the frame-rate of a video in order to match the refresh rate of a display, again improving quality so that a video "[could] be shown correctly on a computer display."  *E.g., Keith Jack*, at 414:

| Frame Rate Conversion | Frame rate conversion is the act of converting one frame rate to another. One real example that poses a difficult problem is that the frame rate of NTSC, 30 frames per second, is different from a typical computer's display, which may be anywhere from 70 to 75 frames per second (or Hz if you prefer). Therefore, some frame-rate conversion process must be performed before NTSC video can be shown correctly on a computer display. Without frame rate conversion, the screen might look as if it "stalls" every now and then. If there is motion within the video, the objects that are moving might appear cut in half. |

*364.*    *Keith Jack* additionally informs that there were specific techniques that persons of skill in the art knew and were capable of applying to preserve the frame rate of video during a deinterlacing process.  *E.g.*, *Keith Jack*, at 333-334.  For example, in order to preserve the number of video images displayed per second when using field merging to deinterlace input frames, *Keith Jack* teaches that alternating sets of fields can be merged and display resulting fields matching the field rate:



**Figure 9.6. Producing Deinterlaced Frames at Field Rates.**

*Keith Jack*, at 334, Fig. 9.6.  A person of skill in the art at the time would have consequently known that discarding one of the two fields of every pair of fields would have caused a lower frame rate resulting in lower video quality.

*365.*    Benjamin Felts, named as an inventor on the '654 Patent, also gave sworn testimony that performing interpolation only one of the two fields would result in visual

artifacts in the form of "jitter or flickering on -- particularly noticeable on sharp transitions in the image data":

```
23          Q.   And what might be the disadvantages of that
24     system?

 1              THE WITNESS:  One disadvantage is that you
 2     are applying what is equivalent to a low-pass filter on
 3     one of the frames and not on the other.  So your -- in
 4     the frequency domain, your -- the amplitude of certain
 5     frequencies will be more attenuated in one of those
 6     frames versus the other.  Visually, that results in
 7     certain -- a little bit of jitter or flickering on --
 8     particularly noticeable on sharp transitions in the
 9     image data.
```

April 18, 2018 Deposition of Benjamin Felts, at 188; *and see id.* at 187 (introductory questions regarding a product "that applies interpolation or the adjusting step ... to only one of [the] fields.").

366.   As described in Mr. Felts' testimony, the visual artifacts resulting from interpolating only one of the fields of each first field and second field of each pair of fields to fill vertical resolution of the non-interlaced monitor would have been visible to one of ordinary skill in the art, who would have been motivated by these artifacts to seek out ways to prevent the artifacts and improve the video signal.  Thus, a person of skill at the time of the invention understood that either discarding one of the two fields or performing interpolation on only one of the fields both would have resulted in degraded video quality (by lowering frame rate or resulting in 'jitter or flittering,' respectively) and been motivated to improve the video quality as a result.  Scaling each of the first field and second field of each pair of fields to fill vertical resolution of the non-interlaced monitor

would have yielded known benefits, including as described in *Keith Jack*.  Consequently, rather than merely displaying "one of the two fields… scaled (interpolated) up to … however many [lines] are in the current display mode" – a misunderstanding of the teachings of *Keith Jack*[10] – a person of ordinary skill would have been motivated to apply known techniques to preserve or improve the quality of a deinterlaced video, including by performing the same scaling process on "each of the first field and second field of each pair of fields." '654 Patent, at Claim 1, element (b).

367.    A person of skill in the art would have understood the benefits of employing other scaling techniques known in the art, including because it would permit the display of video signals of different standards and resolutions of arbitrary size on display monitors and add versatility to the system.  Thus, a person of ordinary skill in the art would have had a motivation to scale each of the first field and second field of each pair of fields to fill vertical resolution of the non-interlaced monitor.

368.    In addition, it would have been obvious to try combining or modifying known techniques by scaling each of the first field and second fields because there were only a finite number of predictable solutions, because known work in the field prompted variations based on predictable design incentives, or in light of market forces either in the field or analogous and related fields would have suggested the combination.  Indeed, the combination or utilization of this technique would have been obvious because the

---

[10]       The '654 Patent states that one method of deinterlacing video known in the art before the purported invention "is just capturing one of the two fields and displaying [the field's lines] *scaled* (interpolated) up to … however many [lines] are in the current display mode." '654 Patent, at 1:34-36, but *Keith Jack* does not state this.  *Keith Jack* instead illustrates the approach with one field, and one of ordinary skill in the art knew long before the time of the alleged invention that this approach was to be applied to both fields.  *See, e.g., Keith Jack*, at 333.

combination represents known potential options with a reasonable expectation of success. No technical barrier would have prevented the implementation of scaling each of the first field and second fields of a pair of fields to fill vertical resolution of a non-interlaced monitor, as recited in claim 1. No unexpected results would have arisen and no undue experimentation would have been required. Moreover, such techniques were well known in the art (*see Keith Jack* and admissions in the Background of the '654 Patent) so their implementation would have been well within the skill of a person of ordinary skill in the art.

369.     Consequently, it is my opinion that a person of skill would have been motivated to and capable of combining or modifying techniques and systems to scale each of the first field and second field of each pair of fields to fill vertical resolution of the non-interlaced monitor.

> (iii)     **Claim 1, element (c)(1):** adjusting one of the first field or second field of the pair of fields to substantially correct for the vertical offset between the pairs of fields;

370.     It would have been obvious to a person having ordinary skill in the art to adjust one of the first field or second field of the pair of fields to substantially correct for the vertical offset between the pairs of fields, including at least because motivations and techniques existed in the art prior to the claimed invention to eliminate any visual artifacts that would be caused by such a vertical offset (including vertical offsets created by the mishandling of video data).

371.     For example, *Keith Jack* confirms that practitioners were mindful of the visual artifacts caused by a vertical offset between fields while working with interlaced video signals, and knew and took care to apply video processing techniques that would result in

the correct spatial positioning of video scan lines. *Keith Jack*, at 335. In fact, *Keith Jack* confirms that persons of skill in the art knew that video processing to correct for vertical offset *was required* if a deinterlacing technique did not inherently result in correct spatial positioning of the scan lines:

> The best vertical frequency response is obtained when field merging is implemented. The spatial position of the lines are already correct and no vertical processing is required, resulting in a flat curve (Line C). Once again, this applies only for stationary areas of the image.

*Id.*

372.    *Keith Jack* further demonstrates that practitioners applied techniques known in the art to ensure the preservation and generation of the correct vertical spatial position of scan lines, including when using deinterlacing techniques to convert an interlaced video signal field into a non-interlaced frame, consistent with Wi-LAN's allegations regarding this element. *See, e.g.,* Final Infringement Contentions, at [SEC] 126 and [VIZIO] 127. For example, Figure 9.4 of *Keith Jack* illustrates that input field lines 1, 2, 3, and 4 (indicated with red, below) are output at the correct vertical spatial positioning in the deinterlaced output as frame lines 1, 3, 5, and 7 (indicated with orange, below), with additional lines generated by interpolation at positions corresponding to the even field at lines 2, 4, 6, and 8 (indicated with green, below):

121



**Figure 9.4. Deinterlacing using Scan Line (Field-based) Interpolation. Shaded scan lines are generated by interpolating between the real scan lines above and below it.**

*Keith Jack*, at Fig. 9.4.

373.   *Keith Jack* demonstrates that practitioners knew to use various techniques known in the art to affect an adjustment of vertical offset.  Adjusting one of the first field or second field of the pair of fields in an interlaced video signal to substantially correct for any vertical offset between the pairs of fields would have yielded known benefits, including as described in *Keith Jack*.

374.   Thus, improving techniques and systems for displaying interlaced video data on a non-interlaced monitor with known techniques for adjusting one of the first field or second field of the pair of fields to substantially correct for the vertical offset between the pairs of fields (including a vertical offset created by mishandling video data), consistent with Wi-

LAN's allegations, would represent an alternative solution with potentially improved results, including providing a system that would reduce any vertical jiggling or flickering and thereby improve image quality.  The visual artifacts caused by any vertical offset between the pairs of fields would have been known to a person having ordinary skill in the art, who would have been motivated by this problem to seek out ways to reduce the visible artifacts.  Moreover, it would have been obvious to a person of skill in the art that the improper handling of video data would have resulted in visual artifacts, and any such artifacts would have been readily visible.  Consequently, a person of skill would have known that correcting any vertical offset between fields would have eliminated or mitigated the appearance of those same artifacts and provide a higher quality video.  These techniques were well known in the art (*see Keith Jack*) so their implementation would have been well within the skill of a person of ordinary skill in the art.

375.    In addition, it would have been obvious to try combining or implementing known techniques for adjusting one of the first field or second field of the pair of fields to substantially correct for the vertical offset between the pairs of fields because there were only a finite number of predictable solutions, because known work in the field prompted variations based on predictable design incentives, or in light of market forces either in the field or analogous and related fields would have suggested the combination.  Indeed, the combination and implementation of such techniques would have been obvious because the combination represents known potential options with a reasonable expectation of success.  Additionally, a person of ordinary skill in the art would not have faced unexpected results or undue experimentation in making the aforementioned replacement. These techniques

were well known in the art (*see Keith Jack*) so their implementation would have been well within the skill of a person of ordinary skill in the art.

376.    Consequently, it is my opinion that a person of skill would have been motivated to and capable of combining or modifying techniques and systems to adjust one of the first field or second field of the pair of fields to substantially correct for the vertical offset between the pairs of fields, consistent with Wi-LAN's apparent application of this limitation.

(iv)    **Claim 1, element (c)(2):** where said adjusting is performed concurrently with said scaling;

377.    It would have been obvious to a person having ordinary skill in the art to perform the adjusting step described by Claim 1, element (c) "where said adjusting is performed concurrently with said scaling," consistent with Wi-LAN's allegations regarding this limitation, including because motivations and techniques for ensuring correct spatial positioning of scan lines as well as balancing video quality against the cost of implementation existed prior to the claimed invention. *See, e.g., Keith Jack*, at 10. *Keith Jack* confirms that practitioners knew and took care to apply video processing techniques that would result in the correct spatial positioning of video scan lines, and in fact confirms that video processing to correct for vertical offset *was required* if a deinterlacing technique did not inherently result in correct spatial positioning of the scan lines:

> The best vertical frequency response is obtained when field merging is implemented. The spatial position of the lines are already correct and no vertical processing is required, resulting in a flat curve (Line C). Once again, this applies only for stationary areas of the image.

*Keith Jack*, at 335.

378.    *Keith Jack* further demonstrates that practitioners applied techniques known in the art to ensure the preservation and generation of the correct vertical spatial position of scan lines, including when using deinterlacing techniques to convert an interlaced video signal field into a non-interlaced frame.  For example, Figure 9.4 of *Keith Jack* illustrates that input field lines 1, 2, 3, and 4 (indicated with red, below) are output at the correct vertical spatial positioning in the deinterlaced output as frame lines 1, 3, 5, and 7 (indicated with orange, below), with additional lines generated by interpolation at positions corresponding to the even field at lines 2, 4, 6, and 8 (indicated with green, below):



Figure 9.4.  Deinterlacing using Scan Line (Field-based) Interpolation. Shaded scan lines are generated by interpolating between the real scan lines above and below it.

*Keith Jack*, at Fig. 9.4.

379.   *Keith Jack* further informs that practitioners were mindful and took efforts to balance "quality versus cost of implementation" when considering techniques for deinterlacing:

> There are several ways of performing the deinterlacing. The designer must trade-off video quality versus cost of implementation. Today's GUI environment will also probably require scaling the video to an arbitrary-sized window; this also requires a trade-off of video quality versus cost.

*Keith Jack*, at 10.

380.   Combined with *Keith Jack*'s teachings regarding the known techniques in the art, *Keith Jack* confirms that practitioners would have been motivated to perform the said adjusting step concurrently with said scaling step, at least in order to balance considerations of "quality versus cost of implementation."  *Id.*; *and see, e.g.*, *id.* at Fig. 9.4.  A person of skill in the art would have readily understood that preforming the steps concurrently would have required fewer steps or components, improving processing speed, avoided the need to resample or process a field or frame of video data twice (with resulting degradation in video quality) where the mishandling of video data resulted in a vertical offset between the odd and even fields of interlaced video data, and reduced costs while processing interlaced video data for display on a non-interlaced monitor. Performing an adjusting step "where said adjusting is performed concurrently with said scaling" would have yielded known benefits, including as described in *Keith Jack*.

381.   Thus, including as demonstrated by *Keith Jack,* practitioners knew to use various techniques known in the art to affect an adjustment of vertical offset currently with said

scaling step.  Moreover, employing such techniques would represent an alternative solution with potentially improved results.

382.     In addition, it would have been obvious to try combining or modifying known techniques by performing the adjusting step concurrently with said scaling step because there were only a finite number of predictable solutions, because known work in the field prompted variations based on predictable design incentives, or in light of market forces either in the field or analogous and related fields would have suggested the combination. Indeed, the combination or utilization of such techniques would have been obvious because the combination represents known potential options with a reasonable expectation of success.  Additionally, a person of ordinary skill in the art would not have faced unexpected results or undue experimentation in making the aforementioned replacement. These techniques were well known in the art (*see Keith Jack*) so their implementation would have been well within the skill of a person of ordinary skill in the art.

383.     Consequently, it is my opinion that a person of skill would have been motivated to and capable of combining or modifying techniques and systems to perform "said adjusting … concurrently with said scaling."

     (v) **Claim 1, element (d):** displaying the first field of each pair of fields on the non-interlaced monitor in a first time period;

384.     It would have been obvious to a person having ordinary skill in the art to display the first field of each pair of fields on a non-interlaced monitor in a first time period, including at least because displaying both the fields of interlaced video was a technique known in the art.  In interlaced video, each frame of video data is separately displayed as two fields.  The NTSC format, for example, uses 60 fields per second representing 30

frames per second. Persons of skill in the art at the time of the claimed invention understood that a higher frame rate would have resulted in a higher quality video, including with less flicker:

| PAL | PAL stands for Phase Alternation Line. PAL is to Europe as NTSC is to North America. In other words, PAL is the video standard used in Europe and a few other countries. There are a few differences. PAL uses 625 lines per frame while NTSC has 525 lines. Therefore, PAL has higher vertical resolution. The frame rate of NTSC is 30 frames per second while for PAL it is 25. This means the update rate for NTSC is higher and therefore there is more flicker with PAL. PAL uses the YUV color space while NTSC uses YIQ or YUV. That's no big deal, just a little mathematical difference. It is becoming increasingly important for imaging systems suppliers to produce equipment that can be sold worldwide without many manufacturing difficulties. This implies that the equipment must be designed from the start to accommodate both standards. |

*Keith Jack*, at 422.

385.     Similarly, practitioners knew techniques to convert and increase the frame-rate of a video in order to match the refresh rate of a display. *E.g., Keith Jack*, at 414:

| Frame Rate Conversion | Frame rate conversion is the act of converting one frame rate to another. One real example that poses a difficult problem is that the frame rate of NTSC, 30 frames per second, is different from a typical computer's display, which may be anywhere from 70 to 75 frames per second (or Hz if you prefer). Therefore, some frame-rate conversion process must be performed before NTSC video can be shown correctly on a computer display. Without frame rate conversion, the screen might look as if it "stalls" every now and then. If there is motion within the video, the objects that are moving might appear cut in half. |

386.     *Keith Jack* additionally informs that there were specific techniques that persons of skill in the art knew and were capable of applying to preserve the frame rate of video during a deinterlacing process. *E.g.*, *Keith Jack*, at 333-334. For example, in order to preserve the number of video images displayed per second when using field merging to deinterlace input frames, *Keith Jack* teaches that alternating sets of fields can be merged and display resulting fields matching the field rate:

128



**Figure 9.6. Producing Deinterlaced Frames at Field Rates.**

*Keith Jack*, at 334, Fig. 9.6. Thus, Output Frame 1 would be created from Input Fields 1 & 2; Output Frame 2 would be created from Input Fields 2 & 3; and so on. *See id. Keith Jack* thereby confirms that persons of skill knew the benefit of and took steps to design systems that would preserve the field rate of the input interlaced video signal.

387.   Thus, a motivation to "display[] the first field of each pair of fields on the non-interlaced monitor in a first time period" and "display[] the second field of each pair of fields on the non-interlaced monitor in a second time period subsequent to the first time period" – thereby preserving the field rate of the input interlaced video signal and the smoother video provided by higher-frame rate video data – existed in the art prior to the '654 Patent.  Consistent with the descriptions of *Keith Jack*, a person of skill in the art would have been well aware that higher frame rates resulted in smoother video and thus a higher-quality video, and would have been motivated to employ these techniques as a result.

388.   In addition, it would have been obvious to try combining or modifying known techniques to display the first field of each pair of fields on a non-interlaced monitor in a

first time period because known work in the field prompted variations based on predictable design incentives, or in light of market forces either in the field or analogous and related fields would have suggested the combination.  Indeed, the combination of known methods with these techniques would have been obvious because the combination represents known potential options with a reasonable expectation of success.  As reflected in the prior art, no undue experimentation would have been required to implement these solutions and no unexpected results would have arisen from their implementation.  These techniques were well known in the art (*see Keith Jack*) so their implementation would have been well within the skill of a person of ordinary skill in the art.  A person of skill would have been motivated to and capable of combining or modifying known methods with techniques for displaying the first field of each pair of fields on the non-interlaced monitor in a first time period.

389.    Consequently, it is my opinion that a person of skill would have been motivated to and capable of combining or modifying techniques and systems to "display[] the first field of each pair of fields on the non-interlaced monitor in a first time period."

> (vi)    **Claim 1, element (e):** displaying the second field of each pair of fields on the non-interlaced monitor in a second time period subsequent to the first time period;

390.    It would have been obvious to a person having ordinary skill in the art to display the second field of each pair of fields on the non-interlaced monitor in a second time period subsequent to the first time period, including at least because displaying both the fields of interlaced video was a technique known in the art. In interlaced video, each frame of video data is separately displayed as two fields.  The NTSC format, for example, uses 60 fields per second representing 30 frames per second.  Persons of ordinary skill at the

130

time of the claimed invention understood that a higher frame rate would have resulted in a

higher quality video, including with less flicker:

| PAL | PAL stands for Phase Alternation Line. PAL is to Europe as NTSC is to North America. In other words, PAL is the video standard used in Europe and a few other countries. There are a few differences. PAL uses 625 lines per frame while NTSC has 525 lines. Therefore, PAL has higher vertical resolution. The frame rate of NTSC is 30 frames per second while for PAL it is 25. This means the update rate for NTSC is higher and therefore there is more flicker with PAL. PAL uses the YUV color space while NTSC uses YIQ or YUV. That's no big deal, just a little mathematical difference. It is becoming increasingly important for imaging systems suppliers to produce equipment that can be sold worldwide without many manufacturing difficulties. This implies that the equipment must be designed from the start to accommodate both standards. |
|---|---|

*Keith Jack*, at 422.

391.     Similarly, practitioners knew techniques to convert and increase the frame-rate of a

video in order to match the refresh rate of a display, thereby improving the subjective

quality of video for the user.  *E.g., Keith Jack*, at 414:

| Frame Rate Conversion | Frame rate conversion is the act of converting one frame rate to another. One real example that poses a difficult problem is that the frame rate of NTSC, 30 frames per second, is different from a typical computer's display, which may be anywhere from 70 to 75 frames per second (or Hz if you prefer). Therefore, some frame-rate conversion process must be performed before NTSC video can be shown correctly on a computer display. Without frame rate conversion, the screen might look as if it "stalls" every now and then. If there is motion within the video, the objects that are moving might appear cut in half. |
|---|---|

392.     *Keith Jack* additionally informs that there were specific techniques that persons of

skill in the art knew and were capable of applying to preserve the frame rate of video

during a deinterlacing process.  *E.g.*, *Keith Jack*, at 333-334.  For example, in order to

preserve the number of video images displayed per second when using field merging to

deinterlace input frames, *Keith Jack* teaches that alternating sets of fields can be merged

and display resulting frames at a rate matching the input field rate:

131



**Figure 9.6. Producing Deinterlaced Frames at Field Rates.**

*Keith Jack*, at 334, Fig. 9.6.  Thus, Output Frame 1 would be created from Input Fields 1 & 2; Output Frame 2 would be created from Input Fields 2 & 3; and so on.  *See id.  Keith Jack* thereby confirms that persons of skill knew the benefit of and took steps to design systems that would improve or preserve the field rate of the input interlaced video signal.

393.    Thus, a motivation to "display[] the first field of each pair of fields on the non-interlaced monitor in a first time period" and "display[] the second field of each pair of fields on the non-interlaced monitor in a second time period subsequent to the first time period" -- thereby preserving the field rate of the input interlaced video signal and resulting in the preservation or improvement of the resulting frame rate of video and the smoother video provided by higher-frame rate video data – existed in the art prior to the '654 Patent.  Consistent with the descriptions of *Keith Jack*, a person of skill in the art would have been well aware that higher frame rates resulted in smoother video and thus a higher-quality video, and would have been motivated to employ these techniques as a result..

394.   In addition, it would have been obvious to try combining or modifying known techniques to display the second field of each pair of fields on the non-interlaced monitor in a second time period subsequent to the first time period because there were only a finite number of predictable solutions, because known work in the field prompted variations based on predictable design incentives, or in light of market forces either in the field or analogous and related fields would have suggested the combination.  Indeed, the combination of known methods with these techniques would have been obvious because the combination represents known potential options with a reasonable expectation of success.  As reflected in the prior art, no undue experimentation would have been required to implement these solutions and no unexpected results would have arisen from their implementation. These techniques were well known in the art (*see Keith Jack*) so their implementation would have been well within the skill of a person of ordinary skill in the art.  A person of skill would have been motivated to and capable of combining or modifying known methods with techniques for displaying the second field of each pair of fields on the non-interlaced monitor in a second time period subsequent to the first time period.

395.   Consequently, it is my opinion that a person of skill would have been motivated to and capable of combining or modifying techniques and systems to "display[] the second field of each pair of fields on the non-interlaced monitor in a second time period subsequent to the first time period."

(vii)   **Claim 4:** wherein scaling is achieved by vertical interpolation between at least adjacent lines in the field being scaled;

396.   It would have been obvious to a person having ordinary skill in the art to achieve the scaling step by vertical interpolation between at least adjacent lines in the field being scaled, for example because scaling by vertical interpolation was a known technique in the art, including explicitly a method of displaying a field's scan lines *scaled (interpolated)* up to … however many [lines] are in the current display mode" as described by *Keith Jack* and conceded by the Description of the '654 Patent:

> Until now there have been two commonly used simple methods for displaying interlaced video being fed into the computer system on a computer monitor. These are normally independent of whether the computer monitor is interlaced or not, as even when the monitor is interlaced it normally refreshes at a rate independent of the incoming video signal.
>
> Throughout this description NTSC video is assumed for the sake of illustrative examples, with references to 240 line fields, 480 line frames, 60 fields per second and 30 frames per second. This does not restrict the invention to NTSC or the line counts or frame or field rates but is merely used for simplicity. The invention is equally applicable to other video standards such as, but not limited to, PAL with 288 line fields, 576 line frames, 50 fields per second and 25 frames per second.
>
> The first method is just capturing one of the two fields, and displaying 240 lines scaled (interpolated) up to 480 or however many are in the current display mode. The special case of scaling to 480 lines (line doubling) is currently used in the art and is well documented. See pages 332–333 of "Video Demystified: a Handbook for the Digital Engineers" by Keith Jack, HighText Publication Inc., 1993 (referred to herein as "Keith Jack").

'654 Patent, at 1:18-41.

397.   *Keith Jack* provides additional detail, for example by identifying the lack of increased vertical resolution as a known deficiency of displaying only a single field per frame.  *Keith Jack*, at 332-333.  *Keith Jack* goes on to identify and describe techniques

known in the art for filling the resolution of a monitor or display.  *Keith Jack*, at 332 (scan

line duplication), 333 (scan line interpolation), and 333-335 (field merging); *and see id.* at

334, at Figures 9.3, 9.4, and 9.5:





398.    As illustrated in Figures 9.3, 9.4, and 9.5, *Keith Jack* demonstrates how to use

various techniques known in the art to generate additional scan lines from an input field to

create an output frame that is scaled to fill vertical resolution of the non-interlaced

monitor.

399.    Scaling each of the first field and second field of each pair of fields to fill vertical resolution of the non-interlaced monitor would have yielded known benefits, including as described in *Keith Jack*.

400.    Consequently, a person of ordinary skill in the art would have been motivated to apply known techniques, including scaling by vertical interpolation between at least adjacent lines in the field being scaled, and would know such techniques represented an alternative solution with potentially improved results. A person of skill in the art would have understood the benefits of using vertical interpolation to accomplish such scaling techniques, including because interpolation was a known technique for generating new pixels and lines of video data and persons of skill would have known that applying this technique would permit the display of video signals of different standards and resolutions of arbitrary size on display monitors and add versatility to the system.  Thus, a person of ordinary skill in the art would have had a motivation to scale by vertical interpolation between at least adjacent lines in the field being scaled.

401.    In addition, it would have been obvious to try combining or modifying known methods by scaling by vertical interpolation between at least adjacent lines in a field being scaled because there were only a finite number of predictable solutions, because known work in the field prompted variations based on predictable design incentives, or in light of market forces either in the field or analogous and related fields would have suggested the combination.  Indeed, the combination or utilization of this technique would have been obvious because the combination represents known potential options with a reasonable expectation of success.  Additionally, a person of ordinary skill in the art would not have faced unexpected results or undue experimentation in making the aforementioned

replacement. These techniques were well known in the art (*see Keith Jack* and admissions in the Background of the '654 Patent) so their implementation would have been well within the skill of a person of ordinary skill in the art.

402.    Consequently, it is my opinion that a person of skill would have been motivated to and capable of combining or modifying techniques and systems to achieve the scaling step by vertical interpolation between at least adjacent lines in the field being scaled.

> (viii)    **Claim 9:** wherein the adjusting step is achieved by vertical interpolation between at least adjacent lines in the field being adjusted.

403.    It would have been obvious to a person having ordinary skill in the art to achieve the adjusting step by vertical interpolation between at least adjacent lines in the field being adjusted, including because as *Keith Jack* confirms practitioners were mindful of the visual artifacts caused by a vertical offset between fields while working with interlaced video signals:

shown in Figure 9.9. Although the cost is minimal, there are problems with this approach, especially when horizontal lines that are one or two noninterlaced scan lines wide are converted. ==Lines that are one noninterlaced scan line wide will flicker== at the frame refresh rate (30 Hz for NTSC, 25 Hz for PAL and SECAM) when converted to interlaced. The reason is that they are only displayed every other field as a result of the simple conversion. This effect may also occur on the top and bottom edges of

137

> objects. **Lines that are two noninterlaced scan lines wide will oscillate up and down between two interlaced scan lines at the frame refresh rate (30 Hz for NTSC, 25 Hz for PAL and SECAM) when converted to interlaced.**

*Keith Jack*, at 336-337.

404.   *Keith Jack* further confirms that practitioners knew and took care to apply video processing techniques that would result in the correct spatial positioning of video scan lines, and in fact confirms that video processing to correct for vertical offset *was required* if a deinterlacing technique did not inherently result in correct spatial positioning of the scan lines:

> The best vertical frequency response is obtained when field merging is implemented. **The spatial position of the lines are already correct and no vertical processing is required,** resulting in a flat curve (Line C). Once again, this applies only for stationary areas of the image.

*Keith Jack*, at 335.

405.   *Keith Jack* further demonstrates that practitioners used interpolation between at least adjacent lines in the field being adjusted to perform the adjusting step, consistent with Wi-LAN's allegations regarding this element.  For example, Figure 9.4 of *Keith Jack* illustrates the use of interpolation to correctly position field lines 1, 2, 3, and 4 of an input field (indicated with red, below) in the deinterlaced output frame as lines 1, 3, 5, and 7 (indicated with orange, below), with additional lines generated by vertical interpolation

138

between the adjacent lines in the field being adjusted at positions corresponding to the

even field at lines 2, 4, 6, and 8 (indicated with green, below):



Keith Jack, at Fig. 9.4 (demonstrating interpolation of deinterlaced output line 2 as

"2=1+3"; deinterlaced output line 4 as "4-3+5"; etc.); *and compare with, e.g.,* Final

Infringement Contentions, at [SEC] 126 and [VIZIO] 127 (depicting Deinterlaced Frame

with Spatial Averaging from Top Field and Deinterlaced Frame with Spatial Averaging

from Bottom Field), [SEC] 184 and [VIZIO] 185 (asserting without explanation "[t]he

adjusting step is performed during the interpolation process, and therefore, 'concurrently'

with the scaling."); *and see id.* at [SEC] 121-185 and [VIZIO] 122-186.

406.    *Keith Jack* demonstrates that practitioners knew to use various techniques known in the art to perform an adjusting step, including where the adjusting step is achieved by vertical interpolation between adjacent lines in the field being adjusted.  Adjusting one of the first field or second field of the pair of fields in an interlaced video signal to substantially correct for any vertical offset between the pairs of fields would have yielded known benefits, including as described in *Keith Jack*.

407.    Thus, combining and improving methods with known techniques for using vertical interpolation between at least adjacent lines in the field being adjusted to achieve the adjusting step by vertical interpolation between at least adjacent lines in the field being adjusted would represent an alternative solution with potentially improved results. A person of skill in the art would have understood the benefits of using vertical interpolation to accomplish such an adjusting step to correct vertical offset (including offset caused by improperly handling video data), including because interpolation was a known technique for generating new pixels and lines of video data and persons of skill would have known that this technique would reduce vertical jiggling or flickering and thereby improve image quality.  Moreover, it would have been obvious to a person of skill in the art that the improper handling of video data would have resulted in visual artifacts, and any such artifacts would have been readily visible.  Consequently, a person of skill would have understood "vertical interpolation between at least adjacent lines in the field being adjusted" to be a technique for achieving the adjusting step and correcting the vertical offset between fields (including where video data was mishandled) in order to eliminate or mitigate the appearance of visual artifacts and provide a higher quality video.

408.     In addition, it would have been obvious to try combining or modifying known methods of adjusting video data, including by interpolation between at least adjacent lines in the field being adjusted, because there were only a finite number of predictable solutions, because known work in the field prompted variations based on predictable design incentives, or in light of market forces either in the field or analogous and related fields would have suggested the combination.  Indeed, the combination or utilization of such techniques would have been obvious because the combination represents known potential options with a reasonable expectation of success.  Additionally, a person of ordinary skill in the art would not have faced unexpected results or undue experimentation in making the aforementioned replacement. These techniques were well known in the art (*see Keith Jack*) so their implementation would have been well within the skill of a person of ordinary skill in the art.

409.     Consequently, it is my opinion that a person of skill would have been motivated to and capable of combining or modifying techniques and systems to achieve the scaling step by vertical interpolation between at least adjacent lines in the field being scaled.

### (b)     Combinations Rendering the '654 Patent Obvious

410.     It is my opinion that the '654 Patent is obvious in view of the following combinations of prior art references:

1)     Exhibit 1: U.S. Patent No. 5,671,018 to Ohara et al. in view of *Katsumata* (Claim 1, 4, and 9);

2)     Exhibit 1: U.S. Patent No. 5,671,018 to Ohara et al. in view of *Miyaguchi* (Claim 1, 4, and 9);

3)     Exhibit 1: U.S. Patent No. 5,671,018 to Ohara et al. in view of *Greggain* (Claim 1, 4, and 9);

4)     Exhibit 1: U.S. Patent No. 5,671,018 to Ohara et al. in view of *Greggain* and *Keith Jack* (Claim 1, 4, and 9);

5) Exhibit 2: U.S. Patent No. 5,181,110 to Katsumata et al. in view of *Ohara* (Claim 1, 4, and 9);

6) Exhibit 2: U.S. Patent No. 5,181,110 to Katsumata et al. in view of *Miyaguchi* (Claim 1, 4, and 9);

7) Exhibit 2: U.S. Patent No. 5,181,110 to Katsumata et al. in view of *Greggain* (Claim 1, 4, and 9);

8) Exhibit 3: U.S. Patent No. 6,166,773 to Greggain et al. in view of *Keith Jack* (Claim 1, 4, and 9);

9) Exhibit 3: U.S. Patent No. 6,166,773 to Greggain et al. in view of *Ohara* (Claim 1, 4, and 9);

10) Exhibit 3: U.S. Patent No. 6,166,773 to Greggain et al. in view of *Miyaguchi* (Claim 1, 4, and 9);

11) Exhibit 3: U.S. Patent No. 6,166,773 to Greggain et al. in view of *Keith Jack* and *Bhayani* (Claim 1, 4, and 9);

12) Exhibit 4: U.S. Patent No. 5,329,314 to Correa et al. in view of *Katsumata* (Claim 1, 4, and 9);

13) Exhibit 4: U.S. Patent No. 5,329,314 to Correa et al. in view of *Keith Jack* (Claim 1, 4, and 9);

14) Exhibit 4: U.S. Patent No. 5,329,314 to Correa et al. in view of *Greggain* (Claim 1, 4, and 9);

15) Exhibit 5: U.S. Patent No. 5,091,783 to Miyaguchi in view of *Keith Jack* (Claim 1, 4, and 9);

16) Exhibit 5: U.S. Patent No. 5,091,783 to Miyaguchi in view of *Ohara* (Claim 1, 4, and 9);

17) Exhibit 5: U.S. Patent No. 5,091,783 to Miyaguchi in view of *Greggain* (Claim 1, 4, and 9);

18) Exhibit 6: EP 0539033 A1 to Nakanishi in view of *Keith Jack* (Claim 1, 4, and 9);

19) Exhibit 6: EP 0539033 A1 to Nakanishi in view of *Ohara* (Claim 1, 4, and 9);

20) Exhibit 6: EP 0539033 A1 to Nakanishi in view of *Greggain* (Claim 1, 4, and 9);

21) Exhibit 6: EP 0539033 A1 to Nakanishi in view of *Miyaguchi* (Claim 1, 4, and 9);

22) Exhibit 7: U.S. Patent No. 5,633,687 to Bhayani et al. in view of *Keith Jack* (Claim 1, 4, and 9);

23) Exhibit 7: U.S. Patent No. 5,633,687 to Bhayani et al. in view of *Ohara* (Claim 1, 4, and 9);

24) Exhibit 7: U.S. Patent No. 5,633,687 to Bhayani et al. in view of *Katsumata* (Claim 1, 4, and 9); and

25) Exhibit 7: U.S. Patent No. 5,633,687 to Bhayani et al. in view of *Greggain* (Claim 1, 4, and 9).

411. The obviousness of the asserted claims of the '654 Patent was confirmed by Wi-LAN's own expert. Wi-LAN's expert confirmed that as of 1996, systems that used interlaced video and non-interlaced video were well-known in the art. Tanner Tr. at 86-89. 124 (admitting that the Claim 1 preamble was well-known to one of ordinary skill in the art). Non-interlaced video was common in computer displays, and the inventors were motivated to take interlaced video and deinterlace it so that it could appear on computer monitors.  Tanner Tr. at 88. Wi-LAN's expert also admitted that vertical interpolation was a well-known prior art technique, and, for instance, that "you can do a lot of things with a vertical interpolator." Tanner Tr. at 208-09, 252-253, 274-277.  Wi-LAN's expert admitted that "one would understand it's a [] tiny, tiny leap to say I have a missing line, but I have no second input for [] the interpolator, and I can create that." Tanner Tr. at 252-253, 259-265 ("it's an amazingly short leap to understand how you could create that top line.").

412. I incorporate Exhibits 1 through 7 by reference into my report.  In addition to the discussion below, Exhibits 1 through 7 provide my opinions about the obviousness of claims 1, 4, and 9 of the '654 Patent. The discussion in Sections VIII.D.4(b)(i)-(vi) are incorporated by reference.

(i)     Combining References with *Keith Jack*

413. A person of ordinary skill in the art would have been motivated to combine the well-known concepts in Exhibits 1 through 7 with *Keith Jack*, because a person of skill in the art would have looked to text books, including *Keith Jack*, as references to resolve

143

questions or problems faced while working with video data such as interlaced video signals.  Moreover, *Keith Jack* demonstrated the importance placed on improving video quality, and confirms that video quality was a key consideration and concern when working with video data or designing a system for processing video data.   To this end, *Keith Jack* identifies numerous visual artifacts and defects caused by improper handling of video data, including "tearing" defects caused by merging two fields into a single buffer, and goes on to disclose known solutions, such as the use of separate buffers (*e.g.*, *Keith Jack* at 335, 358-359).  A person of skill in the art, faced with visual artifacts or defects, would have looked to *Keith Jack* for solutions, and it would have been natural to learn from and apply the known solutions described in *Keith Jack* and incorporate those solutions into the references described in Exhibits 1 through 7, and would have been motivated to do so in order to create an improved, higher-end video processing system. Modifying the systems described in Exhibits 1 through 7 to include the features or apply the techniques taught by *Keith Jack* would have required no more than ordinary skill, including at least because *Keith Jack* was intended to serve as a reference for persons of skill in the art and to expressly teach practitioners how to address issues in video data processing.  Consequently, a person of skill in the art would have implemented the teachings of *Keith Jack* with predictable success.  For these reasons, it would have been a natural choice to modify the teachings of the systems described in Exhibits 1 through 7 based on *Keith Jack*.  *And see supra* at Section VIII.D.4(a).  My opinions regarding the motivations to combine *Keith Jack* with the systems described in Exhibits 1 through 7 are incorporated into those discussions by reference.

(ii)      Combining References with *Ohara*

414.    It would have been obvious to combine *Katsumata*, *Greggain*, *Miyaguchi*, *Nakanishi*, and *Bhayani* with *Ohara*, and a person of ordinary skill would have been motivated to do so, because *Ohara* teaches methods for processing video data that would have resulted in improved video quality and a higher-end system.  *See* Exhibit 1.  For example, a person of ordinary skill in the art would have recognized the benefits of the video processing techniques described by *Ohara*, including because these techniques would have permitted the person of ordinary skill to design a system displaying video signals of different standards and resolutions of an arbitrary size on display monitors, adding versatility to the system.  *Id.*  Similarly, practitioners would have recognized the benefits of *Ohara*'s techniques as representing alternative solutions with improved results, including by disclosing specific methods for addressing the visual artifacts caused by improper handling of video data.  *Id.*  Persons of skill in the art would have appreciated that improper handling of video data would result in visible artifacts, and would have been motivated to seek out methods for resolving these artifacts (including vertical offset between fields of interlaced data handled improperly), including by considering the teachings of *Ohara*.  Persons of skill would have also been motivated to seek out more efficient techniques for designing systems for processing video data, and been motivated to seek out and apply alternative methods for such processing requiring fewer steps or components such as those disclosed by *Ohara*.  *Id.*  Consequently, a person of skill in the art would have implemented the teachings of *Ohara* with predictable success, including because *Ohara* is a patent intended to inform persons of skill in the art how to implement its teachings.  *Id.*  For these reasons, it would have been a natural choice to modify the teachings of the systems described in *Katsumata*, *Greggain*, *Miyaguchi*, *Nakanishi*, and

145

*Bhayani* based on *Ohara*.  *And see supra* at Section VIII.D.4(a) (describing motivations in the art, incorporated by reference).  My opinions regarding the motivations to combine *Ohara* with the systems described in *Katsumata*, *Greggain*, *Miyaguchi*, *Nakanishi*, and *Bhayani* are incorporated into those discussions at Exhibits 2, 3, 5, and 7 by reference.

(iii)     Combining References with *Katsumata*

415.    It would have been obvious to combine *Ohara*, *Correa*, and *Bhayani* with *Katsumata*, and a person of ordinary skill would have been motivated to do so, because *Katsumata* teaches techniques for processing video data that would have resulted in improved video quality and a higher-end system.  *See* Exhibit 2.  For example, a person of ordinary skill in the art would have recognized the benefits of the video processing techniques described by *Katsumata*, including because these techniques would have permitted the person of ordinary skill to design a system displaying video signals of different standards and resolutions of an arbitrary size on display monitors, adding versatility to the system.  *Id.*  Similarly, practitioners would have recognized the benefits of *Katsumata*'s techniques as representing alternative solutions with improved results, including by disclosing specific methods for addressing the visual artifacts caused by improper handling of video data.  *Id.*  Persons of skill in the art would have appreciated that improper handling of video data would result in visible artifacts, and would have been motivated to seek out methods for resolving these artifacts (including vertical offset between fields of interlaced data handled improperly), including by considering the teachings of *Katsumata*.  Similarly, practitioners were motivated by the desire to design high-quality systems for processing video data, and applying the teachings of *Katsumata* would have been a natural choice presenting solutions for numerous considerations the

146

design of such systems.  *Id.*  Consequently, a person of skill in the art would have implemented the teachings of *Katsumata* with predictable success, including because *Katsumata* is a patent intended to inform persons of skill in the art how to implement its teachings.  For these reasons, it would have been a natural choice to modify the teachings of the systems described in *Ohara*, *Correa*, and *Bhayani* based on *Katsumata*.  *And see supra* at Section VIII.D.4(a) (describing motivations in the art, incorporated by reference).  My opinions regarding the motivations to combine *Katsumata* with the systems described in *Ohara*, *Correa*, and *Bhayani* are incorporated into those discussions at Exhibits 1, 4, and 7 by reference.

<center>(iv)    Combining References with *Greggain*</center>

416.    It would have been obvious to combine *Ohara*, *Katsumata*, *Correa*, *Miyaguchi*, *Nakanishi*, and *Bhayani* with *Greggain*, and a person of ordinary skill would have been motivated to do so, because *Greggain* teaches techniques for processing video data that would have resulted in improved video quality and a higher-end system.  *See* Exhibit 3. For example, a person of ordinary skill in the art would have recognized the benefits of the video processing techniques described by *Greggain*, including because these techniques would have permitted the person of ordinary skill to design a system displaying video signals of different standards and resolutions of an arbitrary size on display monitors, adding versatility to the system.  *Id.*  Similarly, practitioners would have recognized the benefits of *Greggain*'s techniques as representing alternative solutions with improved results, including by disclosing specific methods for addressing the visual artifacts caused by improper handling of video data.  *Id.* Persons of skill in the art would have appreciated that improper handling of video data would result in visible artifacts, and would have been

<center>147</center>

motivated to seek out methods for resolving these artifacts (including vertical offset between fields of interlaced data handled improperly), including by considering the teachings of *Greggain*.  Similarly, practitioners were motivated by the desire to design high-quality systems for processing video data, and applying the teachings of *Greggain* would have been a natural choice presenting solutions for numerous considerations the design of such systems.  Consequently, a person of skill in the art would have implemented the teachings of *Greggain* with predictable success, including because *Greggain* is a patent intended to inform persons of skill in the art how to implement its teachings.  *Id.* For these reasons, it would have been a natural choice to modify the teachings of the systems described in *Ohara*, *Katsumata*, *Correa*, *Miyaguchi*, *Nakanishi*, and *Bhayani* based on *Greggain*.  *And see supra* at Section VIII.D.4(a) (describing motivations in the art, incorporated by reference).  My opinions regarding the motivations to combine *Greggain* with the systems described in *Ohara*, *Katsumata*, *Correa*, *Miyaguchi*, *Nakanishi*, and *Bhayani* are incorporated into those discussions at Exhibits 1, 2, 4, 5, 6 and 7 by reference.

(v)      Combining References with *Miyaguchi*

417.    It would have been obvious to combine *Ohara*, *Katsumata*, *Greggain*, and *Nakanishi* with *Miyaguchi*, and a person of ordinary skill would have been motivated to do so, because *Miyaguchi* teaches techniques for processing video data that would have resulted in improved video quality and a higher-end system.  *See* Exhibit 5.  For example, a person of ordinary skill in the art would have recognized the benefits of the video processing techniques described by *Miyaguchi*, including because these techniques would have permitted the person of ordinary skill to design a system displaying video signals of

148

different standards and resolutions of an arbitrary size on display monitors, adding versatility to the system. *Id.* Similarly, practitioners would have recognized the benefits of *Miyaguchi*'s techniques as representing alternative solutions with improved results, including by disclosing specific methods for addressing the visual artifacts caused by improper handling of video data. *Id.* Persons of skill in the art would have appreciated that improper handling of video data would result in visible artifacts, and would have been motivated to seek out methods for resolving these artifacts (including vertical offset between fields of interlaced data handled improperly), including by considering the teachings of *Miyaguchi*. Similarly, practitioners were motivated by the desire to design high-quality systems for processing video data, and applying the teachings of *Miyaguchi* would have been a natural choice presenting solutions for numerous considerations the design of such systems. Consequently, a person of skill in the art would have implemented the teachings of *Miyaguchi* with predictable success, including because *Miyaguchi* is a patent intended to inform persons of skill in the art how to implement its teachings. *Id.* For these reasons, it would have been a natural choice to modify the teachings of the systems described in *Ohara*, *Katsumata*, *Greggain*, and *Nakanishi* based on *Miyaguchi*. *And see supra* at Section VIII.D.4(a) (describing motivations in the art, incorporated by reference). My opinions regarding the motivations to combine *Miyaguchi* with the systems described in *Ohara*, *Katsumata*, *Greggain*, and *Nakanishi* are incorporated into those discussions at Exhibits 1, 2, 3, and 6 by reference.

(vi)     Combining References with *Bhayani*

418.     It would have been obvious to combine *Greggain* with *Bhayani*, and a person of ordinary skill would have been motivated to do so, because *Bhayani* teaches techniques

149

for processing video data that would have resulted in improved video quality and a higher-end system. *See* Exhibit 7. For example, a person of ordinary skill in the art would have recognized the benefits of the video processing techniques described by *Bhayani*, including because these techniques would have permitted the person of ordinary skill to design a system displaying video signals of different standards and resolutions of an arbitrary size on display monitors, adding versatility to the system. *Id.* Similarly, practitioners would have recognized the benefits of *Bhayani*'s techniques as representing alternative solutions with improved results, including by disclosing specific methods for addressing the visual artifacts caused by improper handling of video data and improving the quality of video data processed by the system. *Id.* Persons of skill in the art would have appreciated that improper handling of video data would result in poor video quality, and would have been motivated to seek out methods for resolving these issues (including decreased frame rate), including by considering the teachings of *Bhayani*. Similarly, practitioners were motivated by the desire to design high-quality systems for processing video data, and applying the teachings of *Bhayani* would have been a natural choice presenting solutions for numerous considerations the design of such systems. Consequently, a person of skill in the art would have implemented the teachings of *Bhayani* with predictable success, including because *Bhayani* is a patent intended to inform persons of skill in the art how to implement its teachings. *Id.* For these reasons, it would have been a natural choice to modify the teachings of the systems described in *Greggain* based on *Bhayani*. *And see supra* at Section VIII.D.4(a) (describing motivations in the art, incorporated by reference). My opinions regarding the motivations to combine

*Bhayani* with the systems described in *Greggain* are incorporated into those discussions at Exhibit 3 by reference.

<div align="center">(c)      <strong>Secondary Considerations for the '654 Patent</strong></div>

419.    I understand that secondary considerations may be examined to determine whether an invention would have been obvious to one of ordinary skill in the art, and that presentment of secondary considerations (to the extent any exist) is Plaintiff's burden. I reserve the right to respond to any contentions or opinions regarding the existence of secondary considerations for the '654 Patent presented by Plaintiff.

## IX.    RESERVATION OF RIGHTS

420.    I plan to continue my investigation and study, which may include a review of documents and information which may yet be produced including without limitations copies of expert reports filed by Wi-LAN's experts. Accordingly, I reserve the right to expand upon or modify my opinions as my investigation and study continue, and to supplement my opinions in response to any additional information that becomes available to me. I expect that I will review, and reserve the right to respond to, the reports prepared by Wi-LAN's experts.

421.    I reserve the right to supplement this report, if necessary, based upon additional claim constructions, if any, by Court. I reserve the right to provide a supplement to this report regarding any new material that I may be provided subsequent to the writing of this report.

422.    I declare under penalty of perjury under the laws of California and the United States that the foregoing is true and correct.

<div align="center">151</div>

# EXHIBIT 61

# Exhibit A

# Cliff Reader, Ph.D.

## Expertise

- Real-time Processing and Display
- Video compression (MPEG-HEVC)
- Imaging/Video Systems Architecture
- Imaging/Video Chip Architecture
- Video Compression Algorithms
- Consumer audio/video
- Reconnaissance Imaging
- Medical Imaging

## Professional Summary

Dr. Reader has over forty years of work experience in digital imaging and digital video and audio.  In the 1970's and early 1980's, he was one of the leaders in the digital imaging field, performing extensive work in areas of compression, real-time processing, real-time display, image enhancement, and others.  Applications included reconnaissance imaging, medical imaging, earth resources management and videoconferencing.  This work anticipated much of the technology being used in contemporary consumer digital video systems.  He has in-depth experience of the commercial history and when key parts of technology were first developed and published.

Dr. Reader's career includes technical work in areas of algorithm design, system design, and semiconductor chip design and business development, marketing and sales work in areas of market analysis, product roadmap development and direct sales.

Dr. Reader has held many leadership roles in standards development: US Head of Delegation to MPEG (1991-1993); chief editor of the MPEG1 standard (1991-1993); instigator of the successful effort to make MPEG2 the market standard for digital TV over proprietary competitors in the US and national competitors in Europe and Japan (1992); MPEG4 Subcommittee Chairman (1993-1996); AVS (China) Subgroup Chairman (2003-Present).  He is an expert in all major audio-video standards. MPEG audio (Layer I, II, mp3, AAC), Dolby AC3, MPEG video (1, 2, 4), H.264, Windows Media 9 (VC-1), H.265 (HEVC) and AVS. He is also an expert in DVD standards, including formatting, navigation and authoring.

Dr. Reader has extensive experience in patent licensing and patent pools. He was the technical expert for developing the initial list of potentially essential patents for the first MPEGLA patent pool. He is the Co-Director leading the pool formation and license negotiations for the AVS patent pool. Dr. Reader has experience in the valuation of patents and the acquisition and sale of patent portfolios.

Dr. Reader has authored over twenty technical papers, two book chapters and two patents in digital video processing, display, and compression. He is an Adjunct Professor at Peking University, Beijing, China.

## Employment History

From:    2001        **Independent Consultant**
To:      Present     Saratoga, CA
                     Provide technical and marketing consulting services in the areas of
                     digital imaging and digital video including:
                     ▪ consumer video
                     ▪ real-time processing and display
                     ▪ image and video and audio compression (specializing in MPEG)
                     ▪ imaging/video systems architecture
                     ▪ imaging/video chip architecture
                     ▪ audio/video transmission, including optical & wireless networks
                     Over 60 clients including Apple, Broadcom, China Central TV,
                     Chinese Academy of Sciences, Cisco, Comcast, DirecTV, EchoStar,
                     Fujifilm, Gateway, GE, Haier, HP, IBM, Lenovo, LG, Matsushita,
                     MediaTek, Microsoft, Motorola, Nikon, Nokia, Philips, Riverbed,
                     Samsung, Sharp, Siemens, Sony, Sun Microsystems, Toshiba, TPV,
                     Tyco, US Department of Justice, Verizon, Vizio, Wistron, Yahoo,
                     Zoran and ZTE.

                     Personal database of patent analysis:
                     -Evaluation of all the US patents in the MPEGLA MPEG2 and
                     H.264 patent pools.
                     -Evaluation of the US patents and published applications underlying
                     the H.264 and H.265 standards.
                     -Personal archive of over 2000 audiovisual patents.

                     Personal database of audio and video prior art.
                     -Virtually complete collection of all contributions to the H.26x and
                     MPEGx families of standards from 1985 to today.
                     -Many hundreds of technical journal and conference articles
                     documenting the first invention of key technologies.
                     -Work-in-progress book on the history of video compression.
                     -Historical collection of technical data from the earliest digital video,
                     image processing and real-time image display systems in the 1970s
                     and 1980s.

From:    1999        **nDSP Corporation**
To:      2001        Campbell, CA
         Title:      *Vice President of Marketing and Acting Vice President of Sales*
                     Responsible for marketing and sales in a startup company providing
                     high-quality video signal processors to TV manufacturers.
                     Developed product specifications and roadmap.  Built and managed
                     sales and marketing team of 6 direct and contractor staff in the US
                     and Japan to provide technical sales, sales support, application

engineering, Marcomm and PR.  Established distribution in China, Japan and throughout the Far East.  Secured first sales as company moved into production phase with design wins in China, Japan and Europe.  Initiated and secured major design wins in emerging Progressive DVD business, with production volumes beginning in 4Q00 at an annualized rate of $3.5M.  Established strategic partnership with Pixelworks in LCD chip business.  Pixelworks acquired nDSP in 2001.

| | | |
|---|---|---|
| From: | 1997 | **CagEnt Technologies, Inc. (wholly owned by Samsung)** |
| To: | 1998 | Santa Clara, CA |
| | Position: | *Vice President of Sales, Digital Video Products* |

Responsible for a line of PC-based real-time MPEG2 and Dolby Digital encoders.  Established distribution agreements for third-party DVD authoring software.  Secured OEM contracts for the products.  Built the sales channel worldwide.  Built sales to break-even point in 9 months leading to sale of the product line.

| | | |
|---|---|---|
| From: | 1993 | **Samsung Semiconductor, Inc.** |
| To: | 1997 | San Jose, CA |
| | Position: | *Director of Marketing, Digital Media Products;* |
| | | *Acting Director of Software Engineering* |

Developed business plans for digital audiovisual semiconductor chips. Managed team of over 50 software engineers in US and Korea for development of a media processor. Established strategic partnerships with Microsoft and IBM for media processor

| | | |
|---|---|---|
| From: | 1990 | **Cypress Semiconductor, Inc.** |
| To: | 1993 | San Jose, CA |
| | Position: | *Business Development Manager* |

Founding member of new business unit chartered to develop a "video DSP".  Jointly developed a complete business plan, and personally initiated and developed relationships with Philips, Sun Microsystems, Apple Computers and IBM.  Chief architect for this early media DSP design, capable of complete MPEG1 decode in real time.  (Fully validated by cycle-accurate simulation).  Managed R&D team of 10 hardware and software engineers.

Head of US Delegation to MPEG, 1991 to 1992.  Chief Editor of the MPEG1 standard.  Technical Expert for establishing the MPEGLA Patent Licensing Pool.

| | | |
|---|---|---|
| From: | 1988 | **Sun Microsystems, Inc.** |
| To: | 1990 | Mountain View, CA |
| | Position: | *Program Manager* |

Developed requirements and specifications for real-time imaging system. Managed a team of 20 engineers to develop the architecture and high-level design. Interfaced with two key customers – Philips Medical Systems and Lockheed. Developed design for single-board real-time medical and reconnaissance image display.

| From: | 1981 | **International Imaging Systems, Zoran, Virtual Imaging** |
| To: | 1988 | Design and development of real-time image processing and display systems. Details available on request. |

| From: | 1975 | **Ford Aerospace & ESL (A Division of TRW)** |
| To: | 1981 | Details available on request. |

## Consulting History

| Date | 2017 | **Dish Network** |
| To: | Present | |
| | Duties: | Consulting expert in ClearPlay matter |

| Date | 2017 | **Apple** |
| To: | Present | |
| | Duties: | Preparation of declarations for Inter Partes Review proceedings. (Uniloc matter) |

| Date | 2017 | **Dish Network** |
| To: | Present | |
| | Duties: | Testifying expert in Realtime matter |

| Date | 2017 | **CustomPlay** |
| To: | Present | |
| | Duties: | Preparation of declaration for summary judgment in Amazon case. |

| Date | 2017 | **Vizio, Funai, LG, MediaTek, MStar** |
| | Duties: | Testifying expert in Broadcom case. |

| Date | 2017 | **Apple** |
| | Duties: | Preparation of declarations for Inter Partes Review proceedings. (Nokia matter) |

| Date | 2017 | **Vizio** |
| | Duties: | Preparation of declarations for Inter Partes Review proceeding. (Lightside Technologies matter) |

| Date | 2016 | **Dell, Riverbed, EchoStar, Dish Network** |
|------|------|--------|
| To: | Present | |
| | Duties: | Testifying expert in Realtime matter |

| Date | 2016 | **Sharp, Vizio, ON** |
|------|------|--------|
| To: | Present | |
| | Duties: | Consulting expert in WiLAN matter |

| Date | 2016 | **Avid** |
|------|------|--------|
| To: | 2017 | |
| | Duties: | Testifying expert in Harmonic matter. |

| Date | 2016 | **Apple** |
|------|------|--------|
| | Duties: | Testifying expert in PUMA matter. |

| Date | 2016 | **Vizio** |
|------|------|--------|
| | Duties: | Testifying expert in PMC matter. |

| Date | 2016 | **US Dept. of Justice, Dept. of Homeland Security, DoD, FBI, NSA, & Others** |
|------|------|--------|
| To: | Present | |
| | Duties: | Consulting expert in Discovery Patents (3rd Eye Surveillance) matter. Declarations in support of six Inter Partes Reviews. |

| Date | 2015 | **ST Micro** |
|------|------|--------|
| To: | 2016 | |
| | Duties: | Consulting expert in Avago matter. |

| Date | 2015 | **AT&T** |
|------|------|--------|
| | Duties: | Consulting expert in Raniere matter. |

| Date | 2015 | **Motorola** |
|------|------|--------|
| To: | 2016 | |
| | Duties: | Consulting expert in PUMA matter. |

| Date | 2015 | **TPV** |
|------|------|--------|
| To: | 2016 | |
| | Duties: | Consulting expert in Thomson licensing matter. |

| Date | 2015 | **Tyco (Exacq, Johnson Controls)** |
|------|------|--------|
| To: | Present | |
| | Duties: | Consulting expert in JDS Technologies matter. |

| Date | 2015 | **Tyco** |
|------|------|--------|
| | Duties: | Declaration in support of Inter Partes Review petition in Hawk Technology matter. |

| Date | 2015 | **Sceptre** |
|------|------|-------------|
|      | Duties: | Expert reports in licensing matter concerning MPEGLA MPEG2 pool patents. |

| Date | 2015 | **Samsung** |
|------|------|-------------|
|      | Duties: | Consultant and fact witness in case asserting Samsung patents of which I am a named inventor, against NVidia. |

| Date | 2015 | **Nissim** |
|------|------|------------|
| To:  | 2016 |            |
|      | Duties: | Consultant expert for patent holder in 20th Century Fox, MGM, and Paramount cases concerning patents related to DVD navigation. Testified at Markman hearings. |

| Date | 2015 | **Nikon** |
|------|------|-----------|
| To:  | Present |         |
|      | Duties: | Consultant. |

| Date | 2015 | **Humax** |
|------|------|-----------|
|      | Duties: | Search and analysis of prior art. |

| Date | 2015 | **Apple** |
|------|------|-----------|
|      | Duties: | Analysis of patent portfolio potentially essential for the H.264 standard. |

| Date | 2014 | **Haier** |
|------|------|-----------|
| To:  | Present |         |
|      | Duties: | Analysis of patent portfolios for smart consumer devices. |

| Date | 2014 | **Cisco** |
|------|------|-----------|
| To:  | Present |         |
|      | Duties: | Consultant. |

| Date | 2014 | **ZTE, Sony, LG, Samsung, Nokia, GoPro** |
|------|------|------------------------------------------|
| To:  | 2015 |                                          |
|      | Duties: | Consulting expert. |

| Date | 2014 | **Tyco** |
|------|------|----------|
| To:  | 2015 |          |
|      | Duties: | Expert reports; declaration in support of Inter Partes Review in Trover matter. |

| Date | 2013 | **Humax** |
|------|------|-----------|
|      | Duties: | Consultant. |

| Date | 2014 | **GE Licensing** |
|------|------|------------------|

|       |         |                                                                 |
|-------|---------|-----------------------------------------------------------------|
| To:   | 2015    |                                                                 |
|       | Duties: | Consultant.                                                     |
| Date  | 2014    | **HikVision & Axis**                                            |
| To:   | 2015    |                                                                 |
|       | Duties: | Declaration in support of Inter Partes Review. Expert reports in Trover matter. |
| Date  | 2014    | **Sharp**                                                       |
| To:   | 2016    |                                                                 |
|       | Duties: | Declaration in support of Inter Partes Review in Wi-Lan matter. |
| Date  | 2013    | **InterDigital**                                                |
| To:   | 2015    |                                                                 |
|       | Duties: | Consulting expert in support of licensing a patent portfolio.   |
| Date  | 2013    | **Apple**                                                       |
|       | Duties: | Consulting expert in National Cheng Kung University matter.      |
| Date  | 2013    | **Acer, ASUS, TPV**                                             |
| To:   | 2014    |                                                                 |
|       | Duties: | Testifying expert in Florida Atlantic University matter.         |
| Date  | 2013    | **Toshiba**                                                     |
| To:   | 2014    |                                                                 |
|       | Duties: | Testifying expert in WiLAN matter.                              |
| Date  | 2013    | **Grass Valley Group**                                          |
|       | Duties: | Consulting expert for defense in FastVDO matter.                |
| Date  | 2013    | **TI**                                                          |
| To:   | Present |                                                                 |
|       | Duties: | Consulting expert.                                              |
| Date  | 2012    | **Vizio**                                                       |
|       | Duties: | Consulting expert in Innovus Prime matter.                      |
| Date  | 2012    | **Haier & Shandong Provincial Government**                      |
| To:   | 2014    |                                                                 |
|       | Duties: | Foreign expert advisor for developing and acquiring patent portfolios for innovative consumer products. Development of a patent pool for patents essential to standards for wireless power. |
| Date  | 2012    | **Vizio**                                                       |
| To:   | 2014    |                                                                 |
|       | Duties: | Consulting expert in MIT matter.                                |

| Date | 2012 | **Nokia** |
| To: | 2013 | |
| | Duties: | Consulting expert. |

| Date | 2012 | **TPV & Vizio** |
| To: | 2013 | |
| | Duties: | Testifying expert for defense in Hitachi matter. |

| Date | 2012 | **Samsung** |
| | Duties: | Consulting expert in Myport matter. |

| Date | 2012 | **Verizon Wireless (Cellco) & T-Mobile** |
| To: | 2013 | |
| | Duties: | Testifying expert for defense in Realtime Data matter. |

| Date | 2011 | **Apple** |
| | Duties: | Consulting expert in Technicolor matter. |

| Date | 2012 | **Microsoft** |
| To: | 2014 | |
| | Duties: | Consulting expert for plaintiff in Motorola matter. |

| Date | 2012 | **Apple & LG** |
| To: | 2014 | |
| | Duties: | Testifying expert for defense in MPT matter. |

| Date | 2011 | **Sanyo & Olympus** |
| | Duties: | Consulting expert for defense in FastVDO matter. |

| Date | 2011 | **Apple** |
| | Duties: | Consulting expert for defense in FastVDO matter. |

| Date | 2011 | **Sony** |
| | Duties: | Consulting expert for defense in FastVDO matter. |

| Date | 2011 | **Philips** |
| To: | 2014 | |
| | Duties: | Consulting expert for licensing essential patents. |

| Date | 2011 | **Apple** |
| | Duties: | Consulting expert for defense in MobileMediaIdeas matter. |

| Date | 2011 | **Video264Innovations** |
| | Duties: | Consulting expert. |

| Date | 2011 | **Nikon, Fujifilm & Panasonic** |
|---|---|---|
| | Duties: | Consulting expert for defense in FastVDO matter. |

| Date | 2011 | **Haier** |
|---|---|---|
| To: | 2014 | |
| | Duties: | Consultant for standards, patent pools and patent licensing. |

| Date | 2011 | **Susman Godfrey** |
|---|---|---|
| | Duties: | Consultant for patent analysis. |

| Date | 2011 | **Vizio** |
|---|---|---|
| | Duties: | Testifying expert for defense in MPT matter. |

| Date | 2011 | **Tivo** |
|---|---|---|
| | Duties: | Consulting expert. |

| Date | 2011 | **Nikon** |
|---|---|---|
| To: | 2013 | |
| | Duties: | Consulting expert for defense in MPT matter. |

| Date | 2011 | **Broadcom** |
|---|---|---|
| | Duties: | Consulting expert. |

| Date | 2010 | **Lionsgate Entertainment** |
|---|---|---|
| | Duties: | Consulting expert in MPEG licensing matter. |

| Date | 2010 | **Verizon** |
|---|---|---|
| To: | 2012 | |
| | Duties: | Testifying expert for defense in ActiveVideo Networks matter. |

| Date | 2010 | **Lenovo** |
|---|---|---|
| To: | 2011 | |
| | Duties: | Consulting expert for defense in licensor matter. |

| Date | 2010 | **Sonic, Cyberlink & Joint Defense Team** |
|---|---|---|
| | Duties: | Consulting expert for defense in Mediostream licensor matter. |

| Date | 2010 | **Wistron** |
|---|---|---|
| To: | 2011 | |
| | Duties: | Consulting expert for defense in Toshiba licensor matter. |

| Date | 2010 | **Panasonic, Pioneer** |
|---|---|---|
| To: | 2011 | |
| | Duties: | Consulting expert for defense in VES licensor matter. |

| Date | 2010 | **Zoran** |
|---|---|---|

| | | |
|---|---|---|
| To: | 2011 | |
| | Duties: | Technical analysis of patents potentially related to video coding standards. |
| Date | 2010 | **Intravisual** |
| To: | 2015 | |
| | Duties: | Consulting expert for patent licensing. |
| Date | 2009 | **Apple** |
| | Duties: | Technical analysis of patents potentially related to video coding standards. |
| Date | 2009 | **SanDisk** |
| | Duties: | Consulting expert re Audio and Video coding patents |
| Date | 2009 | **Lenovo** |
| To: | 2011 | |
| | Duties: | Consulting expert for defense in MPEGLA licensor matter. |
| Date | 2009 | **Polycom** |
| To: | 2010 | |
| | Duties: | Consulting expert for defense in MPT matter. |
| Date | 2009 | **DirecTV** |
| To: | 2011 | |
| | Duties: | Consulting expert for defense in MPT matter. |
| Date | 2009 | **EchoStar** |
| To: | 2010 | |
| | Duties: | Consulting expert for defense in MPT matter. |
| Date | 2009 | **Vizio** |
| | Duties: | Consulting expert for defense in Sony matter. |
| Date | 2009 | **Vizio** |
| To: | 2010 | |
| | Duties: | Consulting expert for defense in LG matter. |
| Date | 2009 | **Vizio, TPV, Amtran** |
| To: | 2010 | |
| | Duties: | Technical report & video presentation to US Customs on design issues related to Funai matter.<br>Testified in ITC hearing, March 2010. |
| Date | 2008 | **Humax (Korea)** |
| To: | 2009 | |

|      |          | Duties: | Audio patent and prior art review. |

| Date | 2008 | **IC Media (Canada)** |
| To: | 2009 | |
|  | Duties: | Design of digital signage. |

| Date | 2008 | **AVS Patent Pool Administration (China)** |
| To: | Present | |
|  | Duties: | Co-Director, leading license negotiations among domestic and multinational licensors. |

| Date | 2008 | **DirecTV** |
|  | Duties: | Prior art search for DirecTV's appeal against Finisar. |

| Date | 2008 | **Pure Digital** |
|  | Duties: | Prior art research and analysis. |

| Date | 2008 | **Wragge (UK)** |
|  | Duties: | Prior art review for two video coding patents. |

| Date | 2008 | **Microsoft** |
|  | Duties: | Extensive non-infringement analysis for patents asserted by Multimedia Patent Trust (MPT). |

| Date | 2008 | **iPotential** |
| To: | 2010 | |
|  | Duties: | Technical analysis of patents potentially related to video coding standards. |

| Date | 2008 | **Alba (UK) aka Harvard Research** |
| To: | 2009 | |
|  | Duties: | General education on essential patents, licensing, prior art related to the MPEG2 video standard. |

| Date | 2008 | **Philips (Holland)** |
|  | Duties: | Review of patents for essentiality. |

| Date | 2008 | **Proview** |
|  | Duties: | Prior art search for TV display features. |

| Date | 2008 | **Nissim** |
| To: | Present | |
|  | Duties: | Consultant expert for plaintiff in Time-Warner case concerning patents related to DVD navigation. |

| Date | 2008 | **Comcast** |

| | | |
|---|---|---|
| | Duties: | Technical analysis of MPEG2 systems, DSM-CC, and carousel operation in the cable TV network environment. Contribution to expert's report in Comcast's successful litigation against Finisar. |
| Date To: | 2007 2009 | **Sun Microsystems** |
| | Duties: | Chief architect of royalty-free video codec: OMS Video. Extensive supporting patent analysis and technical publication analysis for prior art review. |
| Date | 2008 | **SanDisk** |
| | Duties: | Technical analysis of patents and prior art searching for audio coding. |
| Date | 2008 | **Stammberger (Munich)** |
| | Duties: | Technical analysis of patents potentially related to video coding standards. |
| Date | 2008 | **Trigem America Liquidating Trust** |
| | Duties: | Preparation of expert reports concerning litigation between Toshiba and Trigem. |
| Date | 2007 | **Susman-Godfrey** |
| | Duties: | Technical analysis of patents potentially related to video coding standards. |
| Date: | 2007 | **Wong-Cabello** |
| | Duties: | Technical analysis of patents potentially related to video coding standards. |
| Date: | 2007 | **Sisvel** |
| | Duties: | Technical assistance in licensing audio patents to a third party. |
| Date: | 2007 | **Quanta** |
| | Duties: | Technical assistance in litigation related to DVD. |
| Date: | 2006 | **CCTV (China Central TV)** |
| | Duties: | Technical analysis of patents potentially related to MPEG2, H.264, AVS and VC-1 video coding standards and MPEG-AAC and Dolby audio coding standards. |
| Date: | 2006 | **MediaTek** |
| | Duties: | Technical analysis of MediaTek patents potentially related to video coding standards. |
| Date: | 2006 | **Alcatel** |
| | Duties: | Technical analysis of Alcatel patents potentially related to video coding |

standards.

| | | |
|---|---|---|
| Date: | 2006 | **Motorola** |
| | Duties: | Analysis of technologies contributed to the H.264 standard. |

| | | |
|---|---|---|
| Date: | 2005 | **Nokia** |
| | Duties: | Analysis of technologies contributed to the H.264 standard. |

| | | |
|---|---|---|
| Date: | 2005 | **Avid** |
| | Duties: | Technical analysis of patents potentially related to coding standards. |

| | | |
|---|---|---|
| Date: | 2005 | **IBM** |
| | Duties: | Analysis of technologies contributed to the H.264 standard. |

| | | |
|---|---|---|
| Date: | 2005 | **HP** |
| | Duties: | Analysis of selected audio coding patents. |

| | | |
|---|---|---|
| Date: | 2005 | **ComVentures** |
| | Duties: | Due diligence review of a start-up company in the video semiconductor business. |

| | | |
|---|---|---|
| Date: | 2005 | **nVidia** |
| | Duties: | Prior art search for a set of third-party patents. |

Date:    2004    **Microsoft**

Duties:
- Working with a major financial services company, developed a procurement model for managing licensing costs.
- Assisting development of non-infringement positions for a set of patents. (Not in suit.)

From:    2004    **SAGEM (France)**
To:      2005

Duties:    Technical analysis of potential infringement by SAGEM of a set of third-party patents.

From:    2004    **Polycom Inc.**
To:      2005

Duties:    Technical analysis of Polycom patents potentially related to video coding standards.

From:    2004    **Sony Corp.**
To:      2006

Duties:
- Technical analysis of potential infringement by Sony of a set of third-party patents. The parties settled without litigation.
- Analysis of a third-party patent per Sony's direction.

| Date: | 2004 | **On2 Inc** |
|---|---|---|
| | Duties: | Delivery of the comprehensive set of reports on IPR potentially related to the emerging H.264 standard. |

| Date: | 2004 | **Matsushita Avionics** |
|---|---|---|
| | Duties: | Technical analysis of potential infringement of Matsushita patents by a third party. |

| Date: | 2004 | **Connex Inc.** |
|---|---|---|
| | Duties: | Teaching the details of key complex algorithms in the H.264 standard. |

| Date: | 2004 | **DoCoMo (Japan)** |
|---|---|---|
| | Duties: | Delivery of the comprehensive set of reports on IPR potentially related to the emerging H.264 standard. |

| From: | 2004 | **DivX Inc.** |
|---|---|---|
| To: | 2006 | |
| | Duties: | Analysis of technologies contributed to the H.264 standard |

| Date: | 2004 | **Cues, Inc** |
|---|---|---|
| | Duties: | Assisted evaluation of infringement by Cues' products of a patent asserted by a third party. The parties settled without litigation. |

| From: | 2003 | **GE Licensing** |
|---|---|---|
| To: | 2004 | |
| | Duties: | Working with a major financial services company, developed a business, market and financial model for valuation of a portfolio of patents through their expiration. |

| From: | 2003 | **Institute of Computing Technology, Chinese Academy of Sciences** |
|---|---|---|
| To: | Present | |
| | Duties: | |

- Preparation of IPR Report for IPR potentially related to the AVS Video standard. This effort involved review of over 2500 abstracts and over 450 patents.
- IPR Subgroup Chairman of AVS. Formed an IPR Experts group to establish a legal foundation for AVS IPR. This group comprised approximately 20 attorneys and business development managers from eight multinational companies representing the PC, consumer, semiconductor and communication industries. (Broadcom, IBM, Intel, Matsushita, Microsoft, Nokia, Sony, Sun Microsystems). The group drafted a member agreement, bylaws and a formal IPR policy governing licensing commitments, disclosure obligations, and protection of license holder rights. AVS Members approved these documents in September 2004.
- Co-Director of AVS Patent Pool. Leading the drafting and

negotiation of patent pool management and licensing agreements.
- Adjunct Professor, supervising a graduate student project on deinterlacing algorithm development.

| | | |
|---|---|---|
| Date: | 2003 | **Yahoo** |
| | Duties: | Prior art search to provide background information per Yahoo's request. |

| | | |
|---|---|---|
| Date: | 2002 | **Gateway, Inc.** |
| To: | 2007 | |
| | Duties: | Extensive prior art search and assistance with claim construction in a litigation matter with Lucent Technologies. |

| | | |
|---|---|---|
| From: | 2002 | **Apple Computer** |
| To: | 2007 | |
| | Duties: | • Technical analysis of Apple patents potentially related to H.264. |
| | | • Prior art search for various patents per Apple's request. |

| | | |
|---|---|---|
| Date: | 2002 | **Siemens (Germany)** |
| | Duties: | • Technical analysis of Siemens patents potentially related to H.264. |
| | | • Delivery of the comprehensive set of reports on IPR potentially related to the emerging H.264 standard. |

| | | |
|---|---|---|
| Date: | 2002 | **JVT Committee (Apple, Cisco, Nokia, Polycom, Sun Microsystems, Tandberg, Teles, Texas Instruments, UBVideo, VideoLocus)** |
| | Duties: | Developed a comprehensive set of reports on IPR potentially related to the emerging H.264 standard. The reports included a technical review of legacy and new patents for video coding, and analysis of the patent statements provided by all companies whose contributions were adopted into H.264. |

| | | |
|---|---|---|
| Date | 2002 | **Intervideo** |
| | Duties: | Advised on market opportunities in the emerging MPEG4 marketplace. |

| | | |
|---|---|---|
| Date: | 2001 | **Proskauer Rose LLP** |
| | Duties: | Provided background support in MPEGLA's (successful) effort to license MPEG2 to the major PC manufacturers. |

| | | |
|---|---|---|
| Date | 2001 | **Pixonics** |
| | Duties: | Developed marketing plan and marketing support materials for this incubator-stage company. |

| | | |
|---|---|---|
| Date | 2001 | **Eltron, (Taiwan)** |
| | Duties: | Provided overview of the digital video semiconductor market. |

| | | |
|---|---|---|
| Date | 1999 | **nDSP Corporation** |
| | Duties: | Drafted the sales and marketing plan for this early-stage company. |

Joined nDSP full-time.

| Date: | 1998 | **IBM Corp.** |
| | Duties: | Assisted with participation in the ATSC DASE (datacasting) standard. |

| Date | 1998 | **Spruce Technologies** |
| | Duties: | Assisted with transition of Cagent MPEG encoder product after it was sold to Spruce. |

| From: | 1997 | **Samsung Advanced Institute of Technology** |
| To: | 1999 | |
| | Duties: | Supported Samsung researchers in MPEG4 standard development. Led effort to provide error-resilient 3D-mesh coding. |

| Date | 1997 | **MPEGLA LLC** |
| | Duties: | Review of opportunity for an MPEG4 patent pool |

| From: | 1993 | **CableLabs** |
| To: | 1994 | |
| | Duties: | Teamed with a patent attorney to develop the initial essential patent list for MPEG2. Reviewed approximately 10,000 abstracts and 1,000 patents for the MPEG2 Video and MPEG2 Systems standards. This effort led to the MPEGLA patent pool. |

## Litigation Support Experience

| | | **Akin Gump, Fish & Richardson, Finnegan, Baker Hostetler, Washington, DC** |
| | Case | Broadcom vs. Vizio, LG, Funai, MediaTek, MStar, **Investigation No. 337-TA-1047** |
| | Project: | Expert report and deposition on non-infringement of Broadcom's patent. |
| | Status: | Ongoing. |

| | | **Jones Day, Cleveland, OH** |
| | Case | Avid Technology vs. Harmonic, **Case No. C.A. No. 12-627-GMS** |
| | Project: | Expert reports and deposition on infringement of Avid's patent. |
| | Status: | Parties settled before trial. |

| | | **Haynes and Boone, Dallas, TX** |
| | Case | Realtime vs. Riverbed, **Case No. 6:1S-CV-463-RWS-JDL** |
| | Project: | Expert report, deposition and trial testimony (E. District Texas) on invalidity of Realtime patent. |
| | Status: | Jury found Realtime patent invalid at trial. |

              **Akin Gump, LLP, Irvine, CA**

Case        Personalized Media Communications "PMC" vs. TPV et al, **Case No.**
              **2:15-cv-01366-JRG-RSP**
Project:   Declaration in support of claim construction brief.
Status:    Parties settled.

              **Feinberg, Day, LLP, Menlo Park, CA**
Case        Parthenon Unified Memory Architecture "PUMA" vs. Apple, **Case No.**
              **9:12-cv-80701**
Project:   Expert report and deposition concerning unified memory architecture.
Status:    Trial stayed at request of PUMA. Parties settled.

              **Carey, Rodriguez, LLP, Miami**
Case        *Twentieth Century Fox Home Entertainment, LLC, Paramount Pictures
              Corp., vs. Nissim Corp., **Case No. 14-81349/813450-cv-MARRA**
Project:   Expert witness for patent owner in counterclaims for infringement.
              Declaration and expert testimony at Markman Hearings concerning DVD
              standards essential patents.
Status:    Parties settled before trial.

              *Nissim asserted its patents against Twentieth Century Fox and
              Paramount. The latter filed a complaint seeking a declaratory judgment
              of non-infringement and invalidity.

              **TechKnowledge Law Group, Turner Boyd LLP & O'Melveny &**
              **Myers LLP, Los Angeles,**
Case        Florida Atlantic University Research Corporation vs. Acer, ASUS &
              TPV, **Case No. 9:12-cv-80701**
Project:   Expert testimony at Markman Hearings concerning scan converter
              design. Expert reports and deposition testimony.
Status:    Parties settled before trial.

              **Finnegan, Henderson, Farabow, Garrett & Dunner, LLP**
Case        WiLAN vs. Toshiba, **Case No. 1:12-Civ-23744**
Project:   Expert reports & deposition testimony concerning digital television
              design.
Status:    Parties settled before trial.

              **O'Melveny & Myers LLP, Los Angeles & Akin Gump LLP, Dallas**
Case        Hitachi vs. TPV, **Case No. 2:10-CV-260-JRG**
Project:   Expert reports, depositions & trial testimony (E. District Texas)
              concerning digital television design.
Status:    Jury found no infringement of Hitachi's patents by TPV and found
              Hitachi's patents invalid. (Partially reversed by JMOL)

              **Fish & Richardson P.C. San Diego**
Case        Multimedia Patent Trust vs. Apple & LG, **Case No. 10-cv-2618 H**

Project:    Expert report, & deposition testimony concerning development of
            technology, standards and patents for video coding**.**
Status:     Jury found no infringement of MPT's patents and found MPT's patents
            invalid.

**Gibson Dunn LLP, Palo Alto**
Case        <u>Realtime Data vs. Verizon Wireless & T-Mobile,</u> **Case No. 6:10-cv-
            00493-LED**
Project:    Expert reports, depositions and testifying expert in jury trial (E. District
            Texas) concerning infringement and validity of patents related to data
            transmission.
Status:     Jury found no infringement of Realtime Data's patents by T-Mobile, and
            found Realtime Data's patents invalid.

**O'Melveny & Myers LLP, San Francisco**
Case        <u>MobileMediaIdeas vs. Apple,</u> **Case No. 10-258-SLR**
Project:    Expert reports and deposition, concerning infringement and validity of
            patents related to MPEG Audio Layer III ("mp3") coding.
Status:     Trial bifurcated.

**Jones Day, Cleveland**
Case        <u>Multimedia Patent Trust Vs. Vizio,</u> **Case No. 09-CV-0278-H (CAB)**
Project:    Expert report, concerning infringement of patents related to H.264 video
            coding. (Slated for deposition and jury trial)
Status:     Parties settled on the day before my deposition.

**Kellog, Huber, et al, Washington, DC**
Case        <u>Active Video Vs. Verizon, No. 2:10-cv-00248-RAJ-FBS; 2011</u>
Project:    Expert report, deposition and testifying expert in jury trial concerning
            infringement of patents related to video-on-demand
Status:     Jury finding of infringement with significantly reduced damages and no
            finding of willful infringement.

**Jones Day, Washington, DC**
Case        <u>Funai Vs. Vizio, et al, ITC Investigation No. 337-TA-617; 2010</u>
Project:    Expert report, deposition and testifying expert in ITC hearing concerning
            infringement of a patent related to ATSC broadcast standards
Status:     Parties settled after the hearing following reports adverse to complainant.

**Wilson Sonsini, Goodrich and Rosati, Palo Alto, CA.**
Case        <u>Terayon vs. RGB Networks; 2007</u>
Project:    Expert report for defendant in a contract dispute alleging violation of a
            non-compete agreement.
Status:     Mediation hearing resolved the dispute to the satisfaction of both parties.

**Wilmer Cutler Pickering Hale and Dorr, Boston, MA**

Case      Qualcomm Inc. vs. Broadcom Corp. No. 05 CV 1958 B (BLM); 2007
Project:   Expert report and deposition on behalf of Broadcom against assertions of infringement of patents concerning video encoding and decoding, and on Qualcomm's compliance with the policies and procedures for IPR policy in the H.264 standards committee (JVT of ITU-ISO/IEC).
Status:    Broadcom found not guilty of infringing Qualcomm's patents. The patents were determined to be not essential for implementing the H.264 standard. Qualcomm found guilty of inequitable behavior in the manner of their participation in the H.264 standards committee. Qualcomm's patents held unenforceable against H.264.

**Greenberg Glusker Fields Claman Machtinger & Kinsella**.
Case      DTS vs. MediaTek; 2005
Project:   Expert report for defendant in a contract dispute related to hacking into semiconductor chips to enable functionality for which a license fee was payable.
Status:    Mediation hearing resolved the dispute to the satisfaction of both parties. The Mediator personally thanked me for the clarity of my report, which covered technical, business and licensing issues.

**Arvay Finley Barristers**, Victoria, BC, Canada.
Case      AVT Audio Visual Telecommunications vs. University of British Columbia; 2005
Project:   Expert report and testimony on behalf of AVT in a contract dispute related to mobile video communication including failure to disclose intellectual property.
Status:    Arbitration hearing resulted in adverse ruling to AVT.

**Thelen Reid & Priest**, San Jose, CA.
Case      Toshiba Corp. vs. Trigem Computer Inc. & Trigem America Corp. Case No. CV-03-4558-GHK(AJWx); 2005
Project:   Expert report on behalf of Trigem regarding invalidity of patents relating to video and sub-picture data in multimedia computer systems.
Status:    Suspended due to insolvency of Trigem.

**Morrison & Foerster LLP**, San Francisco, CA.
Case      Tivo Inc. vs. Echostar Communications Corp., Echostar DBS Corp., Echostar Technologies Corp ,& EchoStar LLC, Case No. 2-04CV-01; 2005
Project:   Expert report and deposition on behalf of Echostar against assertions of infringement of a patent concerning personal video recorders (PVR).
Status:    Adverse ruling to Echostar.

**Pinsent Curtis Biddle**, Leeds, UK
Case      Thomson Licensing S.A. and Deutsche Thomson Brandt GmbH vs. Pace Micro Technology PLC. Case No. HC 2000 No. 1584; 2001

Project: Expert report and slated to testify on behalf of Pace arguing invalidity of patent and defending against assertions infringement of a patent concerning interlaced video coding.

Status: Parties agreed to settlement on the second day of trial. Settlement terms were very favorable to defendant, and shortly after the trial, Thomson joined the MPEGLA patent pool.

## Education

| | | |
|---|---|---|
| 1974 | University of Sussex, England | Ph.D., Applied Sciences (EE/CS) Thesis on "Orthogonal Transform Coding of Still and Moving Pictures". All research performed in residence at the Image Processing Institute, USC Los Angeles, CA. |
| 1970 | University of Liverpool, England | Bachelor of Engineering with Honours, Physical Electronics |

## Publications (Partial List)

C Reader, "Orthogonal Transform Coding of Still and Moving Pictures", Ph.D. thesis, U. Sussex, England, 1973.

C. Reader, "Intraframe and Interframe Adaptive Transform Coding." SPIE Vol. 66, pp. 108-117, *Efficient Transmission of Pictorial Information* (1975).

C. Reader, W.H. Chen, "Local Retransmission of Compressed Imagery Data", SPIE Vol. 149 pp. 196-204, *Applications of Digital Image Processing* (1978).

L. Hubble, C. Reader, "State of the Art in Image Display Systems", SPIE Vol. 199, pp 2-8, *Advances in Display Technology* (1979).

C. Reader, W. D. Flanagan, "Design Considerations for Real-Time Image Processing", SPIE Vol. 180, *Real-Time Signal Processing II,* (1979).

C. Reader, L. Hubble, "Trends in Image Display Systems", Proc. IEEE, Vol. 69, No. 5, pp. 606-614, (1981).

J. Adams, C. Patton, C. Reader, D. Zamora, "Hardware for Geometric Warping", Electronic Imaging, April 1984.

*Digital Image Processing Techniques (Computational Techniques),* Michael P. Ekstrom (Editor), Chapter describing hardware for real-time image processing and display systems, Academic Press, 1984, pp. 289-360.

C. Reader, et al, "A New Architecture for Real-Time Image Processing," SPIE Vol. 534, pp. 72-78, *Architectures and Algorithms for Digital Image Processing II* (1985).

B. Thacker, R. Rinaldi, C. Reader, "Multiwindow Displays of Text, Graphics and Images", SPIE Vol. 757, pp. 104-110, *Methods of Handling and Processing Imagery* (1987).

Keynote opening speech at IEEE Conference on Image Processing, 1994.

C. Reader, "MPEG4: Coding for Content, Interactivity, and Universal Accessibility," Optical Engineering, Vol. 35, No. 1 pp. 104-108 (1996).

C. Reader, P. Schirling, A. Puri, MPEG Tutorial paper at IEC – NCF/Infovision '97.

O. Avaro, P.A. Chou, A. Eleftheriadis, C. Herpel, C. Reader, J. Signes, "The MPEG4 Systems and Description Languages: a Way Ahead in Audio Visual Information Representation", Signal Processing: Image Communication, Vol. 9, No. 4, pp. 385-431 (1997).

*MPEG Video Compression Standard,* Edited by Mitchell, Pennebaker, Fogg, Le Gall. Chapman & Hall, 1997. Chapter describing the process of establishing the MPEGLA patent pool, Chapter 16, *MPEG Patents,* pp.357-362.

W Gao, C Reader, F Wu, Y He, L Yu, H Lu, S Yang, T Huang, X Pan, "AVS - The Chinese Next-Generation Video Coding Standard", Proc. NAB Conf., 1994.

C Reader, "Origins of the performance of H.264/AVC: an account of the development of H.263 and H.264 coding tools", SPIE Vol. 5909, pp59090W-1-8 Applications of Digital Image Processing XXVIII (2005).

C Reader, "AVS Intellectual Property Rights (IPR) Policy, J. Comput. Sci. & Technol., Co. 21, No. 3 (May 2006).

Q Huang, W Gao, D Zhao, C Reader, "A Real-Time Video Deinterlacing Scheme for MPEG-2 to AVS Transcoding", Advances in Multimedia Information Processing - PCM 2006, Vol. 4261/2006, Springer Berlin / Heidelberg.

Wen Gao, Tiejun Huang, Cliff Reader, Weibei Dou, Xilin Chen, "IEEE Standards for Advanced Audio and Video Coding in Emerging Applications", Computer, vol.47, no. 5, pp. 81-83, May 2014.

Ma S, Huang T, Reader C, Gao W, AVS2-Making video coding smarter [Standards in a Nutshell], IEEE Signal Processing Magazine, vol. 32, no. 2, pp. 172 - 182, 2015.

Wang R, Huang T, Park S-H, Kim J-G, Jang E S, Reader C, Gao W, The MPEG Internet Video-Coding Standard [Standards in a Nutshell], IEEE Signal Processing Magazine, Vol. 33, No. 5, pp. 164-172, Sep. 2016.

Reader C, Patent Landscape for Royalty-Free Video Coding, SPIE Vol. 9971, Sep., 2016

---

## Patents

| Patent Number | Date Issued | Title |
|---|---|---|
| 6,192,073 | 2000 | Methods and apparatus for processing video data |
| 5,845,112 | 2000 | Method for performing dead-zone quantization in a single processor instruction. |

---

## Academic Positions

Taught "early bird" classes at Santa Clara University in Image Processing and Digital Signal Processing

Adjunct Professor of the National Engineering Laboratory for Video Technology, in the Computer Science Department at Peking University, Beijing, China.

---

## Professional Associations and Achievements
- ISO/IEC Certificate of appreciation for development of the MPEG4 standard.
- Senior Member IEEE.
- Member SPIE.
- Member ACM.
- Member AES.
- Member SMPTE.

---

## Contact Information
- 1654 Hillstone Ave.
  Escondido
  CA 92029
- 408 867 4884 Mobile-Office
- cliffreader Skype
- CliffReader WeChat
- cliff@reader.com
- www.reader.com

---

**Resume of Cliff Reader, Ph.D.**                                   **Page 22**

# EXHIBIT 62

Exhibit 1

## U.S. Patent No. 5,671,018 to Ohara
## Invalidity Claim Chart for the '654 Patent
Asserted Claims: 1, 4, and 9

| *Ohara* - Claim 1 | | |
|---|---|---|
| 1(p) | 1. A method for displaying interlaced video data on a non-interlaced monitor, the interlaced video data comprising a plurality of paired fields, each pair of fields being vertically offset relative to each other by one-half of a field line spacing distance, each field comprising a plurality of lines of video data, the method including: | U.S. Patent No. 5,671,018 to *Ohara* ("*Ohara*"), with a priority date of February 7, 1995, teaches "a method for displaying interlaced video on a non-interlaced monitor." Therefore *Ohara* was prior art to the '654 Patent under at least 35 U.S.C. §§ 102(a)-(b) and (e).  I understand that the Court has construed the preamble to be limiting.  *Wi-LAN v. Sharp Electronics Corporation*, Case No. 15-379 (LPS) (CJB), D.I. 281; *Wi-LAN v. VIZIO, Inc.*, Case No. 15-788 (LPS) (CJB), D.I. 220.<br><br>*Ohara* confirms that methods for displaying interlaced video data on a non-interlaced monitor were known even before *Ohara* was filed in 1995. In particular, the "background of the invention" in *Ohara* discloses that digital systems of the time, which included both computer display (i.e., non-interlaced monitor) and televisions systems, were designed to perform various video signal processing tasks for displaying video data. *Ohara* acknowledges that various algorithms existed prior to 1995 to add or subtract pixel data. *Ohara* goes on to state that many television signals have interlaced fields, which include paired odd and even fields. As would readily be known to a person of ordinary skill in the art, the lines on the odd and even fields would necessarily be vertically offset relative to each other by one-half of a field line spacing distance, and those fields would also necessarily include a plurality of lines of video data. |

Exhibit 1



| *Ohara* - Claim 1 |
| --- |

Today's digital image display systems are designed to perform various video signal processing tasks. These digital image display systems include computer display systems, as well as many of today's television systems.

One video signal processing task is scaling, where the number of pixels per row is increased or decreased (horizontal scaling) or the number of rows is increased or decreased (vertical scaling). Various algorithms have been devised to add or subtract the pixel data required for scaling.

Many of today's television signals have interlaced fields, where odd lines are in one field and even lines are in the next. On a CRT display, the fields are scanned separately, but every two adjacent fields are perceived as one complete "frame" of an image.

*Ohara* at 1:9-22.

*Ohara* also teaches basic components that could be used as a part of the digital image display system as shown in Fig. 1 below.  The digital image display system implemented the methods for displaying interlaced video data on a non-interlaced monitor.

*FIG. 1*

*Ohara* at Fig. 1.

*Ohara* further discloses specific scaling/adjusting techniques, including specific methods of using weighted interpolation to generate pixels at the correct spatial positioning, as shown and described in the following sections of this Exhibit, the content of which is incorporated

Exhibit 1

| | | *Ohara* - Claim 1 |
|---|---|---|
| | | by reference herein. Those scaling/adjusting techniques inherently involve methods for displaying interlaced video data on a non-interlaced monitor, the interlaced video data comprising a plurality of paired fields, each pair of fields being vertically offset relative to each other by one-half of a field line spacing distance, each field comprising a plurality of lines of video data.

Therefore, *Ohara* teaches "method for displaying interlaced video data on a non-interlaced monitor, the interlaced video data comprising a plurality of paired fields, each pair of fields being vertically offset relative to each other by one-half of a field line spacing distance, each field comprising a plurality of lines of video data." |
| 1(a) | capturing a first field and a second field of each pair of fields into respective buffers; | I understand that the Court has construed the term "respective buffers" to mean "separate buffers for the first field and the second field." *Wi-LAN v. Sharp Electronics Corporation*, Case No. 15-379 (LPS) (CJB), D.I. 281; *Wi-LAN v. VIZIO, Inc.*, Case No. 15-788 (LPS) (CJB), D.I. 220.  *Ohara* teaches a method of "capturing a first field and a second field of each pair of fields into respective buffers."

Specifically, *Ohara* teaches using field and line buffers to perform various pixel data processing tasks.  The field buffers disclosed by *Ohara* correspond to the claimed first field and second field buffers of claim 1.

Processor system **13** prepares the data for display, by performing various pixel data processing tasks. Processor system **13** includes various memory devices for storing pixel data during processing, such as field and line buffers.

*Ohara* at 2:35-38.

I note that the accused products use line buffers, and that Wi-LAN is interpreting this limitation to be broad enough to cover line buffers as well.  While I disagree with Wi-LAN's position here, to the extent that Wi-LAN's interpretation is adopted by the Court, I |

Exhibit 1

| *Ohara* - Claim 1 |
|---|

|  |  | note that Ohara discloses the use of line buffers as well, and therefore anticipates this claim limitation under that interpretation as well.

Further, *Ohara* teaches the use of frame memory 14, which can be a "double buffer" memory where one buffer is used to capture a first frame, and another buffer is used to capture a second frame.

> Frame memory **14** receives processed pixel data from processor system **13**. Frame memory **14** formats the data, on input or on output, into "bit-plane" format, and delivers the bit-planes to SLM **15** one at a time. The bit-plane format permits each pixel element of SLM **15** to be turned on or off in response to the value of one bit of data at a time. In a typical display system **10**, frame memory **14** is a "double buffer" memory, which means that it has a capacity for at least two display frames. The buffer for one display frame can be read out to SLM **15** while the buffer for another display frame is being written. The two buffers are controlled in a "ping-pong" manner so that data is continuously available to SLM **15**.

*Ohara* at 2:53-65; *see also Ohara* at 2:15-34 (below). |

Exhibit 1

| *Ohara* - Claim 1 |
| --- |

For purposes of example, system **10** is illustrated as receiving an analog video signal, such as a broadcast television signal. It is assumed that the input signal is a "color difference" signal, having a luminance component and a color difference component. Only those components significant to main-screen processing are shown. Other components, such as might be used for processing synchronization and audio signals or for features such as closed captioning, are not shown.

As an overview of the operation of display system **10**, signal interface **11** receives the analog video signal and separates video, synchronization, and audio signals. Signal interface **11** delivers the video signal for the main image to A/D converter **12***a* and Y/C separator **12***b*, which convert the signal into pixel-data samples and which separate the luminance ("Y") data from the chrominance ("C") data, respectively. In FIG. **1**, the signal is converted to digital data before Y/C separation, but in other embodiments, Y/C separation could be performed before A/D conversion, using analog filters.

Ohara also teaches a comparison of "field-to-field pixel values" Ohara at 3:51-53 A person skilled in the art would understand this to be a comparison of pixel values from two separate fields, with each field in its own buffer.

Therefore, *Ohara* teaches "capturing a first field and a second field of each pair of fields into respective buffers."

Modifying *Ohara* to store a second field in a second buffer would have been obvious to a person of skill in the art for several reasons, including because the benefits associated with double buffering were known in the art. For example, the Description of the '654 Patent teaches that a motivation *existed in the art* to use two buffers to receive input signals – namely that the problem of "tearing" could be avoided.

Exhibit 1

| Ohara - Claim 1 |
|---|

| | | | The multiple buffering is to ensure that a video buffer is not being updated while it is being displayed, to avoid "tearing" (a horizontal discontinuity in the displayed data caused by the simultaneous display of part of one field and part of the following field)—a technique commonly known in the art and discussed in Keith Jack (see pages 358–359). '654 Patent, at 4:58-63. As noted therein, *Keith Jack* discusses this motivation extensively. For example, *Keith Jack* details both the cause of video artifacts caused by use of a single buffer ("It is due to the updating of video frame buffers not being synchronized to the graphics display") and a known solution (use of two buffers): Tearing occurs when a video picture is not from a single video frame, but rather is a portion of two separate frames. It is due to the updating of the video frame buffers not being synchronized to the graphics display. As a result, a video picture may not be from a single video frame, but rather a portion of two separate frames. Switching between the video frame buffers must be done during the display vertical retrace interval only after the video frame buffer that is to be used to drive the display has been completely updated with new video information. *Keith Jack*, at 14. *Keith Jack* goes on to explain that not only was the problem of 'tearing' known in the art, it was a concern addressed by "most systems" and had a known solution: "us[ing] multiple video frame stores": |

Exhibit 1

| *Ohara* - Claim 1 |
|---|



*Id.* at 358-359.

Capturing a first field and a second field of each pair of fields into respective buffers would have yielded known benefits, including as described in *Keith Jack* and the Description and Background of the '654 Patent itself.

Indeed, *Ohara* illustrates and discusses the use of a "double buffer" memory, which has the capacity for at least two display frames as described above. *Ohara* describes the multiple buffers can be used in a "ping-pong" manner such that data is continuously available. *Ohara* at 2:53-65. While *Ohara* describes the ping-pong operation on a frame basis, an alternate use of the buffers would have been to ping-pong the storage and retrieval of data on a field basis. This would have been a simple design choice that a person having ordinary skill in the art would have known as an option. This aspect of *Ohara* is entirely consistent with, and provides an example of, a system that uses multiple video frame stores as discussed in *Keith Jack*. *Ohara* also discusses using multiple buffers in the context of a video display system that performs processing of component video signals. *Ohara* at 2:15-

Exhibit 1

| | | *Ohara* - Claim 1 |
|---|---|---|
| | | 34. The teachings of *Ohara* and *Keith Jack* are entirely consistent with one another, which would have been apparent to a person having ordinary skill in the art.<br><br>Based on the foregoing, a motivation to avoid tearing through use of two buffers ("double buffering") was known in the art. Implementing use of two buffers was a technique "commonly known in the art" as conceded by the '654 Patent and as reflected in *Keith Jack*. *See generally* '654 Patent, at 168:14-169:-11; *and also see id.* at 412 (defining "Double Buffering" and explaining solution).  Persons of skill in the art would have therefore been motivated to improve *Ohara* with the teachings of *Keith Jack*.<br><br>In addition, it would have been obvious to try combining or modifying *Ohara* because there were only a finite number of predictable solutions, because known work in the field prompted variations based on predictable design incentives, or in light of market forces either in the field or analogous and related fields would have suggested the combination. Indeed, the combination of *Ohara* with the teachings described here would have been obvious because the combination represents known potential options with a reasonable expectation of success.  No technical barrier would have prevented *Ohara* from being modified to capture both fields into separate buffers, as recited in claim 1. No unexpected results would have arisen and no undue experimentation would have been required.  These techniques were well known in the art (*see Keith Jack*) so their implementation would have been well within the skill of a person of ordinary skill in the art.  Consequently, a person of skill would have been motivated to and capable of combining or modifying *Ohara* with the teachings of *Keith Jack*.<br><br>The discussion in Paragraphs 350 through 352, and Sections VIII.D.4(a) and VIII.D.4(b)(i)-(vi) are incorporated by reference.<br><br>Therefore, *Ohara* in view of *Keith Jack* and prior art admissions in the Description of the '654 Patent renders obvious "capturing a first field and a second field of each pair of fields into respective buffers." |

Exhibit 1

| | *Ohara* - Claim 1 | |
|---|---|---|
| 1(b) | scaling each of the first field and second field of each pair of fields to fill vertical resolution of the non-interlaced monitor; | I understand the Court has construed "scaling" to mean "changing the vertical resolution by changing by a constant factor the number of lines in a field." *Wi-LAN v. Sharp Electronics Corporation*, Case No. 15-379 (LPS) (CJB), D.I. 281; *Wi-LAN v. VIZIO, Inc*., Case No. 15-788 (LPS) (CJB), D.I. 220.  I further understand that Wi-LAN's infringement contentions appear to identify de-interlacing by, for example, certain interpolation functions, allegedly performed by the Accused Products as allegedly meeting this limitation.  *See, e.g.,* October 2, 2017 Final Infringement Contentions to Defendants[1] ("Final Infringement Contentions"), at [SEC] 79-81 and [VIZIO] 80-82 (field merging), [SEC] 83 and [VIZIO] 85 (interpolation); *and see id.* at [SEC] 79-120 and [VIZIO] 80-121.  I further understand that the '654 Patent teaches that with interpolation, "although the number of lines is doubled, the vertical resolution is not increased from the original data[.]"  '654 Patent, at 2:25-29 (citing pages 332-333 of Keith Jack).  To the extent Wi-LAN alleges that that de-interlacing by, for example field merging, scan line duplication, or scan line interpolation scale a field "to fill the vertical resolution of the non-interlaced monitor[,]"  it is my opinion that *Ohara* teaches this limitation.<br><br>In particular, *Ohara*'s background section teaches that various scaling methods existed when *Ohara* was filed. Those prior art methods included scaling methods for fields of video data ultimately displayed on non-interlaced monitors, which were used to, among other things, increase or decrease the number of rows (which *Ohara* describes as vertical scaling). |

---

[1]     I understand Wi-LAN subsequently served a legible copy of these contentions on February 21, 2018.

Exhibit 1

| *Ohara* - Claim 1 |
|---|
| | | | Today's digital image display systems are designed to perform various video signal processing tasks. These digital image display systems include computer display systems, as well as many of today's television systems.<br><br>One video signal processing task is scaling, where the number of pixels per row is increased or decreased (horizontal scaling) or the number of rows is increased or decreased (vertical scaling). Various algorithms have been devised to add or subtract the pixel data required for scaling.<br><br>Many of today's television signals have interlaced fields, where odd lines are in one field and even lines are in the next. On a CRT display, the fields are scanned separately, but every two adjacent fields are perceived as one complete "frame" of an image.<br><br>*Ohara* at 1:9-22; *see also id.* at 1:32-34 (below).<br><br>One aspect of the invention is a method of vertically scaling an image represented by a digital video signal having interlaced fields. The method is performed on a pixel-by-<br><br>*Ohara*'s background section also observes that scaling is conventionally performed on single fields because motion between fields diminishes picture quality if fields are combined for scaling. *Ohara* at 1:23-29.<br><br>The overall inventive concept of Ohara is to scale using inter-field scaling when there is no motion between fields, intra-field scaling when there is motion between fields, or a weighted combination of both methods.  Processing is performed in a pixel basis by calculating a measure of movement.  For example, *Ohara* discloses scaling techniques to create new lines of pixel data.  As described below, conventional scaling techniques, such as line-doubling or interpolation, can be used to create new lines of pixel data. |

Exhibit 1

| *Ohara* - Claim 1 |
|---|
| 

*Ohara* at 4:45-55; *see also id*, Fig. 4 (below).

*Ohara* also teaches various scaling techniques for creating pixels of lines for output fields. For example, *Ohara* discloses examples of intra-field and inter-field scaling involving bi-linear interpolation for "3:4" scaling[2].  *Ohara* further discloses algorithms that can be used to create new pixel line data to fill vertical resolution of the monitor.  Figures 6 and 7 of *Ohara*, along with the accompanying text, flesh out the details of these scaling method. |

[2] Ohara contains several evident typos. With reference to the cited text and figure 6, the scaling ratio should be 5:4, the input fields should be B0 ,,, B3 … Bn and the output lines should be designated as Z0 … Z3 …m, and Y0 … Y3 …Ym.

Exhibit 1

| *Ohara* - Claim 1 |
| --- |
| FIG. 6 illustrates an example of intra-field scaling, specifically, bi-linear interpolation for 3:4 scaling. Data from fields n-1 and n are used to create data for new fields n-1 and n, respectively. The pixels of lines $0, \ldots 3, \ldots n$ of the input fields are designated as $A0 \ldots A3, \ldots An$, and as $B0, \ldots Z3, \ldots Bn$. The pixels of lines $0, \ldots 4, \ldots n$ of the output field are designated as $Z0, \ldots Z4, \ldots n$, and as $Y0, \ldots Y4, \ldots Yn$. For field n, the algorithm for every four lines is:<br><br>$Y0 = A0$<br>$Y1 = \frac{1}{4} A0 + \frac{3}{4} A1$<br>$Y2 = \frac{1}{2} A1 + \frac{1}{2} A2$<br><br>$Y3 = \frac{3}{4} A2 + \frac{1}{4} A3$<br>For field n-1, the algorithm for every four lines is:<br><br>$Z0 = \frac{1}{8} B0 + \frac{7}{8} B1$<br>$Z1 = \frac{3}{8} B1 + \frac{5}{8} B2$<br>$Z2 = \frac{5}{8} B2 + \frac{3}{8} B3$<br>$Z3 = \frac{7}{8} B3 + \frac{1}{8} B4$<br><br>Examples of intra-field vertical scaling algorithms, such as bi-linear and cubic interpolation for various scaling ratios, are described in U.S. patent Ser. No. 08/147,249, incorporated by reference above, and in U.S. patent Ser. No. 08/091,852, entitled "Method and Device for Multi-Format Television". These patent applications are assigned to Texas Instruments Incorporated and are incorporated by reference herein. The cubic interpolation method uses three input pixel values for each new pixel value, rather than two.<br><br>*Ohara* at 4:56-5:16. |

Exhibit 1

| *Ohara* - Claim 1 |
|---|



*Ohara* at Fig. 6 (demonstrating how, for example, Field n-1 starts with five pixel values, then ends with four pixel values, therefore changing the vertical resolution by changing by a constant factor the number of lines in a field).

Overall, a person of ordinary skill in the art would have recognized that *Ohara* teaches a system using scaling methods that process pixel values on a line-by-line basis, where new pixel values are generated for a vertically scaled image.  Examples of how the system can be arranged as disclosed in *Ohara* as shown and described below.

Exhibit 1



| ***Ohara* - Claim 1** |
|---|

*Ohara* at Fig. 3.

FIG. 3 is a functional block diagram of the vertical scaling process **13***a*. The steps illustrated in FIG. **3** are implemented with programming stored in a program memory to be executed by processor system **13**. As stated above, for purposes of example, the data being processed is Y pixel data, although demodulated C pixel data (Cr, Cb or R-Y, B-Y or I, Q) or RGB pixel data could be similarly processed. As stated above, the process of FIG. **3** could be implemented with one or more serial video processors, which process pixel values on a line-by-basis.

*Ohara* at 3:40-49.

Exhibit 1

| | | |
|---|---|---|
| | | *Ohara* - Claim 1 |

The result of the motion detection process is an n-bit value, M, whose magnitude indicates motion. Each pixel to be generated by scaling has an associated M value.

Referring again to FIG. 3, the pixel data is also processed with both an inter-field scaling process **35** and an intra-field scaling process **36**. These processes are performed in parallel on the same stream of pixel data. They both generate new pixel values for the vertically scaled image, but use different data.

The intra-field scaling process **35** is performed with data in the same field. Intra-field scaling is suitable for images that have motion, because temporal variations in the image from frame to frame will not be reflected in the new pixel values.

*Ohara* at 4:31-44.

According to these teachings, *Ohara* can be used to change the vertical resolution by changing by a constant factor the number of lines in a field.

*Ohara* also teaches that its invention can be used with any display systems.

processing on the data. System **10** uses a spatial light modulator (SLM) to generate images from the data. System **20** uses a cathode ray tube (CRT), where the data is converted to analog form after being processed. In general, the invention could be used with any display system that digitally processes image data.

*Ohara* at 2:3-8.

Therefore, *Ohara* teaches "scaling each of the first field and second field of each pair of fields to fill vertical resolution of the non-interlaced monitor."

Exhibit 1

| *Ohara* - Claim 1 | | |
|---|---|---|
| | | Furthermore, modifying *Ohara* to scale each of the first field and second field of each pair of fields to fill vertical resolution of a non-interlaced monitor would have been obvious for several reasons, including at least because the benefits of "scal[ing] (interpolat[ing])" the number of scan lines "up to … however many [scan lines] are in the current display mode" were admittedly known in the art, consistent with Wi-LAN's allegations regarding this element.  *See, e.g.,* Final Infringement Contentions, at [SEC] 95 and [VIZIO] 96. <br><br>For example, scaling by interpolation to fill a display, consistent with Wi-LAN's allegations regarding this element, was an admittedly known method in the art, as admitted in the Description of the '654 Patent and *Keith Jack*: |

Exhibit 1

| *Ohara* - Claim 1 |
|---|
| <table><tr><td></td><td></td><td><p>Until now there have been two commonly used simple methods for displaying interlaced video being fed into the computer system on a computer monitor. These are normally independent of whether the computer monitor is interlaced or not, as even when the monitor is interlaced it normally refreshes at a rate independent of the incoming video signal.</p><p>Throughout this description NTSC video is assumed for the sake of illustrative examples, with references to 240 line fields, 480 line frames, 60 fields per second and 30 frames per second. This does not restrict the invention to NTSC or the line counts or frame or field rates but is merely used for simplicity. The invention is equally applicable to other video standards such as, but not limited to, PAL with 288 line fields, 576 line frames, 50 fields per second and 25 frames per second.</p><p>The first method is just capturing one of the two fields, and displaying 240 lines scaled (interpolated) up to 480 or however many are in the current display mode. The special case of scaling to 480 lines (line doubling) is currently used in the art and is well documented. See pages 332–333 of "Video Demystified: a Handbook for the Digital Engineers" by Keith Jack, HighText Publication Inc., 1993 (referred to herein as "Keith Jack").</p><p>The second method is to perform simple de-interlacing where both fields are captured into a single 480 line buffer and double the buffer line length for a single field in order to store a field in every other line. This is referred to as "Field Merging" (see p. 333 of Keith Jack)</p></td></tr></table> |

'654 Patent, at 1:18-46; *and see, e.g.,* Final Infringement Contentions, at [SEC] 83, 95 and [VIZIO] 85, 96.

*Keith Jack*, as cited in the Description of the '654 Patent, identifies and describes techniques known in the art for performing an interlaced to non-interlaced conversion. *Keith Jack*, at 332 (scan line duplication), 333 (scan line interpolation), and 333-335 (field merging); *and see id.* at 333-334, at Figures 9.3, 9.4, and 9.5:

Exhibit 1

| *Ohara* - Claim 1 |
|---|



Figure 9.3. Deinterlacing using Scan Line (Field-based) Duplication. Shaded scan lines are generated by duplicating the real scan line above it.

Figure 9.4. Deinterlacing using Scan Line (Field-based) Interpolation. Shaded scan lines are generated by interpolating between the real scan lines above and below it.

Figure 9.5. Deinterlacing using Field Merging. Shaded scan lines are generated by using the real scan line from the next or previous field.

As illustrated in Figures 9.3, 9.4, and 9.5, *Keith Jack* demonstrates that persons of ordinary skill used various techniques known in the art to generate additional scan lines from an input field to create an output frame that is scaled to fill vertical resolution of the non-

Exhibit 1

| *Ohara* - Claim 1 |
|---|

<table>
<tr>
<td></td>
<td></td>
<td>

interlaced monitor, consistent with Wi-LAN's allegations regarding this element.  *And see, e.g.,* Final Infringement Contentions, at [SEC] 83, 95 and [VIZIO] 85, 96.

A person of skill would have been motivated to perform any such scaling on "each pair of fields to fill vertical resolution of the non-interlaced monitor," consistent with Wi-LAN's allegations regarding this element, and indeed there is no reason that any person of skill would have failed to do so.  *See, e.g.,* Final Infringement Contentions, at [SEC] 83, 95 and [VIZIO] 85, 96.  Persons of skill in the art at the time of the claimed invention understood that a higher framerate resulted in a higher quality video, including with less flicker:

> **PAL**  PAL stands for Phase Alternation Line. PAL is to Europe as NTSC is to North America. In other words, PAL is the video standard used in Europe and a few other countries. There are a few differences. PAL uses 625 lines per frame while NTSC has 525 lines. Therefore, PAL has higher vertical resolution. The frame rate of NTSC is 30 frames per second while for PAL it is 25. This means the update rate for NTSC is higher and therefore there is more flicker with PAL. PAL uses the YUV color space while NTSC uses YIQ or YUV. That's no big deal, just a little mathematical difference. It is becoming increasingly important for imaging systems suppliers to produce equipment that can be sold worldwide without many manufacturing difficulties. This implies that the equipment must be designed from the start to accommodate both standards.

*Keith Jack*, at 422.  *Keith Jack* also informs that persons of skill in the art knew of and applied techniques to convert and increase the frame-rate of a video in order to match the refresh rate of a display, again improving quality so that a video "[could] be shown correctly on a computer display."  *E.g., Keith Jack*, at 414:

> **Frame Rate Conversion**  Frame rate conversion is the act of converting one frame rate to another. One real example that poses a difficult problem is that the frame rate of NTSC, 30 frames per second, is different from a typical computer's display, which may be anywhere from 70 to 75 frames per second (or Hz if you prefer). Therefore, some frame-rate conversion process must be performed before NTSC video can be shown correctly on a computer display. Without frame rate conversion, the screen might look as if it "stalls" every now and then. If there is motion within the video, the objects that are moving might appear cut in half.

</td>
</tr>
</table>

Exhibit 1

| *Ohara* - Claim 1 |
|---|
| | | *Keith Jack* additionally informs that there were specific techniques that persons of skill in the art knew and were capable of applying to preserve the frame rate of video during a deinterlacing process.  *E.g.*, *Keith Jack*, at 333-334.  For example, in order to preserve the number of video images displayed per second when using field merging to deinterlace input frames, *Keith Jack* teaches that alternating sets of fields can be merged and display resulting fields matching the field rate:<br><br><br><br>*Keith Jack*, at 334, Fig. 9.6.  A person of skill in the art at the time would have consequently known that discarding one of the two fields of every pair of fields would have caused a lower frame rate resulting in lower video quality.<br><br>Similarly, Benjamin Felts, named as an inventor on the '654 Patent, gave sworn testimony that performing interpolation only one of the two fields would result in visual artifacts in the form of "jitter or flickering on -- particularly noticeable on sharp transitions in the image data": |

Exhibit 1

| | | |
|---|---|---|
| | | **_Ohara_ - Claim 1** |

23          Q.    And what might be the disadvantages of that

24    system?

1              THE WITNESS:  One disadvantage is that you

2    are applying what is equivalent to a low-pass filter on

3    one of the frames and not on the other.  So your -- in

4    the frequency domain, your -- the amplitude of certain

5    frequencies will be more attenuated in one of those

6    frames versus the other.  ==Visually, that results in==

7    ==certain -- a little bit of jitter or flickering on --==

8    ==particularly noticeable on sharp transitions in the==

9    ==image data.==

April 18, 2018 Deposition of Benjamin Felts, at 188; *and see id.* at 187 (introductory questions regarding a product "that applies interpolation or the adjusting step ... to only one of [the] fields.").

Thus, a person of skill at the time of the invention understood that either discarding one of the two fields or performing interpolation on only one of the fields both would have resulted in degraded video quality (by lowering frame rate or resulting in 'jitter or flittering,' respectively) and been motivated to improve the video quality as a result.  Consequently, rather than merely displaying "one of the two fields… scaled (interpolated) up to … however many [lines] are in the current display mode" – a misunderstanding of the teachings of *Keith Jack*[3] – a person of ordinary skill would have been motivated to apply

---

[3]        The '654 Patent states that one method of de-interlacing video known in the art before the purported invention "is just capturing one of the two fields and displaying [the field's lines] *scaled* (interpolated) up to … however many [lines] are in the current display mode." '654 Patent, at 1:34-36, but *Keith Jack* does not state this.  *Keith Jack* instead illustrates the approach with one field, and one of ordinary skill in the art knew long before the time of the alleged invention that this approach was to be applied to both fields.  *See, e.g., Keith Jack*, at 333.

Exhibit 1

| *Ohara* - Claim 1 |
|---|
| known techniques to preserve or improve the quality of a de-interlaced video, including by performing the same scaling process on "each of the first field and second field of each pair of fields."<br><br>Scaling each of the first field and second field of each pair of fields to fill vertical resolution of the non-interlaced monitor would have yielded known benefits, including as described in *Keith Jack* and the Description and Background of the '654 Patent itself.<br><br>Additionally, *Ohara* describes various scaling methods, including vertical scaling, and acknowledges that "[v]arious algorithms have been devised to add or subtract the pixel data required for scaling," (*Ohara* at 1:16-17) including using pixel values from neighboring lines and using interpolation methods to provide pixel values for new lines, *id.* at 1:24-29. *Ohara* also states that "[v]arious modifications of the disclosed embodiments, as well as alternative embodiments, will be apparent to persons skilled in the art.  It is, therefore, contemplated that the appended claims will cover all modifications that fall within the true scope of the invention."  *Id.* at 6:40-44.<br><br>Thus, replacing *Ohara's* disclosed scaling techniques with scaling techniques from other prior art references where each of the first field and second field of each pair of fields are scaled to fill vertical resolution of the non-interlaced monitor would represent alternative solutions with potentially improved results. Thus, a person of ordinary skill in the art would have had a motivation to improve *Ohara's* techniques with scaling each of the first field and second field of each pair of fields to fill vertical resolution of the non-interlaced monitor. Persons of skill in the art would have therefore been motivated to improve *Ohara* with the teachings of *Greggain* and *Miyaguchi*, which both disclose scaling techniques where each of the first field and second field of each pair of fields are scaled to fill vertical resolution of the non-interlaced monitor. *See* Exhibits 3 and 5 at element 1(b) (incorporated here by reference).<br><br>In addition, it would have been obvious to try combining or modifying *Ohara* with the teachings of *Greggain* and *Miyaguchi* because there were only a finite number of predictable solutions, because known work in the field prompted variations based on |

Exhibit 1

| *Ohara* - Claim 1 |
|---|

|  |  | predictable design incentives, because they are directed to similar technology, or in light of market forces either in the field or analogous and related fields would have suggested the combination.  Indeed, the combination of *Ohara* with the teachings described here would have been obvious because the combination represents known potential options with a reasonable expectation of success.  No technical barrier would have prevented *Ohara* from being modified to scale each of the first field and second field of each pair of fields to fill vertical resolution of a non-interlaced monitor, as recited in claim 1. No unexpected results would have arisen and no undue experimentation would have been required in making such a replacement. These techniques were well known in the art (*see Keith Jack* and admissions in the Background of the '654 Patent) so their implementation would have been well within the skill of a person of ordinary skill in the art. Furthermore, *Ohara* describes methods for scaling interlaced fields of video data, *Miyaguchi* discloses scaling video signals, which is referred to as doubling the data rate, and *Greggain* discloses de-interlacing video data including a step of scaling fields of video data.  Thus, all of these references are directed to similar technology, all address and solve similar problems relating to processing video data, and a person of ordinary skill in the art who was considering scaling video signals would have been motivated to look to other prior art scaling methods to improve the device being modified, in this case *Ohara*. |
|  |  | Consequently, a person of skill would have been motivated to and capable of combining or modifying *Ohara* with the teachings of at least *Greggain* and *Miyaguchi*, and the teachings of those references as described in Exhibits 3 and 5 at element 1(b), which are incorporated here by reference. |
|  |  | The discussion in Paragraphs 350 through 352, and Sections VIII.D.4(a) and VIII.D.4(b)(i)-(vi) are incorporated by reference. |
|  |  | Therefore, *Ohara* in view of *Greggain* and *Ohara* in view of *Miyaguchi* render obvious "wherein scaling is achieved by vertical interpolation between at least adjacent lines in the field being scaled." |

Exhibit 1

| | | ***Ohara* - Claim 1** |
|---|---|---|
| 1(c)(1) | adjusting one of the first field or second field of the pair of fields to substantially[4] correct for the vertical offset between the pairs of fields, | I understand the Court has construed "adjusting" to mean "vertical repositioning", and construed "to substantially correct for the vertical offset between the pairs of fields" to mean "to largely or approximately correct for the vertical offset." *Wi-LAN v. Sharp Electronics Corporation*, Case No. 15-379 (LPS) (CJB), D.I. 281; *Wi-LAN v. VIZIO, Inc.*, Case No. 15-788 (LPS) (CJB), D.I. 220. I also understand that Wi-LAN disclaimed Claim 8 of the '654 Patent, which claims a method of such adjusting where the adjusting step "includes changing display positions of one of the scaled first field or scaled second field by one or more lines on the noninterlaced monitor." '654 Patent, at Cl. 8; '654 Patent, at Disclaimer.  I further understand that Wi-LAN's infringement contentions appear to identify certain interpolation functions purportedly performed by the Accused Products as allegedly meeting this limitation.  *See, e.g.,* Final Infringement Contentions, at [SEC] 126 and [VIZIO] 127 (depicting Deinterlaced Frame with Spatial Averaging from Top Field and Deinterlaced Frame with Spatial Averaging from Bottom Field); *and see id.* at [SEC] 121-185 and [VIZIO] 122-186.  To the extent Wi-LAN alleges that such methods "adjust[] one of the first field or second field of the pair of fields to substantially correct for the vertical offset between the pairs of fields," it is my opinion that *Ohara* teaches this limitation. <br><br>In particular, *Ohara* teaches interpolation methods to create new lines of pixel data.  For example, as described below, techniques such as line-doubling and interpolation are disclosed by *Ohara* as to creating new lines of pixel data. <br><br> <br><br>*Ohara* at 2:47-49. |

---

[4]       As set forth in my accompanying Report, it is my opinion that the term "to substantially correct for the vertical offset between the pairs of fields" is indefinite, and that opinion is incorporated here by reference.  Notwithstanding, I have analyzed *Ohara* consistent with the Court's construction for the purposes of this Report.  *See Wi-LAN v. Sharp Electronics Corporation*, Case No. 15-379 (LPS) (CJB), D.I. 281; *Wi-LAN v. VIZIO, Inc.*, Case No. 15-788 (LPS) (CJB), D.I. 220.

Exhibit 1

| *Ohara* - Claim 1 | | |
|---|---|---|
| | | <br><br>*Ohara* at 1:9-22.<br><br><br>*Ohara* at 4:45-55. |

Exhibit 1

| *Ohara* - Claim 1 |
|---|



One aspect of the invention is a method of vertically scaling an image represented by a digital video signal having interlaced fields. The method is performed on a pixel-by-

*Ohara* at 1:32-34.

*Ohara* at Fig. 1.

*Ohara* at Fig. 4.

Exhibit 1

| *Ohara* - Claim 1 |
|---|



*Ohara* at 3:56-65.

*Ohara* discloses various interpolation methods that adjust line data in one of the first field or second field of the pair of fields to substantially correct for the vertical offset between the pairs of fields.

Exhibit 1

| | | *Ohara* - Claim 1 | | |
|---|---|---|---|---|
| | | $Y3=\frac{3}{4} A2+\frac{1}{4} A3$<br>For field n-1, the algorithm for every four lines is:<br>$Z0=\frac{1}{8} B0+\frac{7}{8} B1$<br>$Z1=\frac{3}{8} B1+\frac{5}{8} B2$<br>$Z2=\frac{5}{8} B2+\frac{3}{8} B3$<br>$Z3=\frac{7}{8} B3+\frac{1}{8} B4$<br>    Examples of intra-field vertical scaling algorithms, such as bi-linear and cubic interpolation for various scaling ratios, are described in U.S. patent Ser. No. 08/147,249, incorporated by reference above, and in U.S. patent Ser. No. 08/091,852, entitled "Method and Device for Multi-Format Television". These patent applications are assigned to Texas Instruments Incorporated and are incorporated by reference herein. The cubic interpolation method uses three input pixel values for each new pixel value, rather than two.<br><br>*Ohara* at 4:56-5:16. | | |

Exhibit 1

| *Ohara* - Claim 1 |
|---|
|  |

*Ohara* at Fig. 6.

As shown above in Fig. 6, new pixels Z0, Z1, Z2, and Z3 as well as pixels Y0, Y1, Y2, and Y3 are generated using a various interpolation methods whereby the positioning of those new pixels, and thus the positioning of the new lines created from the new pixels, are adjusted for a first and second field (i.e., Field n-1 and Field n) to substantially correct for a vertical offset between the pairs of fields.

As shown below in Fig. 7 and the accompanying text, new pixel data is also created using an inter-field scaling method. Like the intra-field scaling method, the inter-field scaling method results in positioning of the new lines created from the new pixels, which are adjusted for a first and second field (i.e., Field n-1 and Field n) to substantially correct for a vertical offset between the pairs of fields.

Exhibit 1

| Ohara - Claim 1 |
| --- |
|  |

*Ohara* at Fig. 7.

Exhibit 1

| *Ohara* - Claim 1 |
|---|
| FIG. 7 illustrates an example of inter-field scaling, specifically, hi-linear interpolation for 3:4 scaling. For field n, the interpolation algorithm for every four lines is:<br><br>$Y0=A0$<br>$Y1=\frac{1}{2}\,B1+\frac{1}{2}\,A1$<br>$Y2=B2$<br>$Y3=\frac{1}{2}\,A2+\frac{1}{2}\,B3$<br>For field n-1, the algorithm is:<br>$Z0=\frac{1}{4}\,CO+\frac{3}{4}\,B1$<br>$Z1=\frac{3}{4}\,C1+\frac{1}{4}\,B2$<br>$Z2=\frac{1}{4}\,B2+\frac{3}{4}\,C2$<br>$Z3=\frac{3}{4}\,B3+\frac{1}{4}\,C3$<br>Like the process for intra-field scaling, the inter-field scaling process accommodates interlaced fields by "centering" coefficients of values of neighboring pixels in pairs of adjacent fields. In the above example, pixel Y1 in field n is between pixels Y0 and Y2. The coefficients of pixel Z1 ($\frac{3}{4}$ and $\frac{1}{4}$) are between those of its neighbors, Y0 and Y1 ($\frac{3}{4}$ is between 1 and $\frac{1}{2}$; $\frac{1}{4}$ is between 1 and $\frac{1}{2}$).<br><br>*Ohara* at 5:35-54.<br><br>Furthermore, *Ohara* explicitly addresses deinterlacing. *See, e.g., Ohara* at 2:41-44 ("In addition to these tasks, other tasks performed by processor system 13 could include linearization (de-gamma) and de-interlacing to convert interlaced fields into display frames." Indeed, *Ohara* specifically discloses interpolation to perform the scaling operations, including bilinear and cubic methods (5:9), and explicitly discloses the adjustments on the fields by a method similar to the "phases" of interpolation discussed by Felts in his deposition. *See, e.g.*, *Ohara* at Fig. 6, 4:57-5:34.<br><br>Therefore, *Ohara* teaches "adjusting one of the first field or second field of the pair of fields to substantially correct for the vertical offset between the pairs of fields." |

Exhibit 1

| | | ***Ohara* - Claim 1** |
|---|---|---|
| | | Furthermore, modifying *Ohara* to adjust one of the first or second field of the pair of fields to substantially correct for the vertical offset between the pairs of fields would have been obvious for several reasons, including at least because motivations and techniques existed in the art prior to the claimed invention to eliminate any visual artifacts that would be caused by such a vertical offset.<br><br>For example, *Keith Jack* confirms that practitioners were mindful of the visual artifacts caused by a vertical offset between fields while working with interlaced video signals, and knew and took care to apply video processing techniques that would result in the correct spatial positioning of video scan lines.  *Keith Jack*, at 335.  In fact, *Keith Jack* confirms that persons of skill in the art knew that video processing to correct for vertical offset *was required* if a deinterlacing technique did not inherently result in correct spatial positioning of the scan lines:<br><br>The best vertical frequency response is obtained when field merging is implemented. The spatial position of the lines are already correct and no vertical processing is required, resulting in a flat curve (Line C). Once again, this applies only for stationary areas of the image.<br><br>*Id.*<br><br>*Keith Jack* further demonstrates that practitioners applied techniques known in the art to ensure the preservation and generation of the correct vertical spatial position of scan lines, including when using deinterlacing techniques to convert an interlaced video signal field into a non-interlaced frame, consistent with Wi-LAN's allegations regarding this element.  *See, e.g.,* Final Infringement Contentions, at [SEC] 126 and [VIZIO] 127.  For example, Figure 9.4 of *Keith Jack* illustrates that input field lines 1, 2, 3, and 4 (indicated with red, below) are output at the correct vertical spatial positioning in the deinterlaced output as frame lines 1, 3, 5, and 7 (indicated with orange, below), with additional lines generated by |

Exhibit 1

| | | *Ohara* - Claim 1 |
|---|---|---|
| | | interpolation at positions corresponding to the even field at lines 2, 4, 6, and 8 (indicated with green, below):  *Keith Jack*, at Fig. 9.4. <br><br> *Keith Jack* demonstrates that practitioners knew to use various techniques known in the art to affect an adjustment of vertical offset as interpreted by Wi-LAN, including to treat artifacts created by mishandled video data.  Adjusting one of the first field or second field of the pair of fields in an interlaced video signal to substantially correct for any vertical |

Exhibit 1

| *Ohara* - Claim 1 | | |
|---|---|---|
| | | offset between the pairs of fields would have yielded known benefits, including as described in *Keith Jack*.<br><br>Additionally, *Ohara* describes various techniques known in the art to affect an adjustment of vertical offset, including vertical scaling, and acknowledges that "[v]arious algorithms have been devised to add or subtract the pixel data required for scaling," *Ohara* at 1:16-17, including using pixel values from neighboring lines and using interpolation methods to provide pixel values for new lines, *id.* at 1:24-29. *Ohara* also states that "[v]arious modifications of the disclosed embodiments, as well as alternative embodiments, will be apparent to persons skilled in the art.  It is, therefore, contemplated that the appended claims will cover all modifications that fall within the true scope of the invention."  *Id.* at 6:38-44.<br><br>Thus, replacing *Ohara*'s disclosed techniques with known techniques for adjusting one of the first field or second field of the pair of fields to substantially correct for the vertical offset between the pairs of fields would represent an alternative solution with potentially improved results. Thus, a person of ordinary skill in the art would have had a motivation to improve *Ohara*'s techniques with adjusting each of the first field and second field of each pair of fields to fill vertical resolution of the non-interlaced monitor. These techniques were well known in the art (*see Keith Jack*) so their implementation would have been well within the skill of a person of ordinary skill in the art.  Persons of skill in the art would have therefore been motivated to improve *Ohara* with the teachings of *Greggain*, which discloses techniques for adjusting one of the first field or second field of the pair of fields to substantially correct for the vertical offset between the pairs of fields. *See* Exhibit 3 at element 1(c)(1) (incorporated by reference herein). Furthermore, *Ohara* describes methods for scaling and adjusting interlaced fields of video data, and *Greggain* similarly discloses de-interlacing video data by continuously calculating the spatial position of the output lines and then mapping interlaced input fields to progressive scan output frames, which naturally performs adjustment of one of the fields. Thus, *Ohara* and *Greggain* are directed to similar technology, all address and solve similar problems relating to processing video data, and a person of ordinary skill in the art who was considering scaling and adjusting video signals as disclosed in *Ohara* would have been motivated to look to the other methods scaling and adjusting video data to improve the *Ohara* invention. |

Exhibit 1

| | | *Ohara* - Claim 1 |
|---|---|---|
| | | In addition, it would have been obvious to try combining or modifying *Ohara* because there were only a finite number of predictable solutions, because known work in the field prompted variations based on predictable design incentives, or in light of market forces either in the field or analogous and related fields would have suggested the combination. Indeed, the combination of *Ohara* with the teachings described here would have been obvious because the combination represents known potential options with a reasonable expectation of success.  Additionally, a person of ordinary skill in the art would not have faced unexpected results or undue experimentation in making the aforementioned replacement. These techniques were well known in the art (*see Keith Jack*) so their implementation would have been well within the skill of a person of ordinary skill in the art. Consequently, a person of skill would have been motivated to and capable of combining or modifying *Ohara* with the teachings of at least *Greggain*, and the teachings of that reference as described in Exhibit 3 at element 1(c)(1) are incorporated here by reference.<br><br>The discussion in Paragraphs 350 through 352, and Sections VIII.D.4(a) and VIII.D.4(b)(i)-(vi) are incorporated by reference.<br><br>Therefore, *Ohara* in view of *Greggain* renders obvious "adjusting one of the first field or second field of the pair of fields to substantially correct for the vertical offset between the pairs of fields." |
| 1(c)(2) | where said adjusting is performed concurrently[5] with said scaling; | I understand that the Court has construed "said adjusting is performed concurrently with said scaling" to mean the adjusting and scaling steps must overlap, either by interleaving or simultaneous execution, such that one cannot complete before the other begins."  *Wi-LAN v. Sharp Electronics Corporation*, Case No. 15-379 (LPS) (CJB), D.I. 281; *Wi-LAN v. VIZIO, Inc.*, Case No. 15-788 (LPS) (CJB), D.I. 220. I further understand that Wi-LAN's |

---

[5]     As set forth in my accompanying Report, it is my opinion that the term "concurrently" renders Claim 1 and the asserted dependent claims invalid under 35 U.S.C. § 112, and that opinion is incorporated here by reference.  Notwithstanding, I have analyzed *Ohara* consistent with the Court's construction for the purposes of this Report.  *See Wi-LAN v. Sharp Electronics Corporation*, Case No. 15-379 (LPS) (CJB), D.I. 281; *Wi-LAN v. VIZIO, Inc.*, Case No. 15-788 (LPS) (CJB), D.I. 220.

Exhibit 1

| *Ohara* - Claim 1 |
|---|

|  |  | infringement contentions appear to identify certain interpolation functions purportedly performed by the Accused Products as allegedly meeting this limitation.  *See, e.g.,* Final Infringement Contentions, at [SEC] 126 and [VIZIO] 127 (depicting Deinterlaced Frame with Spatial Averaging from Top Field and Deinterlaced Frame with Spatial Averaging from Bottom Field), [SEC] 184 and [VIZIO] 185 (asserting without explanation "[t]he adjusting step is performed during the interpolation process, and therefore, 'concurrently' with the scaling."); *and see id.* at [SEC] 121-185 and [VIZIO] 122-186.  To the extent Wi-LAN alleges that such methods perform an adjusting step "where said adjusting is performed concurrently with said scaling," it is my opinion that *Ohara* teaches this limitation.<br><br>As noted above, and incorporated by reference herein, *Ohara* also teaches interpolation methods for adjusting one of the first field or second field of the pair of fields to substantially correct for the vertical offset between the pairs of fields.<br><br>*Ohara* teaches that these interpolation scaling and adjusting methods can be performed concurrently.  For example, *Ohara* teaches intra-field scaling, as shown and described below.  The intra-field scaling method described and shown below would satisfy the scaling and/or adjusting limitations found in claim 1 of the '654 Patent.<br><br> |

FIG. 6 illustrates an example of intra-field scaling, specifically, bi-linear interpolation for 3:4 scaling. Data from fields n-1 and n are used to create data for new fields n-1 and n, respectively. The pixels of lines 0, . . . 3, . . . n of the input fields are designated as A0 . . . A3, . . . An, and as B0, . . . Z3, . . . Bn. The pixels of lines 0, . . . 4, . . . n of the output field are designated as Z0, . . . Z4, . . . n, and as Y0, . . . Y4, . . . Yn. For field n, the algorithm for every four lines is:

$$Y0=A0$$
$$Y1=\frac{1}{4}A0+\frac{3}{4}A1$$
$$Y2=\frac{1}{2}A1+\frac{1}{2}A2$$

Exhibit 1

| *Ohara* - Claim 1 |
|---|
| |

$Y3=\frac{3}{4}\ A2+\frac{1}{4}\ A3$

For field n-1, the algorithm for every four lines is:

$Z0=\frac{1}{8}\ B0+\frac{7}{8}\ B1$

$Z1=\frac{3}{8}\ B1+\frac{5}{8}\ B2$

$Z2=\frac{5}{8}\ B2+\frac{3}{8}\ B3$

$Z3=\frac{7}{8}\ B3+\frac{1}{8}\ B4$

Examples of intra-field vertical scaling algorithms, such as bi-linear and cubic interpolation for various scaling ratios, are described in U.S. patent Ser. No. 08/147,249, incorporated by reference above, and in U.S. patent Ser. No. 08/091,852, entitled "Method and Device for Multi-Format Television". These patent applications are assigned to Texas Instruments Incorporated and are incorporated by reference herein. The cubic interpolation method uses three input pixel values for each new pixel value, rather than two.

*Ohara* at 4:56-5:16.

Exhibit 1

| *Ohara* - Claim 1 |
|---|
| <br><br>*Ohara* at Fig. 6 (illustrating adjustments made to pixel positions through the use of interpolation methods and formulas taught by *Ohara*).<br><br>*Ohara* also teaches inter-field scaling, as shown and described below.  The inter-field scaling method described and shown below would satisfy the scaling and/or adjusting limitations found in claim 1 of the '654 Patent. |

Exhibit 1

| *Ohara* - Claim 1 |
|---|
|  *Ohara* at Fig. 7 (illustrating adjustments made to pixel positions through the use of interpolation methods and formulas taught by *Ohara*). |

Exhibit 1

| *Ohara* - Claim 1 |
|---|
| FIG. 7 illustrates an example of inter-field scaling, specifically, hi-linear interpolation for 3:4 scaling. For field n, the interpolation algorithm for every four lines is:<br><br>$Y0=A0$<br>$Y1=\frac{1}{2}B1+\frac{1}{2}A1$<br>$Y2=B2$<br>$Y3=\frac{1}{2}A2+\frac{1}{2}B3$<br>For field n-1, the algorithm is:<br>$Z0=\frac{1}{4}C0+\frac{3}{4}B1$<br>$Z1=\frac{3}{4}C1+\frac{1}{4}B2$<br>$Z2=\frac{1}{4}B2+\frac{3}{4}C2$<br>$Z3=\frac{3}{4}B3+\frac{1}{4}C3$<br>Like the process for intra-field scaling, the inter-field scaling process accommodates interlaced fields by "centering" coefficients of values of neighboring pixels in pairs of adjacent fields. In the above example, pixel Y1 in field n is between pixels Y0 and Y2. The coefficients of pixel Z1 ($\frac{3}{4}$ and $\frac{1}{4}$) are between those of its neighbors, Y0 and Y1 ($\frac{3}{4}$ is between 1 and $\frac{1}{2}$; $\frac{1}{4}$ is between 1 and $\frac{1}{2}$).<br><br>*Ohara* at 5:35-54.<br><br>As noted above, the overall inventive concept of Ohara is to scale using inter-field scaling when there is no motion between fields, intra-field scaling when there is motion between fields, or a weighted combination of both methods.  In particular, as shown and described below, *Ohara* teaches that the intra-field and inter-field scaling methods can take place in parallel on the same stream of pixel data. |

Exhibit 1

| *Ohara* - Claim 1 | | |
|---|---|---|
| | | *Ohara* at Fig. 3.<br><br>FIG. 3 is a functional block diagram of the vertical scaling process **13***a*. The steps illustrated in FIG. **3** are implemented with programming stored in a program memory to be executed by processor system **13**. As stated above, for purposes of example, the data being processed is Y pixel data, although demodulated C pixel data (Cr, Cb or R-Y, B-Y or I, Q) or RGB pixel data could be similarly processed. As stated above, the process of FIG. **3** could be implemented with one or more serial video processors, which process pixel values on a line-by-basis.<br><br>*Ohara* at 3:40-49. |

Exhibit 1

| | | | *Ohara* - Claim 1 |
|---|---|---|---|
| | | | The result of the motion detection process is an n-bit value, M, whose magnitude indicates motion. Each pixel to be generated by scaling has an associated M value.<br><br>Referring again to FIG. 3, the pixel data is also processed with both an inter-field scaling process **35** and an intra-field scaling process **36**. These processes are performed in parallel on the same stream of pixel data. They both generate new pixel values for the vertically scaled image, but use different data.<br><br>The intra-field scaling process **35** is performed with data in the same field. Intra-field scaling is suitable for images that have motion, because temporal variations in the image from frame to frame will not be reflected in the new pixel values.<br><br>*Ohara* at 4:31-44.<br><br>At a minimum, using a weighted combination of both inter-field scaling and intra-field scaling methods, and/or performing both methods in parallel on the same stream of pixel data would satisfy this limitation, in particular the requirement for the scaling and adjusting steps to be performed simultaneously.<br><br>Furthermore, *Ohara* explicitly addresses deinterlacing.  *See, e.g., Ohara* at 2:41-44 ("In addition to these tasks, other tasks performed by processor system 13 could include linearization (de-gamma) and de-interlacing to convert interlaced fields into display frames."  Indeed, *Ohara* specifically discloses interpolation to perform the scaling operations, including bilinear and cubic methods (5:9), and explicitly discloses the adjustments on the fields by a method similar to the "phases" of interpolation discussed by Felts in his deposition.  *See, e.g.*, *Ohara* at Fig. 6, 4:57-5:34.<br><br>Therefore, *Ohara* teaches "where said adjusting is performed concurrently with said scaling." |

Exhibit 1

| | | *Ohara* - Claim 1 |
|---|---|---|
| | | Furthermore, modifying *Ohara* to perform an adjusting step "where said adjusting is performed concurrently with said scaling" would have been obvious for several reasons, including because motivations and techniques for ensuring correct spatial positioning of scan lines as well as balancing video quality against the cost of implementation existed prior to the claimed invention.  *See, e.g., Keith Jack*, at 10.  *Keith Jack* confirms that practitioners knew and took care to apply video processing techniques that would result in the correct spatial positioning of video scan lines, and in fact confirms that video processing to correct for vertical offset *was required* if a deinterlacing technique did not inherently result in correct spatial positioning of the scan lines:<br><br>The best vertical frequency response is obtained when field merging is implemented. **The spatial position of the lines are already correct and no vertical processing is required,** resulting in a flat curve (Line C). Once again, this applies only for stationary areas of the image.<br><br>*Keith Jack*, at 335.<br><br>*Keith Jack* further demonstrates that practitioners applied techniques known in the art to ensure the preservation and generation of the correct vertical spatial position of scan lines, including when using deinterlacing techniques to convert an interlaced video signal field into a non-interlaced frame.  For example, Figure 9.4 of *Keith Jack* illustrates that input field lines 1, 2, 3, and 4 (indicated with red, below) are output at the correct vertical spatial positioning in the deinterlaced output as frame lines 1, 3, 5, and 7 (indicated with orange, below), with additional lines generated by interpolation at positions corresponding to the even field at lines 2, 4, 6, and 8 (indicated with green, below): |

Exhibit 1

| | | | |
|---|---|---|---|
| | | | **_Ohara_ - Claim 1** |



*Keith Jack*, at Fig. 9.4.

*Keith Jack* further informs that practitioners were mindful and took efforts to balance "quality versus cost of implementation" when considering techniques for deinterlacing:

Exhibit 1

| *Ohara* - Claim 1 | | |
|---|---|---|
| | |  |

There are several ways of performing the deinterlacing. The designer must trade-off video quality versus cost of implementation. Today's GUI environment will also probably require scaling the video to an arbitrary-sized window; this also requires a trade-off of video quality versus cost.

*Keith Jack*, at 10.  Combined with *Keith Jack*'s teachings regarding the known techniques in the art, *Keith Jack* confirms that practitioners would have been motivated to perform the said adjusting step concurrently with said scaling step, at least in order to balance considerations of "quality versus cost of implementation." *Id.*; *and see, e.g.*, *id.* at Fig. 9.4. *Keith Jack* demonstrates that practitioners knew to use various techniques known in the art to affect an adjustment of vertical offset as interpreted by Wi-LAN, including to treat artifacts created by mishandled video data, currently with said scaling step.  Moreover, performing an adjusting step "where said adjusting is performed concurrently with said scaling" would have yielded known benefits, including as described in *Keith Jack*.

Additionally, *Ohara* describes various techniques known in the art to affect an adjustment of vertical offset, including vertical and horizontal scaling, and acknowledges that "[v]arious algorithms have been devised to add or subtract the pixel data required for scaling," *Ohara* at 1:16-17, including using pixel values from neighboring lines and using interpolation methods to provide pixel values for new lines, *id.* at 1:24-29. *Ohara* also states that "[v]arious modifications of the disclosed embodiments, as well as alternative embodiments, will be apparent to persons skilled in the art.  It is, therefore, contemplated that the appended claims will cover all modifications that fall within the true scope of the invention." *Id.* at 6:38-44.

Thus, replacing *Ohara*'s disclosed techniques with known techniques for adjusting one of the first field or second field of the pair of fields "where said adjusting is performed concurrently with said scaling" would represent an alternative solution with potentially

Exhibit 1

| *Ohara* - Claim 1 |
|---|

|  |  | improved results. Thus, a person of ordinary skill in the art would have had a motivation to improve *Ohara*'s techniques by performing the adjusting step "where said adjusting is performed concurrently with said scaling." Persons of skill in the art would have therefore been motivated to improve *Ohara* with the teachings of *Greggain,* which discloses techniques for adjusting one of the first field or second field of the pair of fields "where said adjusting is performed concurrently with said scaling." *See* Exhibit 3 at element 1(c)(1) (incorporated herein by reference).  Furthermore, *Ohara* describes methods for scaling and adjusting interlaced fields of video data, and *Greggain* similarly discloses de-interlacing video data by continuously calculating the spatial position of the output lines and then mapping interlaced input fields to progressive scan output frames, which naturally performs adjustment of one of the fields. Thus, *Ohara* and *Greggain* are directed to similar technology, all address and solve similar problems relating to processing video data, and a person of ordinary skill in the art who was considering scaling and adjusting video signals as disclosed in *Ohara* would have been motivated to look to the other methods scaling and adjusting video data to improve the *Ohara* invention.<br><br>In addition, it would have been obvious to try combining or modifying *Ohara* because there were only a finite number of predictable solutions, because known work in the field prompted variations based on predictable design incentives, or in light of market forces either in the field or analogous and related fields would have suggested the combination. Indeed, the combination of *Ohara* with the teachings described here would have been obvious because the combination represents known potential options with a reasonable expectation of success. Additionally, a person of ordinary skill in the art would not have faced unexpected results or undue experimentation in making the aforementioned replacement. These techniques were well known in the art (*see Keith Jack*) so their implementation would have been well within the skill of a person of ordinary skill in the art. Consequently, a person of skill would have been motivated to and capable of combining or modifying *Ohara* with the teachings of at least *Greggain*, and the teachings of that reference as described in Exhibit 3 at element 1(c)(2), which are incorporated here by reference. |

Exhibit 1

| | | ***Ohara* - Claim 1** |
|---|---|---|
| | | The discussion in Paragraphs 350 through 352, and Sections VIII.D.4(a) and VIII.D.4(b)(i)-(vi) are incorporated by reference.<br><br>Therefore, *Ohara* in view of *Greggain* renders obvious "where said adjusting is performed concurrently with said scaling." |
| 1(d) | displaying the first field of each pair of fields on the non-interlaced monitor in a first time period; and | *Ohara* teaches "displaying the first field of each pair of fields on the non-interlaced monitor in a first time period."<br><br>Specifically, *Ohara* also teaches that its invention can be used with any display system, and discloses the use of display systems and display optics to display fields at different time periods.<br><br>processing on the data. System **10** uses a spatial light modulator (SLM) to generate images from the data. System **20** uses a cathode ray tube (CRT), where the data is converted to analog form after being processed. In general, the invention could be used with any display system that digitally processes image data.<br><br>*Ohara* at 2:3-8.<br><br><br><br>*FIG. 1*<br><br>*Ohara* at Fig. 1.<br><br>*Ohara* further discusses using multiple buffer memories such that one display frame can be read out while another buffer for another display frame is being written. |

Exhibit 1

| Ohara - Claim 1 |
|---|

in response to the value of one bit of data at a time. In a typical display system **10**, frame memory **14** is a "double buffer" memory, which means that it has a capacity for at least two display frames. The buffer for one display frame can be read out to SLM **15** while the buffer for another display frame is being written. The two buffers are controlled in a "ping-pong" manner so that data is continuously available to SLM **15**.

*Ohara* at 2:57-65.

Through these types of disclosures, a person of ordinary skill in the art would have readily understood that the *Ohara* invention involved displaying a first field of each pair of fields on the monitor, which could be a non-interlaced monitor, at a first time period. Indeed, this is what the "double buffer" memory in *Ohara* was designed to enable.

Therefore, *Ohara* teaches "displaying the first field of each pair of fields on the non-interlaced monitor in a first time period."

Furthermore, modifying *Ohara* to "display[] the first field of each pair of fields on the non-interlaced monitor in a first time period" would have been obvious to a person of ordinary skill in the art for several reasons, including at least because displaying both the fields of interlaced video was a technique known in the art. In interlaced video, each frame of video data is separately displayed as two fields. The Background of the '654 Patent details, for example, that the NTSC format uses 60 fields per second representing 30 frames per second. '654 Patent, at 1:25-28. Persons of skill in the art at the time of the claimed invention understood that a higher framerate would have resulted in a higher quality video, including with less flicker:

Exhibit 1

| *Ohara* - Claim 1 |
|---|

|  |  |  |
|---|---|---|
|  |  | **PAL**      PAL stands for Phase Alternation Line. PAL is to Europe as NTSC is to North America. In other words, PAL is the video standard used in Europe and a few other countries. There are a few differences. PAL uses 625 lines per frame while NTSC has 525 lines. Therefore, PAL has higher vertical resolution. The frame rate of NTSC is 30 frames per second while for PAL it is 25. This means the update rate for NTSC is higher and therefore there is more flicker with PAL. PAL uses the YUV color space while NTSC uses YIQ or YUV. That's no big deal, just a little mathematical difference. It is becoming increasingly important for imaging systems suppliers to produce equipment that can be sold worldwide without many manufacturing difficulties. This implies that the equipment must be designed from the start to accommodate both standards. |

*Keith Jack*, at 422.  Similarly, practitioners knew techniques to convert and increase the frame-rate of a video in order to match the refresh rate of a display.  *E.g., Keith Jack*, at 414:

|  |  |  |
|---|---|---|
|  |  | **Frame Rate Conversion**      Frame rate conversion is the act of converting one frame rate to another. One real example that poses a difficult problem is that the frame rate of NTSC, 30 frames per second, is different from a typical computer's display, which may be anywhere from 70 to 75 frames per second (or Hz if you prefer). Therefore, some frame-rate conversion process must be performed before NTSC video can be shown correctly on a computer display. Without frame rate conversion, the screen might look as if it "stalls" every now and then. If there is motion within the video, the objects that are moving might appear cut in half. |

*Keith Jack* additionally informs that there were specific techniques that persons of skill in the art knew and were capable of applying to preserve the frame rate of video during a deinterlacing process.  *E.g.*, *Keith Jack*, at 333-334.  For example, in order to preserve the number of video images displayed per second when using field merging to deinterlace input frames, *Keith Jack* teaches that alternating sets of fields can be merged and display resulting fields matching the field rate:

Exhibit 1

| *Ohara* - Claim 1 |
|---|
| <br><br>Figure 9.6. Producing Deinterlaced Frames at Field Rates.<br><br>*Keith Jack*, at 334, Fig. 9.6.  Thus, Output Frame 1 would be created from Input Fields 1 & 2; Output Frame 2 would be created from Input Fields 2 & 3; and so on.  *See id.*  Keith Jack thereby confirms that persons of skill knew the benefit of and took steps to design systems that would preserve the field rate of the input interlaced video signal.<br><br>Thus, a motivation to "display[] the first field of each pair of fields on the non-interlaced monitor in a first time period" and "display[] the second field of each pair of fields on the non-interlaced monitor in a second time period subsequent to the first time period" -- thereby preserving the field rate of the input interlaced video signal -- existed in the art prior to the '654 Patent.  Persons of skill in the art would have therefore been motivated to improve *Ohara* with the teachings of *Katsumata,* which disclosed a method for displaying the first field of each pair of fields on the non-interlaced monitor in a first time period.  *See* Ex. 2, at element 1(d) (incorporated herein by reference).<br><br>In addition, it would have been obvious to try combining or modifying *Ohara* because there were only a finite number of predictable solutions, because known work in the field prompted variations based on predictable design incentives, or in light of market forces either in the field or analogous and related fields would have suggested the combination. |

Exhibit 1

| | Ohara - Claim 1 | |
|---|---|---|
| | | Indeed, the combination of *Ohara* with the teachings described here would have been obvious because the combination represents known potential options with a reasonable expectation of success.  As reflected in the prior art, no undue experimentation would have been required to implement these solutions and no unexpected results would have arisen from their implementation.  These techniques were well known in the art (*see Keith Jack*) so their implementation would have been well within the skill of a person of ordinary skill in the art.  Consequently, a person of skill would have been motivated to and capable of combining or modifying *Ohara* with the teachings of at least *Katsumata*, and the teachings of that reference as described in Exhibit 2 at element 1(d) are incorporated here by reference.<br><br>The discussion in Paragraphs 350 through 352, and Sections VIII.D.4(a) and VIII.D.4(b)(i)-(vi) are incorporated by reference.<br><br>Therefore, for the reasons discussed above, modifying *Ohara* in view of *Katsumata* to "display[] the first field of each pair of fields on the non-interlaced monitor in a first time period" would have been obvious in view of the prior art. |
| 1(e) | displaying the second field of each pair of fields on the non-interlaced monitor in a second time period subsequent to the first time period. | *Ohara* teaches "displaying the second field of each pair of fields on the non-interlaced monitor in a second time period subsequent to the first time period."<br><br>Specifically, *Ohara* also teaches that its invention can be used with any display systems, and discloses the use of display systems and display optics to display fields at different time periods.<br><br>processing on the data. System **10** uses a spatial light modulator (SLM) to generate images from the data. System **20** uses a cathode ray tube (CRT), where the data is converted to analog form after being processed. In general, the invention could be used with any display system that digitally processes image data.<br><br>*Ohara* at 2:3-8. |

Exhibit 1

| *Ohara* - Claim 1 |
| --- |



*Ohara* at Fig. 1.

*Ohara* at 2:57-65.

Through these types of disclosures, a person of ordinary skill in the art would have readily understood that the *Ohara* invention involved displaying a second field of each pair of fields on the monitor, which could be a non-interlaced monitor, at a second time period subsequent to the first time period. Indeed, this is what the "double buffer" memory in *Ohara* was designed to enable.

Therefore, *Ohara* teaches "displaying the second field of each pair of fields on the non-interlaced monitor in a second time period subsequent to the first time period."

Thus, *Ohara* anticipates Claim 1.

Exhibit 1

| | | *Ohara* - Claim 1 | |
|---|---|---|---|
| | | Furthermore, modifying *Ohara* to "display[] the second field of each pair of fields on the non-interlaced monitor in a second time period subsequent to the first time period" would have been obvious to a person of ordinary skill in the art for several reasons, including at least because displaying both the fields of interlaced video was a technique known in the art. In interlaced video, each frame of video data is separately displayed as two fields. The Background of the '654 Patent details, for example, that the NTSC format uses 60 fields per second representing 30 frames per second. '654 Patent, at 1:25-28. Persons of ordinary skill at the time of the claimed invention understood that a higher framerate would have resulted in a higher quality video, including with less flicker: | |

> **PAL**        PAL stands for Phase Alternation Line. PAL is to Europe as NTSC is to North America. In other words, PAL is the video standard used in Europe and a few other countries. There are a few differences. PAL uses 625 lines per frame while NTSC has 525 lines. Therefore, PAL has higher vertical resolution. The frame rate of NTSC is 30 frames per second while for PAL it is 25. This means the update rate for NTSC is higher and therefore there is more flicker with PAL. PAL uses the YUV color space while NTSC uses YIQ or YUV. That's no big deal, just a little mathematical difference. It is becoming increasingly important for imaging systems suppliers to produce equipment that can be sold worldwide without many manufacturing difficulties. This implies that the equipment must be designed from the start to accommodate both standards.

*Keith Jack*, at 422.  Similarly, practitioners knew techniques to convert and increase the frame-rate of a video in order to match the refresh rate of a display, thereby improving the subjective quality of video for the user.  *E.g., Keith Jack*, at 414:

> **Frame Rate**        Frame rate conversion is the act of converting one frame rate to another. One real
> **Conversion**       example that poses a difficult problem is that the frame rate of NTSC, 30 frames per second, is different from a typical computer's display, which may be anywhere from 70 to 75 frames per second (or Hz if you prefer). Therefore, some frame-rate conversion process must be performed before NTSC video can be shown correctly on a computer display. Without frame rate conversion, the screen might look as if it "stalls" every now and then. If there is motion within the video, the objects that are moving might appear cut in half.

Exhibit 1

| *Ohara* - Claim 1 |
|---|
| *Keith Jack* additionally informs that there were specific techniques that persons of skill in the art knew and were capable of applying to preserve the frame rate of video during a deinterlacing process. *E.g.*, *Keith Jack*, at 333-334. For example, in order to preserve the number of video images displayed per second when using field merging to deinterlace input frames, *Keith Jack* teaches that alternating sets of fields can be merged and display resulting frames at a rate matching the input field rate:<br><br><br><br>*Keith Jack*, at 334, Fig. 9.6. Thus, Output Frame 1 would be created from Input Fields 1 & 2; Output Frame 2 would be created from Input Fields 2 & 3; and so on. *See id.* *Keith Jack* thereby confirms that persons of skill knew the benefit of and took steps to design systems that would improve or preserve the field rate of the input interlaced video signal.<br><br>Thus, a motivation to "display[] the first field of each pair of fields on the non-interlaced monitor in a first time period" and "display[] the second field of each pair of fields on the non-interlaced monitor in a second time period subsequent to the first time period" -- thereby preserving the field rate of the input interlaced video signal and resulting in the preservation or improvement of the resulting frame rate of video -- existed in the art prior to the '654 Patent. Persons of skill in the art would have therefore been motivated to improve *Ohara* with the teachings of *Katsumata*, which discloses displaying the second field of each |

Exhibit 1

| | | *Ohara* - Claim 1 |
|---|---|---|
| | | pair of fields on the non-interlaced monitor in a second time period subsequent to the first time period. *See* Ex. 2, at element 1(e) (incorporated here by reference). |
| | | In addition, it would have been obvious to try combining or modifying *Ohara* because there were only a finite number of predictable solutions, because known work in the field prompted variations based on predictable design incentives, or in light of market forces either in the field or analogous and related fields would have suggested the combination. Indeed, the combination of *Ohara* with the teachings described here would have been obvious because the combination represents known potential options with a reasonable expectation of success.  As reflected in the prior art, no undue experimentation would have been required to implement these solutions and no unexpected results would have arisen from their implementation. These techniques were well known in the art (*see Keith Jack*) so their implementation would have been well within the skill of a person of ordinary skill in the art.  Consequently, a person of skill would have been motivated to and capable of combining or modifying *Ohara* with the teachings of at least *Katsumata*, and the teachings of that reference as described in Exhibit 2 at element 1(e) are incorporated here by reference. |
| | | The discussion in Paragraphs 350 through 352, and Sections VIII.D.4(a) and VIII.D.4(b)(i)-(vi) are incorporated by reference. |
| | | Therefore, for the reasons discussed above, modifying *Ohara* in view of *Katsumata* to "display[] the second field of each pair of fields on the non-interlaced monitor in a second time period subsequent to the first time period" would have been obvious in view of the prior art. |

| | | *Ohara* - Claim 4 |
|---|---|---|
| 4 | The method of claim 1, wherein scaling is achieved by vertical interpolation between at | I understand the Court has construed the term "vertical interpolation between at least adjacent lines" to mean "calculating values for new pixels between at least vertically adjacent lines using known values." *Wi-LAN v. Sharp Electronics Corporation*, Case No. 15-379 (LPS) (CJB), D.I. 281; *Wi-LAN v. VIZIO, Inc.*, Case No. 15-788 (LPS) (CJB), D.I. |

Exhibit 1

| | | *Ohara* - Claim 4 |
|---|---|---|
| | least adjacent lines in the field being scaled. | 220. I further understand that Wi-LAN's infringement contentions appear to identify deinterlacing by, for example, certain interpolation functions, allegedly performed by the Accused Products as allegedly meeting this limitation. *See, e.g.,* Final Infringement Contentions, at [SEC] 79-81 and [VIZIO] 80-82 (field merging), [SEC] 83 and [VIZIO] 85 (interpolation); and *see id.* at [SEC] 79-120 and [VIZIO] 80-121. I further understand that the '654 Patent teaches that with interpolation, "although the number of lines is doubled, the vertical resolution is not increased from the original data[.]" '654 Patent, at 2:25-29 (citing pages 332-333 of Keith Jack). To the extent Wi-LAN alleges that that deinterlacing by, for example, field merging, scan line duplication, or scan line interpolation scale a field, "wherein said scaling is achieved by vertical interpolation between at least adjacent lines in the field being scaled," it is my opinion that *Ohara* teaches this limitation.<br><br>*Ohara* teaches different various scaling techniques achieved by vertical interpolation between at least adjacent lines in the field being scaled, as shown and described below. For example, *Ohara*'s background section teaches that scaling techniques achieved by vertical interpolation predated *Ohara*, and thus the '654 Patent.<br><br>Today's digital image display systems are designed to perform various video signal processing tasks. These digital image display systems include computer display systems, as well as many of today's television systems.<br>    One video signal processing task is scaling, where the number of pixels per row is increased or decreased (horizontal scaling) or the number of rows is increased or decreased (vertical scaling). Various algorithms have been devised to add or subtract the pixel data required for scaling.<br>    Many of today's television signals have interlaced fields, where odd lines are in one field and even lines are in the next. On a CRT display, the fields are scanned separately, but every two adjacent fields are perceived as one complete "frame" of an image.<br><br>*Ohara* at 1:9-22. |

Exhibit 1

| *Ohara* - Claim 4 |
| --- |



*Ohara* teaches using interpolation to create new lines of pixel data, the new pixel data being positioned between two preexisting lines of pixel data.

> It may use conventional scaling techniques, such as line-doubling or interpolation, to create new lines of pixel data. In general, interpolation computes the value of the new pixel by computing a weighted sum of original pixel values on either side of it. The closer the input pixels are to the new pixel, the more weight it is given. If the pixel to be interpolated is to have the value Y, and it is distance a from input pixel A1 and distance b from input pixel A2, where a+b=1, the new pixel value would be:
>
> $X = a \, A1 + b \, A2$

Fig. 4 of *Ohara* discloses generating pixel Y by using vertical interpolation between adjacent lines in the field being scaled.

*Ohara* at Fig. 4.

Exhibit 1



|                                                                                  | *Ohara* - Claim 4 |
| --- | --- |

*Ohara* at 3:56-65.

*Ohara* also discloses intra-field scaling methods, wherein scaling is achieved by vertical interpolation between at least adjacent lines in the field being scaled. This is shown and described below.

Exhibit 1

| *Ohara* - Claim 4 | | |
|---|---|---|
| | | $Y3 = \frac{3}{4}\, A2 + \frac{1}{4}\, A3$<br>For field **n-1**, the algorithm for every four lines is:<br><br>$Z0 = \frac{1}{8}\, B0 + \frac{7}{8}\, B1$<br>$Z1 = \frac{3}{8}\, B1 + \frac{5}{8}\, B2$<br>$Z2 = \frac{5}{8}\, B2 + \frac{3}{8}\, B3$<br>$Z3 = \frac{7}{8}\, B3 + \frac{1}{8}\, B4$<br><br>Examples of intra-field vertical scaling algorithms, such as bi-linear and cubic interpolation for various scaling ratios, are described in U.S. patent Ser. No. 08/147,249, incorporated by reference above, and in U.S. patent Ser. No. 08/091,852, entitled "Method and Device for Multi-Format Television". These patent applications are assigned to Texas Instruments Incorporated and are incorporated by reference herein. The cubic interpolation method uses three input pixel values for each new pixel value, rather than two.<br><br><br>*Ohara* at 4:56-5:16. |

Exhibit 1

| *Ohara* - Claim 4 |
|---|



*Ohara* at Fig. 6

*Ohara* at Fig. 3.

Exhibit 1

| *Ohara* - Claim 4 |
| --- |

FIG. 3 is a functional block diagram of the vertical scaling process **13***a*. The steps illustrated in FIG. 3 are implemented with programming stored in a program memory to be executed by processor system **13**. As stated above, for purposes of example, the data being processed is Y pixel data, although demodulated C pixel data (Cr, Cb or R-Y, B-Y or I, Q) or RGB pixel data could be similarly processed. As stated above, the process of FIG. 3 could be implemented with one or more serial video processors, which process pixel values on a line-by-basis.

*Ohara* at 3:40-49.

The result of the motion detection process is an n-bit value, M, whose magnitude indicates motion. Each pixel to be generated by scaling has an associated M value.

Referring again to FIG. 3, the pixel data is also processed with both an inter-field scaling process **35** and an intra-field scaling process **36**. These processes are performed in parallel on the same stream of pixel data. They both generate new pixel values for the vertically scaled image, but use different data.

The intra-field scaling process **35** is performed with data in the same field. Intra-field scaling is suitable for images that have motion, because temporal variations in the image from frame to frame will not be reflected in the new pixel values.

*Ohara* at 4:31-44.

Therefore, *Ohara* teaches "[t]he method of claim 1, wherein scaling is achieved by vertical interpolation between at least adjacent lines in the field being scaled."

Thus, *Ohara* anticipates Claim 4.

Exhibit 1

| *Ohara* - Claim 4 | | |
|---|---|---|
| | | Furthermore, modifying *Ohara* to achieve scaling by vertical interpolation between at least adjacent lines in the field being scaled would have been obvious for several reasons. For example, scaling by vertical interpolation was a known technique in the art, including explicitly a method of displaying a field's scan lines *scaled (interpolated)* up to … however many [lines] are in the current display mode" as described by the Description of the '654 Patent and *Keith Jack*:<br><br>Until now there have been two commonly used simple methods for displaying interlaced video being fed into the computer system on a computer monitor. These are normally independent of whether the computer monitor is interlaced or not, as even when the monitor is interlaced it normally refreshes at a rate independent of the incoming video signal.<br><br>Throughout this description NTSC video is assumed for the sake of illustrative examples, with references to 240 line fields, 480 line frames, 60 fields per second and 30 frames per second. This does not restrict the invention to NTSC or the line counts or frame or field rates but is merely used for simplicity. The invention is equally applicable to other video standards such as, but not limited to, PAL with 288 line fields, 576 line frames, 50 fields per second and 25 frames per second.<br><br>The first method is just capturing one of the two fields, and displaying 240 lines scaled (interpolated) up to 480 or however many are in the current display mode. The special case of scaling to 480 lines (line doubling) is currently used in the art and is well documented. See pages 332–333 of "Video Demystified: a Handbook for the Digital Engineers" by Keith Jack, HighText Publication Inc., 1993 (referred to herein as "Keith Jack").<br><br>'654 Patent, at 1:18-41.<br><br>*Keith Jack*, as cited in the Description of the '654 Patent provides additional detail, for example by identifying the lack of increased vertical resolution as a known deficiency of displaying only a single field per frame.  *Keith Jack*, at 332-333; *and see also* '654 Patent, at 3:42-44.  *Keith Jack* goes on to identify and describe techniques known in the art for |

Exhibit 1

| *Ohara* - Claim 4 |
|---|
| filling the resolution of a monitor or display.  *Keith Jack*, at 332 (scan line duplication), 333 (scan line interpolation), and 333-335 (field merging); *and see id.* at 334, at Figures 9.3, 9.4, and 9.5: <br><br> |

Exhibit 1

| *Ohara* - Claim 4 | | |
|---|---|---|
| | | As illustrated in Figures 9.3, 9.4, and 9.5, *Keith Jack* demonstrates how to use various techniques known in the art to generate additional scan lines from an input field to create an output frame that is scaled to fill vertical resolution of the non-interlaced monitor. |
| | | Scaling each of the first field and second field of each pair of fields to fill vertical resolution of the non-interlaced monitor would have yielded known benefits, including as described in *Keith Jack* and the Description and Background of the '654 Patent itself. |
| | | Additionally, *Ohara* describes various scaling techniques, including vertical scaling, and acknowledges that "[v]arious algorithms have been devised to add or subtract the pixel data required for scaling," *Ohara* at 1:16-17, including using pixel values from neighboring lines and using interpolation methods to provide pixel values for new lines, *id.* at 1:24-29. *Ohara* also states that "[v]arious modifications of the disclosed embodiments, as well as alternative embodiments, will be apparent to persons skilled in the art.  It is, therefore, contemplated that the appended claims will cover all modifications that fall within the true scope of the invention."  *Id.* at 6:38-44. |
| | | Thus, replacing *Ohara*'s disclosed techniques with scaling each of the first field and second field of each pair of fields to fill vertical resolution of the non-interlaced monitor would represent an alternative solution with potentially improved results. Thus, a person of ordinary skill in the art would have had a motivation to improve *Ohara*'s techniques with scaling each of the first field and second field of each pair of fields to fill vertical resolution of the non-interlaced monitor. Persons of skill in the art would have therefore been motivated to improve *Ohara* with the teachings of *Greggain* and *Miyaguchi*, which both disclose a method wherein scaling is achieved by vertical interpolation between at least adjacent lines in the field being scaled.  *See* Exhibits 3 and 5 at Claim 4 (incorporated here by reference). |
| | | In addition, it would have been obvious to try combining or modifying *Ohara* because there were only a finite number of predictable solutions, because known work in the field prompted variations based on predictable design incentives, or in light of market forces either in the field or analogous and related fields would have suggested the combination. |

Exhibit 1

| | | *Ohara* - Claim 4 |
|---|---|---|
| | | Indeed, the combination of *Ohara* with the teachings described here would have been obvious because the combination represents known potential options with a reasonable expectation of success. Additionally, a person of ordinary skill in the art would not have faced unexpected results or undue experimentation in making the aforementioned replacement. Furthermore, *Ohara* describes methods for scaling interlaced fields of video data, *Miyaguchi* discloses scaling video signals, which is referred to as doubling the data rate, and *Greggain* discloses de-interlacing video data including a step of scaling fields of video data.  Thus, all of these references are directed to similar technology, all address and solve similar problems relating to processing video data, and a person of ordinary skill in the art who was considering scaling video signals would have been motivated to look to other prior art scaling methods to improve the device being modified, in this case *Ohara*. These techniques were well known in the art (*see Keith Jack* and admissions in the Background of the '654 Patent) so their implementation would have been well within the skill of a person of ordinary skill in the art. Consequently, a person of skill would have been motivated to and capable of combining or modifying *Ohara* with the teachings of *Greggain* and *Miyaguchi*, and the teachings of those references as described in Exhibits 3 and 5 at Claim 4 are incorporated here by reference.<br><br>The discussion in Paragraphs 350 through 352, and Sections VIII.D.4(a) and VIII.D.4(b)(i)-(vi) are incorporated by reference.<br><br>Therefore, *Ohara* in view of *Greggain* and *Ohara* in view of *Miyaguchi* renders obvious "wherein scaling is achieved by vertical interpolation between at least adjacent lines in the field being scaled." |

| | | *Ohara* - Claim 9 |
|---|---|---|
| 9 | The method of claim 1, wherein the adjusting step is achieved by vertical interpolation | I understand the Court has construed the term "the adjusting step is achieved by vertical interpolation between at least adjacent lines" to mean "the adjusting step is achieved by calculating values for new pixels between at least vertically adjacent lines using known values." *Wi-LAN v. Sharp Electronics Corporation*, Case No. 15-379 (LPS) (CJB), D.I. |

Exhibit 1

| *Ohara* - Claim 9 | |
|---|---|
| between at least adjacent lines in the field being adjusted. | 281; *Wi-LAN v. VIZIO, Inc.*, Case No. 15-788 (LPS) (CJB), D.I. 220. I also understand that Wi-LAN disclaimed Claim 8 of the '654 Patent, which claims a method of such adjusting where the adjusting step "includes changing display positions of one of the scaled first field or scaled second field by one or more lines on the noninterlaced monitor." '654 Patent, at Cl. 8; '654 Patent, at Disclaimer.  I further understand that Wi-LAN's infringement contentions appear to identify certain interpolation functions purportedly performed by the Accused Products as allegedly meeting this limitation.  *See, e.g.,* Final Infringement Contentions , at [SEC] 126 and [VIZIO] 127 (depicting Deinterlaced Frame with Spatial Averaging from Top Field and Deinterlaced Frame with Spatial Averaging from Bottom Field), [SEC] 184 and [VIZIO] 185 (asserting without explanation "[t]he adjusting step is performed during the interpolation process, and therefore, 'concurrently' with the scaling."); *and see id.* at [SEC] 121-185 and [VIZIO] 122-186.  To the extent Wi-LAN alleges that such methods "achieve[ the adjusting step] by vertical interpolation between at least adjacent lines in the field being adjusted," it is my opinion that *Ohara* teaches this limitation.

In particular, *Ohara* also teaches adjustments methods achieved by vertical interpolation between adjacent lines in the field as shown and described below.

For example, as described above, inter -field scaling methods disclosed in *Ohara* performed the claimed adjusting step.  As shown and described below, these methods adjust pixel line data by using vertical interpolation between at least adjacent lines in the field being adjusted. |

Exhibit 1

| *Ohara* - Claim 9 | | | |
|---|---|---|---|
| | | | FIG. 6 illustrates an example of intra-field scaling, specifically, bi-linear interpolation for 3:4 scaling. Data from fields n-1 and n are used to create data for new fields n-1 and n, respectively. The pixels of lines $0, \ldots 3, \ldots n$ of the input fields are designated as $A0 \ldots A3, \ldots An$, and as $B0, \ldots Z3, \ldots Bn$. The pixels of lines $0, \ldots 4, \ldots n$ of the output field are designated as $Z0, \ldots Z4, \ldots n$, and as $Y0, \ldots Y4, \ldots Yn$. For field n, the algorithm for every four lines is:

$Y0=A0$
$Y1=\frac{1}{4} A0+\frac{3}{4} A1$
$Y2=\frac{1}{2} A1+\frac{1}{2} A2$

$Y3=\frac{3}{4} A2+\frac{1}{4} A3$
For field n-1, the algorithm for every four lines is:
$Z0=\frac{1}{8} B0+\frac{7}{8} B1$
$Z1=\frac{3}{8} B1+\frac{5}{8} B2$
$Z2=\frac{5}{8} B2+\frac{3}{8} B3$
$Z3=\frac{7}{8} B3+\frac{1}{8} B4$

Examples of intra-field vertical scaling algorithms, such as bi-linear and cubic interpolation for various scaling ratios, are described in U.S. patent Ser. No. 08/147,249, incorporated by reference above, and in U.S. patent Ser. No. 08/091,852, entitled "Method and Device for Multi-Format Television". These patent applications are assigned to Texas Instruments Incorporated and are incorporated by reference herein. The cubic interpolation method uses three input pixel values for each new pixel value, rather than two.

*Ohara* at 4:56-5:16. |

Exhibit 1

| *Ohara* - Claim 9 |
|---|



*Ohara* at Fig. 6

*Ohara* at Fig. 3.

Exhibit 1

| *Ohara* - Claim 9 |
|---|
| |

FIG. 3 is a functional block diagram of the vertical scaling process 13*a*. The steps illustrated in FIG. 3 are implemented with programming stored in a program memory to be executed by processor system 13. As stated above, for purposes of example, the data being processed is Y pixel data, although demodulated C pixel data (Cr, Cb or R-Y, B-Y or I, Q) or RGB pixel data could be similarly processed. As stated above, the process of FIG. 3 could be implemented with one or more serial video processors, which process pixel values on a line-by-basis.

*Ohara* at 3:40-49.

The result of the motion detection process is an n-bit value, M, whose magnitude indicates motion. Each pixel to be generated by scaling has an associated M value.

Referring again to FIG. 3, the pixel data is also processed with both an inter-field scaling process 35 and an intra-field scaling process 36. These processes are performed in parallel on the same stream of pixel data. They both generate new pixel values for the vertically scaled image, but use different data.

The intra-field scaling process 35 is performed with data in the same field. Intra-field scaling is suitable for images that have motion, because temporal variations in the image from frame to frame will not be reflected in the new pixel values.

*Ohara* at 4:31-44.

Therefore, *Ohara* teaches "[t]he method of claim 1, wherein the adjusting step is achieved by vertical interpolation between at least adjacent lines in the field being adjusted."

Thus, *Ohara* anticipates Claim 9.

Exhibit 1

| *Ohara* - Claim 9 |
|---|

Additionally, modifying *Ohara* to achieve the adjusting step by vertical interpolation between at least adjacent lines in the field being adjusted would have been obvious for several reasons. For example, *Keith Jack* confirms that practitioners were mindful of the visual artifacts caused by a vertical offset between fields while working with interlaced video signals:

> shown in Figure 9.9. Although the cost is minimal, there are problems with this approach, especially when horizontal lines that are one or two noninterlaced scan lines wide are converted. ==Lines that are one noninterlaced scan line wide will flicker== at the frame refresh rate (30 Hz for NTSC, 25 Hz for PAL and SECAM) when converted to interlaced. The reason is that they are only displayed every other field as a result of the simple conversion. This effect may also occur on the top and bottom edges of

> objects. ==Lines that are two noninterlaced scan lines wide will oscillate up and down between two interlaced scan lines at the frame refresh rate (30 Hz for NTSC, 25 Hz for PAL and SECAM) when converted to interlaced.==

*Keith Jack*, at 336-337.

*Keith Jack* further confirms that practitioners knew and took care to apply video processing techniques that would result in the correct spatial positioning of video scan lines, and in fact confirms that video processing to correct for vertical offset *was required* if a deinterlacing technique did not inherently result in correct spatial positioning of the scan lines:

Exhibit 1

| | | *Ohara* - Claim 9 |
|---|---|---|
| | | The best vertical frequency response is obtained when field merging is implemented. **The spatial position of the lines are already correct and no vertical processing is required,** resulting in a flat curve (Line C). Once again, this applies only for stationary areas of the image. <br><br> *Keith Jack*, at 335. <br><br> *Keith Jack* further demonstrates that practitioners used interpolation between at least adjacent lines in the field being adjusted to perform the adjusting step, consistent with Wi-LAN's allegations regarding this element.  For example, Figure 9.4 of *Keith Jack* illustrates the use of interpolation to correctly position field lines 1, 2, 3, and 4 of an input field (indicated with red, below) in the deinterlaced output frame as lines 1, 3, 5, and 7 (indicated with orange, below), with additional lines generated by vertical interpolation between the adjacent lines in the field being adjusted at positions corresponding to the even field at lines 2, 4, 6, and 8 (indicated with green, below): |

Exhibit 1

| Ohara - Claim 9 |
|---|



*Keith Jack*, at Fig. 9.4 (demonstrating interpolation of deinterlaced output line 2 as "2=1+3"; deinterlaced output line 4 as "4-3+5"; etc.); *and compare with, e.g.,* Final Infringement Contentions, at [SEC] 126 and [VIZIO] 127 (depicting Deinterlaced Frame with Spatial Averaging from Top Field and Deinterlaced Frame with Spatial Averaging from Bottom Field), [SEC] 184 and [VIZIO] 185 (asserting without explanation "[t]he adjusting step is performed during the interpolation process, and therefore, 'concurrently' with the scaling."); *and see id.* at [SEC] 121-185 and [VIZIO] 122-186.

Exhibit 1

| *Ohara* - Claim 9 | | |
|---|---|---|
| | | *Keith Jack* demonstrates that practitioners knew to use various techniques known in the art to perform an adjusting step, including where the adjusting step is achieved by vertical interpolation between adjacent lines in the field being adjusted.  Adjusting one of the first field or second field of the pair of fields in an interlaced video signal to substantially correct for any vertical offset between the pairs of fields would have yielded known benefits, including as described in *Keith Jack*.<br><br>Additionally, *Ohara* describes various techniques known in the art to affect an adjustment of vertical offset, including vertical scaling, and acknowledges that "[v]arious algorithms have been devised to add or subtract the pixel data required for scaling," *Ohara* at 1:16-17, including using pixel values from neighboring lines and using interpolation methods to provide pixel values for new lines, *id*. at 1:24-29. *Ohara* also states that "[v]arious modifications of the disclosed embodiments, as well as alternative embodiments, will be apparent to persons skilled in the art.  It is, therefore, contemplated that the appended claims will cover all modifications that fall within the true scope of the invention."  *Id*. at 6:38-44.<br><br>Thus, replacing *Ohara*'s disclosed techniques with known techniques for using vertical interpolation between at least adjacent lines in the field being adjusted to achieve the adjusting step would represent an alternative solution with potentially improved results. Thus, a person of ordinary skill in the art would have had a motivation to improve *Ohara's* techniques with vertical interpolation between at least adjacent lines in the field being adjusted to achieve the adjusting step.  Persons of skill in the art would have therefore been motivated to improve *Ohara* with the teachings of *Greggain,* which discloses techniques for adjusting, wherein the adjusting step is achieved by vertical interpolation between at least adjacent lines in the field being adjusted. *See* Exhibit 3 at Claim 9 (incorporated herein by reference). Furthermore, *Ohara* describes methods for scaling and adjusting interlaced fields of video data, and *Greggain* similarly discloses de-interlacing video data by continuously calculating the spatial position of the output lines and then mapping interlaced input fields to progressive scan output frames, which naturally performs adjustment of one of the fields. Thus, *Ohara* and *Greggain* are directed to similar technology, all address and solve similar problems relating to processing video data, and a person of ordinary skill in the art who was considering scaling and adjusting video signals as disclosed in *Ohara* |



Exhibit 1

| *Ohara* - Claim 9 |
|---|
| would have been motivated to look to the other methods scaling and adjusting video data to improve the *Ohara* invention.<br><br>In addition, it would have been obvious to try combining or modifying *Ohara* because there were only a finite number of predictable solutions, because known work in the field prompted variations based on predictable design incentives, or in light of market forces either in the field or analogous and related fields would have suggested the combination. Indeed, the combination of *Ohara* with the teachings described here would have been obvious because the combination represents known potential options with a reasonable expectation of success.  Additionally, a person of ordinary skill in the art would not have faced unexpected results or undue experimentation in making the aforementioned replacement. These techniques were well known in the art (*see Keith Jack*) so their implementation would have been well within the skill of a person of ordinary skill in the art. Consequently, a person of skill would have been motivated to and capable of combining or modifying *Ohara* with the teachings of at least *Greggain*, and the teachings of that reference as described in Exhibit 3 at Claim 9 are incorporated here by reference.<br><br>The discussion in Paragraphs 350 through 352, and Sections VIII.D.4(a) and VIII.D.4(b)(i)-(vi) are incorporated by reference.<br><br>Therefore, *Ohara* in view of *Greggain* renders obvious "wherein the adjusting step is achieved by vertical interpolation between at least adjacent lines in the field being adjusted." |

# EXHIBIT 63

Exhibit 2

*U.S. Patent No. 5,181,110 to Katsumata*
**Invalidity Claim Chart for the '654 Patent**
Asserted Claims: 1, 4, and 9

| *Katsumata* - Claim 1 | | |
|---|---|---|
| 1(p) | 1. A method for displaying interlaced video data on a non-interlaced monitor, the interlaced video data comprising a plurality of paired fields, each pair of fields being vertically offset relative to each other by one-half of a field line spacing distance, each field comprising a plurality of lines of video data, the method including: | U.S. Patent No. 5,181,110 to Katsumata et al. (*Katsumata*), with a filing date of December 27, 1990, teaches "method for displaying interlaced video data on a non-interlaced monitor, the interlaced video data comprising a plurality of paired fields, each pair of fields being vertically offset relative to each other by one-half of a field line spacing distance, each field comprising a plurality of lines of video data." Therefore *Katsumata* was prior art to the '654 Patent under at least 35 U.S.C. §§ 102(a), (b), and (e). I understand that the Court has construed the preamble to be limiting. *Wi-LAN v. Sharp Electronics Corporation*, Case No. 15-379 (LPS) (CJB), D.I. 281; *Wi-LAN v. VIZIO, Inc.*, Case No. 15-788 (LPS) (CJB), D.I. 220.<br><br>In particular, *Katsumata* teaches a method of receiving interlaced video for conversion and display on a progressive scan display: |

Exhibit 2

| Katsumata - Claim 1 |
|---|

[57]   **ABSTRACT**

A video signal processing circuit capable of enlarging and displaying a picture and adapted for use in an apparatus in which a desired picture is selected, and a video signal representative of the desired picture under interlaced scanning is received, stored in a memory and processed to provide an enlarged video signal, includes a real signal/interpolated signal preparation circuit for preparing, from the stored video signal, new scanning lines for an image to be enlarged, and a memory processing circuit having switching control function to store an output signal of the real signal/interpolated signal preparation circuit in a memory, read the video signal out of the memory at a period different from a period at which the output signal is stored in the memory, and delay a read-out signal by one or more fields so that an enlarged signal is delivered.

*Katsumata*, at Abstract; *and see id.* at 4:44-47 ("Fig. 5B shows a scanning line structure for a standard scan display and Fig. 5C a scanning line structure for progressive scan display."):

The method of solving the first problem will first be described briefly. When an interpolated scanning line preparation circuit is used which prepares new scanning lines from adjacent scanning line signals so as to carry out enlargement, there occur scanning line structures as shown in FIGS. **5A** to **5D**. Here, a scanning line name **12** implies a signal generated from scanning lines **1** and **2** and a scanning line AB implies a scanning line generated from scanning lines A and B. FIG. **5B** shows a scanning line structure for a standard scan display and FIG. **5C** a scanning line structure for progressive scan display.

*Katsumata*, at 4:36-47. *Katsumata* teaches that the disclosed circuit is applied in the context of a progressive scan display (*e.g.*, a non-interlaced monitor),

Exhibit 2

| | | | |
|---|---|---|---|
| | | **_Katsumata_ - Claim 1** | |

> When an enlargement processing circuit provided with the motion adaptive scanning line interpolation circuit is applied to the unit for progressive scan display, quality of an enlarged image can be improved further for a still picture and a moving picture.

_Katsumata_, at 4:66-5:2.  _Katsumata_ additionally teaches the structure of the input signal, detailing that for the first field "the vertical address increases through 00, 02, 04 …" and for the second field ("through 01, 03, 05 …")[1].

> enlarged image. For example, under the interlaced scanning of the input signal, vertical addresses are as shown in FIG. 3A in the case of normal display but in the case of 4-times enlargement, vertical addresses are as shown in FIG. 3B. In the case of the normal display under interlaced scanning, the vertical address increases through 00, 02, 04 . . . in the first field and through 01, 03, 05 . . . in the second field. If in this case images of the

_Katsumata_, 1:60-2:4.

_Katsumata_'s disclosure of receiving an interlaced video signal and processing the signal to display it on a progressive scan display thereby teaches "[a] method for displaying interlaced video data on a non-interlaced monitor."

_Katsumata_ also informs that interlaced video data comprises a plurality of paired fields.  For example, _Katsumata_ teaches that an input interlaced signal has vertical addresses alternating between the first (_i.e._, even) and second (_i.e.,_ odd) fields:

---

[1] Katsumata chooses to begin line numbering at 0, so the even field is the top field.

Exhibit 2

| Katsumata - Claim 1 |
| --- |



*Katsumata*, at Fig. 3A; *and see id.* 1:56-63:



These paired fields as illustrated by *Katsumata* represent video data before application of any enlargement or conversion process, at Figure 5A, representing a pair of odd and even

Exhibit 2

| *Katsumata* - Claim 1 |
|---|

|  |  | fields.  The same teaching illustrates that the even field is vertically offset from the odd field by one-half of a field line spacing distance: |
|---|---|---|



*Katsumata*, at Fig. 5A (annotated).

Therefore, *Katsumata* teaches "a method for displaying interlaced video data on a non-interlaced monitor, the interlaced video data comprising a plurality of paired fields, each pair of fields being vertically offset relative to each other by one-half of a field line spacing distance, each field comprising a plurality of lines of video data."

| 1(a) | capturing a first field and a second field of | I understand that the Court has construed the term "respective buffers" to mean "separate buffers for the first field and the second field."  *Wi-LAN v. Sharp Electronics Corporation*, |
|---|---|---|

Exhibit 2

| *Katsumata* - Claim 1 | |
|---|---|
| each pair of fields into respective buffers; | Case No. 15-379 (LPS) (CJB), D.I. 281; *Wi-LAN v. VIZIO, Inc.*, Case No. 15-788 (LPS) (CJB), D.I. 220.  It is my opinion that *Katsumata* teaches "capturing a first field and a second field of each pair of fields into respective buffers." <br><br> *Katsumata* teaches that a first and second buffer memory alternately store the "real" (original input) scanning line signals field by field: <br><br> The first and second buffer memories alternately store the real scanning line signals field by field and the third and fourth buffer memories alternately store the interpolated scanning line signals field by field. For example, at the phase of a field within which writing of the first and third buffer memories proceeds, a signal of one-preceding field is read out of the second and fourth buffer memories and delivered through the first and second switch circuits. At the phase of a field within which writing of the second and fourth buffer memories proceeds, a signal of one-preceding field is read out of the first and third buffer memories and delivered through the first and second switch circuits. Accord- <br><br> *Katsumata*, at 3:51-54.  *Katsumata* further teaches a circuit employing such respective buffers.  Specifically, one embodying circuit taught by *Katsumata* is illustrated at Fig. 1, which depicts a total of four separate buffers that are further described in the accompanying specification as comprising two separate buffers (a "first and second buffer") for capturing the first and second fields ("real scanning line signals") and an additional two buffers for storing interpolated data: |

Exhibit 2

| *Katsumata* - Claim 1 |
|---|



*Katsumata*, at Fig. 1; *and see id.* at 6:8-26:

> An embodiment of the invention will be described with reference to FIG. **1**. In FIG. **1**, **101** designates an input terminal for a video signal, **102** an output terminal for an image, **104** a real signal/interpolated signal generating circuit for preparing a real scanning line signal and an interpolated scanning line signal on the basis of the video signal from the input terminal **101**, **105 and 106** first and second buffer memories for storing the real scanning line signal, **107** and **108** third and fourth buffer memories for storing the interpolated scanning line signal, **109** an address generation circuit for applying write/read addresses to the first, second, third and fourth buffer memories **105**, **106**, **107** and **108**, **110** a first switch circuit for selecting one of output signals of the first and second buffer memories **105** and **106**. **111** a second switch circuit for selecting one of output signals of the third and fourth buffer memories **107** and **108**, and **103** a third switch circuit for switching output signals of the first and second switch circuits.

Exhibit 2

| | | Katsumata - Claim 1 |
|---|---|---|
| | | *Katsumata* additionally describes in detail corresponding separation circuits for the processing of the luminance and chrominance (Y/C) subchannels, including the interpolation of these subchannels.  *Katsumata* teaches that these subcircuits would include a frame and a field memory (buffers) in order to effect the processing of the chroma and luma information into a destination output frame.<br><br>According to another feature of the invention, an apparatus provided with a luminance and chrominance (Y/C) separation circuit having a memory for at least one frame delaying a television signal and a scanning line interpolation circuit having a memory for one field delaying the Y/C separation circuit comprises a first delay circuit for delaying the output of the output of the Y/C separation circuit, a second delay circuit for delaying the scanning line interpolation circuit, a fourth switch circuit for switching the first delay circuit and the input television signal and applying a resulting signal to the frame memory, a fifth switch circuit for switching the second delay circuit and the output of the Y/C separation circuit and applying a resulting signal to the field memory, a sixth switch circuit for switching outputs of the Y/C separation circuit and frame memory, a seventh switch circuit for switching outputs of the field memory and scanning line interpolation circuit, an eighth switch circuit for switching outputs of the sixth switch circuit and seventh switch circuit, and a line buffer succeeding the eighth switch circuit.<br><br>*Katsumata*, at 3:27-47.  *Katsumata* further describes and discloses a circuit capable of processing the luminance and chrominance subchannels in accordance with the invention, including the disclosure of buffers to store information from the frames and fields as they are processed: |

Exhibit 2

| | | *Katsumata* - Claim 1 |
|---|---|---|
| | |  FIG. **9** shows a detailed circuit construction of the real signal/interpolated signal preparation circuit **104** of FIG. **1**. In FIG. **9**, **901** designates an input terminal for video signal, **902** an output terminal for real scanning line signal, **903** an output terminal for interpolated scanning line signal, **904** a frame memory for one frame delaying the video signal inputted through the input terminal **901**, **905** a motion adaptive Y (luminance signal) separation circuit adapted to extract a Y signal by using the video signal from the input terminal **901** and an output signal from the frame memory **904**, **906** a field memory for one field delaying an output signal from the motion adaptive Y separation circuit **905**, **907** a motion adaptive scanning line interpolation circuit adapted to prepare an interpolated scanning line by using output signals from the motion adaptive Y separation circuit **905** and field memory **906**, and **908** a motion processing<br><br>*Katsumata*, at 7:26-42; *see also id.* at 8:64-9:2; *and see id.* at Fig. 9:<br><br>Therefore, *Katsumata* teaches "capturing a first field and a second field of each pair of fields into respective buffers." |
| 1(b) | scaling each of the first field and second field of | I understand the Court has construed "scaling" to mean "changing the vertical resolution by changing by a constant factor the number of lines in a field." *Wi-LAN v. Sharp Electronics* |

Exhibit 2

| | | *Katsumata* - Claim 1 |
|---|---|---|
| | each pair of fields to fill vertical resolution of the non-interlaced monitor; | *Corporation*, Case No. 15-379 (LPS) (CJB), D.I. 281; *Wi-LAN v. VIZIO, Inc*., Case No. 15-788 (LPS) (CJB), D.I. 220.  I further understand that Wi-LAN's infringement contentions appear to identify field merging and certain interpolation functions allegedly performed by the Accused Products as allegedly meeting this limitation.  *See, e.g.,* Final Infringement Contentions, at [SEC] 79-81 and [VIZIO] 80-82 (field merging), [SEC] 83 and [VIZIO] 85 (interpolation); *and see id.* at [SEC] 79-120 and [VIZIO] 80-121.  I further understand that the '654 Patent teaches that with interpolation, "although the number of lines is doubled, the vertical resolution is not increased from the original data[.]"  '654 Patent, at 2:25-29 (citing pages 332-333 of Keith Jack).  To the extent Wi-LAN alleges that field merging, scan line duplication, or scan line interpolation scale a field "to fill the vertical resolution of the non-interlaced monitor[,]"  it is my opinion that *Katsumata* teaches this limitation.<br><br>Specifically, *Katsumata* teaches scaling the fields by repetitively reading out real scanning line signals, along with interpolated scanning line signals, to effect a 'change in the vertical resolution by changing by a constant factor the number of lines in a field.'  For example, *Katsumata* teaches that this process effects an enlargement (scaling) in the vertical direction:<br><br>Signals stored in the buffer memories **105, 106, 107** and **108** are repetitively read in the form of a batch of two lines in accordance with read addresses from the address generation circuit **109** in order to effect enlargement in the vertical direction. Enlargement in the horizontal direction can be realized by applying twice the same address or halving the frequency of the read clock. The first and second switch circuits **110 and 111**<br><br>*Katsumata*, at 6:49-53.  At Figs. 5B and 5C, *Katsumata* illustrates this teaching, expressly demonstrating that the process describe results in a change by a constant factor the number of lines in the field.  *See, e.g.,* Fig. 5B and 5C.  For example, at Figures 5B and 5C, *Katsumata* demonstrates that interpolation can be used to change by a constant factor the number of lines in a field, regardless of whether the input field is interlaced (Fig. 5B, demonstrating scan lines increased by a constant factor of two) or progressive (Fig. 5C, |

Exhibit 2

| ***Katsumata* - Claim 1** | | |
|---|---|---|
| | | demonstrating scan lines increased by a constant factor of two): |



Figs. 5B and 5C; *and see* 4:37-47 ("When an interpolated scanning line preparation circuit is used which prepares new scanning lines from adjacent scanning line signals so as to carry out enlargement, there occur scanning line structures as shown in FIGS. 5A to 5D. Here, a scanning line name 12 implies a signal generated from scanning lines 1 and 2 and a scanning line AB implies a scanning line generated from scanning lines A and B. FIG. 5B shows a scanning line structure for a standard scan display and FIG. 5C a scanning line structure for progressive scan display.").

Exhibit 2

| *Katsumata* - Claim 1 |
|---|

| | | *Katsumata* teaches that both the real and interpolated signals are stored in the buffer memories 105, 106, 107 and 108, and are actual scanning line signal such as scanning line 1 or scanning line A or an interpolated scanning line signal such as scanning line 12 or scanning line AB.  *See id.* at 6:30-37 ("Referring to FIG. 1, in the real signal/interpolated signal preparation circuit 104, an actual scanning line signal such as scanning line 1 or scanning line A and an interpolated scanning line signal such as scanning line 12 or scanning line AB in FIG. 5B are prepared from the video signal inputted to the input terminal 101 and they are supplied to the first, second, third and fourth buffer memories 105, 106, 107 and 108.").  A signal generating circuit (element 104) is responsible for preparing either a real scan line or an interpolated scan line based on the video input signal (element 101): |
|---|---|---|



*Katsumata*, at Fig. 1.  By operation of this circuit, if one interpolated scan line is prepared for every one real scan line, the resulting number of lines is increased by a constant factor of two.  If two interpolated scan lines are prepared for every one real scan line, the number of lines is increased by a constant factor of three.  In my opinion, a person of skill in the art would have understood that the proportion of real and interpolated scan lines would have

Exhibit 2

| *Katsumata* - Claim 1 |
|---|

| | | been arbitrary, such as to permit a person of skill to change the number of lines in order to fill a display of arbitrary size.<br><br>*Katsumata* also details an embodiment where new scanning lines are generated from existing scanning lines, thus increasing by a constant factor the number of lines in the field, consistent with Wi-LAN's allegations regarding this element.  *See, e.g.,* Figs. 5A through 5D; *and see id.* at 4:36-47 (text accompanying Figs. 5A through 5D).<br><br> |

Exhibit 2

| | | |
|---|---|---|
| | | ***Katsumata* - Claim 1** |
| | | *Katsumata*, at Figs. 5A through 5D.<br><br><br><br>*Katsumata*, at Figs. 6A - 6C; *see also* 4:11-23; 6:9-26.  *Katsumata* expands on these teachings, including by describing that the interpolation process depicted operates to carry out an enlargement: |

Exhibit 2

| Katsumata - Claim 1 | | | |
| --- | --- | --- | --- |
| | | | The method of solving the first problem will first be described briefly. When an interpolated scanning line preparation circuit is used which prepares new scanning lines from adjacent scanning line signals so as to carry out enlargement, there occur scanning line structures as shown in FIGS. 5A to 5D. Here, a scanning line name 12 implies a signal generated from scanning lines 1 and 2 and a scanning line AB implies a scanning line generated from scanning lines A and B. FIG. 5B shows a scanning line structure for a standard scan display and FIG. 5C a scanning line structure for progressive scan display. |

*Katsumata*, at 4:36-47.  Adding interpolated lines to the real lines results in a two-times scaling; reading out each real and interpolated line twice further doubles the scaling for a change by a factor of four of the number of lines in the field, and fills the display.  *See id.*; *and see* 8:9-12.

Therefore, *Katsumata* teaches "scaling each of the first field and second field of each pair of fields to fill vertical resolution of the non-interlaced monitor."

Furthermore, to the extent this limitation is not taught by *Katsumata*, it would have been obvious to modify *Katsumata* to scale each of the first field and second field of each pair of fields to fill vertical resolution of a non-interlaced monitor for several reasons, including at least because the benefits of "scal[ing] (interpolat[ing])" the number of scan lines "up to … however many [scan lines] are in the current display mode" were admittedly known in the art, consistent with Wi-LAN's allegations regarding this element.  *See, e.g.,* Final Infringement Contentions, at [SEC] 95 and [VIZIO] 96.

For example, scaling by interpolation to fill a display, consistent with Wi-LAN's allegations regarding this element, was an admittedly known method in the art, as described in the Description of the '654 Patent and *Keith Jack*:

Exhibit 2

| ***Katsumata* - Claim 1** | | |
|---|---|---|
| | | Until now there have been two commonly used simple methods for displaying interlaced video being fed into the computer system on a computer monitor. These are normally independent of whether the computer monitor is interlaced or not, as even when the monitor is interlaced it normally refreshes at a rate independent of the incoming video signal.<br><br>Throughout this description NTSC video is assumed for the sake of illustrative examples, with references to 240 fields, 480 line frames, 60 fields per second and 30 frames per second. This does not restrict the invention to NTSC or the line counts or frame or field rates but is merely used for simplicity. The invention is equally applicable to other video standards such as, but not limited to, PAL with 288 line fields, 576 line frames, 50 fields per second and 25 frames per second.<br><br>The first method is just capturing one of the two fields, and displaying 240 lines scaled (interpolated) up to 480 or however many are in the current display mode. The special case of scaling to 480 lines (line doubling) is currently used in the art and is well documented. See pages 332–333 of "Video Demystified: a Handbook for the Digital Engineers" by Keith Jack, HighText Publication Inc., 1993 (referred to herein as "Keith Jack").<br><br>The second method is to perform simple de-interlacing where both fields are captured into a single 480 line buffer and double the buffer line length for a single field in order to store a field in every other line. This is referred to as "Field Merging" (see p. 333 of Keith Jack)<br><br>'654 Patent, at 1:18-46; *and see, e.g.,* Final Infringement Contentions, at [SEC] 83, 95 and [VIZIO] 85, 96.<br><br>*Keith Jack* identifies and describes techniques known in the art for performing an interlaced to non-interlaced conversion. *Keith Jack*, at 332 (scan line duplication), 333 (scan line interpolation), and 333-335 (field merging); *and see id.* at 334, at Figures 9.3, 9.4, and 9.5: |

Exhibit 2

| | |
|---|---|
| ***Katsumata* - Claim 1** | |



As illustrated in Figures 9.3, 9.4, and 9.5, *Keith Jack* demonstrates that persons of ordinary skill used various techniques known in the art to generate additional scan lines from an input field to create an output frame that is scaled to fill vertical resolution of the non-interlaced monitor, consistent with Wi-LAN's allegations regarding this element. *And see,*

Exhibit 2

| | | *Katsumata* - Claim 1 |
|---|---|---|
| | | *e.g.,* Final Infringement Contentions, at [SEC] 83, 95 and [VIZIO] 85, 96.<br><br>A person of skill would have been motivated to perform any such scaling on "each pair of fields to fill vertical resolution of the non-interlaced monitor," consistent with Wi-LAN's allegations regarding this element, and indeed there is no reason that any person of skill would have failed to do so. *See, e.g.,* Final Infringement Contentions, at [SEC] 83, 95 and [VIZIO] 85, 96. Persons of skill in the art at the time of the claimed invention understood that a higher framerate resulted in a higher quality video, including with less flicker: |

**PAL**  PAL stands for Phase Alternation Line. PAL is to Europe as NTSC is to North America. In other words, PAL is the video standard used in Europe and a few other countries. There are a few differences. PAL uses 625 lines per frame while NTSC has 525 lines. Therefore, PAL has higher vertical resolution. The frame rate of NTSC is 30 frames per second while for PAL it is 25. This means the update rate for NTSC is higher and therefore there is more flicker with PAL. PAL uses the YUV color space while NTSC uses YIQ or YUV. That's no big deal, just a little mathematical difference. It is becoming increasingly important for imaging systems suppliers to produce equipment that can be sold worldwide without many manufacturing difficulties. This implies that the equipment must be designed from the start to accommodate both standards.

*Keith Jack*, at 422. *Keith Jack* also informs that persons of skill in the art knew of and applied techniques to convert and increase the frame-rate of a video in order to match the refresh rate of a display, again improving quality so that a video "[could] be shown correctly on a computer display." *E.g., Keith Jack*, at 414:

**Frame Rate Conversion**  Frame rate conversion is the act of converting one frame rate to another. One real example that poses a difficult problem is that the frame rate of NTSC, 30 frames per second, is different from a typical computer's display, which may be anywhere from 70 to 75 frames per second (or Hz if you prefer). Therefore, some frame-rate conversion process must be performed before NTSC video can be shown correctly on a computer display. Without frame rate conversion, the screen might look as if it "stalls" every now and then. If there is motion within the video, the objects that are moving might appear cut in half.

*Keith Jack* additionally informs that there were specific techniques that persons of skill in the art knew and were capable of applying to preserve the frame rate of video during a deinterlacing process. *E.g., Keith Jack*, at 333-334. For example, in order to preserve the number of video images displayed per second when using field merging to deinterlace input

Exhibit 2

| *Katsumata* - Claim 1 |
|---|

|  |  | frames, *Keith Jack* teaches that alternating sets of fields can be merged and display resulting fields matching the field rate:  *Keith Jack*, at 334, Fig. 9.6.  A person of skill in the art at the time would have consequently known that discarding one of the two fields of every pair of fields would have caused a lower frame rate resulting in lower video quality. Similarly, Benjamin Felts, named as an inventor on the '654 Patent, gave sworn testimony confirming that performing interpolation only one of the two fields would result in visual artifacts in the form of "jitter or flickering on -- particularly noticeable on sharp transitions in the image data": |
|  |  | 23          Q.   And what might be the disadvantages of that<br>24     system? |

Exhibit 2

| *Katsumata* - Claim 1 |
|---|

|  |  |  | 1    THE WITNESS:  One disadvantage is that you<br>2    are applying what is equivalent to a low-pass filter on<br>3    one of the frames and not on the other.  So your -- in<br>4    the frequency domain, your -- the amplitude of certain<br>5    frequencies will be more attenuated in one of those<br>6    frames versus the other.  Visually, that results in<br>7    certain -- a little bit of jitter or flickering on --<br>8    particularly noticeable on sharp transitions in the<br>9    image data. |
|  |  |  | April 18, 2018 Deposition of Benjamin Felts, at 188; *and see id.* at 187 (introductory questions regarding a product "that applies interpolation or the adjusting step ... to only one of [the] fields.").<br><br>Thus, a person of skill at the time of the invention understood and observed that either discarding one of the two fields or performing interpolation on only one of the fields both would have resulted in degraded video quality (by lowering frame rate or resulting in 'jitter or flittering,' respectively) and been motivated to seek out solutions for improving the video quality as a result.  Consequently, rather than merely displaying "one of the two fields… scaled (interpolated) up to … however many [lines] are in the current display mode" – a misunderstanding of the teachings of *Keith Jack*[2] – a person of ordinary skill would have been motivated to apply known techniques to preserve or improve the quality of a deinterlaced video, including by performing the same scaling process on "each of the first field and second field of each pair of fields." |

---

[2]     The '654 Patent states that one method of deinterlacing video known in the art before the purported invention "is just capturing one of the two fields and displaying [the field's lines] *scaled* (interpolated) up to … however many [lines] are in the current display mode." '654 Patent, at 1:34-36, but *Keith Jack* does not state this.  *Keith Jack* instead illustrates the approach with one field, and one of ordinary skill in the art knew long before the time of the alleged invention that this approach was to be applied to both fields.  *See, e.g., Keith Jack*, at 333.

Exhibit 2

| | | *Katsumata* - Claim 1 |
|---|---|---|
| | | Scaling each of the first field and second field of each pair of fields to fill vertical resolution of the non-interlaced monitor would have yielded known benefits, including as described in *Keith Jack*.<br><br>Additionally, as illustrated and discussed in *Katsumata*, other methods of enlarging images for display on a TV screen were known in the art.  *See Katsumata*, at 1:15-2:18 (describing known techniques in the prior art).  A person of skill would have been motivated to apply knowledge of such teachings, including at least the disclosures of *Greggain* and *Miyaguchi*, in order to improve the teachings of *Katsumata*.<br><br>Thus, expanding on *Katsumata*'s disclosed techniques with additional methods for scaling each of the first field and second field of each pair of fields to fill vertical resolution of the non-interlaced monitor would represent an alternative solution with potentially improved results. Thus, a person of ordinary skill in the art would have had a motivation to improve *Katsumata*'s techniques with scaling each of the first field and second field of each pair of fields to fill vertical resolution of the non-interlaced monitor. Persons of skill in the art would have therefore been motivated to improve *Katsumata* with the teachings of *Greggain* or *Miyaguchi*.  *And see* Exs. 3 and 5.<br><br>In addition, it would have been obvious to try combining or modifying *Katsumata* because there were only a finite number of predictable solutions, because known work in the field prompted variations based on predictable design incentives, or in light of market forces either in the field or analogous and related fields would have suggested the combination. Indeed, the combination of *Katsumata* with the teachings described here would have been obvious because the combination represents known potential options with a reasonable expectation of success.  No technical barrier would have prevented *Katsumata* from being modified to capture both fields into separate buffers, as recited in claim 1. No unexpected results would have arisen and no undue experimentation would have been required in making such a replacement. These techniques were well known in the art (*see Keith Jack* and admissions in the Background of the '654 Patent) so their implementation would have been well within the skill of a person of ordinary skill in the art.  Consequently, a person of |

Exhibit 2

| | | *Katsumata* - Claim 1 |
|---|---|---|
| | | skill would have been motivated to and capable of combining or modifying *Katsumata* with the teachings of *Greggain* or *Miyaguchi*, and the teachings of those references as described in Exhibits 3 and 5 at element 1(b) are incorporated here by reference.<br><br>The discussion in Paragraphs 350 through 352, and Sections VIII.D.4(a) and (b)(i)-(vi) are incorporated by reference.<br><br>Therefore, *Katsumata* in view of *Greggain* or *Katsumata* in view of *Miyaguchi* renders obvious "scaling each of the first field and second field of each pair of fields to fill vertical resolution of the non-interlaced monitor." |
| 1(c)(1) | adjusting one of the first field or second field of the pair of fields to substantially[3] correct for the vertical offset between the pairs of fields, | I understand the Court has construed "adjusting" to mean "vertical repositioning", and construed "to substantially correct for the vertical offset between the pairs of fields" to mean "to largely or approximately correct for the vertical offset." *Wi-LAN v. Sharp Electronics Corporation*, Case No. 15-379 (LPS) (CJB), D.I. 281; *Wi-LAN v. VIZIO, Inc.*, Case No. 15-788 (LPS) (CJB), D.I. 220. I also understand that Wi-LAN disclaimed Claim 8 of the '654 Patent, which claims a method of such adjusting where the adjusting step "includes changing display positions of one of the scaled first field or scaled second field by one or more lines on the noninterlaced monitor." '654 Patent, at Cl. 8; '654 Patent, at Disclaimer. I further understand that Wi-LAN's infringement contentions appear to identify certain interpolation functions purportedly performed by the Accused Products as allegedly meeting this limitation. *See, e.g.,* Final Infringement Contentions, at [SEC] 126 and [VIZIO] 127 (depicting Deinterlaced Frame with Spatial Averaging from Top Field and Deinterlaced Frame with Spatial Averaging from Bottom Field); *and see id.* at [SEC] 121-185 and [VIZIO] 122-186. To the extent Wi-LAN alleges that such methods "adjust[] one of the first field or second field of the pair of fields to substantially correct for the vertical offset between the pairs of fields," it is my opinion that *Katsumata* teaches this limitation. |

---

[3] As set forth in my accompanying Report, it is my opinion that the term "to substantially correct for the vertical offset between the pairs of fields" is indefinite, and that opinion is incorporated here by reference. Notwithstanding, I have analyzed *Katsumata* consistent with the Court's construction for the purposes of this Report. *See Wi-LAN v. Sharp Electronics Corporation*, Case No. 15-379 (LPS) (CJB), D.I. 281; *Wi-LAN v. VIZIO, Inc.*, Case No. 15-788 (LPS) (CJB), D.I. 220.

Exhibit 2

| *Katsumata* - Claim 1 |
|---|
| Specifically, *Katsumata* teaches that interlaced video signals include an even field that is vertically offset from the odd field by one-half of a field line spacing distance.  *See also supra*, at 5, above; *and see, e.g., Katsumata*, at Fig. 5A.  *Katsumata* further teaches embodiments that produce blank lines to vertically reposition a second field and thereby adjust for vertical offset.  *See, e.g., Katsumata* at Fig. 5C:<br><br><br><br>*Katsumata*, at Fig. 5C (highlight indicating blank lines generated).  Consistent with |

Exhibit 2

| *Katsumata* - Claim 1 |
|---|

|  |  | WiLAN's allegations regarding this element, these additional lines correct for the vertical offset in the "PRESENT FIELD" and the "1 FIELD EARLIED" illustrated by Fig. 5A during the de-interlacing process.  *And see* Fig. 5A: <br><br>  <br><br> *Katsumata*, at Fig. 5A; *and see id.* 4:37-47 ("When an interpolated scanning line preparation circuit is used which prepares new scanning lines from adjacent scanning line signals so as to carry out enlargement, there occur scanning line structures as shown in FIGS. 5A to 5D. Here, a scanning line name 12 implies a signal generated from scanning lines 1 and 2 and a scanning line AB implies a scanning line generated from scanning lines A and B. FIG. 5B shows a scanning line structure for a standard scan display and FIG. 5C a scanning line structure for progressive scan display."); *see also* Fig. 9; Fig. 10; 7:26-42; |

Exhibit 2

| | | *Katsumata* - Claim 1 |
|---|---|---|
| | | 7:55-61; 7:13-54.<br><br>Therefore, *Katsumata* teaches "adjusting one of the first field or second field of the pair of fields to substantially correct for the vertical offset between the pairs of fields."<br><br>Furthermore, to the extent this limitation is not taught by *Katsumata*, it would have been obvious to modify *Katsumata* to adjust one of the first or second field of the pair of fields to substantially correct for the vertical offset between the pairs of fields for several reasons, including at least because motivations and techniques existed in the art prior to the claimed invention to eliminate any visual artifacts that would be caused by such a vertical offset.<br><br>For example, *Keith Jack* confirms that practitioners were mindful of the visual artifacts caused by a vertical offset between fields while working with interlaced video signals, and knew and took care to apply video processing techniques that would result in the correct spatial positioning of video scan lines.  *Keith Jack*, at 335.  In fact, *Keith Jack* confirms that persons of skill in the art knew that video processing to correct for vertical offset *was required* if a deinterlacing technique did not inherently result in correct spatial positioning of the scan lines: |

> The best vertical frequency response is obtained when field merging is implemented. **The spatial position of the lines are already correct and no vertical processing is required,** resulting in a flat curve (Line C). Once again, this applies only for stationary areas of the image.

*Id.*

*Keith Jack* further demonstrates that practitioners applied techniques known in the art to ensure the preservation and generation of the correct vertical spatial position of scan lines, including when using deinterlacing techniques to convert an interlaced video signal field into a non-interlaced frame, consistent with Wi-LAN's allegations regarding this element.

Exhibit 2

| *Katsumata* - Claim 1 | | |
|---|---|---|
| | | *See, e.g.,* Final Infringement Contentions, at [SEC] 126 and [VIZIO] 127.  For example, Figure 9.4 of *Keith Jack* illustrates that input field lines 1, 2, 3, and 4 (indicated with red, below) are output at the correct vertical spatial positioning in the deinterlaced output as frame lines 1, 3, 5, and 7 (indicated with orange, below), with additional lines generated by interpolation at positions corresponding to the even field at lines 2, 4, 6, and 8 (indicated with green, below):<br><br><br><br>*Keith Jack*, at Fig. 9.4.<br><br>*Keith Jack* demonstrates that practitioners knew to use various techniques known in the art |

Exhibit 2

| *Katsumata* - Claim 1 |
|---|

| | | to affect an adjustment of vertical offset.  Adjusting one of the first field or second field of the pair of fields in an interlaced video signal to substantially correct for any vertical offset between the pairs of fields would have yielded known benefits, including as described in *Keith Jack*.<br><br>The stated object of *Katsumata* is to "provide an accurately enlarged, high-quality image even in a moving picture."  *Katsumata*, 3:5-6.  Consistent with this purpose, *Katsumata* discloses storing signals associated with fields that include a vertical offset (*see, e.g.,* Fig. 5A) and producing blank lines in those signals associated with one of the fields to correct the vertical offset, consistent with WiLAN's allegations regarding this element.  *See id.*, Figs 1 and 5C.<br><br>Thus, replacing *Katsumata*'s disclosed techniques with known techniques for adjusting one of the first field or second field of the pair of fields to substantially correct for the vertical offset between the pairs of fields would represent an alternative solution with potentially improved results. Thus, a person of ordinary skill in the art would have had a motivation to improve *Katsumata*'s techniques with adjusting each of the first field and second field of each pair of fields to fill vertical resolution of the non-interlaced monitor. These techniques were well known in the art (*see Keith Jack*) so their implementation would have been well within the skill of a person of ordinary skill in the art.  Persons of skill in the art would have therefore been motivated to improve *Katsumata* with the teachings of *Ohara* or *Greggain*. *See, e.g.,* Exs. 1 and 3.<br><br>In addition, it would have been obvious to try combining or modifying *Katsumata* because there were only a finite number of predictable solutions, because known work in the field prompted variations based on predictable design incentives, or in light of market forces either in the field or analogous and related fields would have suggested the combination. Indeed, the combination of *Katsumata* with the teachings described here would have been obvious because the combination represents known potential options with a reasonable expectation of success.  Additionally, a person of ordinary skill in the art would not have faced unexpected results or undue experimentation in making the aforementioned replacement. These techniques were well known in the art (*see Keith Jack*) so their |

Exhibit 2

| | | ***Katsumata* - Claim 1** |
|---|---|---|
| | | implementation would have been well within the skill of a person of ordinary skill in the art. Consequently, a person of skill would have been motivated to and capable of combining or modifying *Katsumata* with the teachings of *Ohara* or *Greggain*, and the teachings of those references as described in Exhibits 1 and 3 at element 1(c)(1) are incorporated here by reference. *See, e.g.,* Exs. 1 and 3.  The discussion in Paragraphs 350 through 352, and Sections VIII.D.4(a) and (b)(i)-(vi) are incorporated by reference.  Therefore, *Katsumata* in view of *Ohara* or *Katsumata* in view of *Greggain* renders obvious "adjusting one of the first field or second field of the pair of fields to substantially correct for the vertical offset between the pairs of fields." |
| 1(c)(2) | where said adjusting is performed concurrently[4] with said scaling; | I understand that the Court has construed "said adjusting is performed concurrently with said scaling" to mean the adjusting and scaling steps must overlap, either by interleaving or simultaneous execution, such that one cannot complete before the other begins." *Wi-LAN v. Sharp Electronics Corporation*, Case No. 15-379 (LPS) (CJB), D.I. 281; *Wi-LAN v. VIZIO, Inc.*, Case No. 15-788 (LPS) (CJB), D.I. 220.  I further understand that Wi-LAN's infringement contentions appear to identify certain interpolation functions purportedly performed by the Accused Products as allegedly meeting this limitation. *See, e.g.,* Final Infringement Contentions, at [SEC] 126 and [VIZIO] 127 (depicting Deinterlaced Frame with Spatial Averaging from Top Field and Deinterlaced Frame with Spatial Averaging from Bottom Field), [SEC] 184 and [VIZIO] 185 (asserting without explanation "[t]he adjusting step is performed during the interpolation process, and therefore, 'concurrently' with the scaling."); *and see id.* at [SEC] 121-185 and [Vizio] 122-186.  To the extent Wi-LAN alleges that such methods perform an adjusting step "where said adjusting is |

---

4       As set forth in my accompanying Report, it is my opinion that the term "concurrently" renders Claim 1 and the asserted dependent claims invalid under 35 U.S.C. § 112, and that opinion is incorporated here by reference.  Notwithstanding, I have analyzed *Katsumata* consistent with the Court's construction for the purposes of this Report. *See Wi-LAN v. Sharp Electronics Corporation*, Case No. 15-379 (LPS) (CJB), D.I. 281; *Wi-LAN v. VIZIO, Inc.*, Case No. 15-788 (LPS) (CJB), D.I. 220.

Exhibit 2

| | | *Katsumata* - Claim 1 |
|---|---|---|
| | | performed concurrently with said scaling," it is my opinion that *Katsumata* teaches this limitation.<br><br>Specifically, as described above, *Katsumata* teaches that interlaced video signals include an even field that is vertically offset from the odd field by one-half of a field line spacing distance.  *See also supra*, at 5, above; *and see, e.g., Katsumata*, at Fig. 5A.  *Katsumata* further teaches embodiments that produce blank lines to vertically reposition a second field and thereby adjust for vertical offset.  *See, e.g., Katsumata* at Fig. 5C: |

Exhibit 2

| ***Katsumata* - Claim 1** | | |
|---|---|---|
| | |  |

*Katsumata*, at Fig. 5C (highlight indicating blank lines generated).  To the extent WiLAN alleges that such an accomodation for the vertical offset adjusts for the vertical offset between the even and odd fields during the interpolation process (*see, e.g.,* Final Infringement Contentions, at [SEC] 184 and [VIZIO] 185; *and see id.* at [SEC] 126, 121-185 and [VIZIO] 127, 122-186, *Katsumata* discloses these additional lines correct for the vertical offset in the "PRESENT FIELD" and the "1 FIELD EARLIED" illustrated by Fig. 5A during the de-interlacing process consistent with WiLAN's allegations regarding this element.  *And see* Fig. 5A:

Exhibit 2

| **Katsumata - Claim 1** | | |
|---|---|---|
| | |  *Katsumata*, at Fig. 5A; *and see id.* 4:37-47 ("When an interpolated scanning line preparation circuit is used which prepares new scanning lines from adjacent scanning line signals so as to carry out enlargement, there occur scanning line structures as shown in FIGS. 5A to 5D. Here, a scanning line name 12 implies a signal generated from scanning lines 1 and 2 and a scanning line AB implies a scanning line generated from scanning lines A and B. FIG. 5B shows a scanning line structure for a standard scan display and FIG. 5C a scanning line structure for progressive scan display.")<br><br>Therefore, *Katsumata* teaches "where said adjusting is performed concurrently with said scaling." |

Exhibit 2

| | | |
|---|---|---|
| | | ***Katsumata* - Claim 1** |

Furthermore, to the extent this limitation is not taught by *Katsumata*, it would have been obvious to modify *Katsumata* to perform an adjusting step "where said adjusting is performed concurrently with said scaling" for several reasons, including because motivations and techniques for ensuring correct spatial positioning of scan lines as well as balancing video quality against the cost of implementation existed prior to the claimed invention.  *See, e.g., Keith Jack*, at 10.  *Keith Jack* confirms that practitioners knew and took care to apply video processing techniques that would result in the correct spatial positioning of video scan lines, and in fact confirms that practitioners knew that video processing to correct for vertical offset *was required* if a deinterlacing technique did not inherently result in correct spatial positioning of the scan lines:

> The best vertical frequency response is obtained when field merging is implemented. The spatial position of the lines are already correct and no vertical processing is required, resulting in a flat curve (Line C). Once again, this applies only for stationary areas of the image.

*Keith Jack*, at 335.

*Keith Jack* further demonstrates that practitioners applied techniques known in the art to ensure the preservation and generation of the correct vertical spatial position of scan lines, including when using deinterlacing techniques to convert an interlaced video signal field into a non-interlaced frame.  For example, Figure 9.4 of *Keith Jack* illustrates that input field lines 1, 2, 3, and 4 (indicated with red, below) are output at the correct vertical spatial positioning in the deinterlaced output as frame lines 1, 3, 5, and 7 (indicated with orange, below), with additional lines generated by interpolation at positions corresponding to the even field at lines 2, 4, 6, and 8 (indicated with green, below):

Exhibit 2

| | | |
|---|---|---|
| | | **_Katsumata_ - Claim 1** |
| | |  |

*Keith Jack*, at Fig. 9.4.

*Keith Jack* further informs that practitioners were mindful and took efforts to balance "quality versus cost of implementation" when considering techniques for deinterlacing:

Exhibit 2

| | | |
|---|---|---|
| | | **_Katsumata_ - Claim 1** |

There are several ways of performing the deinterlacing. **The designer must trade-off video quality versus cost of implementation.** Today's GUI environment will also probably require scaling the video to an arbitrary-sized window; this also requires a trade-off of video quality versus cost.

*Keith Jack*, at 10.  Combined with *Keith Jack*'s teachings regarding the known techniques in the art, *Keith Jack* confirms that practitioners would have been motivated to perform the said adjusting step concurrently with said scaling step, at least in order to balance considerations of "quality versus cost of implementation."  *Id.*; *and see, e.g.*, *id.* at Fig. 9.4.  *Keith Jack* demonstrates that practitioners knew to use various techniques known in the art to affect an adjustment of vertical offset currently with said scaling step.

The stated object of *Katsumata* is to "provide an accurately enlarged, high-quality image even in a moving picture."  *Katsumata*, 3:5-6.  Consistent with this purpose, *Katsumata* discloses storing signals associated with fields that include a vertical offset (*see, e.g.*, Fig. 5A) and producing blank lines in those signals associated with one of the fields to correct the vertical offset, consistent with WiLAN's allegations regarding this element.  *See id.*, Figs 1 and 5C.  Further, performing an adjusting step "where said adjusting is performed concurrently with said scaling" would have yielded known benefits, including as described in *Keith Jack*.

Thus, replacing *Katsumata*'s disclosed techniques with known techniques for adjusting one of the first field or second field of the pair of fields "where said adjusting is performed concurrently with said scaling" would represent an alternative solution with potentially improved results.  Thus, a person of ordinary skill in the art would have had a motivation to improve *Katsumata*'s techniques by performing the adjusting step "where said adjusting is performed concurrently with said scaling."   Persons of skill in the art would have therefore been motivated to improve *Katsumata* with the teachings of *Ohara* or *Greggain*.  *See, e.g.*, Exs. 1 and 3.

Exhibit 2

| | | ***Katsumata* - Claim 1** |
|---|---|---|
| | | In addition, it would have been obvious to try combining or modifying *Katsumata* because there were only a finite number of predictable solutions, because known work in the field prompted variations based on predictable design incentives, or in light of market forces either in the field or analogous and related fields would have suggested the combination. Indeed, the combination of *Katsumata* with the teachings described here would have been obvious because the combination represents known potential options with a reasonable expectation of success.  Additionally, a person of ordinary skill in the art would not have faced unexpected results or undue experimentation in making the aforementioned replacement. These techniques were well known in the art (*see Keith Jack*) so their implementation would have been well within the skill of a person of ordinary skill in the art. Consequently, a person of skill would have been motivated to and capable of combining or modifying *Katsumata* with at least the teachings of *Ohara* or *Greggain*, and the teachings of those references as described in Exhibits 1 and 3 at element 1(c)(2) are incorporated here by reference. <br><br> The discussion in Paragraphs 350 through 352, and Sections VIII.D.4(a) and (b)(i)-(vi) are incorporated by reference. <br><br> Therefore, *Katsumata* in view of *Ohara* or *Katsumata* in view of *Greggain* renders obvious "where said adjusting is performed concurrently with said scaling." |
| 1(d) | displaying the first field of each pair of fields on the non-interlaced monitor in a first time period; and | *Katsumata* teaches "displaying the first field of each pair of fields on the non-interlaced monitor in a first time period." <br><br> Specifically, *Katsumata* teaches that each field is stored in a separate buffer (*and see supra*, at Element 1(a)), and that the memories of these buffers are alternately read out for display: |

Exhibit 2

| Katsumata - Claim 1 |
|---|

|  |  | The first and second buffer memories alternately store the real scanning line signals field by field and the third and fourth buffer memories alternately store the interpolated scanning line signals field by field. For example, at the phase of a field within which writing of the first and third buffer memories proceeds, a signal of one-preceding field is read out of the second and fourth buffer memories and delivered through the first and second switch circuits. At the phase of a field within which writing of the second and fourth buffer memories proceeds, a signal of one-preceding field is read out of the first and third buffer memories and delivered through the first and second switch circuits. Accordingly, the signal of one-preceding field can be displayed to solve the aforementioned problem (2) that different fields are displayed on upper and lower portions of the screen. By switching the outputs of the first and second switch circuits by means of the output of the third

switch circuit, an enlarged image of a moving picture can always be displayed using a signal within one field to solve the aforementioned problem (1) of the comb-tooth like disturbance.

*Katsumata*, at 3:51-4:10.  *Katsumata*'s disclosure teaches that a described embodiment 'switches' between the outputs of the first and second switch circuits in order to permit the display of an enlarged image. *Id.*  Further, *Katsumata* discloses that these switching circuits each operate to use a signal "within one field" in order "to solve the aforementioned problem … of the comb-tooth like disturbance." *Id.*  *Katsumata* thereby discloses that the described embodiment reads out the contents of separate buffers holding even and odd field data respectively, in order to display that content. *And see Katsumata*, at Fig. 1: |

Exhibit 2

| *Katsumata* - Claim 1 |
|---|



Fig. 1 (depicting buffer memories 105 and 107, corresponding to real and interpolated scan line data for the first field); *and see* 6:49-65 ("Signals stored in the buffer memories 105, 106, 107 and 108 are repetitively read in the form of a batch of two lines in accordance with read addresses from the address generation circuit 109 in order to effect enlargement in the vertical direction. Enlargement in the horizontal direction can be realized by applying twice the same address or halving the frequency of the read clock.  The first and second switch circuits 110 and 111 are controlled by a pulse (FP) which is switchable every field as shown in FIG. 8D, so that within a field in which signals are written in the first and third buffer memories 105 and 107, signals read out of the second and fourth buffer memories 106 and 108 are delivered and within another field in which signals are written in the second and fourth buffer memories 106 and 108, *signals read out of the first and third buffer memories*

Exhibit 2

| ***Katsumata* - Claim 1** |
|---|

*105 and 107 are delivered.*" (emphasis added)); *and see* Fig. 8.

By using switches to select the real and interpolated scan lines corresponding to the first field for display, *Katsumata* teaches that the scan lines corresponding to the first field of each pair of fields is displayed on the non-interlaced monitor in a first time period. *And see* Fig. 5C (depicting display of scan lines corresponding to odd, *i.e.*, the first, field):



*Katsumata*, at Fig. 5C; *and see also* 4:46-47; *and* 6:27-29.

Exhibit 2

| | | *Katsumata* - Claim 1 |
|---|---|---|
| | | Therefore, *Katsumata* teaches "displaying the first field of each pair of fields on the non-interlaced monitor in a first time period." |
| 1(e) | displaying the second field of each pair of fields on the non-interlaced monitor in a second time period subsequent to the first time period. | *Katsumata* teaches "displaying the second field of each pair of fields on the non-interlaced monitor in a second time period subsequent to the first time period."<br><br>Specifically, *Katsumata* teaches that each field is stored in a separate buffer (*and see supra*, at Element 1(a)), and that the memories of these buffers are alternately read out for display:<br><br>The first and second buffer memories alternately store the real scanning line signals field by field and the third and fourth buffer memories alternately store the interpolated scanning line signals field by field. For example, at the phase of a field within which writing of the first and third buffer memories proceeds, a signal of one-preceding field is read out of the second and fourth buffer memories and delivered through the first and second switch circuits. At the phase of a field within which writing of the second and fourth buffer memories proceeds, a signal of one-preceding field is read out of the first and third buffer memories and delivered through the first and second switch circuits. Accordingly, the signal of one-preceding field can be displayed to solve the aforementioned problem (2) that different fields are displayed on upper and lower portions of the screen. By switching the outputs of the first and second switch circuits by means of the output of the third<br><br>switch circuit, an enlarged image of a moving picture can always be displayed using a signal within one field to solve the aforementioned problem (1) of the comb-tooth like disturbance.<br><br>*Katsumata*, at 3:51-4:10. *Katsumata*'s disclosure teaches that a described embodiment 'switches' between the outputs of the first and second switch circuits in order to permit the display of an enlarged image. *Id.* Further, *Katsumata* discloses that these switching circuits each operate to use a signal "within one field" in order "to solve the aforementioned |

Exhibit 2

| *Katsumata* - Claim 1 |
|---|

| | | problem … of the comb-tooth like disturbance." *Id.* *Katsumata* thereby discloses that the described embodiment reads out the contents of separate buffers holding even and odd field data respectively, in order to display that content. *And see Katsumata*, at Fig. 1:  Fig. 1 (depicting buffer memories 106 and 108, corresponding to real and interpolated scan line data for the second field); *and see* 6:49-65 ("Signals stored in the buffer memories 105, 106, 107 and 108 are repetitively read in the form of a batch of two lines in accordance with read addresses from the address generation circuit 109 in order to effect enlargement in the vertical direction. Enlargement in the horizontal direction can be realized by applying twice the same address or halving the frequency of the read clock.  The first and second switch circuits 110 and 111 are controlled by a pulse (FP) which is switchable every field as shown in FIG. 8D, so that within a field in which signals are written in the first and third buffer memories 105 and 107, signals read out of the second and fourth buffer memories 106 and 108 are delivered and within another field in which signals are written in the second and |

Exhibit 2

| ***Katsumata* - Claim 1** |||
|---|---|---|
| | | fourth buffer memories 106 and 108, *signals read out of the first and third buffer memories 105 and 107 are delivered*." (emphasis added)); *and see* Fig. 8.<br><br>By using switches to select the real and interpolated scan lines corresponding to the second field for display, *Katsumata* teaches that the scan lines corresponding to the second field of each pair of fields is displayed on the non-interlaced monitor in a second time period subsequent to the first time period.  *And see* Fig. 5C (depicting display of scan lines corresponding to even, *i.e.*, the second, field):<br><br> |

Exhibit 2

| | | ***Katsumata* - Claim 1** |
|---|---|---|
| | | *Katsumata*, at Fig. 5C; *and see also* 4:46-47; *and* 6:27-29.<br><br>Therefore, *Katsumata* teaches "displaying the second field of each pair of fields on the non-interlaced monitor in a second time period subsequent to the first time period." |

| | | ***Katsumata* - Claim 4** |
|---|---|---|
| 4 | The method of claim 1, wherein scaling is achieved by vertical interpolation between at least adjacent lines in the field being scaled. | I understand the Court has construed the term "vertical interpolation between at least adjacent lines" to mean "calculating values for new pixels between at least vertically adjacent lines using known values." *Wi-LAN v. Sharp Electronics Corporation*, Case No. 15-379 (LPS) (CJB), D.I. 281; *Wi-LAN v. VIZIO, Inc.*, Case No. 15-788 (LPS) (CJB), D.I. 220. I further understand that Wi-LAN's infringement contentions appear to identify field merging and certain interpolation functions allegedly performed by the Accused Products as allegedly meeting this limitation. *See, e.g.*, Final Infringement Contentions, at [SEC] 79-81 and [VIZIO] 80-82 (field merging), [SEC] 83 and [VIZIO] 85 (interpolation); *and see id.* at [SEC] 79-120 and [VIZIO] 80-121. I further understand that the '654 Patent teaches that with interpolation, "although the number of lines is doubled, the vertical resolution is not increased from the original data[.]" '654 Patent, at 2:25-29 (citing pages 332-333 of Keith Jack). To the extent Wi-LAN alleges that field merging, scan line duplication, or scan line interpolation scale a field, "wherein said scaling is achieved by vertical interpolation between at least adjacent lines in the field being scaled," it is my opinion that *Katsumata* teaches this limitation.<br><br>Specifically, as describe above including with regard to Element 1(b), *Katsumata* teaches that both real and interpolated scan lines are read out for display of each of the first and second fields, respectively. *See* Element 1(b); *and see, e.g., Katsumata*, at 6:49-53. At Figures 5B and 5C, *Katsumata* teaches that interpolation between adjacent lines can change by a constant factor the number of lines in a field for either interlaced (Fig. 5B) or progressive (Fig. 5C) display signals: |

Exhibit 2

| | | |
|---|---|---|
| | | ***Katsumata* - Claim 4** |
| | | 

Figs. 5B and 5C; *and see* 4:37-47 ("When an interpolated scanning line preparation circuit is used which prepares new scanning lines from adjacent scanning line signals so as to carry out enlargement, there occur scanning line structures as shown in FIGS. 5A to 5D. Here, a scanning line name 12 implies a signal generated from scanning lines 1 and 2 and a scanning line AB implies a scanning line generated from scanning lines A and B. FIG. 5B shows a scanning line structure for a standard scan display and FIG. 5C a scanning line structure for progressive scan display.").

*Katsumata* teaches that certain lines are interpolated by the "interpolated scanning line |

Exhibit 2

| *Katsumata* - Claim 4 |
|---|

preparation circuit" which is used to "prepare[] new scanning lines *from adjacent scanning line signals so as to carry out enlargement*[.]" (emphasis added):

> The method of solving the first problem will first be described briefly. When an interpolated scanning line preparation circuit is used which prepares new scanning lines from adjacent scanning line signals so as to carry out enlargement, there occur scanning line structures as shown in FIGS. 5A to 5D. Here, a scanning line name 12 implies a signal generated from scanning lines 1 and 2 and a scanning line AB implies a scanning line generated from scanning lines A and B. FIG. 5B shows a scanning line structure for a standard scan display and FIG. 5C a scanning line structure for progressive scan display.

*Katsumata*, at 4:36-47.  *Katsumata* illustrates these teachings, including for interlaced (Figs. 5B) and progressive (Fig. 5C) display signals.  For example, at Figure 5C, *Katsumata* illustrates the creation of additional lines for the odd and even fields as "12" and "AB", respectively:



*Katsumata*, at Fig. 5C (detail); *and see id.* at 4:36-47:

Exhibit 2

| *Katsumata* - Claim 4 | | |
| --- | --- | --- |
| | | The method of solving the first problem will first be described briefly. When an interpolated scanning line preparation circuit is used which prepares new scanning lines from adjacent scanning line signals so as to carry out enlargement, there occur scanning line structures as shown in FIGS. 5A to 5D. Here, a scanning line name 12 implies a signal generated from scanning lines 1 and 2 and a scanning line AB implies a scanning line generated from scanning lines A and B. FIG. 5B shows a scanning line structure for a standard scan display and FIG. 5C a scanning line structure for progressive scan display.

Thus, consistent with WiLAN's allegations regarding this term, *Katsumata* teaches "scaling is achieved by vertical interpolation between at least adjacent lines in the field being scaled."

Therefore, *Katsumata* teaches "[t]he method of claim 1, wherein scaling is achieved by vertical interpolation between at least adjacent lines in the field being scaled." Thus, *Katsumata* anticipates Claim 4.

Furthermore, to the extent this limitation is not taught by *Katsumata*, it would have been obvious to modify *Katsumata* to achieve scaling by vertical interpolation between at least adjacent lines in the field being scaled for several reasons. For example, scaling by vertical interpolation was a known technique in the art, including explicitly a method of displaying a field's scan lines *scaled (interpolated)* up to … however many [lines] are in the current display mode" as described by the Description of the '654 Patent and *Keith Jack*: |

Exhibit 2

| Katsumata - Claim 4 |
| --- |
| |

|  |  |  |
| --- | --- | --- |
|  |  | Until now there have been two commonly used simple methods for displaying interlaced video being fed into the computer system on a computer monitor. These are normally independent of whether the computer monitor is interlaced or not, as even when the monitor is interlaced it normally refreshes at a rate independent of the incoming video signal.<br><br>Throughout this description NTSC video is assumed for the sake of illustrative examples, with references to 240 line fields, 480 line frames, 60 fields per second and 30 frames per second. This does not restrict the invention to NTSC or the line counts or frame or field rates but is merely used for simplicity. The invention is equally applicable to other video standards such as, but not limited to, PAL with 288 line fields, 576 line frames, 50 fields per second and 25 frames per second.<br><br>The first method is just capturing one of the two fields, and displaying 240 lines scaled (interpolated) up to 480 or however many are in the current display mode. The special case of scaling to 480 lines (line doubling) is currently used in the art and is well documented. See pages 332–333 of "Video Demystified: a Handbook for the Digital Engineers" by Keith Jack, HighText Publication Inc., 1993 (referred to herein as "Keith Jack").<br><br>'654 Patent, at 1:18-41.<br><br>*Keith Jack*, as cited in the Description of the '654 Patent provides additional detail, for example by identifying the lack of increased vertical resolution as a known deficiency of displaying only a single field per frame.  *Keith Jack*, at 332-333; *and see also* '654 Patent, at 3:42-44.  *Keith Jack* goes on to identify and describe techniques known in the art for filling the resolution of a monitor or display.  *Keith Jack*, at 332 (scan line duplication), 333 (scan line interpolation), and 333-335 (field merging); *and see id.* at 334, at Figures 9.3, 9.4, and 9.5: |

Exhibit 2

| *Katsumata* - Claim 4 |
|---|
|  |

As illustrated in Figures 9.3, 9.4, and 9.5, *Keith Jack* demonstrates how to use various techniques known in the art to generate additional scan lines from an input field to create an output frame that is scaled to fill vertical resolution of the non-interlaced monitor.

Exhibit 2

| *Katsumata* - Claim 4 |
| --- |
| Scaling each of the first field and second field of each pair of fields to fill vertical resolution of the non-interlaced monitor would have yielded known benefits, including as described in *Keith Jack* and the Description and Background of the '654 Patent itself.<br><br>Thus, replacing *Katsumata*'s disclosed techniques with scaling each of the first field and second field of each pair of fields to fill vertical resolution of the non-interlaced monitor would represent an alternative solution with potentially improved results. Thus, a person of ordinary skill in the art would have had a motivation to improve *Katsumata*'s techniques with scaling each of the first field and second field of each pair of fields to fill vertical resolution of the non-interlaced monitor. Persons of skill in the art would have therefore been motivated to improve *Katsumata* with at least the teachings of *Miyaguchi* or *Greggain*. *See, e.g.,* Exs. 3 and 5.<br><br>In addition, it would have been obvious to try combining or modifying *Katsumata* because there were only a finite number of predictable solutions, because known work in the field prompted variations based on predictable design incentives, or in light of market forces either in the field or analogous and related fields would have suggested the combination. Indeed, the combination of *Katsumata* with the teachings described here would have been obvious because the combination represents known potential options with a reasonable expectation of success.  Additionally, a person of ordinary skill in the art would not have faced unexpected results or undue experimentation in making the aforementioned replacement. These techniques were well known in the art (*see Keith Jack* and admissions in the Background of the '654 Patent) so their implementation would have been well within the skill of a person of ordinary skill in the art.  Consequently, a person of skill would have been motivated to and capable of combining or modifying *Katsumata* with at least the teachings of *Miyaguchi* or *Greggain*, and the teachings of those references as described in Exhibits 3 and 5 at Claim 4 are incorporated here by reference.<br><br>The discussion in Paragraphs 350 through 352, and Sections VIII.D.4(a) and (b)(i)-(vi) are incorporated by reference. |
| Therefore, *Katsumata* in view of *Miyaguchi* and *Katsumata* in view of *Greggain* renders obvious "[t]he method of claim 1, |

Exhibit 2

| wherein scaling is achieved by vertical interpolation between at least adjacent lines in the field being scaled." |
|---|

| | *Katsumata* - Claim 9 | |
|---|---|---|
| 9 | The method of claim 1, wherein the adjusting step is achieved by vertical interpolation between at least adjacent lines in the field being adjusted. | I understand the Court has construed the term "the adjusting step is achieved by vertical interpolation between at least adjacent lines" to mean "the adjusting step is achieved by calculating values for new pixels between at least vertically adjacent lines using known values."  *Wi-LAN v. Sharp Electronics Corporation*, Case No. 15-379 (LPS) (CJB), D.I. 281; *Wi-LAN v. VIZIO, Inc.*, Case No. 15-788 (LPS) (CJB), D.I. 220.  I also understand that Wi-LAN disclaimed Claim 8 of the '654 Patent, which claims a method of such adjusting where the adjusting step "includes changing display positions of one of the scaled first field or scaled second field by one or more lines on the noninterlaced monitor."  '654 Patent, at Cl. 8; '654 Patent, at Disclaimer.  I further understand that Wi-LAN's infringement contentions appear to identify certain interpolation functions purportedly performed by the Accused Products as allegedly meeting this limitation.  *See, e.g.,* Final Infringement Contentions, at [SEC] 126 and [VIZIO] 127 (depicting Deinterlaced Frame with Spatial Averaging from Top Field and Deinterlaced Frame with Spatial Averaging from Bottom Field), [SEC] 184 and [VIZIO] 185 (asserting without explanation "[t]he adjusting step is performed during the interpolation process, and therefore, 'concurrently' with the scaling."); *and see id.* at [SEC] 121-185 and [VIZIO] 122-186.  To the extent Wi-LAN alleges that such methods "achieve[ the adjusting step] by vertical interpolation between at least adjacent lines in the field being adjusted," it is my opinion that *Katsumata* teaches this limitation. <br><br> Specifically, as describe above including with regard to Element 1(b), *Katsumata* teaches that both real and interpolated scan lines are read out for display of each of the first and second fields, respectively.  *See* Element 1(b); *and see, e.g., Katsumata*, at 6:49-53.  At Figures 5B and 5C, and consistent with WiLAN's allegations regarding this element, *Katsumata* teaches that interpolation between adjacent lines can operate to largely or approximately correct for the vertical offset between the first and second field for a progressive (Fig. 5C) display signals, including by generating new line values (depicted as "12" or "AB") by interpolation at the proper spatial positioning: |

Exhibit 2

| | *Katsumata* - Claim 9 | |
|---|---|---|
| | |  |

*Katsumata*, at Fig. 5C (detail); *and see* 4:37-47 ("When an interpolated scanning line preparation circuit is used which prepares new scanning lines from adjacent scanning line signals so as to carry out enlargement, there occur scanning line structures as shown in FIGS. 5A to 5D. Here, a scanning line name 12 implies a signal generated from scanning lines 1 and 2 and a scanning line AB implies a scanning line generated from scanning lines A and B. FIG. 5B shows a scanning line structure for a standard scan display and FIG. 5C a scanning line structure for progressive scan display.").

Therefore, *Katsumata* teaches "wherein the adjusting step is achieved by vertical interpolation between at least adjacent lines in the field being adjusted."

Additionally, to the extent this limitation is not taught by *Katsumata*, it would have been obvious to modify *Katsumata* to achieve the adjusting by vertical interpolation between at least adjacent lines in the field being adjusted for several reasons. For example, *Keith Jack* confirms that practitioners were mindful of the visual artifacts caused by a vertical offset between fields while working with interlaced video signals:

Exhibit 2

| Katsumata - Claim 9 | | |
| --- | --- | --- |
| | | shown in Figure 9.9. Although the cost is minimal, there are problems with this approach, especially when horizontal lines that are one or two noninterlaced scan lines wide are converted. ==Lines that are one noninterlaced scan line wide will flicker== at the frame refresh rate (30 Hz for NTSC, 25 Hz for PAL and SECAM) when converted to interlaced. The reason is that they are only displayed every other field as a result of the simple conversion. This effect may also occur on the top and bottom edges of objects. ==Lines that are two noninterlaced scan lines wide will oscillate up and down between two interlaced scan lines at the frame refresh rate (30 Hz for NTSC, 25 Hz for PAL and SECAM) when converted to interlaced.== <br><br> *Keith Jack*, at 336-337. <br><br> *Keith Jack* further confirms that practitioners knew and took care to apply video processing techniques that would result in the correct spatial positioning of video scan lines, and in fact confirms that video processing to correct for vertical offset *was required* if a deinterlacing technique did not inherently result in correct spatial positioning of the scan lines: |

Exhibit 2

| | | *Katsumata* - Claim 9 |
|---|---|---|
| | | The best vertical frequency response is obtained when field merging is implemented. **The spatial position of the lines are already correct and no vertical processing is required,** resulting in a flat curve (Line C). Once again, this applies only for stationary areas of the image.<br><br>*Keith Jack*, at 335.<br><br>*Keith Jack* further demonstrates that practitioners used interpolation between at least adjacent lines in the field being adjusted to perform the adjusting step, consistent with Wi-LAN's allegations regarding this element.  For example, Figure 9.4 of *Keith Jack* illustrates the use of interpolation to correctly position field lines 1, 2, 3, and 4 of an input field (indicated with red, below) in the deinterlaced output frame as lines 1, 3, 5, and 7 (indicated with orange, below), with additional lines generated by vertical interpolation between the adjacent lines in the field being adjusted at positions corresponding to the even field at lines 2, 4, 6, and 8 (indicated with green, below): |

Exhibit 2

| *Katsumata* - Claim 9 |
|---|



*Keith Jack*, at Fig. 9.4 (demonstrating interpolation of deinterlaced output line 2 as "2=1+3"; deinterlaced output line 4 as "4-3+5"; etc.); *and compare with, e.g.,* Final Infringement Contentions, at [SEC] 126 and [VIZIO] 127 (depicting Deinterlaced Frame with Spatial Averaging from Top Field and Deinterlaced Frame with Spatial Averaging from Bottom Field), [SEC] 184 and [VIZIO] 185 (asserting without explanation "[t]he adjusting step is performed during the interpolation process, and therefore, 'concurrently' with the scaling."); *and see id.* at [SEC] 121-185 and [VIZIO] 122-186.

*Keith Jack* demonstrates that practitioners knew to use various techniques known in the art

Exhibit 2

| *Katsumata* - Claim 9 | | |
|---|---|---|
| | | to perform an adjusting step, including where the adjusting step is achieved by vertical interpolation between adjacent lines in the field being adjusted.  Adjusting one of the first field or second field of the pair of fields in an interlaced video signal to substantially correct for any vertical offset between the pairs of fields would have yielded known benefits, including as described in *Keith Jack*.<br><br>Thus, replacing *Katsumata*'s disclosed techniques with known techniques for using vertical interpolation between at least adjacent lines in the field being adjusted to achieve the adjusting step would represent an alternative solution with potentially improved results.  Thus, a person of ordinary skill in the art would have had a motivation to improve *Katsumata*'s techniques with vertical interpolation between at least adjacent lines in the field being adjusted to achieve the adjusting step.  Persons of skill in the art would have therefore been motivated to improve *Katsumata* with at least the teachings of *Ohara* or *Greggain.  See, e.g.,* Exs. 1 and 3.<br><br>In addition, it would have been obvious to try combining or modifying *Katsumata* because there were only a finite number of predictable solutions, because known work in the field prompted variations based on predictable design incentives, or in light of market forces either in the field or analogous and related fields would have suggested the combination.  Indeed, the combination of *Katsumata* with the teachings described here would have been obvious because the combination represents known potential options with a reasonable expectation of success.  Additionally, a person of ordinary skill in the art would not have faced unexpected results or undue experimentation in making the aforementioned replacement. These techniques were well known in the art (*see Keith Jack*) so their implementation would have been well within the skill of a person of ordinary skill in the art.  Consequently, a person of skill would have been motivated to and capable of combining or modifying *Katsumata* with the teachings of *Ohara* or *Greggain*, and the teachings of those references as described in Exhibits 1 and 3 at Claim 9 are incorporated here by reference.<br><br>The discussion in Paragraphs 350 through 352, and Sections VIII.D.4(a) and (b)(i)-(vi) are incorporated by reference. |

Exhibit 2

Therefore, *Katsumata* in light of *Ohara* and *Katsumata* in view of *Greggain* renders obvious "wherein the adjusting step is achieved by vertical interpolation between at least adjacent lines in the field being adjusted."

# EXHIBIT 64

Exhibit 3

*U.S. Patent No. 6,166,773 to Greggain*
**Invalidity Claim Chart for the '654 Patent**
Asserted Claims: 1, 4, and 9

| | *Greggain* - Claim 1 | |
|---|---|---|
| 1(p) | 1. A method for displaying interlaced video data on a non-interlaced monitor, the interlaced video data comprising a plurality of paired fields, each pair of fields being vertically offset relative to each other by one-half of a field line spacing distance, each field comprising a plurality of lines of video data, the method including: | U.S. Patent No. 6,166,773 to Greggain et al. (*Greggain*), with a priority date of November 8, 1995, teaches "method for displaying interlaced video data on a non-interlaced monitor, the interlaced video data comprising a plurality of paired fields, each pair of fields being vertically offset relative to each other by one-half of a field line spacing distance, each field comprising a plurality of lines of video data." Therefore *Greggain* was prior art to the '654 Patent under at least 35 U.S.C. §§ 102(a)-(b) and (e). I understand that the Court has construed the preamble to be limiting. *Wi-LAN v. Sharp Electronics Corporation*, Case No. 15-379 (LPS) (CJB), D.I. 281; *Wi-LAN v. VIZIO, Inc.*, Case No. 15-788 (LPS) (CJB), D.I. 220.

In particular, *Greggain* teaches converting interlaced video fields to progressive (*i.e.*, non-interlaced) video frames by capturing, scaling, and adjusting each field of an interlaced signal prior to displaying a corresponding deinterlaced frame.



[57]          **ABSTRACT**

A method and apparatus are provided for converting interlaced video fields of arbitrary size to progressive scan format video frames of arbitrary size. The method and apparatus of the invention provide consistent conversion quality even while output video dimensions are scaled in real-time. According to a first aspect of the invention the space between output lines is calculated with respect to the input fields. According to a second aspect, the output line spacing information is used to calculate the final line positions in a progressive scan output frame.

*Greggain* at Abstract. *Greggain* teaches that the methods and technologies disclosed for converting interlaced video fields of arbitrary size into a progressive scan format (*i.e.*, |

Exhibit 3

| *Greggain* - Claim 1 |
|---|
| deinterlaced video) includes the "interpolation and spatial positioning of each input field line at the correct output progressive scan line position": |

> The method and apparatus of the present invention de-interlaces video by properly interpolating and spatially positioning each input field line at the correct output progressive scan line position based on the relative size of the input and output video frames. The process of the invention is broken down into two steps. The first step involves calculating the space between output progressive scan lines and then using this information to determine the correct spatial position of these lines. Once the position of the output lines is calculated, an image resizing engine is used to map the input lines to the appropriate output spatial position and store these lines in an external frame buffer.

*Greggain*, at 2:4-15.

*Greggain* informs that the progressive video (*i.e.*, de-interlaced video) may be displayed on various display devices including computer monitors and television systems, consistent with Wi-LAN's allegations regarding this element.

> De-interlacing has many applications including slow motion playback, computer video-in-a-window displays and large screen projection television systems to name but a few. All of these applications require the high quality and performance provided by the generation of progressive scan frames using a de-interlacing process.

*Greggain* at 1:32. *Greggain* also teaches "the interlaced video data comprising a plurality of paired fields," including by illustrating that the interlaced video used as an input for the disclosed techniques comprise even and odd fields.

Exhibit 3

| *Greggain* - Claim 1 |
|---|

|  |  | an application that requires an arbitrarily sized output progressive scan video window. <mark>The original video signal is composed of interlaced scanned odd and even fields.</mark> These fields are mapped into progressive scan frames through a process of spatial interpolation and positioning that produces exactly double or quadruple the number of input lines per field. |
|---|---|---|

*Greggain* at 1:25-26; *and see also* Figure 1:



*Greggain* teaches that a plurality of such even and odd fields are organized into pairs:

Exhibit 3

| *Greggain* - Claim 1 |
|---|



*Greggain*, at 6:34-36.

And, in addition to the disclosures above, *Greggain* expressly teaches that "standard interlaced video frames contain even and odd fields each having 240 active lines [*i.e.*, 'a plurality of lines'], for a total of 480 lines per frame."

*Greggain* at 3:38-40.

*Greggain* goes on to establish that each even field is vertically offset relative to each odd field by one-half of a field line spacing distance.  Specifically, *Greggain* defines the distance between odd lines as the variable *W* (orange highlight, below) and the spacing between lines in the even and odd fields as *A* (green highlight, below):

Exhibit 3

| *Greggain* - Claim 1 |
|---|



*Greggain*, at Fig. 1.

*Greggain* then teaches that *A* (*i.e.*, the vertical offset between lines in the even and odd fields) is one-half *W* (*i.e.*, the field line spacing):

> Since all of the even and odd field lines are equally spaced (e.g. A=1; S=4 and T=8 in the example of FIGS. **4** and **5**) by mapping the input even field to the output even frame, then
>
> $$A*(2*S-1)=B*(T-1), \qquad (2\text{-}1)$$
>
> and by positioning the input odd field lines between the input even field lines, then
>
> $$A=\tfrac{1}{2}*W \qquad (2\text{-}2).$$

*Greggain*, at 3:58-67.  While this explanation facially relates to Figures 4 and 5, *W* and *A* represent the same values in those Figure 1 as in Figures 4 and 5.  Thus, while Figures 4 and

Exhibit 3

| | | *Greggain* - Claim 1 |
|---|---|---|
| | | 4 are used to establish the application and relevance of the values, the values reflected by *W* and *A* in Figure 1 establish the determination of vertical offset between the even and odd fields.  *See* Fig. 1; *and see* Figs. 4 and 5:<br><br><br><br>*Greggain* at Figures 4 and 5.<br><br>Therefore, *Greggain* teaches "a method for displaying interlaced video data on a non-interlaced monitor, the interlaced video data comprising a plurality of paired fields, each pair of fields being vertically offset relative to each other by one-half of a field line spacing distance, each field comprising a plurality of lines of video data." |
| 1(a) | capturing a first field and a second field of each pair of fields into respective buffers; | I understand that the Court has construed the term "respective buffers" to mean, "separate buffers for the first field and the second field."  *Wi-LAN v. Sharp Electronics Corporation*, Case No. 15-379 (LPS) (CJB), D.I. 281; *Wi-LAN v. VIZIO, Inc.*, Case No. 15-788 (LPS) (CJB), D.I. 220.  I further understand that Wi-LAN's final infringement contentions appear to identify certain system-on-a-chip architectures with only one buffer or where a single |

Exhibit 3

| *Greggain* - Claim 1 |
|---|

| | | buffer alternates between holding the first field or second field of each pair of fields.  *See, e.g.,* August 18, 2017 Final Infringement Contentions[1] ("Final Infringement Contentions"), at 31-33, 36; *and see id.* at 31-78.  To the extent Wi-LAN alleges that such system-on-a-chip architectures "captur[e] a first field and a second field of each pair of fields into respective buffers" consistent with the Court's construction, it is my opinion that *Greggain* teaches "capturing a first field and a second field of each pair of fields into respective buffers."<br><br>Specifically, *Greggain* teaches the use of interlaced input fields are mapped discretely to corresponding output frames, with even input fields mapped to even output frames and odd input fields mapped to odd output frames, respectively.  *See, e.g., Greggain,* at 2:62-3:1:<br><br>    FIGS. **1**, **2** and **3** each show two input fields (not to scale) which are referred to as the Even Input Field (lines Y0, Y2, Y4, Y6) and the Odd Input Field (lines Y1, Y3, Y5, Y7), and two output frames referred to as the Even Output Frame and the Odd Output Frame. All even input fields are mapped to even output frames and the odd input fields are mapped to the odd output frames. The variables in each of these figures is explained in Table A, below:<br><br>*Greggain* at 2:62-3:1.  *Greggain* goes on to teach the storage of the even lines in a buffer associated with the even field and of the odd lines in a buffer associated with the odd field. |

---

[1]    I understand Wi-LAN subsequently served a legible copy of these contentions on February 21, 2018.

Exhibit 3

| | | |
|---|---|---|
| | | **_Greggain_ - Claim 1** |
| | | FIG. **1** shows a single input interlaced video frame containing a total of 8 lines numbered 0 to 7. In actual fact, standard interlaced video frames contain even and odd fields each having 240 active lines, for a total of 480 lines per frame. A reduced number of lines are depicted for ease of illustration. The even lines Y1, Y2, Y4 and Y6 are stored in the even field and the odd lines Y1, Y3, Y5 and Y7 are stored in the odd field. |

_Greggain_ at 3:41-43.

By contrast, _Greggain_ does not disclose or suggest mapping even input field lines to an odd output frame or odd input field lines to an even output frame.

_Greggain_ also teaches storing the lines of an even input field at particular locations with a frame buffer for an even frame and storing the lines of an odd input field at particular locations within a separate frame buffer for an odd frame.  The separate nature of these frame buffers is reflected by Table B and Table C, which reflect storage of certain lines at the same line position (_e.g._, 0.5_W_).

Exhibit 3

| *Greggain* - Claim 1 |
|---|

|  |  | According to the next step in the method of the present invention, the proper spatial location of each output line is determined using 1-2, resulting in the spatial locations set forth in Tables B and C, for the even output frame (FIG. **4**) and the odd output frame (FIG. **5**), respectively. |
|  |  | **TABLE B** |

TABLE B

| Output Line Number | Spatial Location (1-2) |
|---|---|
| F0 | $P_{j=0} = 0$ |
| F1 | $P_{j=1} = 0.5W$ |
| F2 | $P_{j=2} = 1.0W$ |
| F3 | $P_{j=3} = 1.5W$ |
| F4 | $P_{j=4} = 2.0W$ |
| F5 | $P_{j=5} = 2.5W$ |
| F6 | $P_{j=6} = 3.0W$ |
| F7 | $P_{j=7} = 3.5W$ |

TABLE C

| Output Line Number | Spatial Location (1-2) |
|---|---|
| F0 | $P_{j=0} = -0.5W$ |
| F1 | $P_{j=1} = 0W$ |
| F2 | $P_{j=2} = 0.5W$ |
| F3 | $P_{j=3} = 1.0W$ |
| F4 | $P_{j=4} = 1.5W$ |
| F5 | $P_{j=5} = 2.0W$ |
| F6 | $P_{j=6} = 2.5W$ |
| F7 | $P_{j=7} = 3.0W$ |

*Greggain* at 4:10-39.

Therefore, *Greggain* teaches "capturing a first field and a second field of each pair of fields into respective buffers." Furthermore, to the extent this element is not expressly disclosed by *Greggain*, it is inherently disclosed. Using "separate buffers for the first field and the second field" is inherent because *Greggain*'s teaching that the even lines "are stored in the even frame" and the odd lines "are stored in the odd frame" (*Greggain* at 3:41-43) would be functionally moot if the fields were written to a single buffer.

Thus, *Greggain* teaches "capturing a first field and a second field of each pair of fields into

Exhibit 3

| *Greggain* - Claim 1 |
|---|

respective buffers."

Furthermore, to the extent not expressly or inherently disclosed by *Greggain*, modifying *Greggain* to store a second field in a second buffer would have been obvious to a person of skill in the art for several reasons, including because the benefits associated with double buffering were known in the art. For example, the Description of the '654 Patent teaches that a motivation *existed in the art* to use two buffers to receive input signals - namely that the problem of "tearing" could be avoided.

> The multiple buffering is to ensure that a video buffer is not being updated while it is being displayed, to avoid "tearing" (a horizontal discontinuity in the displayed data caused by the simultaneous display of part of one field and part of the following field)—a technique commonly known in the art and discussed in Keith Jack (see pages 358–359).

'654 Patent, at 4:58-63.

As noted therein, *Keith Jack* discusses this motivation extensively. For example, *Keith Jack* details both the cause of video artifacts caused by use of a single buffer ("It is due to the updating of video frame buffers not being synchronized to the graphics display") and a known solution (use of two buffers):

> Tearing occurs when a video picture is not from a single video frame, but rather is a portion of two separate frames. It is due to the updating of the video frame buffers not being synchronized to the graphics display. As a result, a video picture may not be from a single video frame, but rather a portion of two separate frames. Switching between the video frame buffers must be done during the display vertical retrace interval only after the video frame buffer that is to be used to drive the display has been completely updated with new video information.

Exhibit 3

| | | *Greggain* - Claim 1 |
|---|---|---|
| | | *Keith Jack*, at 14. *Keith Jack* goes on to explain that not only was the problem of 'tearing' known in the art, it was a concern addressed by "most systems" and had a known solution: "us[ing] multiple video frame stores":<br><br>As a result, when displaying live video on the computer monitor, **most systems** currently do not compensate for the frame-rate differences other than attempting to ensure "tearing" does<br><br>not frequently occur (see Chapter 2 for additional system-level discussions on frame-rate conversion). To ensure "tearing" does not occur, some high-end systems use multiple video frame stores. Note that processing must be performed on component (i.e., RGB, YUV, YIQ, YCrCb, etc.) video signals. Composite color video signals cannot be processed directly due to the subcarrier phase information present (which would be meaningless after processing).<br><br>*Id.* at 358-359.<br><br>Capturing a first field and a second field of each pair of fields into respective buffers would have yielded known benefits, including as described in *Keith Jack* and the Description and Background of the '654 Patent itself.<br><br>Based on the foregoing, a motivation to avoid tearing through use of two buffers ("double buffering") was known in the art. Implementing use of two buffers was a technique "commonly known in the art" as conceded by the '654 Patent and as reflected in *Keith Jack*. *See generally Keith Jack*, at 412 (defining "Double Buffering" and explaining solution). Persons of skill in the art would have therefore been motivated to improve *Greggain* with the teachings of *Keith Jack*.<br><br>In addition, it would have been obvious to try combining or modifying *Greggain* with these |

Exhibit 3

| *Greggain* - Claim 1 | | |
|---|---|---|
| | | teachings because there were only a finite number of predictable solutions, because known work in the field prompted variations based on predictable design incentives, or in light of market forces either in the field or analogous and related fields would have suggested the combination.  Indeed, the combination of *Greggain* with the teachings described here would have been obvious because the combination represents known potential options with a reasonable expectation of success.  No technical barrier would have prevented *Greggain* from being modified to capture both fields into separate buffers, as recited in claim 1. No unexpected results would have arisen and no undue experimentation would have been required.  These techniques were well known in the art (*see Keith Jack*) so their implementation would have been well within the skill of a person of ordinary skill in the art.<br><br>The discussion in Paragraphs 350 through 352, and Sections VIII.D.4(a) and (b)(i)-(vi) are incorporated by reference.<br><br>Therefore, *Greggain* in view of *Keith Jack* or prior art admissions in the Description of the '654 Patent renders obvious "capturing a first field and a second field of each pair of fields into respective buffers." |
| 1(b) | scaling each of the first field and second field of each pair of fields to fill vertical resolution of the non-interlaced monitor; | I understand the Court has construed "scaling" to mean "changing the vertical resolution by changing by a constant factor the number of lines in a field."  *Wi-LAN v. Sharp Electronics Corporation*, Case No. 15-379 (LPS) (CJB), D.I. 281; *Wi-LAN v. VIZIO, Inc.*, Case No. 15-788 (LPS) (CJB), D.I. 220.  I also understand that Wi-LAN's infringement contentions appear to identify deinterlacing by, for example, certain interpolation functions, allegedly performed by the Accused Products as allegedly meeting this limitation.  *See, e.g.,* Final Infringement Contentions, at [SEC] 79-81 and [VIZIO] 80-82 (field merging), [SEC] 83 and [VIZIO] 84 (interpolation); *and see id.* at [SEC] 79-120 and [VIZIO] 80-121.  I further understand that the '654 Patent teaches that with interpolation, "although the number of lines is doubled, the vertical resolution is not increased from the original data[.]"  '654 Patent, at 2:25-29 (citing pages 332-333 of Keith Jack).  To the extent Wi-LAN alleges that deinterlacing by, for example, field merging, scan line duplication, or scan line interpolation scale a field "to fill the vertical resolution of the non-interlaced monitor[,]"  it is my opinion that *Greggain* teaches this limitation. |

Exhibit 3

| *Greggain* - Claim 1 |
|---|

|  |  | Specifically, *Greggain* teaches the intra-field interpolation and spatial positioning of lines in order to resize an input interlaced field to fill a progressive frame of arbitrary size, consistent with Wi-LAN's infringement allegations regarding this element.<br><br>1. Field of the Invention<br>This invention relates in general to video signal de-interlacing and interpolation. More particularly, the invention relates to a method and apparatus for properly interpolating and spatially positioning video lines from an arbitrarily sized video field to create an arbitrarily resized progressive scan frame.<br><br>*Greggain*, at 1:10-16.  *Greggain* then teaches that an "Image Resizing Engine" (orange highlight, below) generates deinterlaced video from "Input Video Lines," and that the 'Input Video' referenced is interlaced:<br><br><br>FIG.7<br><br>*Greggain*, Fig. 7; *and see Greggain*, at 1:65-2:3: |

Exhibit 3

| | | |
|---|---|---|
| | | ***Greggain* - Claim 1** |



*Greggain* teaches that the "Image Resizing Engine" generates successive video lines for a progressive (de-interlaced) video frame using lines from either of an even or an odd input field. Thus, the disclosures of *Greggain* reflect an intra-field (vertical) interpolation, using vertically adjacent lines within each respective field. *E.g., Greggain*, at 17:6-9:

In accordance with its disclosure of a method for "converting interlaced video fields of arbitrary size to progressive scan format video frames of arbitrary size," (*Greggain*, at Abstract), *Greggain* teaches that the described intra-field interpolation is used to change the vertical resolution by changing by a constant factor the number of lines in a field. For example, *Greggain* demonstrates one embodiment of the disclosed technique used to convert interlaced input fields with 4 lines each (red and yellow highlights, below) to progressive output video frames with three lines each (orange highlights, below), representing a change by a constant factor (*i.e.,* 4 input lines to 3 output lines):

Exhibit 3

| *Greggain* - Claim 1 |
|---|



*Greggain*, at Fig. 3.  *Greggain* additionally teaches the same technique is used to scale by intra-field interpolation an input field to create de-interlaced frames with twice the number of lines, using vertically adjacent lines within each field to create the resulting values.  *See, e.g., Greggain*, at Figs. 4 and 5 (illustrating use of interlaced input fields with four lines each to generate progressive output frames with eight lines each):

Exhibit 3

| | | | *Greggain* - Claim 1 |
|---|---|---|---|
| | | |  |

The examples described above describe changing the vertical resolution of interlaced input fields by a constant factor to generate progressive output frames with both fewer and greater numbers of lines, relative to the input fields. Additionally, *Greggain* teaches that the same techniques can be applied via a mathematical relationship that provides for scaling the input fields by an arbitrary, but constant, factor, consistent with Wi-LAN's infringement allegations regarding this limitation. Specifically, *Greggain* defines certain variables (*i.e.*, constant values applied for a given scaling effort):

Exhibit 3

| | | |
|---|---|---|
| | | **_Greggain_ - Claim 1** |

|  |  |  |
|---|---|---|
| | | TABLE A |
| | | Variable Name — Description |
| | | A — Space between input interlaced video lines |
| | | W — Space between lines in the even or odd input fields |
| | | B — Space between lines in the even or odd output frames |
| | | S — The number of lines in each input field |
| | | T — The number of lines in each output frame |

_Greggain_ at 3:4-14.  Using these defined variables, _Greggain_ teaches the formula for determining the spacing between output lines with respect to the lines of the interlaced input fields:

According to the present invention, the following relationship is implemented for determining the space between output lines with respect to the interlaced input lines:

$$TarInc = B = (2*S-1)/(2*(T-1))$$  (1-1)

_Greggain_ at 3:16-20.

According to these teachings, _Greggain_ can be used to change the vertical resolution by changing by an arbitrary, but constant, factor the number of lines in a field.  For example, using an number of desired lines for an output frame ($T$) that is twice the number of input lines (_e.g._, $T = 8$ and $S = 4$, consistent with Figs. 4 and 5), _Greggain_ teaches the space between lines in the even or odd output frames should be $B = (2*4-1)/(2*(8-1)) = 7/14 = 0.5$.  Thus, _Greggain_ generates lines using the input field and spatially positions each line at 50% of the line spacing from the input field.  The same formula applies to any desired number of output lines using any number of input lines.

17 of 73

Exhibit 3

| *Greggain* - Claim 1 | | |
|---|---|---|
| | | In accordance with the teachings of *Greggain*, the disclosed technique operates to fill the frame buffer, demonstrating that the vertical resolution of a monitor is filled:<br><br>Output frame lines must be stored at different locations in an external frame buffer. FIG. **8** shows storage of video lines from the output even frame starting at the top of the frame buffer. Lines from the output odd frame are stored in such a way that the last line is at the bottom of the frame buffer. These different storage requirements greatly simplify the top and bottom boundary conditions encountered while spatially positioning the output.<br><br>*Greggain*, at 6:38-46; *and see id.* at Fig. 9: |

Exhibit 3

| *Greggain* - Claim 1 |
|---|



*Greggain* also teaches the software implementation of this approach to scaling and adjusting: Columns 7-16 of *Greggain* discloses software for generating an even frame by scaling an even input field. The TincYAccum variable represents the current offset illustrated as the output of adder 73 in Figure 7. The values of this offset have an initial value of 0 and -0.5, for even and odd field scaling and adjusting, respectively. The odd field's initial value for TincYAccum is stored as -2048, which represents a shifted-left form of -0.5 as discussed in column 7.  The code for this software implementation is included at the end of the present chart and is incorporated by reference herein.

As discussed, I understand that the '654 Patent teaches that with interpolation, "although the number of lines is doubled, the vertical resolution is not increased from the original data[.]"

Exhibit 3

| *Greggain* - Claim 1 |
|---|
| | | '654 Patent, at 2:25-29 (citing pages 332-333 of Keith Jack).  To the extent Wi-LAN alleges that field merging, scan line duplication, or scan line interpolation scale a field "to fill the vertical resolution of the non-interlaced monitor[,]" including in situations where the vertical resolution of the video format remains unchanged (*e.g.*, 1080i to 1080p), it is my opinion that *Greggain* teaches such an application as well.  Indeed, the teachings described regarding Table A permit application of *Greggain* in scenarios where an input image size matches the output image size.  For additional example, at Figures 4 and 5, *Greggain* illustrates an embodiment where the number of lines for both the even and odd fields changed by a constant factor (*i.e.*, doubled) using interpolation.  *See* Figs. 4 and 5 (interpolated pixel creating new lines highlighted orange; pixels representing original lines highlighted yellow); *and* '654 Patent, at 3:54-4:43 (accompanying text): |

Exhibit 3

| *Greggain* - Claim 1 |
|---|



*Greggain*, at Figs. 4 and 5; *and see, e.g.,* Final Infringement Contentions, at 83.  This application of *Greggain* results in output fields that copy each of the original lines from the input field into a spatially correct location of the output frame, and additionally generate new lines by interpolation, thus changing by a constant factor the number of lines in a field (*i.e.*, a factor of two for both fields).  As discussed above, *Greggain* teaches the same embodiment is useful in other contexts, including where each line of the input field is not copied to a corresponding location in the output frame, and where the output frame is instead generated by altering the video data of the input lines.  *See, e.g.*, *Greggain*, at Fig. 3 (illustrating application where lines Y1 through Y7 are not mapped to output frame and

Exhibit 3

| | | |
|---|---|---|
| ***Greggain* - Claim 1** | | |
| | | instead used to generate by interpolation lines F1 and F2 in both output frames).  Thus, it is my opinion that *Greggain* teaches this limitation.<br><br>Therefore, *Greggain* teaches "scaling each of the first field and second field of each pair of fields to fill vertical resolution of the non-interlaced monitor."<br><br>Modifying *Greggain* to scale each of the first field and second field of each pair of fields to fill vertical resolution of a non-interlaced monitor would have been obvious for several reasons, including at least because the benefits of "scal[ing] (interpolat[ing])" the number of scan lines "up to … however many [scan lines] are in the current display mode" were admittedly known in the art, consistent with Wi-LAN's allegations regarding this element. *See, e.g.,* Final Infringement Contentions, at 95.<br><br>For example, scaling by interpolation to fill a display, consistent with Wi-LAN's allegations regarding this element, was an admittedly known method in the art, as described in the Description of the '654 Patent and *Keith Jack*: |

Exhibit 3

| | | *Greggain* - Claim 1 |
|---|---|---|
| | | Until now there have been two commonly used simple methods for displaying interlaced video being fed into the computer system on a computer monitor. These are normally independent of whether the computer monitor is interlaced or not, as even when the monitor is interlaced it normally refreshes at a rate independent of the incoming video signal.<br><br>Throughout this description NTSC video is assumed for the sake of illustrative examples, with references to 240 fields, 480 line frames, 60 fields per second and 30 frames per second. This does not restrict the invention to NTSC or the line counts or frame or field rates but is merely used for simplicity. The invention is equally applicable to other video standards such as, but not limited to, PAL with 288 line fields, 576 line frames, 50 fields per second and 25 frames per second.<br><br>The first method is just capturing one of the two fields, and displaying 240 lines scaled (interpolated) up to 480 or however many are in the current display mode. The special case of scaling to 480 lines (line doubling) is currently used in the art and is well documented. See pages 332–333 of "Video Demystified: a Handbook for the Digital Engineers" by Keith Jack, HighText Publication Inc., 1993 (referred to herein as "Keith Jack").<br><br>The second method is to perform simple de-interlacing where both fields are captured into a single 480 line buffer and double the buffer line length for a single field in order to store a field in every other line. This is referred to as "Field Merging" (see p. 333 of Keith Jack)<br><br>'654 Patent, at 1:18-46; *and see, e.g.,* Final Infringement Contentions, at 83, 95.<br><br>*Keith Jack*, as cited in the Description of the '654 Patent, identifies and describes techniques known in the art for performing an interlaced to non-interlaced conversion. *Keith Jack*, at 332 (scan line duplication), 333 (scan line interpolation), and 333-335 (field merging); *and see id.* at 334, at Figures 9.3, 9.4, and 9.5: |

Exhibit 3

| *Greggain* - Claim 1 |
|---|
|  |

As illustrated in Figures 9.3, 9.4, and 9.5, *Keith Jack* demonstrates that persons of ordinary skill used various techniques known in the art to generate additional scan lines from an input field to create an output frame that is scaled to fill vertical resolution of the non-interlaced monitor, consistent with Wi-LAN's allegations regarding this element. *And see,*

Exhibit 3

| *Greggain* - Claim 1 |
|---|

*e.g.,* Final Infringement Contentions, at 83, 95.

A person of skill would have been motivated to perform any such scaling on "each pair of fields to fill vertical resolution of the non-interlaced monitor," consistent with Wi-LAN's allegations regarding this element, and indeed there is no reason that any person of skill would have failed to do so. *See, e.g.,* Final Infringement Contentions, at 83, 95. Persons of skill in the art at the time of the claimed invention understood that a higher framerate resulted in a higher quality video, including with less flicker:

> **PAL**
>
> PAL stands for Phase Alternation Line. PAL is to Europe as NTSC is to North America. In other words, PAL is the video standard used in Europe and a few other countries. There are a few differences. PAL uses 625 lines per frame while NTSC has 525 lines. Therefore, PAL has higher vertical resolution. The frame rate of NTSC is 30 frames per second while for PAL it is 25. This means the update rate for NTSC is higher and therefore there is more flicker with PAL. PAL uses the YUV color space while NTSC uses YIQ or YUV. That's no big deal, just a little mathematical difference. It is becoming increasingly important for imaging systems suppliers to produce equipment that can be sold worldwide without many manufacturing difficulties. This implies that the equipment must be designed from the start to accommodate both standards.

*Keith Jack*, at 422. *Keith Jack* also informs that persons of skill in the art knew of and applied techniques to convert and increase the frame-rate of a video in order to match the refresh rate of a display, again improving quality so that a video "[could] be shown correctly on a computer display." *E.g., Keith Jack*, at 414:

> **Frame Rate Conversion**
>
> Frame rate conversion is the act of converting one frame rate to another. One real example that poses a difficult problem is that the frame rate of NTSC, 30 frames per second, is different from a typical computer's display, which may be anywhere from 70 to 75 frames per second (or Hz if you prefer). Therefore, some frame-rate conversion process must be performed before NTSC video can be shown correctly on a computer display. Without frame rate conversion, the screen might look as if it "stalls" every now and then. If there is motion within the video, the objects that are moving might appear cut in half.

*Keith Jack* additionally informs that there were specific techniques that persons of skill in the art knew and were capable of applying to preserve the frame rate of video during a deinterlacing process. *E.g., Keith Jack*, at 333-334. For example, in order to preserve the number of video images displayed per second when using field merging to deinterlace input

Exhibit 3

| | | | |
|---|---|---|---|
| | | ***Greggain* - Claim 1** | |

frames, *Keith Jack* teaches that alternating sets of fields can be merged and display resulting fields matching the field rate:



*Keith Jack*, at 334, Fig. 9.6.  A person of skill in the art at the time would have consequently known that discarding one of the two fields of every pair of fields would have caused a lower frame rate resulting in lower video quality.

Similarly, Benjamin Felts, named as an inventor on the '654 Patent, gave sworn testimony confirming that performing interpolation only one of the two fields would result in visual artifacts in the form of "jitter or flickering on -- particularly noticeable on sharp transitions in the image data":

```
23          Q.   And what might be the disadvantages of that
24     system?
```

Exhibit 3

| *Greggain* - Claim 1 |
|---|

|  |  |  | <br>1      THE WITNESS: One disadvantage is that you<br>2      are applying what is equivalent to a low-pass filter on<br>3      one of the frames and not on the other. So your -- in<br>4      the frequency domain, your -- the amplitude of certain<br>5      frequencies will be more attenuated in one of those<br>6      frames versus the other. ==Visually, that results in==<br>7      ==certain -- a little bit of jitter or flickering on --==<br>8      ==particularly noticeable on sharp transitions in the==<br>9      ==image data.==<br><br>April 18, 2018 Deposition of Benjamin Felts, at 188; *and see id.* at 187 (introductory questions regarding a product "that applies interpolation or the adjusting step ... to only one of [the] fields.").<br><br>Thus, a person of skill at the time of the invention understood that either discarding one of the two fields or performing interpolation on only one of the fields both would have resulted in degraded video quality (by lowering frame rate or resulting in 'jitter or flittering,' respectively) and been motivated to improve the video quality as a result. Consequently, rather than merely displaying "one of the two fields… scaled (interpolated) up to … however many [lines] are in the current display mode" – a misunderstanding of the teachings of *Keith Jack*[2] – a person of ordinary skill would have been motivated to apply known techniques to preserve or improve the quality of a deinterlaced video, including by performing the same scaling process on "each of the first field and second field of each pair of fields." |

---

[2]    The '654 Patent states that one method of deinterlacing video known in the art before the purported invention "is just capturing one of the two fields and displaying [the field's lines] *scaled* (interpolated) up to … however many [lines] are in the current display mode." '654 Patent, at 1:34-36, but *Keith Jack* does not state this. *Keith Jack* instead illustrates the approach with one field, and one of ordinary skill in the art knew long before the time of the alleged invention that this approach was to be applied to both fields. *See, e.g., Keith Jack*, at 333.

Exhibit 3

| *Greggain* - Claim 1 |
|---|
| Scaling each of the first field and second field of each pair of fields to fill vertical resolution of the non-interlaced monitor would have yielded known benefits, including as described in *Keith Jack*.<br><br>*Greggain* itself teaches also that de-interlacing systems were "well known" in the prior art, and thus it would have been obvious to apply the techniques taught by other such de-interlacing systems, including the specific scaling techniques taught by *Miyaguchi* and described in Exhibit 5, to improve the disclosure of *Greggain*.  *See, e.g.*, *Greggain*, at 1:48-54 (describing teachings of prior-art systems used to "produce either double or quadruple the number of input lines per field, as discussed above") *and* 1:55-63.<br><br>Thus, replacing *Greggain*'s disclosed techniques with scaling each of the first field and second field of each pair of fields to fill vertical resolution of the non-interlaced monitor would represent an alternative solution with potentially improved results. Thus, a person of ordinary skill in the art would have had a motivation to improve *Greggain*'s techniques with scaling each of the first field and second field of each pair of fields to fill vertical resolution of the non-interlaced monitor. Persons of skill in the art would have therefore been motivated to improve *Greggain* with the teachings of *Miyaguchi* (Ex. 5).<br><br>In addition, it would have been obvious to try combining or modifying *Greggain* because there were only a finite number of predictable solutions, because known work in the field prompted variations based on predictable design incentives, or in light of market forces either in the field or analogous and related fields would have suggested the combination. Indeed, the combination of *Greggain* with the teachings described here would have been obvious because the combination represents known potential options with a reasonable expectation of success.  No technical barrier would have prevented *Greggain* from being modified to capture both fields into separate buffers, as recited in claim 1. No unexpected results would have arisen and no undue experimentation would have been required in making such a replacement. These techniques were well known in the art (*see Keith Jack* and admissions in the Background of the '654 Patent) so their implementation would have been well within the skill of a person of ordinary skill in the art.  Consequently, a person of |

Exhibit 3

| | | ***Greggain* - Claim 1** |
|---|---|---|
| | | skill would have been motivated to and capable of combining or modifying *Greggain* with the teachings of *Miyaguchi*, and the teachings of those references as described in Exhibits 5 at element 1(b) are incorporated here by reference.<br><br>The discussion in Paragraphs 350 through 352, and Sections VIII.D.4(a) and (b)(i)-(vi) are incorporated by reference.<br><br>Therefore, *Greggain* in light of *Miyaguchi* renders obvious "scaling each of the first field and second field of each pair of fields to fill vertical resolution of the non-interlaced monitor." |
| 1(c)(1) | adjusting one of the first field or second field of the pair of fields to substantially[3] correct for the vertical offset between the pairs of fields, | I understand the Court has construed "adjusting" to mean "vertical repositioning", and construed "to substantially correct for the vertical offset between the pairs of fields" to mean "to largely or approximately correct for the vertical offset." *Wi-LAN v. Sharp Electronics Corporation*, Case No. 15-379 (LPS) (CJB), D.I. 281; *Wi-LAN v. VIZIO, Inc.*, Case No. 15-788 (LPS) (CJB), D.I. 220. Thus, a person of skill would understand this element to require the "vertical repositioning of one of the first field or second field of the pair of fields to largely or approximately correct for the vertical offset." I also understand that Wi-LAN disclaimed Claim 8 of the '654 Patent, which claims a method of such adjusting where the adjusting step "includes changing display positions of one of the scaled first field or scaled second field by one or more lines on the noninterlaced monitor." '654 Patent, at Cl. 8; '654 Patent, at Disclaimer. I further understand that Wi-LAN's infringement contentions appear to identify certain interpolation functions purportedly performed by the Accused Products as allegedly meeting this limitation. *See, e.g.,* Final Infringement Contentions, at [SEC] 126 and [VIZIO] 127 (depicting Deinterlaced Frame with Spatial Averaging from Top Field and Deinterlaced Frame with Spatial Averaging from Bottom Field); *and see id.* at [SEC] 121-185 and [VIZIO] 122-186. It is my opinion |

---

[3]    As set forth in my accompanying Report, it is my opinion that the term "to substantially correct for the vertical offset between the pairs of fields" is indefinite, and that opinion is incorporated here by reference. Notwithstanding, I have analyzed *Greggain* consistent with the Court's construction for the purposes of this Report. *See* D.I. 281.

Exhibit 3

| *Greggain* - Claim 1 |
|---|

|  |  | that *Greggain* teaches the method of "adjusting one of the first field or second field of the pair of fields to substantially correct for the vertical offset between the pairs of fields."

In particular, *Greggain* teaches that interlaced-to-progressive conversion using techniques already known in the art would include a mapping of even and odd fields to progressive scan frames through a "process of spatial interpolation and positioning."  *See Greggain,* at 1:26-30:

2. Description of the Prior Art

Current state-of-the-art de-interlacing involves converting an interlaced scanned video signal into a progressive scan (sometimes referred to as sequentially scanned) video signal with exactly double or quadruple the number of output lines. The output size restriction makes it very difficult and expensive to de-interlace video fields for use in an application that requires an arbitrarily sized output progressive scan video window. The original video signal is composed of interlaced scanned odd and even fields. These fields are mapped into progressive scan frames through a process of spatial interpolation and positioning that produces exactly double or quadruple the number of input lines per field.

*Greggain* at 1:25-28.

*Greggain* goes on to then describe how a person of skill practicing the disclosed techniques would account for such an offset in order to vertically reposition one of the first field or second field of the pair of fields to correct for the vertical offset.  In particular, *Greggain* teaches that scan lines are iteratively mapped from values in the input field into spatially correct locations within the output frame, given that input line's position within the input field and whether the line is part of an even or an odd field.  First, *Greggain* defines variables used for the calculation of each of the output scan lines in the frame buffer: |

Exhibit 3

| *Greggain* - Claim 1 |
|---|



**TABLE A**

| Variable Name | Description |
|---|---|
| A | Space between input interlaced video lines |
| W | Space between lines in the even or odd input fields |
| B | Space between lines in the even or odd output frames |
| S | The number of lines in each input field |
| T | The number of lines in each output frame |

*Greggain*, at Table A. *Greggain* then provides that the incremental spacing for each line in the output frame (whether even or odd) can be calculated using these defined variables:

According to the present invention, the following relationship is implemented for determining the space between output lines with respect to the interlaced input lines:

$$TarInc = B = (2*S-1)/(2*(T-1)) \qquad (1-1)$$

*Greggain*, at 3:16-21.

Once the 'Target Increment' value (defined as *B* in Table A and Formula 1-1) is determined from the characteristics of the interlaced input fields and the desired characteristics of the output frames, the individual spatial position of each line of the output frame is expressed as a function of the preceding output vertical line and the *TarInc* (*B*) value. *Greggain* teaches that in the formula below, $P_j$ represents the location of a line being generated and $P_{j-1}$ indicates the previous output line:

Exhibit 3

| | | *Greggain* - Claim 1 |
|---|---|---|
| | | The actual spatial position of the output lines depends on whether the input field is even or odd. An even input field has lines positioned in the even line spaces and an odd input field has lines positioned in the odd line spaces. The following relationship is implemented for determining the spatial position of the output lines: $$P_j = P_{j-1} + TarInc, \; j=1 \ldots T-1 \qquad (1\text{-}2)$$ where $P_{j=0} = 0$ for Even Input Fields $P_{j=0} = 0.5$ for Odd Input Fields |

*Greggain*, at 3:22-34.  Notably, *Greggain* expressly teaches persons of skill to account for the vertical offset between the even and odd fields (the one-half line vertical offset between the odd and even input fields) by setting $P_{j=0}$ to 0.5 for odd input fields, and $P_{j=0}$ to 0 for even input fields:

The actual spatial position of the output lines depends on whether the input field is even or odd. An even input field has lines positioned in the even line spaces and an odd input field has lines positioned in the odd line spaces. The following relationship is implemented for determining the spatial position of the output lines:

$$P_j = P_{j-1} + TarInc, \; j=1 \ldots T-1 \qquad (1\text{-}2)$$

where

$P_{j=0} = 0$ for Even Input Fields

$P_{j=0} = 0.5$ for Odd Input Fields

*Greggain*, at 3:22-34; *and see supra*, on page 4 *et seq.* (describing *Greggain*'s discussion regarding vertical offset).  By setting $P_j = 0$ for even input fields, *Greggain* additionally teaches how to 'vertically reposition *one* of the first field or second field,' consistent with

Exhibit 3

| *Greggain* - Claim 1 | | |
|---|---|---|
| | | Wi-LAN's infringement allegations regarding this element.  Through these equations, *Greggain* teaches how to determine the correct spatial position of lines in the output frame.<br><br>*Greggain* additionally teaches how to use the determined spatial position of lines for the output frames in order to generate output lines at those locations, thereby performing the "vertical repositioning of one of the first field or second field of the pair of fields to largely or approximately correct for the vertical offset."  *Greggain* illustrates certain applications of this embodiment through an example involving input even and odd fields comprising four lines each, with even and odd progressive output frames comprising eight lines; *i.e.*, conventional de-interlacing: |

Exhibit 3

| | | | |
|---|---|---|---|
| | | | **Greggain - Claim 1** |



*Greggain*, at Fig. 1.  In the accompanying text, *Greggain* details the process a person of skill would utilize to perform this process to determine line spacing:

Exhibit 3

| *Greggain* - Claim 1 |
|---|
| FIG. 1 shows a single input interlaced video frame containing a total of 8 lines numbered 0 to 7. In actual fact, standard interlaced video frames contain even and odd fields each having 240 active lines, for a total of 480 lines per frame. A reduced number of lines are depicted for ease of illustration. The even lines Y1, Y2, Y4 and Y6 are stored in the even field and the odd lines Y1, Y3, Y5 and Y7 are stored in the odd field.<br><br>Each de-interlaced output frame contains a total of 8 lines numbered 0 through 7. To map each input field (4 lines) to each output frame (8 lines) requires a magnification of 2 times. It is important to note that only the first line of the even field (Y0) maps to the first line of the even output frame (F0) and the last line of the odd field (Y7) maps to the last line of the odd output frame (F7). The remaining input lines are mapped to a fractional position with respect to the output frames.<br><br>The method and apparatus of the present invention correctly calculates the output line position depending on the user specified resize factor, as shown in greater detail with reference to FIGS. 4 and 5.<br><br>Since all of the even and odd field lines are equally spaced (e.g. A=1; S=4 and T=8 in the example of FIGS. 4 and 5) by mapping the input even field to the output even frame, then<br><br>$$A*(2*S-1)=B*(T-1) \qquad (2\text{-}1),$$<br><br>and by positioning the input odd field lines between the input even field lines, then<br><br>$$A=\tfrac{1}{2}*W \qquad (2\text{-}2).$$ |

Exhibit 3

| *Greggain* - Claim 1 |
|---|

<table>
<tr>
<td></td>
<td></td>
<td>



*Greggain*, at 3:36-4:5.

*Greggain* additionally details the circuitry for applying these formulae.  For example, *Greggain* teaches that *TarInc* (*B*) can be computed from the values of *S* and *T* using two multipliers (elements 61 and 67), two subtractors (elements 63 and 65) and one divider (element 69):

</td>
</tr>
</table>

Exhibit 3

| *Greggain* - Claim 1 | | |
|---|---|---|
| | |  |

*Greggain*, at Fig. 6; *and see id.* at 5:57-65 (accompanying text).

*Greggain* also teaches circulator for an accumulator that contains the line location communicated to the described Image Resizing Engine.  Through this Figure 7 and accompanying text, *Greggain* provides explicit instructions for accounting for the vertical offset between the odd and even input fields.  Specifically, *Greggain* teaches that an initial location of "0" or "0.5" is selected for the first line (yellow highlight, below), with subsequent line locations reflecting an incremented offset of *TarInc* (*B*) from the previously

Exhibit 3

| | | |
|---|---|---|
| | | *Greggain* - Claim 1 |

generated line location (orange highlight, below):



FIG.7

*Greggain*, at Fig. 7.  The Image Resizing Engine receives the target line location for a line and also receives the data for the Input Video Line and generates Deinterlaced Video from those inputs as shown above.  This accumulator is further detailed in the accompanying text:

> FIG. 7 depicts a hardware embodiment for executing the process set forth in 1-2. An accumulator is formed by the

Exhibit 3

| | | *Greggain* - Claim 1 |
|---|---|---|
| | | combination of register **71** and adder **73** with multiplexer **75** controlling the initial value. As the data from an even field is loaded into image resizing engine **77**, the MuxSelect signal ensures that the value 0 is multiplexed into register **71** to initialize the accumulator to zero. As each new input line is loaded into the image resizing engine **77**, the value of TarInc is accumulated to produce the target line spacing value required for an even output frame. When data from an odd field is loaded into the image resizing engine **77**, the MuxSelect signal ensures that the value –0.5 is multiplexed into register **71** to initialize the accumulator. This ensures that all target line spacing values produced for an output frame are properly positioned. The Clk signal is used to synchronize all data movement in accordance with standard digital system design.<br><br>*Greggain*, at 5:66-6:17 (accounting for vertical offset between odd and even input fields). This workflow is additionally detailed at Figure 8: |

Exhibit 3

| *Greggain* - Claim 1 |
| --- |



*Greggain*, at Figures 8A and 8B ("Figure 8").

As illustrated by Figure 8 of *Greggain*, step 803 considers whether the field being processed is an even field or an odd field, and sets the starting position for placing the resulting lines such that even field lines are stored at the top of the output frame and odd field lines are stored beginning one-half line from the top of the output frame. This one-half line offset of input lines reflects the "adjusting" step by "vertically repositioning one of the first field or second field of the pair of fields to largely or approximately correct for the vertical offset," including as consistent with Wi-LAN's infringement allegations regarding this element. I

Exhibit 3

| *Greggain* - Claim 1 |
| --- |
| further note that, by setting the starting position of lines for odd fields at 0.5, *Greggain* in fact corrects for the *precise* vertical offset between the two fields.   *Greggain* demonstrates the result of these line spacing calculations, for example in Tables D and E: |

> According to the next step in the method of the present invention, the proper spatial location of each output line is determined using 1-2, resulting in the spatial locations set forth in Tables D and E for the even output frame and the odd output frame, respectively.

### TABLE D

| Output Line Number | Spatial Location (1-2) |
| --- | --- |
| F0 | $P_{j-0} = 0$ |
| F1 | $P_{j-0} = 1.166(7/6)W$ |
| F2 | $P_{j-2} = 2.33(14/6)W$ |
| F3 | $P_{j-3} = 3.5(21/6)W$ |

### TABLE E

| Output Line Number | Spatial Location (1-2) |
| --- | --- |
| F0 | $P_{j-0} = -0.5W$ |
| F1 | $P_{j-1} = 0.667(7/6 - 0.5)W$ |
| F2 | $P_{j-2} = 1.833(14/6 - 0.5)W$ |
| F3 | $P_{j-3} = 3.0(21/6 - 0.5)W$ |

*Greggain*, at 4:63-5:17; *and see id.* at Table D, Output Line No. F0 ($P_{j-0} = 0$) and Table E, Output Line No. F0 ($P_{j-0}$ = -0.5W).

*Greggain* additionally teaches that output lines are generated at the resulting spatial positioning determined by these processes. *E.g.*, *Greggain*, at 2:12-15 ("Once the position of the output lines is calculated, an image resizing engine is used to map the input lines to the appropriate output spatial position and store these lines in an external frame buffer."); 17:6-9 ("an image resizing engine for receiving successive ones of said lines of said odd or even input video fields and respective target line spacing values and in response generating

Exhibit 3

| *Greggain* - Claim 1 |
|---|

successive lines of said output video frame[.]"); *and see id.* at 6:49-52 (incorporating teachings for an image resizing engine as disclosed in U.S. patent application Ser. No. 125,530).

Additionally, *Greggain* teaches a software implementation of the approach discussed above to scaling and adjusting.  In particular, Columns 7-16 of *Greggain* disclose software for generating an even frame by scaling an even input field. The *TincYAccum* variable represents the current offset illustrated as the output of adder 73 in Figure 7. The values of this offset have an initial value of 0 and -0.5, for even and odd field scaling and adjusting, respectively. The odd field's initial value for *TincYAccum* is stored as -2048, which represents a shifted-left form of -0.5 as discussed in column 7.  The code for this software implementation is included at the end of the present chart and is incorporated by reference herein.

Therefore, *Greggain* teaches "adjusting one of the first field or second field of the pair of fields to substantially correct for the vertical offset between the pairs of fields."

Modifying *Greggain* to adjust one of the first or second field of the pair of fields to substantially correct for the vertical offset between the pairs of fields would have been obvious for several reasons, including at least because motivations and techniques existed in the art prior to the claimed invention to eliminate any visual artifacts that would be caused by such a vertical offset.

For example, *Keith Jack* confirms that practitioners were mindful of the visual artifacts caused by a vertical offset between fields while working with interlaced video signals, and knew and took care to apply video processing techniques that would result in the correct spatial positioning of video scan lines.  *Keith Jack*, at 335.  In fact, *Keith Jack* confirms that persons of skill in the art knew that video processing to correct for vertical offset *was required* if a deinterlacing technique did not inherently result in correct spatial positioning of the scan lines:

Exhibit 3

| | | |
|---|---|---|
| | | *Greggain* - Claim 1 |
| | |  |

<div align="center">

*Id.*

*Keith Jack* further demonstrates that practitioners applied techniques known in the art to ensure the preservation and generation of the correct vertical spatial position of scan lines, including when using deinterlacing techniques to convert an interlaced video signal field into a non-interlaced frame, consistent with Wi-LAN's allegations regarding this element. *See, e.g.,* Final Infringement Contentions, at 126 . For example, Figure 9.4 of *Keith Jack* illustrates that input field lines 1, 2, 3, and 4 (indicated with red, below) are output at the correct vertical spatial positioning in the deinterlaced output as frame lines 1, 3, 5, and 7 (indicated with orange, below), with additional lines generated by interpolation at positions corresponding to the even field at lines 2, 4, 6, and 8 (indicated with green, below):

</div>

Exhibit 3

| | | *Greggain* - Claim 1 |
|---|---|---|
| | | <br><br>*Keith Jack*, at Fig. 9.4.<br><br>*Keith Jack* demonstrates that practitioners knew to use various techniques known in the art to affect an adjustment of vertical offset. Adjusting one of the first field or second field of the pair of fields in an interlaced video signal to substantially correct for any vertical offset between the pairs of fields would have yielded known benefits, including as described in *Keith Jack*.<br><br>*Greggain* itself teaches also that de-interlacing systems were "well known" in the prior art, |

Exhibit 3

| | | *Greggain* - Claim 1 |
|---|---|---|
| | | and thus it would have been obvious to apply the techniques taught by other such de-interlacing systems, including the specific adjusting techniques taught by *Ohara* and described in Exhibit 1, to improve the disclosure of *Greggain*. *See, e.g.*, *Greggain*, at 1:48-54 (describing teachings of prior-art systems used to "produce either double or quadruple the number of input lines per field, as discussed above") *and* 1:55-63. |

Thus, replacing *Greggain*'s disclosed techniques with known techniques for adjusting one of the first field or second field of the pair of fields to substantially correct for the vertical offset between the pairs of fields would represent an alternative solution with potentially improved results. Thus, a person of ordinary skill in the art would have had a motivation to improve *Greggain*'s techniques with adjusting each of the first field and second field of each pair of fields to fill vertical resolution of the non-interlaced monitor. These techniques were well known in the art (*see Keith Jack*) so their implementation would have been well within the skill of a person of ordinary skill in the art. Persons of skill in the art would have therefore been motivated to improve *Greggain* with the teachings of *Ohara* (Ex. 1).

In addition, it would have been obvious to try combining or modifying *Greggain* because there were only a finite number of predictable solutions, because known work in the field prompted variations based on predictable design incentives, or in light of market forces either in the field or analogous and related fields would have suggested the combination. Indeed, the combination of *Greggain* with the teachings described here would have been obvious because the combination represents known potential options with a reasonable expectation of success. Additionally, a person of ordinary skill in the art would not have faced unexpected results or undue experimentation in making the aforementioned replacement. These techniques were well known in the art (*see Keith Jack*) so their implementation would have been well within the skill of a person of ordinary skill in the art. Consequently, a person of skill would have been motivated to and capable of combining or modifying *Greggain* with the teachings of *Ohara*, and the teachings of that reference as described in Exhibit 1 at element 1(c)(1) are incorporated here by reference.

The discussion in Paragraphs 350 through 352, and Sections VIII.D.4(a) and (b)(i)-(vi) are incorporated by reference.

Exhibit 3

| | | *Greggain* - Claim 1 |
|---|---|---|
| | | Therefore, *Greggain* in view of *Ohara* renders obvious "adjusting one of the first field or second field of the pair of fields to substantially correct for the vertical offset between the pairs of fields." |
| 1(c)(2) | where said adjusting is performed concurrently[4] with said scaling; | I understand that the Court has construed "said adjusting is performed concurrently with said scaling" to mean the adjusting and scaling steps must overlap, either by interleaving or simultaneous execution, such that one cannot complete before the other begins." *Wi-LAN v. Sharp Electronics Corporation*, Case No. 15-379 (LPS) (CJB), D.I. 281; *Wi-LAN v. VIZIO, Inc.*, Case No. 15-788 (LPS) (CJB), D.I. 220.. I further understand that Wi-LAN's infringement contentions appear to identify certain interpolation functions purportedly performed by the Accused Products as allegedly meeting this limitation. *See, e.g.,* Final Infringement Contentions, at [SEC] 126 and [VIZIO] 127 (depicting Deinterlaced Frame with Spatial Averaging from Top Field and Deinterlaced Frame with Spatial Averaging from Bottom Field), [SEC] 184 and [VIZIO] 185 (asserting without explanation "[t]he adjusting step is performed during the interpolation process, and therefore, 'concurrently' with the scaling."); *and see id.* at [SEC] 121-185 and [VIZIO] 122-186.  It is my opinion that *Greggain* teaches the method of "where said adjusting is performed concurrently with said scaling." <br><br> As discussed in conjunction with the preceding portion of Claim 1 (element 1(c)(1)), which is incorporated here by reference, *Greggain* teaches that an Image Resizing Engine receives a target line location and Input Video Lines as inputs and generates Deinterlaced Video from those inputs. Figure 7 is repeated below for convenience. |

---

[4] As set forth in my accompanying Report, it is my opinion that the term "concurrently" renders Claim 1 and the asserted dependent claims invalid under 35 U.S.C. § 112, and that opinion is incorporated here by reference.  Notwithstanding, I have analyzed *Greggain* consistent with the Court's construction for the purposes of this Report.  *See* D.I. 281.

Exhibit 3

| *Greggain* - Claim 1 | | |
|---|---|---|
| | | 

FIG.7

*Greggain*, at Figure 7.

*Greggain* teaches that the location of each line of the output frame is determined, and the corresponding line values generated by the Image Resizing Engine, as part of a process that changes by a constant factor the number of lines in a field.  The discussion regarding *Greggain*'s disclosure of the scaling process (element 1(b), above) and adjusting process (element 1(c)(1), above) are incorporated by reference.  That is, during the process of generating a full output frame by changing by a constant factor the number of lines in a field (scaling, *see, e.g.,* page 13 *et seq.*, above), *Greggain* teaches the iterative process of vertically repositioning lines of at least the odd field to largely or approximately correct for the vertical offset (adjusting, *see, e.g.,* page 30 *et seq.*, above).  Since *Greggain* teaches that multiple output lines are adjusted over the course of generating one output frame by changing by a constant factor the number of lines, the adjusting step overlaps by interleaving and simultaneous execution with the scaling step, such that the adjusting steps |

Exhibit 3

| *Greggain* - Claim 1 |
|---|

|  |  | for a given field occur entirely during the process of scaling the same field.<br><br>Therefore, *Greggain* teaches "where said adjusting is performed concurrently with said scaling."<br><br>Modifying *Greggain* to perform an adjusting step "where said adjusting is performed concurrently with said scaling" would have been obvious for several reasons, including because motivations and techniques for ensuring correct spatial positioning of scan lines as well as balancing video quality against the cost of implementation existed prior to the claimed invention.  *See, e.g., Keith Jack*, at 10.  *Keith Jack* confirms that practitioners knew and took care to apply video processing techniques that would result in the correct spatial positioning of video scan lines, and in fact confirms that video processing to correct for vertical offset *was required* if a deinterlacing technique did not inherently result in correct spatial positioning of the scan lines:<br><br>> The best vertical frequency response is obtained when field merging is implemented. **The spatial position of the lines are already correct and no vertical processing is required,** resulting in a flat curve (Line C). Once again, this applies only for stationary areas of the image.<br><br>*Keith Jack*, at 335.<br><br>*Keith Jack* further demonstrates that practitioners applied techniques known in the art to ensure the preservation and generation of the correct vertical spatial position of scan lines, including when using deinterlacing techniques to convert an interlaced video signal field into a non-interlaced frame.  For example, Figure 9.4 of *Keith Jack* illustrates that input field lines 1, 2, 3, and 4 (indicated with red, below) are output at the correct vertical spatial positioning in the deinterlaced output as frame lines 1, 3, 5, and 7 (indicated with orange, below), with additional lines generated by interpolation at positions corresponding to the even field at lines 2, 4, 6, and 8 (indicated with green, below): |

Exhibit 3

| | | *Greggain* - Claim 1 |
|---|---|---|
| | |  *Keith Jack*, at Fig. 9.4.<br><br>*Keith Jack* further informs that practitioners were mindful and took efforts to balance "quality versus cost of implementation" when considering techniques for deinterlacing: |

Exhibit 3

| | | | *Greggain* - Claim 1 |
|---|---|---|---|
| | | | There are several ways of performing the deinterlacing. **The designer must trade-off video quality versus cost of implementation.** Today's GUI environment will also probably require scaling the video to an arbitrary-sized window; this also requires a trade-off of video quality versus cost. |
| | | | *Keith Jack*, at 10.  Combined with *Keith Jack*'s teachings regarding the known techniques in the art, *Keith Jack* confirms that practitioners would have been motivated to perform the said adjusting step concurrently with said scaling step, at least in order to balance considerations of "quality versus cost of implementation."  *Id.*; *and see, e.g.*, *id.* at Fig. 9.4. *Keith Jack* demonstrates that practitioners knew to use various techniques known in the art to affect an adjustment of vertical offset currently with said scaling step. Performing an adjusting step "where said adjusting is performed concurrently with said scaling" would have yielded known benefits, including as described in *Keith Jack*. Thus, replacing *Greggain*'s disclosed techniques with known techniques for adjusting one of the first field or second field of the pair of fields "where said adjusting is performed concurrently with said scaling" would represent an alternative solution with potentially improved results.  Thus, a person of ordinary skill in the art would have had a motivation to improve *Greggain*'s techniques by performing the adjusting step "where said adjusting is performed concurrently with said scaling."   Persons of skill in the art would therefore been motivated to improve *Greggain* with the teachings of *Ohara* (Ex. 1). *Greggain* itself teaches also that de-interlacing systems were "well known" in the prior art, and thus it would have been obvious to apply the techniques taught by other such de-interlacing systems, including the specific adjusting techniques taught by *Ohara* and described in Exhibit 1, to improve the disclosure of *Greggain*.  *See, e.g.*, *Greggain*, at 1:48-54 (describing teachings of prior-art systems used to "produce either double or quadruple the number of input lines per field, as discussed above") *and* 1:55-63. |

Exhibit 3

| *Greggain* - Claim 1 | | |
|---|---|---|
| | | In addition, it would have been obvious to try combining or modifying *Greggain* because there were only a finite number of predictable solutions, because known work in the field prompted variations based on predictable design incentives, or in light of market forces either in the field or analogous and related fields would have suggested the combination. Indeed, the combination of *Greggain* with the teachings described here would have been obvious because the combination represents known potential options with a reasonable expectation of success.  Additionally, a person of ordinary skill in the art would not have faced unexpected results or undue experimentation in making the aforementioned replacement. These techniques were well known in the art (*see Keith Jack*) so their implementation would have been well within the skill of a person of ordinary skill in the art. Consequently, a person of skill would have been motivated to and capable of combining or modifying *Greggain* with the teachings of *Ohara*, and the teachings of that reference as described in Exhibit 1 at element 1(c)(2) are incorporated here by reference.<br><br>The discussion in Paragraphs 350 through 352, and Sections VIII.D.4(a) and (b)(i)-(vi) are incorporated by reference.<br><br>Therefore, *Greggain* in view of *Ohara* renders obvious "where said adjusting is performed concurrently with said scaling." |
| 1(d) | displaying the first field of each pair of fields on the non-interlaced monitor in a first time period; and | *Greggain* teaches "displaying the first field of each pair of fields on the non-interlaced monitor in a first time period."<br><br>In particular, *Greggain* teaches that even and odd output frames are generated according to the specific techniques described above, and stored at buffer locations.  Displaying each of the resulting frames generated according to these teachings is inherent, because the purpose of generating output frames and storing those frames to a buffer is to display them.  *And see, e.g., Greggain*, at 2:66-3:1: |

51 of 73

Exhibit 3

| | | *Greggain* - Claim 1 |
|---|---|---|
| | | FIGS. **1**, **2** and **3** each show two input fields (not to scale) which are referred to as the Even Input Field (lines Y0, Y2, Y4, Y6) and the Odd Input Field (lines Y1, Y3, Y5, Y7), and two output frames referred to as the Even Output Frame and the Odd Output Frame. All even input fields are mapped to even output frames and the odd input fields are mapped to the odd output frames. The variables in each of these figures is explained in Table A, below: |

*Greggain* at 2:66-3:1.

Indeed, the stated purpose of *Greggain* is the generation of progressive video from interlaced video, which *Greggain* does in part by storing data in a frame buffer - a mechanism for converting video data into a video signal for display. Implicit in these steps is the notion that *Greggain*'s result will be displayed as a person of ordinary skill in the art would recognize. This purpose is described by *Greggain* at the outset of its disclosure:

De-interlacing has many applications including slow motion playback, computer video-in-a-window displays and large screen projection television systems to name but a few. All of these applications require the high quality and performance provided by the generation of progressive scan frames using a de-interlacing process.

*Greggain* at 1:31-36.  Implementing the stated applications of a de-interlaced (progressive) video signal converted according to the teachings of *Greggain* would necessarily require displaying that video signal (*e.g.*, on a computer display or large screen projection television system).  Consequently, a person of skill in the art would have understood that the progressive odd output frame generated in *Greggain* would be displayed in a first time period, and the progressive even output frame generated would be displayed in a second time period subsequent to the first.

Therefore, *Greggain* teaches "displaying the first field of each pair of fields on the non-interlaced monitor in a first time period."

Modifying *Greggain* to "display[] the first field of each pair of fields on the non-

Exhibit 3

| *Greggain* - Claim 1 |
| --- |
| interlaced monitor in a first time period" would have been obvious to a person of ordinary skill in the art for several reasons, including at least because displaying both the fields of interlaced video was a technique known in the art.  In interlaced video, each frame of video data is separately displayed as two fields.  The NTSC format, for example, uses 60 fields per second representing 30 frames per second.  Persons of skill in the art at the time of the claimed invention understood that a higher framerate would have resulted in a higher quality video, including with less flicker:<br><br>**PAL**   PAL stands for Phase Alternation Line. PAL is to Europe as NTSC is to North America. In other words, PAL is the video standard used in Europe and a few other countries. There are a few differences. PAL uses 625 lines per frame while NTSC has 525 lines. Therefore, PAL has higher vertical resolution. The frame rate of NTSC is 30 frames per second while for PAL it is 25. ==This means the update rate for NTSC is higher and therefore there is more flicker with PAL.== PAL uses the YUV color space while NTSC uses YIQ or YUV. That's no big deal, just a little mathematical difference. It is becoming increasingly important for imaging systems suppliers to produce equipment that can be sold worldwide without many manufacturing difficulties. This implies that the equipment must be designed from the start to accommodate both standards.<br><br>*Keith Jack*, at 422.  Similarly, practitioners knew techniques to convert and increase the frame-rate of a video in order to match the refresh rate of a display.  *E.g., Keith Jack*, at 414:<br><br>**Frame Rate Conversion**   Frame rate conversion is the act of converting one frame rate to another. One real example that poses a difficult problem is that the frame rate of NTSC, 30 frames per second, is different from a typical computer's display, which may be anywhere from 70 to 75 frames per second (or Hz if you prefer). ==Therefore, some frame-rate conversion process must be performed before NTSC video can be shown correctly on a computer display.== Without frame rate conversion, the screen might look as if it "stalls" every now and then. If there is motion within the video, the objects that are moving might appear cut in half.<br><br>*Keith Jack* additionally informs that there were specific techniques that persons of skill in the art knew and were capable of applying to preserve the frame rate of video during a deinterlacing process.  *E.g., Keith Jack*, at 333-334.  For example, in order to preserve the number of video images displayed per second when using field merging to deinterlace input frames, *Keith Jack* teaches that alternating sets of fields can be merged |

53 of 73

Exhibit 3

| | | *Greggain* - Claim 1 |
|---|---|---|
| | | and display resulting fields matching the field rate:  *Keith Jack*, at 334, Fig. 9.6.  Thus, Output Frame 1 would be created from Input Fields 1 & 2; Output Frame 2 would be created from Input Fields 2 & 3; and so on.  *See id.* *Keith Jack* thereby confirms that persons of skill knew the benefit of and took steps to design systems that would preserve the field rate of the input interlaced video signal. Thus, a motivation to "display[] the first field of each pair of fields on the non-interlaced monitor in a first time period" and "display[] the second field of each pair of fields on the non-interlaced monitor in a second time period subsequent to the first time period" – thereby preserving the field rate of the input interlaced video signal and the "noticeably smoother" video provided by higher-framerate video data ('654 Patent, at 2:40-42) – existed in the art prior to the '654 Patent.  Consistent with the descriptions of *Keith Jack* and the background of the '654 Patent, a person of skill in the art would have been well aware that higher frame rates resulted in smoother video and thus a higher-quality video. Persons of skill in the art would have therefore been motivated to improve *Greggain* with the teachings of *Bhayani*. In addition, it would have been obvious to try combining or modifying *Greggain* |

Exhibit 3

| *Greggain* - Claim 1 | | |
|---|---|---|
| | | because there were only a finite number of predictable solutions, because known work in the field prompted variations based on predictable design incentives, or in light of market forces either in the field or analogous and related fields would have suggested the combination.  Indeed, the combination of *Greggain* with the teachings described here would have been obvious because the combination represents known potential options with a reasonable expectation of success.  As reflected in the prior art, no undue experimentation would have been required to implement these solutions and no unexpected results would have arisen from their implementation.  These techniques were well known in the art (*see Keith Jack*) so their implementation would have been well within the skill of a person of ordinary skill in the art.  Consequently, a person of skill would have been motivated to and capable of combining or modifying *Greggain* with the teachings of *Bhayani*, and the teachings of those references as described in Exhibit 7 at element 1(d) are incorporated here by reference.<br><br>The discussion in Paragraphs 350 through 352, and Sections VIII.D.4(a) and (b)(i)-(vi) are incorporated by reference.<br><br>Therefore, for the reasons discussed above, modifying *Greggain* to "display[] the first field of each pair of fields on the non-interlaced monitor in a first time period" would have been obvious in view of the prior art. |
| 1(e) | displaying the second field of each pair of fields on the non-interlaced monitor in a second time period subsequent to the first time period. | *Greggain* teaches "displaying the second field of each pair of fields on the non-interlaced monitor in a second time period subsequent to the first time period."<br><br>In particular, *Greggain* teaches that even and odd output frames are generated according to the specific techniques described above, and stored at buffer locations.  Displaying each of the resulting frames generated according to these teachings is inherent, because the purpose of generating output frames and storing those frames to a buffer is to display them.  *And see, e.g., Greggain*, at 2:66-3:1: |

Exhibit 3

| | | |
|---|---|---|
| | | ***Greggain* - Claim 1** |

FIGS. **1**, **2** and **3** each show two input fields (not to scale) which are referred to as the Even Input Field (lines Y0, Y2, Y4, Y6) and the Odd Input Field (lines Y1, Y3, Y5, Y7), and two output frames referred to as the Even Output Frame and the Odd Output Frame. All even input fields are mapped to even output frames and the odd input fields are mapped to the odd output frames. The variables in each of these figures is explained in Table A, below:

*Greggain* at 2:66-3:1.

Indeed, the stated purpose of *Greggain* is the generation of progressive video from interlaced video, which *Greggain* does in part by storing data in a frame buffer - a mechanism for converting video data into a video signal for display. Implicit in these steps is the notion that *Greggain*'s result will be displayed as a person of ordinary skill in the art would recognize. This purpose is described by *Greggain* at the outset of its disclosure:

De-interlacing has many applications including slow motion playback, computer video-in-a-window displays and large screen projection television systems to name but a few. All of these applications require the high quality and performance provided by the generation of progressive scan frames using a de-interlacing process.

*Greggain* at 1:31-36.  Implementing the stated applications of a de-interlaced (progressive) video signal converted according to the teachings of *Greggain* would necessarily require displaying that video signal (*e.g.*, on a computer display or large screen projection television system).  Consequently, a person of skill in the art would have understood that the progressive odd output frame generated in *Greggain* would be displayed in a first time period, and the progressive even output frame generated would be displayed in a second time period subsequent to the first.

Therefore, *Greggain* teaches "displaying the second field of each pair of fields on the non-interlaced monitor in a second time period subsequent to the first time period."

Thus, *Greggain* anticipates Claim 1.

56 of 73

Exhibit 3

| *Greggain* - Claim 1 |
|---|

Modifying *Greggain* to "display[] the second field of each pair of fields on the non-interlaced monitor in a second time period subsequent to the first time period" would have been obvious to a person of ordinary skill in the art for several reasons, including at least because displaying both the fields of interlaced video was a technique known in the art. In interlaced video, each frame of video data is separately displayed as two fields. The NTSC format, for example, uses 60 fields per second representing 30 frames per second. Persons of ordinary skill at the time of the claimed invention understood that a higher framerate would have resulted in a higher quality video, including with less flicker:

| PAL | PAL stands for Phase Alternation Line. PAL is to Europe as NTSC is to North America. In other words, PAL is the video standard used in Europe and a few other countries. There are a few differences. PAL uses 625 lines per frame while NTSC has 525 lines. Therefore, PAL has higher vertical resolution. The frame rate of NTSC is 30 frames per second while for PAL it is 25. ==This means the update rate for NTSC is higher and therefore there is more flicker with PAL.== PAL uses the YUV color space while NTSC uses YIQ or YUV. That's no big deal, just a little mathematical difference. It is becoming increasingly important for imaging systems suppliers to produce equipment that can be sold worldwide without many manufacturing difficulties. This implies that the equipment must be designed from the start to accommodate both standards. |
|---|---|

*Keith Jack*, at 422. Similarly, practitioners knew techniques to convert and increase the frame-rate of a video in order to match the refresh rate of a display, thereby improving the subjective quality of video for the user. *E.g., Keith Jack*, at 414:

| Frame Rate Conversion | Frame rate conversion is the act of converting one frame rate to another. One real example that poses a difficult problem is that the frame rate of NTSC, 30 frames per second, is different from a typical computer's display, which may be anywhere from 70 to 75 frames per second (or Hz if you prefer). ==Therefore, some frame-rate conversion process must be performed before NTSC video can be shown correctly on a computer display.== Without frame rate conversion, the screen might look as if it "stalls" every now and then. If there is motion within the video, the objects that are moving might appear cut in half. |
|---|---|

*Keith Jack* additionally informs that there were specific techniques that persons of skill in the art knew and were capable of applying to preserve the frame rate of video during a deinterlacing process. *E.g.*, *Keith Jack*, at 333-334. For example, in order to preserve

Exhibit 3

| | | |
|---|---|---|
| | | *Greggain* **- Claim 1** |
| | | the number of video images displayed per second when using field merging to deinterlace input frames, *Keith Jack* teaches that alternating sets of fields can be merged and display resulting frames at a rate matching the input field rate:  *Keith Jack*, at 334, Fig. 9.6.  Thus, Output Frame 1 would be created from Input Fields 1 & 2; Output Frame 2 would be created from Input Fields 2 & 3; and so on.  *See id. Keith Jack* thereby confirms that persons of skill knew the benefit of and took steps to design systems that would improve or preserve the field rate of the input interlaced video signal. Thus, a motivation to "display[] the first field of each pair of fields on the non-interlaced monitor in a first time period" and "display[] the second field of each pair of fields on the non-interlaced monitor in a second time period subsequent to the first time period" -- thereby preserving the field rate of the input interlaced video signal and resulting in the preservation or improvement of the resulting frame rate of video and the "noticeably smoother" video provided by higher-framerate video data ('654 Patent, at 2:40-42) – existed in the art prior to the '654 Patent.  Consistent with the descriptions of *Keith Jack* and the background of the '654 Patent, a person of skill in the art would have been well aware that higher frame rates resulted in smoother video and thus a higher-quality video. |

Figure 9.6. Producing Deinterlaced Frames at Field Rates.

Exhibit 3

| | | *Greggain* - Claim 1 |
|---|---|---|
| | | Persons of skill in the art would have therefore been motivated to improve *Greggain* with the teachings of *Bhayani*.

In addition, it would have been obvious to try combining or modifying *Greggain* because there were only a finite number of predictable solutions, because known work in the field prompted variations based on predictable design incentives, or in light of market forces either in the field or analogous and related fields would have suggested the combination.  Indeed, the combination of *Greggain* with the teachings described here would have been obvious because the combination represents known potential options with a reasonable expectation of success.  As reflected in the prior art, no undue experimentation would have been required to implement these solutions and no unexpected results would have arisen from their implementation. These techniques were well known in the art (*see Keith Jack*) so their implementation would have been well within the skill of a person of ordinary skill in the art.  Consequently, a person of skill would have been motivated to and capable of combining or modifying *Greggain* with the teachings of *Bhayani*, and the teachings of those references as described in Exhibits 7 at element 1(e) are incorporated here by reference.

The discussion in Paragraphs 350 through 352, and Sections VIII.D.4(a) and (b)(i)-(vi) are incorporated by reference.

Therefore, for the reasons discussed above, modifying *Greggain* to "display[] the second field of each pair of fields on the non-interlaced monitor in a second time period subsequent to the first time period" would have been obvious in view of the prior art. |

| | | *Greggain* - Claim 4 |
|---|---|---|
| 4 | The method of claim 1, wherein scaling is achieved by vertical interpolation between at | I understand the Court has construed the term "vertical interpolation between at least adjacent lines" to mean "calculating values for new pixels between at least vertically adjacent lines using known values."  *Wi-LAN v. Sharp Electronics Corporation*, Case No. 15-379 (LPS) (CJB), D.I. 281; *Wi-LAN v. VIZIO, Inc.*, Case No. 15-788 (LPS) (CJB), D.I. |

Exhibit 3

| | | *Greggain* - Claim 4 |
|---|---|---|
| | least adjacent lines in the field being scaled. | 220.  I further understand that Wi-LAN's infringement contentions appear to identify deinterlacing by, for example, certain interpolation functions, allegedly performed by the Accused Products as allegedly meeting this limitation.  *See, e.g.,* Final Infringement Contentions, at [SEC] 79-81 and [VIZIO] 80-82 (field merging), [SEC] 83 and [VIZIO] 84 (interpolation); *and see id.* at [SEC] 79-120 and [VIZIO] 80-121.  I further understand that the '654 Patent teaches that with interpolation, "although the number of lines is doubled, the vertical resolution is not increased from the original data[.]"  '654 Patent, at 2:25-29 (citing pages 332-333 of Keith Jack).  To the extent Wi-LAN alleges that deinterlacing by, for example, field merging, scan line duplication, or scan line interpolation scale a field, "wherein said scaling is achieved by vertical interpolation between at least adjacent lines in the field being scaled," it is my opinion that *Greggain* teaches this limitation.<br><br>In particular, as discussed in conjunction with the "scaling" step of claim 1 (and see element 1(b), above, which is incorporated by reference), *Greggain* teaches intra-field (vertical) interpolation and spatial positioning of lines to resize an interlaced field to fill a progressive frame of arbitrary size.<br><br>1. Field of the Invention<br>    This invention relates in general to video signal de-interlacing and interpolation. More particularly, the invention relates to a method and apparatus for properly interpolating and spatially positioning video lines from an arbitrarily sized video field to create an arbitrarily resized progressive scan frame.<br><br>*Greggain* at 1:10-15.  *Greggain* additionally teaches the techniques described above for Claim 1 are used to scale by intra-field interpolation an input field to create de-interlaced frames with twice the number of lines, using vertically adjacent lines within each field to create the resulting values.  At Figures 4 and 5, *Greggain* illustrates one application of the disclosed techniques, where new pixels for both the even and odd fields are created using interpolation between adjacent lines.  *See* Figs. 4 and 5 (interpolated values highlighted orange; original values copied from field to frame highlighted yellow); *and* '654 Patent, at |

Exhibit 3

| *Greggain* - Claim 4 |
|---|

3:54-4:43 (accompanying text):



*Greggain*, at Figs. 4 and 5.  *Greggain* also confirms that the "Image Resizing Engine" generates successive video lines for a progressive (de-interlaced) video frame using lines from either of an even or an odd input field.  Thus, the disclosures of *Greggain* reflect an intra-field (vertical) interpolation, using vertically adjacent lines within each respective field.  *E.g.*, *Greggain*, at 17:6-9:

Exhibit 3

| *Greggain* - Claim 4 |
|---|

<table>
<tr><td></td><td></td><td>



c) an image resizing engine for <mark>receiving successive</mark> ones of said <mark>lines of said odd or even input video fields</mark> and respective target line spacing values and <mark>in response generating successive lines of said output video frame,</mark>

*Greggain* also teaches a software implementation of this approach to scaling and adjusting: Columns 7-16 of *Greggain* discloses software for generating an even frame by scaling an even input field. The TincYAccum variable represents the current offset illustrated as the output of adder 73 in Figure 7. The values of this offset have an initial value of 0 and -0.5, for even and odd field scaling and adjusting, respectively. The odd field's initial value for TincYAccum is stored as -2048, which represents a shifted-left form of -0.5 as discussed in column 7.

The code for this software implementation is included at the end of the present chart and is incorporated by reference herein.

Therefore, *Greggain* teaches "[t]he method of claim 1, wherein scaling is achieved by vertical interpolation between at least adjacent lines in the field being scaled." Thus, *Greggain* anticipates Claim 4.

</td></tr>
</table>

| *Greggain* - Claim 9 |  |  |
|---|---|---|
| 9 | The method of claim 1, wherein the adjusting step is achieved by vertical interpolation between at least adjacent lines in the field being adjusted. | I understand the Court has construed the term "the adjusting step is achieved by vertical interpolation between at least adjacent lines" to mean "the adjusting step is achieved by calculating values for new pixels between at least vertically adjacent lines using known values." *Wi-LAN v. Sharp Electronics Corporation*, Case No. 15-379 (LPS) (CJB), D.I. 281; *Wi-LAN v. VIZIO, Inc.*, Case No. 15-788 (LPS) (CJB), D.I. 220.  I also understand that Wi-LAN disclaimed Claim 8 of the '654 Patent, which claims a method of such adjusting where the adjusting step "includes changing display positions of one of the scaled first field or scaled second field by one or more lines on the noninterlaced monitor." '654 Patent, at Cl. 8; '654 Patent, at Disclaimer.  I further understand that Wi-LAN's infringement contentions appear to identify certain interpolation functions purportedly performed by the |

Exhibit 3

| *Greggain* - Claim 9 |
|---|

|  |  |  | Accused Products as allegedly meeting this limitation.  *See, e.g.,* Final Infringement Contentions, at [SEC] 126 and [VIZIO] 127 (depicting Deinterlaced Frame with Spatial Averaging from Top Field and Deinterlaced Frame with Spatial Averaging from Bottom Field), [SEC] 184 and [VIZIO] 185 (asserting without explanation "[t]he adjusting step is performed during the interpolation process, and therefore, 'concurrently' with the scaling."); *and see id.* at [SEC] 121-185 and [VIZIO] 122-186.  It is my opinion that *Greggain* teaches the element of "achiev[ing the adjusting step] by vertical interpolation between at least adjacent lines in the field being adjusted."<br><br>As discussed in conjunction with the "adjusting" step of claim 1 (and see element 1(c)(1)-(2), above, which are incorporated by reference), *Greggain* teaches the vertically repositioning of one of the first field or second field of the pair of fields to largely or approximately correct for the vertical offset.  In particular, *Greggain* teaches that the vertical offset between the even and odd fields is taken into account when determining the correct spatial positioning of each line in the respective odd and even output frames.  *See, e.g.*, *Greggain*, at Tables D and E:<br><br>According to the next step in the method of the present invention, the proper spatial location of each output line is determined using 1-2, resulting in the spatial locations set forth in Tables D and E for the even output frame and the odd output frame, respectively. |

Exhibit 3

| *Greggain* - Claim 9 |
|---|
| <br><br>*Greggain*, at 4:63-5:17; *see id.* at Table D, Output Line No. F0 ($P_{j-0} = 0$) and Table E, Output Line No. F0 ($P_{j-0}$ = -0.5W); *and see generally* pages 30-36 (describing teachings of formulae for adjusting step) and 36-41 (describing teachings regarding circuitry for adjusting step).  Once the correct spatial locations are determined by these formulae or by circuitry applying same, *Greggain* teaches that the Image Resizing Engine generates the resulting lines by interpolation: |

Exhibit 3

| | | |
|---|---|---|
| | | ***Greggain* - Claim 9** |
| | | The method and apparatus of the present invention de-interlaces video by properly interpolating and spatially positioning each input field line at the correct output progressive scan line position based on the relative size of the input and output video frames. The process of the invention is broken down into two steps. The first step involves calculating the space between output progressive scan lines and then using this information to determine the correct spatial position of these lines. Once the position of the output lines is calculated, an image resizing engine is used to map the input lines to the appropriate output spatial position and store these lines in an external frame buffer.<br><br>*Greggain*, at 2:4-15.  Figure 1 of *Greggain* illustrates an application of these techniques, and discloses that (excepting for the first line of the even input field, and last line of the odd input field) the entirety of the lines in the resulting output frames are mapped "to a fractional position with respect to the odd output frame": |

Exhibit 3

| *Greggain* - Claim 9 | | |
|---|---|---|
| | | <br><br>*Greggain*, at 3:37-53. Similarly, at Figures 4 and 5, *Greggain* illustrates one application of the disclosed techniques, where additional lines for both the even and odd fields are created using interpolation between adjacent lines.  *See* Figs. 4 and 5 (interpolated values highlighted orange; original values copied from field to frame highlighted yellow); *and* '654 Patent, at 3:54-4:43 (accompanying text): |

Exhibit 3

| *Greggain* - Claim 9 |
| --- |



*Greggain*, at Figs. 4 and 5.  *Greggain* also confirms that the "Image Resizing Engine" generates successive video lines for a progressive (de-interlaced) video frame using lines from either of an even or an odd input field.  Thus, the disclosures of *Greggain* reflect the method of the adjusting step achieved by vertical interpolation between at least adjacent lines in the field being adjusted.  *E.g., Greggain*, at 17:6-9:

Exhibit 3

| | | *Greggain* - Claim 9 |
|---|---|---|
| | | 

*Greggain* also teaches a software implementation of this approach to scaling and adjusting: Columns 7-16 of *Greggain* disclose software for generating an even frame by scaling an even input field. The *TincYAccum* variable represents the current offset illustrated as the output of adder 73 in Figure 7. The values of this offset have an initial value of 0 and -0.5, for even and odd field scaling and adjusting, respectively. The odd field's initial value for TincYAccum is stored as -2048, which represents a shifted-left form of -0.5 as discussed in column 7.

The code for this software implementation is included at the end of the present chart and is incorporated by reference herein.

Therefore, *Greggain* teaches "[t]he method of claim 1, wherein the adjusting step is achieved by vertical interpolation between at least adjacent lines in the field being adjusted."  Thus, *Greggain* anticipates Claim 9. |

Exhibit 3

## Appendix

At Columns 7 through 16, *Greggain* includes exemplary software code teaching the scaling and adjusting steps discussed in this Exhibit.  The code is explicitly divided into sections respectively related to even field and odd field processing. For example, the *TincYAccum* value represents the vertical offset for a line being generated for placement in an output frame, and the software code additionally establishes initial values for the spatial positioning of the even and odd fields and incremental changes (*see* highlights, below).

Exhibit 3

| 9 | 10 |

-continued

```
NewSourceLine = -1;
CurSourceLine = 0;
//
// Read the first input line and convert it to RGB format
// The new input line has the pixel bytes ordered RGBRGBRGB. . .
// Our algorithm requires three separate streams of RRR. . ., GGGG. . ., and BBBB. . .
// processed concurrently. Therefore, the routine ReadLine reads a raw line
// and then passes this information to ToRGBLine for separation into R, G and
// B streams.
//
InputRaw.ReadLine(&Source, 0);
InputRaw.ToRGBLine(Input);
//
// Perform the center tap multiply on the first input line
//
Filtered1.FilterY(GCoeff[GenesisType][YFilter][0], Input);
//
// LOOP through the rest of the FIR kernel coefficients for the
//     first filtered output line,
//
for (KernalY = 1; KernalY <= KernalYSize; KernalY++)
    //
    // Perform the appropriate multiply-accumulate for each FIR
    // coefficient
    Filtered1.FilterYAdd(GCoeff [GenesisType] [YFilter] [KernalY], Input);
//
// ENDLOOP: - FIR kernel coefficients
//
// Start the second filtered line using the outer most FIR coefficient
//
Filtered2.FilterY(GCoeff[GenesisType][YFilter][KernalYSize], Input);
//
// LOOP through all the input lines,
//
for (CurrentLine = 0; CurrentLine < iTargetY; CurrentLine++)
{
    //
    // LOOP through half of the FIR coefficients (excluding the center tap)
    //
    for (KernalY = 1; KernalY <= KernalYSize; KernalY++)
    {
        // Accumulate the vertical Tinc value
        //
        TincyAccum += TincY;
        //
        // Get the integer Portion of the accumulate Tinc to determine
        // if the value has "crossed" an input line boundary. A crossing
        // occurs when the integer portion of TincAccum changes. In this
        // implementation, the integer portion is the number of the new
        // new input line.
        //
        NewSourceLine = GetInt(TincYAccum) + 1;
        //
        // IF the integer portion of TincAccum has changed, THEN:
        //
        if (NewSourceLine != CurSourceLine)
        {
            // Swap the current input line with the previous one,
            // and then read in a new input line into the
            // current input. (This causes the old input line)
            //
            PrevInput.SwapLineWith (Input);
            InputRaw.ReadLine (&Source, NewSourceLine);
            InPutRaw.ToRGBLine(Input);
            CurSourceLine = NewSourceLine
        //
        // ENDIF: -- if integer portion of TincAccum
        //
        }
        //
        // Create an upsampled line based on the current input and
        // the previous input.
        // Create the output filtered lines by correctly multiply-accumulating
        // the FIR coefficients.
        //
        UpsampleY.UnsampleY (TincYAccum, PrevInput, Input);
        Filtered1.FilterYAdd(GCoeff[GenesisType][YFilter][KernalY], UpsampleY);
        Filtered2.FilterYAdd(GCoeff[GenesisType][YFilter][KernalYSize - KernalY], UpsampleY)
    //
    // ENDLOOP: -- half of the FIR Coefficients
    }
```

Exhibit 3

| 11 | 12 |
|---|---|

-continued

```
    //
    }
    // Output line Filtered1 is now complete. Swap it with the
    // incomplete Filtered2 line and adjust the filter gain.
    // Filtered2 is ready for horizontal processing.
    Filtered2.SwapLineWith (Filtered1);
    Filtered2.Filter YGain();
    //
    // Upsample and filter the vertically complete Filtered2 line
    //
    UpsamplcX.UpsampleX(Tincx, Filtered2);
    Output.FilterX(GenesisType, XFilter, UpsampleX);
    //
    // Write the vertically and horizontally complete Filtered2 line
    // back to the output bitmap.
    OutputRaw.FromRGBLine(Output);
    OutputRaw.PutLine(&Target, CurrentLine);
    //
    // Reset the Filtered2 line with the center FIR coefficient
    //
    Filtered2.FilterY(iCoeff[GenesisType] [YFilter] [KernelYSize], UpsampleY);
    //
    // Update the progress status display
    //
    ResizeBreathe(CurrentLine.iTargetY);
    //
    // ENDLOOP: - through all input line.
    //
    }
    return( ALL_OK );
//
END: - ResizeGenesis
//
}
//
// Odd Field De-Interlacing
//
GSZ_INT CGSBitmap::DeIntOdd(GSZ_INT GenesisType)
//
// BEGIN OddField De-Interlacing
//      GenesisType - Type of Genesis resizing algorithm to perform
{
    GSZ_INT          CurrentLine;
    GSZ_INT          NewSourceLine;
    GSZ_INT          CurSourceLine;
    GSZ_INT          XFilter;
    GSZ_INT          YFilter;
    GSZ_INDEX        TincX;
    GSZ_INDEX        TincY;
    GSZ_INDEX        TincYAccum;
    GSZ_INT          KernelY;
    GSZ_INT          KernelYSize;
    CGSZLine         InputRaw;
    CGSZRGBLine      Input;
    CGSZRGBLine      PrevInput;
    CGSZRGBLine      UpsampleX;
    CGSZRGBLine      UpsampleY;
    CGSZRGBLine      Filtered1;
    CGSZRGBLine      Filtered2;
    CGSZLine         OutputRaw;
    CGSZRGBLine      Output;
    XFilter = CalcFilter(SourceX, iTargetX);
    YFilter = CalcFilter(SourceY, iTargetY);
    if (XFilter < 0) || (YFilter < 0) || (XFilter >= MAX_FILTER) || (YFilter >= MAX_FILTER))
        return( FILTER_TOO_LARGE );
    assert(XFilter >= 0);
    assert(XFilter < MAX_FILTER);
    assert(YFilter >= 0);
    assert(YFilter < MAX_FILTER);
    //
    // Initializing the value of TincYAccum to -0.5 indicates that the
    // first filtered output line is in the odd field of the input
    // bitmap. This first line is offset by a slight negative amount
    // indicating its 1/2 line negative adjustment for the odd field.
    //
    TincYAccum = -2048;
    //
    // Calculate Horizontal and Vertical Tinc
    // These values are all shifted Left to ensure that all calculations are
```

Exhibit 3

| 13 | 14 |
|---|---|

-continued

```
// performed in integer arithmetic and then shifted back after the
// division.
//
// Calculate Horizontal TicInc using the odd Field De-Interlacing Equation
//
TicX = (C((GSZ_INDEX) (iSourceX - 1)) << INDEX_PRECISION) / (iTargetX - 1)) >> XFilter;
//
// Calculate Vertical TicInc using the Even Field De-Interlacing Equation
//
TicY = ((((GSZ_INDEX) (2*iSourceY - 1)) << INDEX_PRECISION) / (2*(iTargetY - 1))) >> YFilter;
assert(TicX <= INDEX_PRECISION_MASK);
assert(TicY <= INDEX_PRECISION_MASK);
//
// Calculate the size of the required FIR filter
//
KernalYSize = 1 << YFilter;
//
// Create memory space for the required video lines
//
InputRaw.Allocate(iSourceX);
OutputRaw.Allocate(iTargetX);
Input.Allocate(iSourceX);
Output.Allocate(iTargetX);
PrevInput.Allocate(iSourceX);
UpsampleX.Allocate(iSourceX);
UpsampleX.Allocate(((iTargetX - 1) << XFilter) + 1);
Filtered1.Allocate(iSourceX);
Filtered2.Allocate(iSourceX);
//
// Initialize the Source control flags
// When NewSourceLine equals CurrentSourceLine, it means that the Integer
// portion of the TincAccumulator has "crossed" an input line boundary. Once
// this happens, a new input line must be read from the input bitmap.
// NOTE: The first time through the algorithm, NewSourceLine is artificially
// set to -1 to force the initial reading of the second source line.
//
NewSourceLine = -1;
CurSourceLine = 0;
//
// Read the first input line and convert it to RGB format
// The raw input line has the pixel bytes ordered RGBRGBRGB. . .
// Our algorithm requires three separate streams of RRR. . ., GGGG . . ., and BBBB. . .
// processed concurrently. Therefore, the routine ReadLine reads a raw line
// and then passes this information to ToRGBLine for separation into R, G and
// B streams.
//
InputRaw.ReadLine(&Source, 0);
InputRaw.ToRGBLine(Input);
//
// Perform the center tap multiply on the first input line
//
Filtered1.FilterY(icoeff[GenesisType][YFilter] [0], Input);
//
// LOOP through the rest of the FIR kernel coefficients for the
//      first filtered output line.
//
for (KernalY = 1; KernalY <= KernalYSize; KernalY++)
     //
     // Perform the appropriate multiply-accumulate for each FIR
     // coefficient
     //
     Filtered1.FilterYAdd(iCoeff[GenesisType] [YFilter ] [KernalY], Input);
     //
// ENDLOOP: -- FIR kernel coefficients
//
// Start the second filtered line using the outer most FIR coefficient
//
Filtered2.FilterY(iCoeff[GenesisType] [YFilter] [KernalYSize], Input);
//
// LOOP through all the input lines,
//
for (CurrentLine = 0; CurrentLine < iTargetY; CurrentLine++
{
     //
     // LOOP through half of the FIR coefficients (excluding the centre tap)
     //
     for (KernalY = 1; KernalY <= KernalYSize; KernalY++)
     {
          //
```

Exhibit 3

| 15 | 16 |
|---|---|

-continued

```
    TincyAccum += TincY;
    //
    // Get the integer Portion of the accumulate Tinc to determine
    // if the value has "crossed" an input line boundary. A crossing
    // occurs when the integer portion of TincAccum changes. In this
    // implementation, the integer portion is the number of the new
    // new input line.
    //
    NewSourceLine = GetInt(TincYAccum) + 1;
    //
    // IF the integer portion of TincAccum has changed, THEN:
    //
    if (NewSourceLine != CurSourceLine)
    {
        // Swap the current input line with the previous one,
        // and then read in a new input line into the
        // current input. (This erases the old input line)
        //
        PrevInput.SwapLineWith (Input);
        InputRaw.ReadLine (&Source, NewSourceLine);
        InPutRaw.ToRGBLine(Input);
        CurSourceLine = NewSourceLine
    //
    // ENDIF: -- if integer portion of TincAccum
    //
    }
    // Create an upsampled line based on the current input and
    // the previous input.
    // Create the output filtered lines by correctly multiply-accumulating
    // the FIR coefficients.
    //
    Upsample.Y.Unsample.Y (TincYAccum, PrevInput, Input);
    Filtered1.FilterYAdd[iCoeff][GenesisType][YFilter][KernalY], Upsample.Y);
    Filtered2.FilterYAdd[iCoeff][GenesisType][YFilter][KernalYSize − KernalY], Upsample.Y)
    //
    // ENDLOOP: -- half of the FIR Coefficients
    //
    // Output line Filtered1 is now complete. Swap it with the
    // incomplete Filtered2 line and adjust the filter gain.
    // Filtered2 is ready for horizontal processing.
    Filtered2.SwapLineWith (Filtered1);
    Filtered2.FilterYGain();
    //
    // Upsample and filter the vertically complete Filtered2 line
    //
    Upsample.X.Upsample.X(Tincx, Filtered2);
    Output.FilterX(GenesisType, XFilter, Upsample.X);
    //
    // Write the vertically and horizontally complete Filtered2 line
    // back to the output bitmap.
    OutputRaw.FromRGBLine(Output);
    OutputRaw.PutLine(&Target, CurrentLine);
    //
    // Reset the Filtered2 line with the center FIR coefficient
    //
    Filtered2.FilterY(iCoeff][GenesisType][YFilter][KernalYSize], Upsample.Y);
    //
    // Update the progress status display
    //
    ResizeBreathe(CurrentLine.ITeger/Y);
    //
    // ENDLOOP: -- through all input line.
    //
    }
    return( ALL._OK );
//
END: -- ResizeGenesis
//
}
```